**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| | ) | |
| **IOAN MICULA, et al.,** | ) | |
| | ) | |
| **Petitioners,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 17-cv-02332 (APM)** |
| | ) | |
| **GOVERNMENT OF ROMANIA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

_____ )

### MEMORANDUM OPINION AND ORDER

In this matter to confirm a foreign arbitration award, Respondent the Government of Romania ("Romania") protests that Petitioners have not served process consistent with the requirements of The Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, November 15, 1965, 20 U.S.T. 361 [hereinafter Hague Service Convention].  Both sides agree that the Hague Service Convention applies and that service in conformance with the Convention would satisfy the service requirements of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1608(a)(2).

Petitioners attempted to serve process on Romania in two ways.  First, relying on Article 10(a) of the Hague Service Convention, Petitioners sent the Petition and other relevant papers to Romania via the international courier service DHL.  Romania claims that this attempted service is invalid because Romania has not authorized "alternative" service by courier under Article 10(a) of the Hague Service Convention.  Second, after Romania insisted that proper service can be effected only under Articles 3, 5, and 6 of the Convention, counsel for Petitioners attempted service

under those Articles.   Romania maintains that this supplemental service effort was deficient primarily because Petitioners did not issue service via an appropriate authority or judicial officer.

Romania is wrong on both counts.   And, in trying to convince the court otherwise, Romania's candor to this tribunal is suspect.   The court finds that Petitioners successfully served Romania both under Article 10(a) and under Articles 3, 5, and 6.   Accordingly, Romania's Motion to Dismiss for Insufficient Service of Process is denied.   *See* Resp't's Mot. to Dismiss for Insufficient Service of Process, ECF No. 7; Mem. in Support of Resp't's Mot., ECF No. 8 [hereinafter Resp't's Mem.].

## I.

Article 10(a) of the Hague Service Convention states that, "[p]rovided the State of destination does not object, the present Convention shall not interfere with . . . (a) the freedom to send judicial documents, by postal channels, directly to persons abroad."   Hague Service Convention, art. 10(a). The Supreme Court in *Water Splash, Inc. v. Menon* recently resolved a circuit split as to the meaning of Article 10(a), holding that: "Article 10(a) encompasses service by mail." 137 S. Ct. 1504, 1513 (2017).   The Court, however, clarified that Article 10(a) does not "affirmatively *authorize*[ ] service by mail."   *Id.* at 1513.   Rather, service by mail is permissible under Article 10(a) "if two conditions are met:  first, the receiving state has not objected to service by mail; and second, service by mail is authorized under otherwise-applicable law."   *Id.*   In this case, Romania only challenges Petitioners' satisfaction of the first condition.   It claims that "Romania has never authorized service by alternative means as envisaged by Article 10(a)."   Resp't's Mem. at 4.

Romania is flat wrong.  Romania ratified the Hague Service Convention in August 2003.[1]

When it did so, Romania made no reservation or objection concerning service under Article 10(a).[2]

Under *Water Splash*, Romania's declining to object when it ratified the Convention, or at any time

thereafter, is sufficient to establish that Romania has not objected to service by mail.  *See* 137

S. Ct. at 1512 & n.7 (observing that "several of the Convention's signatories have either objected,

or declined to object, to service by mail under Article 10" and quoting some countries' reservations

regarding Article 10(a)).  Thus, Romania is deemed to allow service by mail under Article 10(a).

Application of *Water Splash* alone therefore forecloses Romania's refusal to accept service by

mail in this case.[3]

But there is more.  The Hague Conference on Private International Law ("Hague

Conference") is an inter-governmental organization that "develops and services multilateral legal

instruments," including the Hague Service Convention.[4]  Romania is a member of the Hague

---

[1] Hague Convention on Private International Law, *Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters* (2018)https://www.hcch.net/en/instruments/conventions/status-table/?cid=17 (last visited May 21, 2018) [hereinafter Contracting Parties List].  Although it ratified the Convention, Romania did file two "declarations," one concerning Article 8, paragraph 2, and another relating to Article 16, paragraph 3, but neither are relevant here.  *See id.*; *see also* Treaty Database: Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, https://treatydatabase.overheid.nl/en/Verdrag/Details/004235_b#Romania (last visited May 21, 2018) [hereinafter Treaty DataBase].

[2] *See* Treaty DataBase.

