## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Application of

IOAN MICULA,

VIOREL MICULA,

S.C. EUROPEAN FOOD S.A.,
S.C. STARMILL S.R.L and

S.C. MULTIPACK S.R.L
 Petitioners

                    v.

THE GOVERNMENT OF ROMANIA,

                    Respondent.

Civil Action No. 17 CV 2332

**MEMORANDUM OF LAW IN
SUPPORT OF ROMANIA'S
RESPONSE TO PETITIONERS'
MOTION FOR JUDGMENT AND
CONFIRMATION OF AWARD**

Ioana Salajanu
Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
Telephone: (312) 494-1000
Facsimile: (312) 494-1001
isalajanu@rfclaw.com

*Attorneys for Respondent Government of Romania*

i

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................1

LEGAL STANDARD.......................................................................................4

ARGUMENT ...................................................................................................7

    I.     ROMANIA HAS SATISFIED THE AMENDED JUDGMENT .................7

          A. Setoff Against European Foods' Tax Liabilities .....................................7

          B. Forced Execution of Payment By Romanian Bailiff ..............................10

          C. Transfer of Payment into a Treasury Account for Petitioners ................10

          D. Ruling in the High Court of Justice Queen's Bench Division Commercial
             Court is not Binding on Romania's Courts, nor United States Courts....12

    II.    THIS COURT SHOULD GIVE DEFERENCE TO ROMANIA'S
          SATISFACTION OF AWARD UNDER INTERNATIONAL COMITY....12

    III.    THIS COURT SHOULD RECOGNIZE ROMANIA'S SATISFACTION OF
          JUDGMENT, PURSUANT TO ROMANIAN LAW, UNDER THE ACT OF
          STATE DOCTRINE......................................................................14

    IV.    PETITIONERS DID NOT FAIL TO RESPOND TO PETITIONERS'
          PETITION ………………………………………………………….15

CONCLUSION..............................................................................................16

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                        **Page**

*Banco Nacional de Cuba v. Sabbatino,*
376 U.S. 398, 84 S. Ct. 923, 11 L. Ed. 2d 804 (1964) …………………………………5, 13,
14

*China Trade & Dev. Corp. v. M.V. Choong Yong,* 837 F.2d 33, 36 (2d Cir.1987) ...............13

*Hilton v. Guyot,* 159 U.S. 113, 163-64, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895) ……………6, 12

*Konowaloff v. Metro. Museum of Art,* 702 F.3d 140, 148 (2d Cir. 2012)..............................14

*Laker Airways, Ltd. v. Sabena, Belgian World Airlines,*
731 F.2d 909, 937 (D.C. Cir. 1984)....................................................................................6

*Mobil Cerro Negro Ltd. v. Bolivarian Republic of Venezuela,*
87 F. Supp. 3d 573, 603 (S.D.N.Y. 2015)..............................................................................13

*O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana S.A.,*
830 R.2d 449, 451 (2nd Cir. 1987) .....................................................................................6

*Republic of Austria v. Altmann,*
541 U.S. 677, 700, 124 S. Ct. 2240, 2254, 159 L. Ed. 2d 1 (2004).......................................6, 13

*Ricaud v. American Metal Co.*, 246 U.S. 304, 309, 38 S.Ct. 312, 62 L.Ed. 733 (1918) .......14

*Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S. Ct. 83, 84, 42 L. Ed. 456 (1897)............14

*Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004)..................6, 13

**Rules of Procedure**

Fed. R. Civ. P. 60(b)(5)................................................................................................5

Local Rule 7(m) ....................................................................................................2, 3, 4

**Statutes**

Romanian Civil Code, Book V, Title VII, Chapter II, Art. 1615 ………………………… 9, 10

Romanian Civil Code, Book V, Title VII, Chapter II, Art. 1616 ………………………… 9

Romanian Civil Code, Book V, Title VII, Chapter II, Art. 1617 ………………………… 9

Romanian Fiscal Procedural Code, Article 116(1) ……………………………………...… 9

**Secondary Sources**

Liviu Pop, Ionut Florin Popa, Stelian Ioan Vidu – *Curs de drept civil, Obligatiile*,
Ed. Universul Juridic, page 540 .............................................................................................9

Respondent, the Government of Romania ("Romania"), through its undersigned counsel, respectfully submits this memorandum of law in opposition to Petitioners' Motion for Judgment and Confirmation of Award.

