**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

In the Matter of the Application of

IOAN MICULA,
VIOREL MICULA,
S.C. EUROPEAN FOOD S.A.,
S.C. STARMILL S.R.L., and
S.C. MULTIPACK S.R.L.,

      *Petitioners*,

  v.

THE GOVERNMENT OF ROMANIA,

      *Romania.*

Civil Action No. 17-CV-02332-APM

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR**
**JUDGMENT AND CONFIRMATION OF ARBITRAL AWARD**

# TABLE OF CONTENTS

Page

ARGUMENT .......................................................................................................................... 2

I.      Romania Provides No Reason Why This Court Should Not Confirm the Award ............. 2

II.     Romania Has Not Satisfied the Award ............................................................................ 3

        A.      The Tax Setoff Against S.C. European Food S.A. Did Not Satisfy the
                Award ...................................................................................................................... 4
        B.      Romania's Deposit of Funds Into a Blocked Treasury Account Did Not
                Satisfy the Award ................................................................................................... 6
        C.      Romania Has Satisfied Only a Tiny Fraction of the Award via Forced
                Executions, and Romania Continues to Reclaim Such Payments to This
                Day .......................................................................................................................... 8
        D.      Romania's Arguments Regarding "Satisfaction" Have Been Considered
                and Rejected by Other Courts and Should Be Estopped Here ............................... 9

III.    Principles of Comity Do Not Compel Recognition of the Purported Satisfaction of the
        Award ............................................................................................................................. 11

IV.     The Act of State Doctrine Does Not Compel Recognition of the Purported Satisfaction of
        the Award ........................................................................................................................ 12

V.      Romania Failed to Respond to Petitioners' Petition on Time and Remains in Default .... 15

CONCLUSION ...................................................................................................................... 16

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Al-Tamimi v. Adelson*, 264 F. Supp. 3d 69 (D.D.C. 2017) ..............................................14

*Austin Inv. Fund, LLC v. United States*, 2015 WL 7303514 (D.D.C. Nov. 19, 2015) ..................................................................................................................14

*Comm'ns Imp. Exp. S.A. v. Republic of the Congo*, 2015 WL 13667748 (D.D.C. July 6, 2015) ....................................................................................................11

*De Csepel v. Republic of Hung.*, 714 F.3d 591 (D.C. Cir. 2013) ..................................11

*Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75 (D.D.C. 2014) ................................13, 14

*Duke Energy Int'l Peru Invs. No. 1 Ltd. v. Republic of Peru*, 904 F. Supp. 2d 131 (D.D.C. 2012) ..............................................................................................2

*El-Amin v. Virgilio*, 251 F. Supp. 3d 208 (D.D.C. 2017) ................................................6

*Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp. 2d 19 (D.C. Cir. 2007) ..............................................................................................................11

*Int'l Trading & Indus. Inv. Co. v. DynCorp. Aerospace Tech.*, 763 F. Supp. 2d 12 (D.D.C. 2011) ..................................................................................................11

*Lamphier v. Wash. Hosp. Ctr.*, 524 A.2d 729 (D.C. Cir. 1987) ......................................4

*Lewis v. United States Parole Comm'n*, 841 F. Supp. 2d 56 (D.D.C. 2012) ...................4

*McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066 (D.C. Cir. 2012) .....................12, 13

*Miminco v. Dem. Rep. of the Congo*, 79 F. Supp. 3d 213 (D.D.C. 2015) ........................2

*Samra v. Shaheen Bus. & Inv. Grp., Inc.*, 355 F. Supp. 2d 483 (D.D.C. 2005) .............7

*SEC v. Bilzerian*, 815 F. Supp. 2d 324 (D.D.C. 2011) ....................................................4

*United States v. Sum of $70,990,605*, 4 F. Supp. 3d 189 (D.D.C. 2014) .......................11

*United States v. Sum of $70,990,605*, 991 F. Supp. 2d 154 (D.D.C. 2013) ...................14

*Virtual Defs. & Dev. Int'l, Inc. v. Republic of Moldova*, 133 F. Supp. 2d 1 (D.D.C. 1999) ..........................................................................................................14

*W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400 (1990) ..............13, 14

*Walker v. Mones*, 2007 WL 1576325 (D.D.C. May 30, 2007)........................................................4

## STATUTES AND RULES

22 U.S.C. § 1650a............................................................................................................2, 3, 14, 16

28 U.S.C. § 1608(e) .................................................................................................................2

Federal Rule of Civil Procedure 55(b)(2) .................................................................................2

## MISCELLANEOUS

47 Am. Jur. 2d Judgments § 765 (2018)....................................................................................3

47 Am. Jur. 2d Judgments § 778 (2018)....................................................................................3

Black's Law Dictionary 1544 (10th Ed.)...................................................................................3

Before this Court is a motion for judgment and confirmation of a final and binding ICSID arbitration award (the "Award") that, under both the ICSID Convention and well-settled law in this jurisdiction, is meant to be recognized in an automatic and expeditious process.   In attempting to oppose Petitioners' Motion for Judgment, Romania does what it has been doing in proceedings in the United States for well over four years now: namely, it offers bad faith, unsubstantiated arguments that have been rejected multiple times in other proceedings and that are designed to do nothing more than allow Romania to continue avoiding its obligations and to delay enforcement of the Award.