[3] Romania relies on the pre-*Water Splash* decision of an intermediate California appellate state court in *Suzuki Motor Co. v. Superior Court*, 200 Cal. App. 3d 1476 (Cal. Ct. App. 1988), for the proposition that "the fact a country does not formally object to service by mail is not acceptance of Article 10(a), service by mail."  Resp't's Reply in Support of its Rule 12(b)(5) Mot. to Dismiss, ECF No. 11, at 2.  That proposition is questionable after *Water Splash*.  But even if *Suzuki Motor Co.* survives *Water Splash*, for the reasons explained below, it is easily distinguishable, as in that case the domestic law of Japan clearly foreclosed service by mail.  The same cannot be said about Romanian domestic law.

[4] *See* Hague Convention on Private International Law, About HCCH, https://www.hcch.net/en/about (last visited May 21, 2018); *see also* Hague Convention on Private International Law, Conventions, Protocols and Principles, https://www.hcch.net/en/instruments/conventions (listing the Hague Service Convention at number 14 in a chronological list of Hague conventions) (last visited May 21, 2018).

Conference.[5]   Critically, Romania has told the Conference repeatedly that it does *not* object to service by mail under Article 10(a).  For starters, the Hague Conference's website includes pages of "practical information" supplied by each member country about service under the Hague Service Convention.[6]  Romania's "practical information" guidance states, without qualification, that Romania has "No opposition" to service under Article 10(a).[7]  Romania affirmed this position as recently as 2013.   A November 2013 questionnaire to member countries asked: "Is the information contained in the practical information chart for your State complete and up-to-date?"[8]  Romania answered "Yes," thereby confirming that it does not object to service by mail under Article 10(a).[9]  Moreover, a recent publication by the Hague Conference, which summarizes member countries positions, reflects the certainty and continuity of Romania's stance.  Characterized as a "practical operation document," the Conference's website contains guidance titled "Table reflecting the applicability of Articles 8(2), 10(a)(b) and (c), 15(2), and 16(3)."[10]  The Table summarizes, as of June 2017, member countries' positions with respect to the listed Articles.  The Table states, without any qualification, that Romania has "No opposition" to service under

---

[5] Hague Convention on Private International Law, HCCH Members, https://www.hcch.net/en/states/hcch-members (last visited May 21, 2018).

[6] *See* Hague Convention on Private International Law, Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, https://www.hcch net/en/instruments/conventions/authorities1/?cid=17 (last visited May 21, 2018).

[7] *See* Hague Convention on Private International Law, Romania—Central Authority & Practical Information, https://www.hcch net/en/states/authorities/details3/?aid=271 (last visited May 21, 2018) [hereinafter "Romania Practical Information"].

[8] *See* Hague Convention on Private International Law, Synopsis of Responses to the Questionnaire of November 2013, 12 (2014), https://assets.hcch net/docs/661b8dec-a0c8-45a1-9b71-0144798e2597.pdf (last visited May 21, 2018).

[9] *Id*.

[10] *See* Hague Convention on Private International Law, Table Reflecting the Applicability of Articles 8(2), 10(a)(b) and (c), 15(2), and 16(3), 12 (2017), https://assets.hcch net/docs/6365f76b-22b3-4bac-82ea-395bf75b2254.pdf.

Article 10(a).[11]  Romania's representations to the Hague Conference therefore leave no doubt that Romania has not objected to service by mail under Article 10(a).

Yet there is even more.  In 2008, the Hague Conference developed another questionnaire covering a range of topics concerning operation of the Hague Service Convention in member countries ("2008 Questionnaire").[12]  With respect to Article 10(a), the questionnaire asked:

> If your State has opposed 'the freedom to send judicial documents, by postal channels, directly to persons abroad' (Art. 10 *a*)), please indicate:
>
> (a)  the reason(s) that motivated this opposition, [and]
>
> (b)  whether your State uses this channel of transmission to send judicial documents abroad for service by mail despite having filed an opposition under Article 10 *a*[.]

2008 Questionnaire at 22.  Romania did not answer either of those questions.  *See id*.  Why the non-response?  Because Romania does not oppose "the freedom to send judicial documents by postal channels," as Romania's answers to two follow-up questions make clear.  The Conference also asked:

> In Conclusion and Recommendation No 56, the 2003 Special Commission concluded that for the purposes of Article 10 *a*), the use of a private courier was the equivalent of using the postal channel under the Service Convention.[13]

---

[11]  *Id*.

[12]  *See* Hague Convention on Private International Law, Questionnaires & Responses (2008), https://assets.hcch.net/upload/wop/2008romania14.pdf(last visited May 21, 2018) [hereinafter 2008 Questionnaire].