## PRELIMINARY STATEMENT

On December 11, 2013, an Arbitration Tribunal entered an Award in favor of Viorel Micula ("Viorel"), Ioan Micula ("Ioan"), European Food S.A., ("European Food") Starmill S.R.L. ("Starmill"), Multipack S.R.L. ("Multipack") (collectively "Petitioners"), and against Romania in the amount of RON 376,433,229 (ca. EUR 84.5 million) plus pre- and post-Award interest (the "Award"). However, as of March 9, 2015, Romania had fully satisfied and executed the Award by: (i) a setoff against European Food's tax debts owed to Romania; (ii) a partial, forced execution of the Award by a bailiff in Romania from seizure of Romanian government funds; and (iii) a voluntary transfer of additional funds into a Treasury account.[1] *See* a true and accurate copy of the legal opinion of Professor Radu Bufan ("Bufan opinion") attached hereto as Exhibit 1 and the Declaration of Romanian Secretary of State of the Ministry of Public Finance Atilla György ("György") attached hereto as Exhibit 2, both attached in support of this Response in Opposition. Pursuant to international comity and the Act of State Doctrine, Romania respectfully requests that this Court recognize that Romania has satisfied the Award and dismiss Petitioners' Petition, with prejudice.

## PROCEDURAL FACTS

On November 6, 2016, Petitioners filed the Petition (ECF Dkt. No. 1). On January 16, 2018, Romania filed a Motion to Dismiss the petition for recognition of arbitral award, arguing

---

[1] This transfer was made via the mechanism provided for under Romanian Law No. 20/2015 establishing the approval of Government Emergency Ordinance No. 77/2014 regarding the national procedures in the field of state aid, as well as for the amendment and completion of Competition Law No. 21/1996 (hereafter "Law No. 20/2015").

insufficient service of process (ECF Dkt. No. 7) and a supporting memorandum of law, (ECF Dkt. No. 8).

On May 22, 2018, this Court denied Romania's Motion (ECF Dkt. No. 15).[2] This Court subsequently entered an Order for a Rule to Show Cause (ECF Dkt. No. 16). The May 22, 2018 Order did not establish a time for Romania to answer or otherwise plead to Petitioners' Petition. On May 30, 2018, Romania filed its memorandum of law and a supporting declaration from a Romanian government representative to show cause why they should not be sanctioned (ECF Dkt. No 18). This Court has not yet ruled on its Order for Rule to Show Cause.

On June 6, 2018, Petitioners filed an Affidavit in Support of Default seeking a default against Romania for failing to file a responsive pleading to the Petition (ECF Dkt. No. 19).

On June 8, 2018, Romania filed a Romania's Motion for Leave to File a Responsive Pleading (ECF Dkt. No. 20). On June 11, 2018, in a minute order, this Court denied Romania's Motion for Leave to File a Responsive Pleading without prejudice for failure to comply with the meet-and-confer requirement under Local Civil Rule 7(m).

On June 11, 2018, the Clerk of the Court entered an order of default against Romania (ECF Dkt. No. 21).

On June 11, 2018, counsel for Romania contacted Petitioners' counsel, Francis Vasquez, per Local Civil Rule 7(m), inquiring as to whether Petitioners have any objection to Romania seeking leave to file a responsive pleading to Petitioners' Petition by June 15, 2018. Petitioners' counsel, Francis Vasquez, responded indicating Petitioners' objection to Romania's request. Per

---

[2] Romania acknowledges and understands that this Court issued a ruling on the issue of service of Petitioners' Petition on Romania. However, in light of the affidavits and documentation provided by Romania on the response on the Rule to Show Cause, and Romania's reiteration of the proper service procedures on the Romanian government, Romania reiterates the FSIA requirements of service.

Local Civil Rule 7(m), Romania made a good-faith effort with Petitioners' Counsel to obtain consent for this motion and to determine whether there is any opposition to the relief sought.