The absurdity of Romania's position is reflected throughout its Response to Petitioners' Motion for Judgment and Confirmation of Award (hereinafter "Opposition" or "Opp."), which is most striking for what it fails to include.  In fact, Romania's Opposition fails to put forth *any* valid defense to confirmation of the Award in any capacity whatsoever.  Specifically, it fails to provide any basis for vacating this Court's entry of default, fails to make any argument that this Court lacks the jurisdiction required to confirm and enforce the Award, fails to offer any valid defenses to confirmation, and takes no issue with Petitioner's calculations of the amount due.

Rather than provide an actual response to the substance of the motion, Romania ventures down a road it has trodden many times before, recycling arguments verbatim from prior proceedings.  Romania's rehashed arguments as to how it has purportedly "satisfied" the Award are without merit, and indeed have already been rejected by other courts.  No matter how Romania tries to spin it, the fact remains that Romania has paid only a tiny fraction of the Award (and is to this day actively attempting to reclaim even the small amount it has paid).

Finally, Romania's invocations of comity and the act of state doctrine are meritless.  This Court should not exercise its discretion to give deference to Romania's incorrect and self-serving

interpretations of its own law.  Moreover, even if this Court *did* extend recognition to the Romanian court decisions at issue here, the analysis would remain unchanged, because 1) the Award is not subject to substantive review by this Court, and 2) the decisions of Romanian courts do nothing to alter the practical reality that Petitioners have received only a tiny fraction of the amount due under the Award, for which they have already accounted in their calculations. Accordingly, the Court should confirm the Award pursuant to 22 U.S.C. § 1650a and enter a judgment pursuant to 28 U.S.C. § 1608(e) and Federal Rule of Civil Procedure 55(b)(2).

## **ARGUMENT**

### I.    **Romania Provides No Reason Why This Court Should Not Confirm the Award**

Romania's Opposition is notable for what it does not contain; namely, a single defense to confirmation of a binding, final ICSID award.  Nor does Romania have any such defense.  The ICSID Convention and its enabling statute, 22 U.S.C. § 1650a, provide that ICSID awards are not subject to substantive review by this Court.  *See* ICSID Convention Art. 54(1) ("Each Contracting State shall recognize an award rendered pursuant to this Convention as binding . . .") (ECF No. 26-3); 22 U.S.C. § 1650a ("The pecuniary obligations imposed by [an ICSID] award shall be enforced and be given the same full faith and credit as if the award were a final judgment" of a sister state); *Miminco v. Dem. Rep. of the Congo*, 79 F. Supp. 3d 213, 218 (D.D.C. 2015) (noting that "a court's confirmation of an ICSID award should entail nothing more than ministerial verification that the award is genuine"); *Duke Energy Int'l Peru Invs. No. 1 Ltd. v. Republic of Peru*, 904 F. Supp. 2d 131, 132-33 (D.D.C. 2012) (where an arbitration award is sufficiently clear, "this Court is required by statute to give the Award full faith and credit and confirm it accordingly").  Thus, Romania's baseless assertions that it has already satisfied the Award (assertions which have been raised, contested, and rejected in other jurisdictions, as discussed *infra* at § II.D) cannot undo the confirmation process, in which the Court is simply

required to recognize the validity of the Award and to convert it into an enforceable judgment under U.S. law.

Not only does Romania fail to provide any reason why this Court should not confirm Petitioners' Award, but Romania also neglects to address *any* of the substantive points raised by Petitioners' Motion for Judgment.  Romania provides no credible basis to vacate the entry of default,[1] makes no argument that this Court lacks jurisdiction to recognize and enforce the Award,[2] and does not object to the conversion of the Award into U.S. dollars or the calculation of interest.[3]  In short, there is no reason why this Court should not confirm the Award pursuant to 22 U.S.C. § 1650a, enter judgment in the amount of $321,299,343 plus any additional prejudgment interest accrued as of the date of the judgment, and award post-judgment interest at the rate identified in the Award.