[13]  Conclusion and Recommendation No. 56 adopted by the Special Commission on the Practical Operation of the Hague Apostille, Evidence and Service Conventions, provides in full:

> The [Special Commission] considered the increasing use of private courier services for the expeditious transmission of documents in a variety of business settings and heard reports that such couriers have been used to serve process under Article 10(a) of the Convention.  In light of that, the [Special Commission] concluded that for the purposes of Article 10(a) the use of a private courier was the equivalent of the postal channel.

a.  Does the law of your State, as a State of origin, allow for private courier services to be used under Article 10 *a*), *i.e.*, are judicial documents sent from your State for service abroad via private courier services:

. . .

b.  Does the law of your State, **as a State of destination**, allow for private courier services to be used under Article 10 *a*), *i.e.*, are judicial documents **received from abroad** and served within your State by private courier services:

. . .

2008 Questionnaire at 22 (emphasis added).  Romania answered both questions "YES."  *Id.*  Thus, in response to the Questionnaire, Romania did not merely state no objection to service by mail under Article 10(a); it expressly represented that *Romanian law* authorizes service of process by mail and private courier.  Accordingly, Romania has made crystal clear its acceptance of service by mail and private courier under Article 10(a).

All of the foregoing leads to the question:  Why does Romania now take the position that it has "never authorized service by alternate means as envisaged by Article 10(a)"?  Resp't's Mem. at 4.  Romania offers no satisfactory answer.  It does not, for instance, offer a Romanian law expert to support its position.  At most, it argues that Petitioners "fail[ ] to cite any case law, or otherwise, requiring a 'formal' objection,"  Resp't's Mem. of Law in Supp. of Resp't's Surreply to its Mot. to Dismiss, ECF No. 13 [hereinafter Resp't's Surreply].  But that contention is utterly disingenuous.  Romania has affirmatively stated to the world that it accepts service from abroad via private courier, yet hides that fact from this court.  Either Romania has not been forthcoming

---

Hague Convention on Private International Law, Conclusions and Recommendations Adopted by the Special Commission on the Practical Operations of the Hague Apostille, Evidence and Service Conventions, 11 (2013), https://www.hcch net/en/publications-and-studies/details4/?pid=3121&dtid=2 (last visited May 21, 2018).

with its lawyers about the state of Romanian law, or the sole purpose of Romania's objection to service under Article 10(a) is to delay the commencement of these proceedings.  Either way, Romania and its counsel are on thin ice with this court and will have to answer for their lack of candor.

## II.

Having determined that service was proper under Article 10(a), the court also disposes of Romania's objections to service under Articles 3, 5, and 6.  Article 3 provides:

> The authority or judicial officer competent under the law of the State in which the documents originate shall forward to the Central Authority of the State addressed a request conforming to the model annexed to the present Convention, without any requirement of legalisation or other equivalent formality.
>
> The document to be served or a copy thereof shall be annexed to the request. The request and the document shall both be furnished in duplicate.

Hague Service Convention, art. 3.  Article 5, in turn, states that the receiving country's designated "Central Authority" shall itself serve, or arrange service of, the document either by a method proscribed by domestic law or a method requested by the applicant, unless it conflicts with domestic law.  *Id.* art. 5.  Finally, Article 6 requires the Central Authority to complete a certification verifying service and deliver it to the applicant.  *Id.* art. 6.

Romania offers multiple grounds on which it claims Petitioners' attempt at service under Articles 3, 5, and 6 was inadequate, but those grounds mainly hinge on one contention: That Petitioners' counsel, Francis A. Vasquez, who forwarded the service documents to Romania's Central Authority, does not qualify as an "authority or a judicial officer competent under the law of the State" to send the service documents.  Resp't's Surreply at 5.  Romania contends that only its embassy in the United States is the "appropriate authority" to serve its Central Authority.  *Id.*

Once more, Romania is wrong.  According to the *Practical Handbook on the Operation of the Hague Convention*, which is published by the Hague Conference, Article 3 "leaves it to the *requesting State* to determine who qualifies as competent authority or judicial officer[.]"  Hague Conference, *Practical Handbook on the Operation of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*, at 43 (2016).  United States courts agree with that interpretation of Article 3.  *See, e.g.*, *Charleston Aluminum, LLC v. Ulbrinox S. De R.L. de S.V.*, No. 3:12-2389, 2013 WL 152895, at *1 (D.S.C. Jan. 15, 2013) ("Article 3, by its terms, defers to the domestic law where the legal documents originate."); *Marschhauser v. Travelers Indem. Co.*, 145 F.R.D. 605, 608 (S.D. Fla. 1992) ("Article 3, expressly states that the authority or judicial officer must be competent in the state in which the documents originate, not the recipient state.").  When applying Article 3, United States courts have looked to Rule 4(c)(2) of the Federal Rules of Civil Procedure to determine who is competent to serve as a forwarding "authority."  *See, e.g.*, *Charleston Aluminum*, 2013 WL 152895, at *1.  And courts uniformly have held that a party's attorney so qualifies.  *See, e.g.*, *id.*; *Coombs v. Iorio*, No. Civ-06-060, 2008 WL 4104529, at *2 (E.D. Okla. Aug. 28, 2008); *FRC Int'l, Inc. v. Taifun Feuerloschgeratebau und Vertriebs GmbH*, No. 3:01-cv-7533, 2002 WL 31086104, at *9 (N.D. Ohio Sept. 4, 2002); *Marschhauser*, 145 F.R.D. at 608–09.  This court rules the same.  Petitioners' counsel therefore is a competent "authority" for purposes of Article 3, and Petitioners were not required to transmit service through the Romanian embassy, as Romania claims.