Given Petitioners' objection to Romania to file a responsive pleading by June 15, 2018, Romania filed an Amended Motion, setting forth its Rule 7(m) attempt. *See* ECF Dkt. No. 22, ¶¶ 11-13. On June 13, 2018, Petitioners filed their Opposition to Romania's Motion. (ECF Dkt. No. 24).

In accord with Local Civil Rule 7(d), Romania expected to have seven days to file its Reply in Support of its Motion for Leave, and intended to file that Reply on June 20, 2018. As an exhibit to that Reply memorandum, Romania was prepared to attach its completed Responsive Pleading with a request to file that document *instanter*, as June 15, 2018 had already passed with no ruling from this Court granting or denying Romania's Motion for Leave to File a Responsive Pleading.

On June 19, 2018, this Court denied Romania's Motion for Leave as moot because Romania did not file its Responsive Pleading on June 15, 2018. *See* Court's Minute Entry dated June 19, 2018. As of June 19, 2018, this Court did not yet rule on Romania's Motion for Leave its Responsive Pleading, hence Romania did not have permission from this Court to file its responsive pleading on June 15, 2018. Moreover, there was a pending objection to Romania's Motion for Leave filed by Petitioners.

On June 20, 2018, Romania filed its Motion for Leave to File a Responsive Pleading Instanter requesting that this Court grant it leave to file, *instanter*, a Motion for Satisfaction of Award pursuant to FRCP 60 (b) (5), along with its corresponding memorandum of law and exhibits in support thereof, which documents it attached to its Motion, and to vacate the default entered by the Court Clerk on June 11, 2018. (ECF Dkt. No. 25).

Prior to filing the Motion for Leave to File a Responsive Pleading *Instanter*, in accord with Local Civil Rule 7(m), the undersigned counsel contacted Petitioners' counsel on June 20, 2018, requesting Petitioners' consent to this motion and the relief sought herein. Petitioners would not consent to either the filing of the Motion, nor the requested relief sought.

On June 28, 2018, Petitioners filed a Motion for Judgment and Confirmation of Arbitral Award. (ECF Dkt. No. 26).

## LEGAL STANDARD

In any action against a foreign state, the state is entitled to sovereign immunity unless the provisions of the FSIA are complied with. 28 U.S.C. §§ 1604, 1330. The only way to establish subject matter and personal jurisdiction is to comply with the FSIA's requirements, including its service of process provisions. 28 U.S.C. §§ 1330(a), (b) and 1608(a); *Argentine Venezuala v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989) ("[T]he FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country …").

Without personal and subject matter jurisdiction, a federal court lacks authority to issue a valid judgment. *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982) ("The validity of an order of a federal court depends upon that court's having jurisdiction over both the subject matter and the parties."); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998), *quoting Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1869) ("Without jurisdiction the court cannot proceed at all in any cause."). Moreover, without proper service, this Court lacks authority to adjudicate its own jurisdiction. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110 (1969) ("It is elementary that one is not bound by a judgment *in personam* resulting from litigation . . . to which he has not been made a party by service of process.").

In an action against a foreign state, service of process is not a mere formality; it is the basis

for the Court's jurisdiction. *Texas Trading & Milling Corp. v. Federal Romania of Nigeria*, 647 F.2d 300, 308 (2d Cir. 1981) (under the FSIA, "subject matter jurisdiction plus service of process equals personal jurisdiction."), *overruled on other grounds by Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Romania*, 582 F.3d 393 (2d Cir. 2009). *Accord Practical Concepts, Inc. v. Romania of Bolivia*, 811 F.2d 1543, 1549 (D.C. Cir. 1987). The requirement of serving process upon and establishing personal jurisdiction over a foreign state arises out of the FSIA.

To this end the FSIA, § 1608(a), provides the exclusive method for serving process on a foreign state. *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994) ("[S]ection 1608(a) 'sets forth the exclusive procedures for service on a foreign state . . . .'"). Plaintiffs must comply strictly with these requirements. *Id.* at 154 ("We hold that strict adherence to the terms of 1608(a) is required."). Absent proper service, a court lacks jurisdiction to enter judgment against a foreign state. *Id.* at 154 ("The Eastern District of New York lacked personal jurisdiction [over the Romania of Bolivia], and the default judgment registered in the District of Columbia was therefore void and unenforceable.").