## II.   Romania Has Not Satisfied the Award

Romania's contention that it has fully "satisfied" the Award is entirely without merit. The satisfaction of a judgment requires "the complete discharge of obligations under a judgment."  Black's Law Dictionary 1544 (10th Ed.); *see also* 47 Am. Jur. 2d Judgments § 765 (2018) ("payment of a judgment in full acts as a satisfaction.").  "Generally, the only way a money judgment can be satisfied is by payment in money, unless the parties agree otherwise." 47 Am. Jur. 2d Judgments § 778 (2018).  Courts in this circuit have routinely held that a judgment is satisfied only upon full payment of the judgment.  *See, e.g.*, *Lamphier v. Wash. Hosp. Ctr.*, 524 A.2d 729, 735 n.12 (D.C. Cir. 1987) ("satisfaction is an acceptance of full compensation for the injury"); *Walker v. Mones*, 2007 WL 1576325, *3, n.3 (D.D.C. May 30,

---

[1] *See* ECF No. 21.

[2] While Romania correctly states that a federal court needs personal and subject matter jurisdiction to issue a valid judgment, nowhere does it suggest that this Court lacks such jurisdiction.  *See* Opp. at 4-5.

[3] *See* Motion for Judgment at 8-11 for an overview of how the amount of the Award and interest should be calculated.

2007) (holding that where judgment creditor was paid $25,203.23 on a remaining principal balance of $13,356.81, "the judgment was fully satisfied.").

As "[t]he party seeking relief from a judgment," Romania "bears the burden of demonstrating that [it] satisfies the prerequisites for such relief." *Lewis v. United States Parole Comm'n*, 841 F. Supp. 2d 56, 61 (D.D.C. 2012). "Relief under Rule 60(b) is an extraordinary remedy that is to be granted only in exceptional cases." *SEC v. Bilzerian*, 815 F. Supp. 2d 324, 327 (D.D.C. 2011). Romania has not met its burden here, nor has it shown any "exceptional" circumstances warranting an order that the Award has been satisfied. To the contrary, as discussed below, of the three measures that Romania alleges "satisfied" the Award, two resulted in *zero* payment to Petitioners, and one resulted in the payment of approximately $10 million to certain Petitioners, with well over $321 million (plus interest that continues to accrue) left unpaid. By any measure, Romania has plainly not satisfied the Award.[4]

### A. The Tax Setoff Against S.C. European Food S.A. Did Not Satisfy the Award

On January 14, 2014, shortly after the Award was issued, the Romanian Ministry of Finance, through the National Agency for Fiscal Administration ("NAFA"), attempted to partially satisfy the Award by issuing a series of tax setoff decisions that offset a portion of the Award against the tax debts of S.C. European Food S.A., one of the Petitioners. Declaration of Oana Popa ("Popa Decl."), at ¶ 4, Exs. I-J. Romania's assertion that this was a credible and legitimate means to satisfy the Award is incorrect. Opp. at 7-10. Although Romania argues that the setoff was valid as a matter of Romanian law, it fails to acknowledge that the Romanian

---

[4] Tellingly, public statements from Romanian officials make it abundantly clear that Romania knows full well it has not satisfied the Award. On March 31, 2015, Victor-Viorel Ponta, Romania's former Prime Minster, gave an interview in which he stated that Romania had "managed not to pay" the Petitioners the sums due under the Award. Popa Decl. at ¶ 20, Ex. V. On April 28, 2015, Mr. Ponta stated that "on the one hand, the Romanian state must pay some money, on the other hand, it does not have to pay, under European law, and we try to save some money for Romania." *Id.* at ¶ 20, Ex. W. That Romania continues, in the face of such public statements, to claim that it has fully "satisfied" the Award is yet more evidence of its bad faith.

Oradea Court of Appeal *struck down* NAFA's attempt to satisfy the Award via a tax setoff in a decision issued on May 11, 2015.[5]

The Oradea Court of Appeal cited two grounds for its annulment of the purported setoff. First, it held that the specific provisions invoked by Romania as the basis for the setoff (the same provisions cited by Romania here) were inapplicable.  Popa Decl. at ¶¶ 5-6, Ex. L.  The court explained that the relevant law provided for setoffs of *fiscal liabilities* to the state budget and taxpayers, but did not apply here, where Romania was attempting to set off a *civil liability* resulting from an arbitral award.  Popa Decl. Ex. L.  Second, the court held the setoff was "illegal" because it was made with respect to only one of the Petitioners, while the Award obligates Romania to pay all of the Petitioners.  *Id*.  The Oradea Court of Appeal's decision is binding on Romania.  *Id*. at ¶, Ex. M.