Two more points before concluding.  First, Petitioners' counsel's use of a private courier, DHL, to serve Romania's Central Authority was proper.  The Hague Service Convention does not specify a method by which to serve a central authority; however, in response to the Conference's 2008 Questionnaire, Romania confirmed that its Central Authority accepts service by private

courier service.   Under a sub-section titled "Forwarding Authority (Art. 3)," the Questionnaire asked, "Do(es) the Central Authority(ies) of your State, as a requested State, accept requests for service when they are sent via a private courier service?," to which Romania responded "YES." 2008 Questionnaire at 13–14.   Second, Petitioners cannot be faulted for their failure to secure a certificate of service from Romania, as required under Article 6.   Pet'rs' Resp. to Romania's Surreply, ECF No. 14 [hereinafter Pet'rs' Resp.], at 10–11.   Petitioners *twice* complied with the Hague Service Convention's requirements, yet Romania in both instances declined to issue a conforming certificate.   *See* Resp't's Mem. at 8–9; Pet'rs' Resp. at 10–11.   Romania cannot invalidate proper service by wrongfully refusing to carry out its Article 6 obligations.   *See Coombs*, 2008 WL 4104529, at *3 ("[T]he failure to provide proof of service by obtaining original certificates of service does not invalidate services of process in this case.").[14]

---

[14] Romania makes two other cursory arguments, both of which the court rejects.  First, it claims that Petitioners "failed to use [the] Model Form of Service," as required by Article 3 of the Hague Service Convention.  Resp't's Surreply at 6.  But nowhere does Romania specify how the form used by Petitioners fails to conform to the "model annexed to the present Convention."  Hague Service Convention, art. 3.  In any event, the court has compared the request form served by Petitioners, *see* Pet'rs' Resp., Vasquez Decl. Ex. C, ECF No. 14-4, with the model form available online, *see* Hague Conference on Private International Law, Model Form Annexed to the Convention, https://www.hcch net/en/publications-and-studies/details4/?pid=6560&dtid=65 (last visited May 18, 2018), and is satisfied that Petitioners have served a request "conforming to the model annexed to the present Convention."

Second, Romania complains that Petitioners did not "file any of the translated documents with the Court and they failed to provide Romania's counsel with copies of such, making it difficult for the Court and Romania's counsel to discern what was sent to Romania."  Resp't's Surreply at 6.  Romania, however, identifies no requirement under the Hague Service Convention that translated documents must be filed with the court in the requesting country or served on the country's counsel.  On the contrary, Article 5 leaves to the discretion of the Central Authority whether service of translated documents is required.  *See* Hague Service Convention, art. 5 ("[T]he Central Authority may require the document to be written in, or translated into, the official language or one of the official languages of the State addressed.").  Romania's Central Authority imposes no translation requirement.  *See* Romania Practical Information (indicating "No" in reference to "Translation requirements (Art. 5(3))"); 2008 Questionnaire, Question 30 (answering "NO requirements" in response to whether "your State, as a requested State, imposes any language or translation requirements for documents to be served in your State under Article 5(1)").  Petitioners nevertheless did serve translated documents on Romania's Central Authority, and has filed them with this court, thereby making them available to Romania's counsel.  *See* Pet'rs' Resp., Vasquez Decl. Exs. E, G, I, and K, ECF Nos. 14-6, 14-8, 14-10, 14-14 to 14-26, 14-28.

III.

For the foregoing reasons, the court finds that Petitioners properly served Romania both under Article 10(a) and under Article 3, 5, and 6 of the Hague Service Convention.   Romania's Motion to Dismiss is therefore denied.


Dated:  May 22, 2018                                  Amit P. Mehta
                                                      United States District Judge