This Court has authority to enter an Order of Satisfaction of Judgment, after which satisfaction of a judgment, any subsequent proceeding must be dismissed. *See* F.R.C.P. 60(b)(5). Legislative actions of a sovereign nation should be given deference and assumed valid by a U.S. Court. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 436-437, 84 S. Ct. 923 (1964) (holding that a Cuban expropriation decree to seize sugar was valid).

International comity is an abstention doctrine that reflects "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard to both international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *O.N.E. Shipping Ltd. v. Flota*

*Mercante Grancolombiana S.A., et al.*, 830 F.2d 449, 451, n.3 (2nd Cir. 1987), quoting from *Hilton v. Guyot*, 159 U.S. 113, 163-64, 16 S.Ct. 139, 143 (1895). The doctrine of international comity summarizes "the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum. Since international comity varies according to the factual circumstances surrounding each claim for its recognition, the absolute boundaries of the duties it imposes are inherently uncertain." *Laker Airways, Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984).

When comity is applied retrospectively, federal courts evaluate three factors: (1) whether the foreign court was competent and used "proceedings consistent with civilized jurisprudence," (2) whether the judgment was rendered by fraud, and (3) whether the foreign judgment was prejudicial because it violated American public policy notions of what is decent and just. *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004). When applied prospectively, federal courts evaluate several factors, including the strength of the United States' interest in using a foreign forum, the strength of the foreign governments' interests, and the adequacy of the alternative forum. *Id.*

The Act of State Doctrine states that the courts of one state should not question the validity of public acts performed by other sovereigns within their own borders, even when such courts have jurisdiction over a controversy in which one of the litigants has standing to challenge those acts. *Republic of Austria v. Altmann*, 541 U.S. 677, 700, 124 S. Ct. 2240 (2004).

## ARGUMENT

### I.    ROMANIA HAS SATISFIED THE ICSID AWARD

#### A.  Setoff against European Food's Tax Liabilities

On December 11, 2013, the date of the ICSID Award, a *de jure* offset occurred between Romania and European Food. On January 14 and 15, 2014 the Romanian Ministry of Finance, via the National Agency For Fiscal Administration ("NAFA"), issued the setoff decisions and communicated to the Petitioners the setoff of RON 337,492,864 (ca. EUR 76 million) against the tax debts owed by European Food to Romania. *See* Ex. 2, ¶¶ 13-15. The setoff of the debts of European Food was done pursuant to the Romanian Civil Code and the Romanian Fiscal Code of Procedure ("FCP"). *Id.* at ¶15.

The setoff against European Food's tax debts to Romania was a partial enforcement of the Award. *See* Ex. 1, at p. 6, ¶ 19.[3] The setoff constituted a partial payment, even if Petitioners did not directly receive cash funds, because a tax setoff is a means of settling obligations provided by the law, to wit, a negation of mutual obligations. *Id.* Under Romanian law, the satisfaction of the Award, occurred when the conditions for the legal setoff were met: the first date that European Food owed back taxes *and* when it, and the other Petitioners, won the Award in arbitration, December 11, 2013. *Id.*

In the annulment proceedings of the Award, Professors Gaillard and Hobér both confirmed that the setoff occurred in this manner. *See* a true and accurate copy of the transcript of the Sept. 21-22, 2015, Hearing on the Annulment in the Matter for Arbitration of the International Centre for Settlement of Investment Dispute, Case No. ARB/05/20 attached hereto as Exhibit 4.

Opening Statement of Professor Gaillard

---

[3] *See* Ex. 3 hereto, Decl. of Dana Vilaia. Ms. Vilaia attests that the substantive law of Mr. Bufan's legal opinion has not substantively modified since Mr. Bufan's declaration in 2016, and what modifications there have been do not impact the legal opinion.

"***Now, on 6th January 2014 they invited Claimants to a first meeting "to
discuss the implications of the enforcement of the ... award",*** *and you
have an excerpt of that request at slide 9. And maybe more importantly,
they took a positive step, against our will, to enforce the Award in the way
they saw fit, because they benefit from the fact that it doesn't have an actual
allocation between Claimants -- which they never requested before the
Tribunal -- and they moved on January 14th 2014* **to make a voluntary
partial execution by offsetting the Award against certain debts of one of
the Claimants in this arbitration.**" *Id.*, Sept. 21, 2015 proceedings, p.
123:9-20 (emphasis added).