Romania buries its acknowledgment of the Oradea Court of Appeal decision in the two-and-a-half year old "legal opinion" of Professor Radu Bufan.  ECF No. 29-1 at Ex. 1.[6]  In that opinion, Professor Bufan states, in a conclusory fashion, that the decision is not binding because it is not a final and irrevocable judgment.  *Id.* at ¶ 45.  Professor Bufan's cursory dismissal of the decision as non-binding on Romania is incorrect.  First, under Romanian law, the rule

---

[5]  In fact, although Romania's Opposition refers to arguments made regarding the setoff during ICSID annulment proceedings, *see* Opp. at 7-8, Romania conveniently neglects to mention that it *conceded* that the setoff had been struck down *in those same proceedings*.  *See* ECF No. 29-1, Ex. 4, at 68:25 – 69:5 ("Now, the four [Petitioners] involved then appealed this [tax setoff] decision of the issuing authority to their regional appellate court in Romania. It found in their favour . . . . The administration has now appealed that decision to the next court, and the decision on that case is pending.").  Romania also misleadingly attempts to claim that, during arbitration proceedings, the ICSID Tribunal held the setoff was valid.  *See* Opp. at 8 ("The ICSID Arbitral Tribunal, in the ICSID Award, held that Romania has a right to set off the Award pursuant to Romanian law.").  The Tribunal held no such thing.  In fact, the Tribunal explicitly stated that it was "not in a position to declare that Romania has a right to set-off the amounts awarded…" and that Romania "has not explained why the (Romanian law) conditions for set-off are fulfilled in this case…".  The Tribunal thus "dismiss[ed] [Romania's] request that the Award explicitly provide that any amount awarded to any of the Claimants is subject to set-off…"  *See* Declaration of Francis A. Vasquez, Jr. ("Vasquez Decl.") Ex. 3, at ¶¶ 1291-1293.

[6]  Romania also includes with its Opposition the Declaration of Dana Vilaia, *see* ECF No. 29-1, at Ex. 3, in which Ms. Vilaia "attests that the substantive law of Mr. Bufan's legal opinion has not substantively modified since Mr. Bufan's declaration in 2016."  Opp. at 7 n.3.  Ms. Vilaia's declaration is silent as to the decision striking down the tax setoff.

suspending the enforcement of a judgment on the basis of a pending appeal applies only to decisions that may be subject to forced execution.  Popa Decl. at ¶ 8.  The Romanian court's decision dealt with a recognition of a right—Romania's right to satisfy the Award by offsetting it against taxes owed by one Petitioner—and was not a judgment that could lead to a forced execution.  *Id.*  The Romanian court's ruling invalidating the setoff stands unless it is rejected on appeal.[7]  Second, the fact remains that the only court to have heard and decided the issue at this point has ruled against the validity of the setoff.  Finally, by arguing that the pending appeal of the setoff decision somehow creates uncertainty regarding the status of the tax setoff, Romania and Professor Bufan merely prove Petitioners' point: Romania cannot rely upon the tax setoff decision in these proceedings to argue that the Award has already been satisfied.

Given the Romanian Court of Appeal's annulment of the setoff, this Court should reject Romania's assertion that the setoff constitutes a partial satisfaction of the Award.

### B. Romania's Deposit of Funds Into a Blocked Treasury Account Did Not Satisfy the Award

On March 9, 2015, pursuant to specially-enacted legislation, Law Number 20/2015, the Romanian Ministry of Finance deposited RON 472,788,675 into a Treasury account in the name of Petitioners, but controlled by Romania.  Popa Decl. at ¶ 12.  None of the Petitioners ever had access to this account.  *Id.*  Romania subsequently withdrew the funds from the account after the European Commission issued a Final Decision on March 30, 2015, holding that payment of the Award would be incompatible with European Union laws regarding state aid.  *Id.* at ¶¶ 13-15.  Thus, and most critically, ***none of the Petitioners ever received any funds from this Treasury account in payment of the Award***.

---

[7]  Indeed, that is how the law of this jurisdiction would treat a decision that is pending an appeal.  *See El-Amin v. Virgilio*, 251 F. Supp. 3d 208, 211 (D.D.C. 2017) ("An 'order is 'final' for res judicata purposes even though it is pending on appeal.") (citations omitted).

Romania's argument that the Award has been "satisfied" by the creation of a legislatively authorized treasury account, Opp. at 10-12, therefore strains the bounds of credulity.  Romania does not contest the facts here.  It readily admits that "[i]mmediately after" Romania transferred funds into the account, "the balance of the special account was frozen."  *Id*. at 11.  Romania further concedes that "the European Commission later ordered Romania to not disburse the funds to Petitioners" and that "Petitioners did not receive the funds."  *Id*.  Despite this, Romania somehow concludes that, as a result of certain legislatively-approved procedures that resulted in the temporary deposit of funds into a block account in the name of Petitioners, "the Award was satisfied in full well before Petitioners filed their petition with this Court."  *Id*. at 12.  This conclusion simply ignores the fact that no payment to the Petitioners was made.