Opening Statement of Professor Gaillard

"THE PRESIDENT: *But in essence you would agree with that setoff, the point?*
PROFESSOR GAILLARD: **In essence we agree with the fact that they can
discharge the Award in the hand of any of the Claimants, because it doesn't
specify whom.**" *Id.*, September 21, 2015 proceedings, p. 126:10-14 (emphasis
added).

Closing Statement of Professor Hobér

"*More importantly, it's actually the other way round*: **I mean, Romania could
have paid to any of the Claimants to fulfill its obligations under the Award.**"
*Id.*, September 22, 2015 proceedings, p. 139:23-25 (emphasis added).

The ICSID Arbitral Tribunal, in the ICSID Award, held that Romania has a right to set off

the Award pursuant to Romanian law.

"If the Tribunal had not dismissed these requests on procedural grounds, it would
have done so on the merits. Indeed, **whether the Respondent has a right to set
off the Award against the EFDG's tax debts would be (primarily at least) a
matter of Romanian law and of enforcement of this Award. Romanian law
establishes the conditions under which a setoff may be carried out and nothing
the Tribunal says will affect that**. In certain jurisdictions, setoff may even operate
as a matter of law (*ipso jure*) when strict conditions are met. Thus, as a matter of
principle, the Tribunal is not in a position to declare that Romania has a right to set
off the amounts awarded in this arbitration against the EFDG's tax debts. Whether
Romania has a right to set off the amounts awarded against the Claimants or other
companies of the EFDG will depend on whether the conditions set out in Romanian
law is fulfilled."

*See* Ex. 1, p. 13, ¶ 47, *citing to* ICSID Award, p. 1291 (emphasis added).

Law No. 287/2009, revising the Romanian Civil Code (the "New Civil Code," or "NCC"), identifies the means of settlement of obligations. The permissible means are listed in Book V ("On Obligations"), Title VII ("Settlement of Obligations"), Chapter II. *See* Ex. 1, p. 9, ¶ 30. Specifically, Art. 1615, Book V, Title VII, Ch. II, identifies the following means of settlement of obligations: payment, setoff, merger of rights, remission of debt, fortuitous impossibility of execution, and "other means expressly provided by the law". *Id.* Article 1616 from that Title defines "setoff" as "the reciprocal debts are released by set-off up to the lower of either amount". *Id.* p. 14, ¶ 56. Setoff is an alternative means of settlement of mutual obligations of the same kind existing between two persons (individuals and/or legal entities), so that either of them is simultaneously a debtor and creditor of the other. Therefore, setoff has the effect of a mutual settlement of the two obligations until the smallest of them is covered, thus avoiding the performance of two payments.[4]

The conditions prescribed in order for the setoff to produce its effect are regulated mainly by Article 1617 of Book V, Title VII, Ch. II. That Article states, in relevant part: "setoff acts by operation of law as soon as there are two certain, determined and due and payable debts, irrespectively of their origin, whose object is an amount of money or a certain amount of fungible goods of the same kind." Setoff is an available means so long as the parties did not waive this benefit. *See Id.* p. 14, ¶ 57. Where all those conditions are fulfilled, the setoff operates *de jure*, eliminating the reciprocal debts up to the lower of either amount. *Id.* at p. 16, ¶ 60.

Here, the NAFA setoff against the tax liability of European Food is such an Article 1616 setoff, as applied by Article 116(1) of the Romanian Fiscal Procedural Code. *Id.* at p. 16, ¶ 61. The setoff of RON 337,492,864 (ca. EUR 76 million) released Romania from that much of its

---

[4] Liviu Pop, Ionut Florin Popa, Stelian Ioan Vidu – *Curs de drept civil, Obligatiile*, Ed. Universul Juridic, p. 540. *See* a true and accurate copy of this excerpt, in its original Romanian, is attached hereto as Exhibit 5.

obligation under the Award, as it was a legal substitution for that of a direct payment to European Food. *Id.* at p. 17, ¶ 65. The setoff provided relief from the Award, even if a cash transfer did not occur, because of the very nature of the setoff: a write-off of mutual obligations. *Id*. at p. 17, ¶ 67. In that way, Romania had already satisfied RON 337,492,864 (ca. EUR 76 million) of the Award.