Romania's argument that a decision by the Romanian Constitutional Court confirmed the legitimacy of Romania's Treasury account transfers under Law Number 20/2015—such that they constituted a "legal and viable" method of satisfying Romania's obligations under the Award—is of no avail.  Opp. at 10-12.  The only effect of the Constitutional Court's decision was to reject a challenge to the constitutionality of Law Number 20/2015.  Popa Decl. at ¶¶ 16-19; *see also* Opp. at 11 ("Thus, the March 2015 Transfer was made in a constitutional manner.").  Its ruling on the constitutionality of the legislation has no bearing on the issue of whether the Award has been satisfied.  The decision cannot alter the fact that Romania did not actually pay Petitioners any portion of the Award through the Treasury account, a fact Romania readily admits.  Absent actual payment, a judgment cannot be deemed satisfied.  *Samra v. Shaheen Bus. & Inv. Grp., Inc.*, 355 F. Supp. 2d 483, 499 n.13 (D.D.C. 2005) ("an obligation to pay money is not discharged until the payee actually receives the money.").  As such, this Court should reject

Romania's argument that it satisfied the Award by depositing funds into the treasury account.[8]

### C. Romania Has Satisfied Only a Tiny Fraction of the Award via Forced Executions, and Romania Continues to Reclaim Such Payments to This Day

Though Romania attempts to claim otherwise, the only events that have led to actual recovery on the Award are a series of forced executions on the accounts of the Romanian Ministry of Finance.  These amounts, totaling approximately $10 million, represent only a small fraction of the amount owed to Petitioners, of which $321,299,343 remains unpaid and continues to accrue interest.  *See* ECF No. 26-1 (Motion for Judgment), at 9-11.

On March 30, 2014, pursuant to the Bucharest Tribunal's order recognizing the Award, a court-authorized executor imposed a 6-month deadline on the Romanian Ministry of Finance to pay Petitioners the Award plus interest and other costs.  ECF No. 26-5, at ¶ 6.  On October 31, 2014, after this deadline had passed, the executor issued orders to seize the accounts of the Ministry of Finance.  *Id*.  As a result of these forced execution proceedings, Petitioners Ioan Micula, S.C. Multipack S.R.L., and S.C. Starmill S.R.L. received a payment of RON 34,004,232 on or around January 9, 2015.  *Id*. at ¶ 7.  These same Petitioners also received a payment of RON 9,096,459 on or around February 10, 2015.  *Id*.  These are the only payments received by any of the Petitioners to date.[9]  Thus, in total, Petitioners Ioan Micula, S.C. Multipack S.R.L., and S.C. Starmill S.R.L. received RON 43,100,691 as a result of the forced payment executions. *Id*.  Converted into U.S. dollars, Petitioners received $11,291,613 from Romania.  *See* ECF No.

---

[8]  Moreover, if Romania's argument is accepted, there would be nothing to prevent other ICSID members from promulgating similar "laws" that create sham accounts that are inaccessible to award recipients, and then claiming that the award has somehow been "satisfied."  Such actions—which Romania claims are valid here—would destroy the very purpose of the ICSID Convention.  As Judge Schofield stated in the Prior N.Y. Action, "the United States has a compelling interest in fulfilling its obligations under Article 54 to recognize and enforce ICSID awards regardless of the actions of another state" and that "[t]o do otherwise would undermine the ICSID Convention's expansive spirit on which many American investors rely when they seek to confirm awards in the national courts of the Convention's other member states."  Case No. 1:15-mc-00107, ECF No. 66 at 13.

[9]  Petitioner Viorel Micula has not received any payments in satisfaction of the Award, nor has Romania contended that it made any payments to Mr. Viorel Micula.

26-4 (Report of Richard Caldwell ("Caldwell Report"), at ¶ 6).

However, Petitioners' small recovery on the Award has been further diminished on the basis of the March 2015 European Commission decision, which authorized Romania to recover funds paid to Petitioners in connection with the Award.  ECF No. 26-5 at ¶ 9.  Romania has recovered RON 3,762,115 and € 250,126 through the course of several payments from Petitioners between June 23, 2015 and June 7, 2018, which amounts to $1,242,014 when converted into U.S. dollars.  *Id.* at ¶ 9; Caldwell Report at ¶ 7.  Thus, Petitioners have received the net amount of $10,049,599 from Romania to date.  Caldwell Report at ¶ 7, Table 2.  Moreover, Romania's most recent recovery from Petitioners was on June 7, 2018, *see* Popa Decl. at ¶ 9, and it is likely that Romania will continue recovering amounts from Petitioners, thus further diminishing Petitioners' already-miniscule recovery.  The distributions received by certain Petitioners are clearly not sufficient to satisfy the Award.  Moreover, these distributions have already been accounted for in the Petitioners' calculation of the amounts incorporated into the judgment.  ECF No. 26-1 (Memorandum in Support of Motion for Judgment), at 10-11; Caldwell Report at ¶¶ 7, 9.