### B.  Forced Execution of Payment by Romanian Bailiff

On January 5, 2015, a bailiff seized RON 36,484,232 (ca. EUR 8.1 million) from the Ministry of Public Finance's account. *See* Ex. 2, at ¶ 16. After this seizure, the bailiff transferred RON 34,004,232 (ca. EUR 7.56 million) to three of the five Petitioners: RON 11,334,744.16 to Ioan, RON 11,334,744.14 to Multipack, and RON 11,334,744.14 to Starmill. *Id.* at ¶ 17. The bailiff retained the remaining balance of the seized funds (RON 2,480,000) as its compensation for the seizure. *Id.* at ¶ 18. Between February 5, 2015 and February 25, 2015, the bailiff seized an additional RON 9,197,482 (ca. EUR 2 million) from the accounts of the Ministry of Finance. *Id.* at ¶ 19.

The NCC, in Title V, Book V, Ch. II, Art. 1615, provides that seizure by the bailiff, like setoff, is a viable method of satisfying the Award. *See* Ex. 1, p. 18, ¶ 72. In that way, Romania had already satisfied RON 45,681,714 (ca. EUR 10.1 million) of the Award.

### C.  Transfer of Payment into a Treasury Account for Petitioners

On March 9, 2015, the Romanian Ministry of Public Finance transferred RON 472,788,675 (ca. EUR 106.5 million), including RON 6,028,608 for the costs of the bailiff, (the "March 2015 Transfer") into a specially created, legislatively authorized, Treasury account in Petitioners' names. *See* Ex. 2, at ¶ 21. The special account authorized by Law No. 20/2015 is an interest-bearing, special purpose account in the name of Petitioners and the bailiff, created specifically to

satisfy writs of execution.[5] *See* Ex. 1, p. 22, ¶ 95. The March 2015 Transfer was authorized by Law No. 20/2015.[6] *See* Ex. 2, ¶ 21, and Ex. 1, p. 22, ¶¶ 89-90. Immediately after the transfer, the balance of the special account was frozen, after the European Commission ordered Romania to not disburse the funds to Petitioners, but instead to retain the funds, because to disburse the funds to Petitioners would be an impermissible provision of state aid to a national company. *See* Ex. 1, p. 21, ¶ 83. However, on December 15, 2015, the Constitutional Court of Romania ("RCC") declared Law No. 20/2015 constitutional. *See* Ex. 1, p. 21, ¶ 87, and Ex. 6 hereto, a translated, true and accurate copy of the RCC Decision in Joined Cases Nos. 918 D/2015, 919 D/2015, 1007 D/2015, 1214 D/2015, and 1653 D/2015, dated December 15, 2015. Thus, the March 2015 Transfer was made in a constitutional manner. *See* Ex. 1, p. 21, ¶ 87.

In this way, the Award was fully satisfied after the March 2015 Transfer, even if the European Commission later ordered Romania to not disburse the funds to Petitioners. *See* Ex. 1, p. 24, ¶ 100, and Ex. 2, ¶ 22. The March 2015 Transfer constitutes partial satisfaction of the Award, even if Petitioners did not receive the funds, because Law No. 20/2015 expressly stated that satisfaction of a writ of execution may be made via transfer of the amounts that correspond to the writ of execution and, if applicable, the execution expenses, into the special account. *See* Ex. 1, p. 24, ¶ 99. Consequently, this method of satisfaction and execution is legal and viable. *Id.,* ¶ 100. Thus, when Petitioners asked this Court to recognize the Award as a Judgment, they were attempting to circumvent the effects of Law No. 20/2015, a statute validly adopted by the Legislative Assembly of Romania and upheld by the RCC.

Thus, via a tax setoff, monies already seized from the Romanian government, and the

---

[5] Law No. 20/2015 defines "writ of execution" as either a court judgment or an arbitral award, such as Petitioners' Award. Law No. 20/2015, Art. 38^3.