### D. Romania's Arguments Regarding "Satisfaction" Have Been Considered and Rejected by Other Courts and Should Be Estopped Here

That Romania's arguments are without merit is further evidenced by the fact that the "satisfaction" arguments it advances here are virtually identical to arguments it has made and that have been rejected by courts in other jurisdictions.  Considered in context, Romania's claims that it has "satisfied" the judgment are part of its continued pattern of attempting to derail enforcement of the Award and should be rejected under principles of collateral estoppel.

In proceedings before the United States District Court for the Southern District of New York (the "Prior N.Y. Action"), Romania raised "satisfaction" arguments on multiple occasions.

*See* Case No. 1:15-mc-00107, ECF No. 31 at 22, ECF No. 32 at ¶¶ 13-29, ECF No. 81 at 7, ECF

No. 81-6 at ¶¶ 13-29, ECF No. 100 at 4-9.   Judge Lorna G. Schofield rejected these arguments,

holding that they were no barrier to confirming the Award and entering judgment against

Romania.   *See* Case No. 1:15-mc-00107, ECF No. 66 at 7-8 (noting that "there can be *no*

substantive review of an ICSID award in this court" and that "[t]o the extent Romania claims it

has already paid at least part of the Award," such arguments could be raised in enforcement

proceedings, not at the recognition phase); ECF No. 82 at 3-4 (stating that the court did not err in

concluding that any amount Romania paid was irrelevant at the recognition stage and noting that

"no substantive review is permissible in any event, and the court merely converts the ICSID

award into a judgment.").

Romania also advanced these arguments during enforcement proceedings before

England's High Court of Justice.   *See* ECF No. 28 at 7-8; Vasquez Decl. Ex. 4, at §§ 45-57, 63-

69; Ex. 5, at 3.   Presented with the same arguments Romania makes here, the High Court of

Justice held that "these arrangements plainly do not constitute payment" of the Award and found

that "most of the Award remains unpaid."   Vasquez Decl. Ex. 6, at ¶ 176(3)-(4).   Romania did

not appeal the English court's decision.[10]   The English court's holding that the Award has not

been satisfied is recognizable by this Court as a matter of comity and, under principles of

collateral estoppel, precludes Romania from re-litigating the same issue here.   *See* ECF No. 28 at

---

[10]   Further, Romania's comment that "Romania in the England case did not provide a legal opinion on the payment issue, as Romania does here," Opp. at 12, is inapposite.   Romania had the opportunity to present more robust arguments in English proceedings and opted not to.   Moreover, the submissions Romania *did* make in that matter were more than adequate to afford the English High Court of Justice an opportunity to fully examine the issue.   In fact, Romania *specifically briefed* the exact three methods of purported satisfaction it alleges here.   *See* Vasquez Decl. Ex. 4 (Romania's Skeleton Argument), at §§45-57, 63-69 (arguing that "Romania . . . made payments corresponding to the <u>entire</u> balance of the Award" by three methods: 1) "offset[ting] a portion of the compensation awarded to the claimants" with "taxes owed by European Foods S.A."; 2) "seiz[ing] sums . . . from the Romanian Ministry of Public Finance's account"; and 3) paying a "sum corresponding to the remainder of the Award . . . into a special account.") (emphasis in original); *see also* Vasquez Decl. Ex. 5 at 3 (Joint Table of Submissions on Key Issues (stating that "the Award has been paid in full")).

8-10; *Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp. 2d 19, 33-34 (D.C. Cir. 2007) (holding that a foreign judgment has a preclusive effect where it is recognized under comity principles and satisfies requirements for collateral estoppel).   Romania should thus be estopped from continuing to rehash the same meritless arguments it has raised in other jurisdictions in order to delay confirmation and enforcement in the instant proceedings.

### III. Principles of Comity Do Not Compel Recognition of the Purported Satisfaction of the Award

Romania contends that principles of comity compel this Court to determine that Romania has satisfied its obligations under the Award primarily based on a setoff against one of the Petitioners' tax debts and the creation of a legislatively authorized Treasury account.  Opp. at 12-14.  "International comity is 'the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience.'"  *United States v. Sum of $70,990,605*, 4 F. Supp. 3d 189, 204 (D.D.C. 2014) (quoting *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895)).  Comity is a matter of judicial discretion.  *Comm'ns Imp. Exp. S.A. v. Republic of the Congo*, 2015 WL 13667748, *2 (D.D.C. July 6, 2015); *see also Int'l Trading & Indus. Inv. Co. v. DynCorp. Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011) ("affording comity to foreign judgments is not mandatory").  Romania bears the burden of proving that comity is appropriate under the circumstances. *See De Csepel v. Republic of Hung.*, 714 F.3d 591, 607 (D.C. Cir. 2013) (explaining that "'comity is an affirmative defense' for which the party seeking recognition of a foreign judgment bears the burden of proof.").