[6] The transfer was made in accordance with the provisions of Art. 38^3 in Law No. 20/2015. *See* Ex. 1, p. 21, ¶ 90.

deposit into the special treasury account, the Award was satisfied in full well before Petitioners filed their petition with this Court. Accordingly, Romania respectfully requests that this Honorable Court grant Romania's Motion for an Order of Satisfaction of Judgment.

### D. Ruling in The High Court of Justice Queen's Bench Division Commercial Court is not Binding on Romania's Courts, nor United States Courts.

Petitioners reference an order entered in the High Court of Justice Queen's Bench Division, Commercial Court, dated January 1, 2017. *See* a true and accurate copy of said Order attached hereto as Exhibit 7. The High Court ruled that that Award remains unpaid. *See Id*. at paragraph 176(4). However, the High Court notes that this issue was just "touched upon" and not developed by Romania.

> Romania contends that the Award has been paid in full, but it did no more than touch on the point in its oral argument, and states it without elaboration in the joint table of submissions on key issues.

*See Id.* at ¶ 174.

Romania in the England case did not provide a legal opinion on the payment issue, as Romania does here. Moreover, an English court's decision, interpreting Romanian law, is not binding on Romanian courts – nor on American courts.

## II. THIS COURT SHOULD GIVE DEFERENCE TO ROMANIA'S SATISFACTION OF AWARD UNDER INTERNATIONAL COMITY

Under the theory of international comity, this Court should give deference to Romanian law, which sustains that, the payments and methods of payments made by Romania have satisfied the Award in full as of March 9, 2015.

International comity is one state's recognition of the legislative, executive, or judicial acts of another state, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws. *Hilton v. Guyot,* 159

U.S. 113, 163-64, 16 S.Ct. 139 (1895). A court must look to the entire context of the case both here and abroad. *See China Trade & Dev. Corp. v. M.V. Choong Yong,* 837 F.2d 33, 36 (2d Cir. 1987). The legislative actions of a sovereign nation should be given deference and assumed valid by a U.S. Court. *See Banco Nacional de Cuba*, 376 U.S. at 436-37 (holding that a Cuban expropriation decree to seize sugar was valid).

As discussed above, Romania has fully satisfied and executed the Award by: (i) a setoff against European Food's tax debts to Romania; (ii) a forced execution of a portion of the Award by a bailiff in Romania; and (iii) a legislatively authorized treasury account. *See* Ex. 2, ¶ 10. These three methods constitute, in their totality, a full satisfaction of the Award. *See* Ex. 1, p. 6, ¶ 18.

The legislative assembly of Romania validly adopted Law No. 20/2015. Moreover, the RCC held the law constitutional on December 15, 2015. *See* Ex. 6. Both the legislative and judiciary bodies of Romania are recognized authorities deserving deference under international comity. The actions taken by these bodies ensure the full payment of the Award. A decision by this Court to not recognize the laws of Romania and the satisfaction of the Award would directly undermine both the sovereignty of Romania and the international relations between the United States and Romania. *See Ungaro-Benages*, 379 F.3d at 1240. Furthermore, it would allow Petitioners to recover twice for the Award, a concern raised by this Court in a similar proceeding. *See Mobil Cerro Negro Ltd. v. Bolivarian Republic of Venezuela*, 87 F. Supp. 3d 573, 603 (S.D.N.Y. 2015) ("The Court's concern was that if the Part One judgment recognizing the award in Mobil's favor remained in place and was not stayed, Mobil, in theory, could seek attachment of more than the sum total of assets to which it may ultimately be held entitled by ICSID.").

Given that Romanian law holds that the Award has been satisfied, Romania respectfully requests, under the principle of international comity, that this Honorable Court give deference to

the payments made and the law of Romania permitting such payments. *See Konowaloff v. Metro. Museum of Art*, 702 F.3d 140, 148 (2d Cir. 2012).

### III.   THIS COURT SHOULD RECOGNIZE ROMANIA'S SATISFACTION OF JUDGMENT, PURSUANT TO ROMANIAN LAW, UNDER THE ACT OF STATE DOCTRINE

> "Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves." *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S. Ct. 83 (1897).