Romania cannot demonstrate, however, that principles of comity would require this Court to find that the Award has been satisfied.  Indeed, recent Romanian judicial decisions do not support this conclusion.  First, as discussed above, the Oradea Court of Appeal has annulled the

Romanian Ministry of Finance's attempts to satisfy the Award through a tax setoff, and that decision is still binding notwithstanding a pending appeal.  *See supra* at § II.A; Popa Decl. at ¶¶ 5-8.  Romania's Opposition fails to address this contradiction because Romania pretends it does not exist.  Indeed, the decision invalidating the tax setoff is completely absent from Romania's Opposition, save for a cursory discussion in the attached January 2016 opinion of Professor Bufan.  ECF No. No. 29-1 at Ex. 1, ¶ 45.  Second, although Romania's Constitutional Court has issued a decision confirming the constitutionality of Law 20/2015 (allowing for the creation of the Treasury account into which funds intended for Petitioners were deposited and then withdrawn by Romania), this decision *does not* address the issue of whether the Award has been paid.  Popa Decl. ¶¶ 17-19.  Romania therefore appears to be asking the Court to grant selective comity—to defer to its stated position in this action that the Award has been satisfied, but to ignore Romanian proceedings that contradict its position.  Romania provides no basis for the Court to adopt such a skewed approach to the application of comity principles here and its argument that comity requires a ruling in its favor should be rejected.

## IV.   The Act of State Doctrine Does Not Compel Recognition of the Purported Satisfaction of the Award

Romania's reliance on the act of state doctrine is completely misplaced.  The act of state doctrine does not apply to the confirmation and satisfaction of ICSID awards.

The act of state doctrine precludes U.S. courts "from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1073 (D.C. Cir. 2012) (citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964)).  The doctrine will only apply when "the relief sought or the defense interposed would [require] a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *McKesson*,

672 F.3d at 1073 (quoting *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990)).   Importantly, "[a]ct of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign."   *Kirkpatrick*, 493 U.S. at 406 (emphasis in original).   In determining whether to apply the doctrine, courts will consider the "policies underlying our act of state cases – international comity, respect for the sovereignty of foreign nations on their own territory, and the avoidance of embarrassment to the Executive Branch in its conduct of foreign relations."   *Id*. at 408.   However, even where "the validity of the act of a foreign sovereign within its own territory is called into question, the policies underlying the act of state doctrine may not justify its application."   *Id*. at 409.   Romania, "as the party invoking the defense," "possesses the burden of proof."   *Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75, 87 (D.D.C. 2014).   Here, Romania has failed to meet that burden.

First, as discussed above, see *supra* § II.A, the purported tax setoff which Romania claims "satisfies" the Award has been struck down by a Romanian appellate court.   Despite the fact that Romania is appealing that decision, the current status of the setoff in Romania is that it is invalid.   Professor Bufan's attempt to argue that under Romanian law the setoff "is currently in full force and effect" because the appellate court decision striking down the setoff "is not a final and irrevocable judgment," ECF No. 29-1 at Ex. 1, ¶ 45, merely proves that there is no "final and irrevocable judgment" in Romania.   Thus, there is no "state act," and without such an act, no need for this Court to afford deference to Romania.   There is also no basis to find that the balance of foreign policy interests favors this Court giving deference to a "state act" that has since been invalidated.   Holding otherwise would constitute an "expansion of the act of state doctrine . . . into new and unchartered fields."   *Kirkpatrick*, 493 U.S. at 409.

Second, while the legislative creation of a Treasury account (and the subsequent finding by the Constitutional Court of Romania that the legislative action was constitutional) may well be considered "state acts" undertaken by Romania, it would be unreasonable for this Court to conclude that these state acts resulted in the payment of the Award when the facts, as explained above, simply do not bear this out. *See supra* § II.B.  Indeed, other courts have evaluated the very same "state acts" and concluded that these measures did not satisfy the Award.  *See supra* § II.D.  Moreover, the narrow issue before the Court here is the recognition of Petitioners' Award, and the existence of the Treasury account has no bearing on whether the Court should recognize the Award and enter judgment.  Thus, because this Court need not even decide the effect of the Treasury account, an act of state analysis is unnecessary.  *See Kirkpatrick*, 493 U.S. at 406 ("Act of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign.") (emphasis in original).[11]

Finally, Romania's act of state arguments wholly ignore the responsibility of U.S. courts to ensure that the United States fulfills its independent obligation to recognize and enforce ICSID awards.  ICSID Convention Art. 54(1) (ECF No. 26-3); 22 U.S.C. § 1650a.  The act of state doctrine does not relieve the Court of this obligation, which compels the granting of Petitioners' motion and the entry of judgment.