Since the 19th Century, the Unites States has recognized the sovereignty of state actions and adhered to the Act of State Doctrine. The Act of State Doctrine states that the courts of one state will not question the validity of public acts performed by other sovereigns within their own borders, even when such courts have jurisdiction over a controversy in which one of the litigants has standing to challenge those acts. *See Altmann*, 541 U.S. at 700. Furthermore, it precludes the courts of the United States from inquiring into the validity of the public acts that a recognized foreign sovereign power adopts within its own territory. *Banco Nacional de Cuba*, 376 U.S. at 418, citing to *Ricaud v. American Metal Co.*, 246 U.S. 304, 309, 38 S.Ct. 314 (1918): "[W]hen it is made to appear that the foreign government has acted in a given way ... the details of such action or the merit of the result cannot be questioned but must be accepted by our courts as a rule for their decision."

Similar to this Court's recognition of the Award through the ICSID, where this Court gave deference to international law and finding, under the Act of State Doctrine, this Court should recognize the validity of the payments by Romania, made pursuant to Romanian law, on the Award. Culminating with the March 2015 Transfer, Romania satisfied the Award in full. Since the Romanian legislature and judiciary have found that Romania's actions are a constitutional

satisfaction of the Award, Romania respectfully requests that this Court recognize that that Romania has satisfied the Award and, ultimately, the Amended Judgment.

## IV.     PETITIONERS DID NOT FAIL TO RESPOND TO PETITIONERS' PETITION

Romania did not fail to respond to Petitioners' Petition. Currently, Romania's Motion for Leave to File a Responsive Pleading *instanter* is pending. Romania acted in good faith when seeking leave to file a responsive pleading *instanter* by attaching a copy of the Motion for Satisfaction of Award if this Court to its motion.

Romania's request for an extension of time of ten calendar days in its Amended Motion for Leave was reasonable considering it requested documentation involving complex statues and law that implicated the Romanian government. The legal opinion issued by Ms. Vilaia was required to determine whether the law cited in Bufan's opinion changed which may have impacted Bufan's legal opinion issued in 2016. Dana Vilaia as counsel for Romania has to confer and obtain approval from Romania which approval does not occur as quickly as with a non-government client. Petitioners' could have avoided "years" of delay by adhering to the order this Court entered in the initial petition filed by Micula in 2015. Hence, Romania seeking a ten calendar day extension, and prepared to file its motion for satisfaction *instanter*, was not excessive. More importantly, as the Responsive Pleading may be filed *instanter*, there will be further delay and no accrued prejudice to Petitioners.

Petitioners' argue that Romania's requests for an extension is a delay tactic. However, it is Petitioners who delayed their action for years, as detailed thoroughly in Romania's Reply in Support of its Motion to File Responsive Pleading *Instanter* (and incorporated herein by reference). They could have avoided "years" of delay by adhering to the order this Court entered in the initial petition filed by Micula in 2015.

Hence, had Petitioners not ignored and adhered to the original DC Order, had Petitioners not forum shopped in 2015 and obtained an *ex parte* judgment relying on the very methods the DC Court ruled as improper, it would have avoided years of delay.

Romania also did not vexatiously delay this DC case either. Upon Romania's filing its initial Motion to Dismiss, Petitioners admitted that their service attempt was improper by withdrawing their initial service and attempting to reserve Romania. Romania recognizes that this Court held in its May 22, 2018, Order that service by mail is valid on Romania. Romania's position remains unchanged as evidenced by the communication from the Romanian Minister of Justice: that service of process by foreign entities on Romania, as a sovereign entity, must occur in all cases through diplomatic channels which must serve according to the Hague Convention. *See generally*, statements at law and argument in ECF Dkt. No. 18.

## CONCLUSION

As of March 9, 2015, Romania satisfied the Award. Pursuant to the principle of international comity and the Act of State doctrine, this Honorable Court should defer to Romania's payments under Romanian law. For those reasons, Romania respectfully requests that this Honorable Court deny Petitioner's Motion for Confirmation of the Award and their Petition for Confirmation of the Award, and dismiss this matter, with prejudice.

Dated: July 12, 2018

Respectfully submitted,
THE GOVERNMENT OF ROMANIA

By: /s/ Ioana Salajanu_____
    One of Its Attorneys

Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
Telephone: (312) 494-1000
Facsimile: (312) 494-1001
isalajanu@rfclaw.com

*Attorney for Defendant*
*Government of Romania*