---

[11] Indeed, courts in this circuit regularly decline to apply the act of state doctrine where the matter at hand does not require a decision regarding the legality of the foreign state's action.  *See, e.g.*, *Al-Tamimi v. Adelson*, 264 F. Supp. 3d 69, 87 (D.D.C. 2017) (declining to apply the act of state doctrine where "it is not clear to the court at this stage to what extent it '*must decide*' the legality of Israeli official actions.") (emphasis in original); *Austin Inv. Fund, LLC v. United States*, 2015 WL 7303514, *7 (D.D.C. Nov. 19, 2015) (declining to apply the act of state doctrine where "the IRS does not seek a declaration that any action of the Chinese government was illegal."); *Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75, 88 (D.D.C. 2014) (declining to apply the act of state doctrine where "[n]o such sovereign public act is at issue in this suit."); *United States v. Sum of $70,990,605*, 991 F. Supp. 2d 154, 167 (D.D.C. 2013) (declining to apply the act of state doctrine where the "requested relief would not require that any official Afghan act be declared invalid"); *Virtual Defs. & Dev. Int'l, Inc. v. Republic of Moldova*, 133 F. Supp. 2d 1, 8 (D.D.C. 1999) (declining to apply act of state doctrine because "[h]ere, the court is not asked to question the validity of a sovereign action, such as price fixing, but is merely asked to adjudicate a contract claim.").

**V.     Romania Failed to Respond to Petitioners' Petition on Time and Remains in Default**

Romania's assertion that it did not fail to respond to Petitioners' Petition, Opp. at 15-16, is baseless.  There is no dispute that Romania's response was due on June 5, 2018 and that, as Romania concedes, it failed to respond by that date.  *See* Opp. at 2 ("On June 8, 2018, Romania filed a Romania's [sic] Motion for Leave to File a Responsive Pleading.").  Moreover, this clerk would not have entered a default on June 11, 2018, ECF No. 21, if Romania had responded within the prescribed time limits.  Romania's belated attempts to file a response are in keeping with its long-standing practices of delaying enforcement and acting in bad faith, and Romania fails to show any excusable neglect that would justify an extension of time.  *See* ECF No. 28 at 1-5; ECF No. 24 at 1-4.

Romania's attempt to shift the blame for its own failures to Petitioners further reflects Romania's bad faith.   Contrary to Romania's groundless accusation, *see* Opp. at 15-16, Petitioners have not "forum shopped."  On April 11, 2014, Petitioner Viorel Micula filed an *ex parte* petition in this Court for confirmation of the Award.   Motion for Judgment at 2. Independently, and without notifying or coordinating with Viorel Micula, the other Petitioners filed an *ex parte* petition to recognize the Award in the Prior N.Y. Action.  *Id.* at 2.  These other Petitioners never participated in the D.C. proceeding brought by Petitioner Viorel Micula. Petitioners have not engaged in forum shopping, and the fault for any delay here squarely belongs to Romania, not to Petitioners.

Romania's motion for leave should be denied but, in any event, the pleading Romania seeks leave to file advances the same faulty arguments as Romania's Opposition here.  Both are without merit, both do nothing to change the fact that Romania remains in default, and both provide no barrier to confirmation of the Award.

## **CONCLUSION**

For the foregoing reasons, Petitioners respectfully request that the Court enter a default judgment:

(a) Confirming the Award pursuant to 22 U.S.C. § 1650a;

(b) Entering judgment against Romania in the amount of $321,299,343, reflecting the sum total of the Award net payments made by Romania, in addition to pre-judgment interest at the rate identified in the Award (calculated as of June 15, 2018);

(c) Ordering Petitioners, following the entry of an order and judgment in this action, to submit to the Court for its review and approval an amended judgment that includes all additional prejudgment interest accrued as of the date of the judgment;

(d) Awarding post-judgment interest at the rate identified in the Award from the date of judgment until the date of full payment; and

(e) Such other and further relief as this Court deems just and proper.

16

Dated:  Washington, D.C.
        July 19, 2018

WHITE & CASE LLP                    SHEARMAN & STERLING LLP


By:  /s/ Francis A. Vasquez, Jr.          By:  /s/ Danforth Newcomb
     Francis A. Vasquez, Jr. [Bar #442161]      Danforth Newcomb [Bar # 422772]
     701 Thirteenth Street, N.W.                Paula H. Anderson
     Washington, DC 20005                       401 Ninth Street, N.W.
     Telephone: (202) 626-3600                  Washington, DC 20004
     fvasquez@whitecase.com                     Telephone: (202) 508-8000
                                                DNewcomb@shearman.com
            -and-                                Paula.Anderson@shearman.com

     Jacqueline L. Chung                    *Counsel for Petitioner Viorel Micula*
     Laura A. Grai
     1221 Avenue of the Americas
     New York, NY 10020
     Telephone: (212) 819-7844
     jacqueline.chung@whitecase.com
     laura.grai@whitecase.com

     *Counsel for Petitioners Ioan Micula, S.C.*
     *European Food S.A., S.C. Starmill S.R.L.,*
     *and S.C. Multipack S.R.L.*

17