**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In the Matter of the Application of<br><br>IOAN MICULA,<br>VIOREL MICULA,<br>S.C. EUROPEAN FOOD S.A.,<br>S.C. STARMILL S.R.L., and<br>S.C. MULTIPACK S.R.L.,<br><br>       *Petitioners*,<br><br>  v.<br><br>THE GOVERNMENT OF ROMANIA,<br><br>       *Romania.* | Civil Action No. 17-CV-02332-APM |

**MEMORANDUM OF LAW IN SUPPORT OF
PETITIONERS' MOTION FOR JUDGMENT ON THE PLEADINGS
OR, IN THE ALTERNATIVE, SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .............................................................................................. 1

BACKGROUND ................................................................................................................... 2

    A.   The Underlying Arbitration .......................................................................... 2

    B.   Prior Enforcement Proceedings .................................................................. 3

    C.   Service of the Petition ................................................................................. 5

ARGUMENT ........................................................................................................................ 6

I.   THIS COURT HAS JURISDICTION TO CONFIRM THE AWARD ................................... 8

    A.   This Court Has Subject Matter Jurisdiction ................................................ 8

    B.   This Court Has Personal Jurisdiction .......................................................... 8

II.  THE AWARD SHOULD BE CONFIRMED PURSUANT TO THE ICSID CONVENTION
    AND IS ENTITLED TO FULL FAITH AND CREDIT UNDER U.S. LAW ........................ 10

III. THE AWARD SHOULD BE CONVERTED INTO U.S. DOLLARS AS OF THE DATE OF
    THE AWARD ............................................................................................................. 11

IV. NO DEFENSES APPLY TO THE ENFORCEMENT OF THE AWARD AS A MATTER OF
    LAW ......................................................................................................................... 15

    A.   Romania Has Not "Satisfied" the Award .................................................. 17

        1.   The Tax Setoff Against S.C. European Food S.A. Did Not Satisfy the Award ...... 19

        2.   Romania's Deposit of Funds into a Blocked Treasury Account Did Not Satisfy the
           Award………............................................................................................... 22

        3.   Romania Has Satisfied Only a Tiny Fraction of the Award Via Forced Executions,
           and Romania Continues to Reclaim Such Payments to This Day .......................... 25

        4.   Romania's Arguments Regarding "Satisfaction" Have Been Considered and
           Rejected by Other Courts and Should Be Estopped Here ...................................... 27

        5.   Principles of Comity Do Not Compel Recognition of the Purported Satisfaction of
           the Award………........................................................................................... 29

        6.   The Act of State Doctrine Does Not Compel Recognition of the Purported
           Satisfaction of the Award............................................................................... 31

    B.   Decisions from the European Commission Do Not Bar Recognition of the Award....... 33

1.   The Act of State Doctrine Does Not Bar Recognition of the Award....................... 34

2.   The Foreign Sovereign Compulsion Doctrine Does Not Compel This Court to Recognize and Apply the European Commission's Decisions............................... 35

3.   The Achmea Judgment Does Not Apply to This Matter ........................................ 37

**CONCLUSION** ...................................................................................................................... **38**

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Al-Tamimi v. Adelson*, 264 F. Supp. 3d 69 (D.D.C. 2017) ............................................................33

*Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516 (2d Cir. 1985) ..................................................................................................................................35

*Austin Inv. Fund, LLC v. U.S.*, 2015 WL 7303514 (D.D.C. Nov. 19, 2015)..............................33

*BCB Holdings Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233 (D.D.C. 2015)...........................13, 15

*Belize Bank Ltd. v. Gov't of Belize*, 191 F. Supp. 3d 26 (D.D.C. 2016) ........................................12

*Blue Ridge Investments, L.L.C. v. Arg.*, 735 F.3d 72 (2d. Cir. 2013) ...........................................8

*Comm'ns Imp. Exp. S.A. v. Congo*, 2015 WL 13667748 (D.D.C. July 6, 2015) ..........................30

*Cont'l Transfert Technique Ltd. v. Gov't of Nigeria*, 932 F. Supp. 2d. 153 (D.D.C. 2013) ......................................................................................................................................12

*Cronin v. Iran*, 238 F. Supp. 2d 222 (D.D.C. 2002) ......................................................................9

*Dale v. Exec. Office of the President*, 164 F. Supp. 2d 22 (D.D.C. 2001)......................................6

*De Csepel v. Hung.*, 714 F.3d 591 (D.C. Cir. 2013)....................................................................30

*Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75 (D.D.C. 2014).................................................31, 33

*Duke Energy Int'l Peru Invs. No. 1 Ltd. v. Peru*, 904 F. Supp. 2d 131 (D.D.C. 2012) ......................................................................................................................................11

*Funnekotter v. Zim.*, 2011 WL 666227 (S.D.N.Y. Feb. 10, 2011) ................................................8

*G.E. Transp. S.p.a. v. Alb.*, 693 F. Supp. 2d 132 (D.D.C. 2010) ................................................12

*Haynsworth v. Corp.*, 121 F.3d 956 (5th Cir. 1997)....................................................................29

*Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp. 2d 19 (D.C. Cir. 2007) ......................................................................................................................................28

*Int'l Trading & Indus. Inv. Co. v. DynCorp. Aerospace Tech.*, 763 F. Supp. 2d 12 (D.D.C. 2011) ............................................................................................................................30

*Inter-Am. Ref. Corp. v. Texaco Maracaibo, Inc.*, 307 F. Supp. 1291 (D. Del. 1970)..............36, 37

*IRIS Corp. v. Japan Airlines Int'l Co.*, 2008 WL 11436770 (E.D.N.Y. Jan. 14, 2008) ................................................................................................35

*Lamphier v. Wash. Hosp. Ctr.*, 524 A.2d 729 (D.C. Cir. 1987) ....................................18

*Lewis v. U.S. Parole Comm'n*, 841 F. Supp. 2d 56 (D.D.C. 2012) ..............................18

*Maniaci v. Georgetown Univ.*, 510 F. Supp. 2d 50 (D.D.C. 2007) .................................7

*McKesson Corp. v. Iran*, 672 F.3d 1066, 1073 (D.C. Cir. 2012) ..................................31

*Mediso Med. Equip. Dev. Servs. v. Bioscan, Inc.*, 75 F. Supp. 3d 359 (D.D.C. 2014) ................................................................................................15

*Micula v. Gov't of Rom.*, 2015 WL 4643180 (S.D.N.Y. Aug. 5, 2015) .......................27

*Micula v. Gov't of Rom.*, 2015 WL 5257013 (S.D.N.Y. Sep. 3, 2015) ........................27

*Miminco v. Dem. Rep. Congo*, 79 F. Supp. 3d 213 (D.D.C. 2015)..........................11, 16

*Mobil Cerro Negro, Ltd. v. Venez.*, 863 F.3d 96 (2d Cir. 2017)...............................7, 16

*Samra v. Shaheen Bus. & Inv. Grp., Inc.*, 355 F. Supp. 2d 483 (D.D.C. 2005) ..........................25

*SEC v. Bilzerian*, 815 F. Supp. 2d 324 (D.D.C. 2011) ................................................18

*Soc'y of Lloyd's v. Ashenden*, 233 F.3d 473 (7th Cir. 2000) ......................................29

*Soc'y of Lloyd's v. Siemon-Netto*, 457 F.3d 94 (2006) ...............................................29

*TECO Guat. Holdings, LLC v. Guat.*, No. 17-102, 2018 WL 4705794 (D.D.C. Sept. 30, 2018) ......................................................................10, 16, 34

*Timberlane Lumber Co. v. Bank of Am., N.T. & S.A.*, 549 F.2d 597 (9th Cir. 1976) ..................36

*Trikona Advisers, Ltd. v. Chugh*, 846 F.3d 22 (2d. Cir. 2017) ....................................28

*U.S. CFTC v. Trade Exch. Network, Ltd.*, 61 F. Supp. 3d 1 (D.D.C. 2014)................................36

*U.S. v. Sum of $70,990,605*, 4 F. Supp. 3d 189 (D.D.C. 2014) ........................30, 33, 35

*Virtual Defs. & Dev. Int'l, Inc. v. Mold.*, 133 F. Supp. 2d 1 (D.D.C. 1999)................................33

*Von Drasek v. Burwell*, 121 F. Supp. 3d 143 (D.D.C. 2015).........................................7

*W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400 (1990) .........31, 32, 34

*Walker v. Mones*, 2007 WL 1576325 (D.D.C. May 30, 2007).....................................18

*World Wide Minerals, Ltd. v. Kaz.*, 116 F. Supp. 2d 98 (D.D.C. 2000) ...........................................9

*Wultz v. Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010) ...........................................................................33

## STATUTES AND RULES

22 U.S.C. § 1650a ...................................................................................1, 2, 3, 8, 17, 33, 34

28 U.S.C. § 1330 .....................................................................................................................8, 9

28 U.S.C. § 1605(a)(6)(B) ...........................................................................................................8

28 U.S.C. § 1608.........................................................................................................5, 6, 9, 30

28 U.S.C. § 1650.........................................................................................................10, 38

Fed. R. Civ. P. 8 ...........................................................................................................................6

Fed. R. Civ. P. 12(c) ...........................................................................................................1, 2, 6, 7

Fed. R. Civ. P. 56.......................................................................................................1, 2, 7

## MISCELLANEOUS

47 Am. Jur. 2d Judgments § 765 (2018) ....................................................................................18

47 Am. Jur. 2d Judgments § 778 (2018) ....................................................................................18

Black's Law Dictionary 1544 (10th Ed.) ....................................................................................18

Petitioners Ioan Micula, Viorel Micula, S.C. European Food S.A., S.C. Starmill S.R.L., and S.C. Multipack S.R.L. (collectively, "Petitioners"), by and through their undersigned counsel, respectfully submit this Memorandum of Law in Support of their Motion for Judgment on the Pleadings or, in the Alternative, Summary Judgment.  Petitioners respectfully request that this Court enter judgment on the pleadings or, in the alternative, grant summary judgment pursuant to either Rule 12(c) or Rule 56 of the Federal Rules of Civil Procedure and confirm the arbitral award rendered in Petitioners' favor (the "Award") pursuant to 22 U.S.C. § 1650a.

## PRELIMINARY STATEMENT

Under both the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "ICSID Convention") and well-settled law in this jurisdiction, an ICSID award is meant to be recognized in an automatic and expeditious process.  Petitioners began enforcement proceedings in the United States related to the Award in 2014.  Despite having numerous opportunities to make its case over the course of more than four years, Respondent Government of Romania ("Romania") has yet to offer a single viable defense to confirmation of the Award—and, indeed, there is none.

Instead, Romania has spent the past four years actively evading its treaty obligations and unnecessarily prolonging proceedings through a variety of bad faith delay tactics.  Romania's Opposition to Petition to Confirm ICSID Arbitration Award and Enter Judgment ("Opposition" or "Opp."), ECF No. 51, which fails to meet the requirements for a responsive pleading, is more of the same.  Tellingly, Romania's Opposition provides no basis for this Court not granting the instant motion, as Romania makes no argument that this Court lacks the jurisdiction required to confirm and enforce the Award and fails to offer any other valid defenses to confirmation.  Rather, Romania ventures down a road it has trodden many times before, recycling old arguments as to how it has purportedly "satisfied" the Award.  Romania's arguments regarding

1

"satisfaction" have already been rejected by other courts and are without merit.  No matter how Romania spins it, the fact remains that Romania has paid only a tiny fraction of the Award (and to this day is actively attempting to reclaim even the small amount it has paid).

Romania's invocations of comity, the act of state doctrine, and the foreign sovereign compulsion doctrine are equally baseless.  This Court should not defer to Romania's incorrect and self-serving interpretations of its own law and of European Union ("EU") law.  Moreover, even if this Court did consider the decisions of Romanian courts and the European Commission, the analysis would remain unchanged, because (1) the Award is not subject to substantive review by this Court, but instead must be accorded "the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several states,"  22 U.S.C. § 1650a(a); and (2) the decisions of Romanian courts and the European Commission do not alter the reality that Petitioners have received only a small fraction of the amount due under the Award, which they have already accounted for in their calculations of the value of the judgment. It is sufficed to say that Petitioners would not be pursuing a judgment on their Award if Romania had already paid them.  Accordingly, the Court should confirm the Award pursuant to 22 U.S.C. § 1650a and enter a judgment pursuant to either Rule 12(c) or Rule 56 of the Federal Rules of Civil Procedure.

## BACKGROUND

### A.  The Underlying Arbitration

The ICSID arbitral tribunal (the "Tribunal") that rendered the Award was duly constituted on September 12, 2006.  Petition, ECF No. 1, ¶ 15; Statement of Material Facts ("SOMF") ¶ 5.  The Tribunal issued the Award on December 11, 2013, finding that Romania violated a bilateral investment treaty ("BIT") between Sweden and Romania by failing to ensure

fair and equitable treatment of Petitioners' investments in Romania.  Petition ¶ 15; SOMF ¶ 6.[1]

The Tribunal awarded compensation in Petitioners' favor in the amount of 376,433,229 Romanian Lei ("RON").  *See* Declaration of Oana Popa ("Popa Decl."), Ex. A, ¶ 1329(c); SOMF ¶ 6.  The Tribunal also awarded interest at the rate of 3-month Romanian Interbank Offer Rate ("ROBOR") plus 5%, compounded on a quarterly basis, from various starting dates for different categories of damages, as detailed in paragraph 1329(d) of the Award, "until full payment of the Award."  Popa Decl. Ex. A ¶ 1329(d); SOMF ¶ 6.  On April 9, 2014, Romania filed an Application for Annulment of the Award (the "Application") with ICSID.  Popa Decl. Ex. B; SOMF ¶ 7.  The ICSID *ad hoc* Committee rejected Romania's Application on February 26, 2016.  Popa Decl. Ex. C, at 101; SOMF ¶ 10.  The Award is thus final and not subject to further challenge before the ICSID Tribunal or the ICSID Committee.  Petition ¶ 22; Popa Decl. Ex. C, at 101; SOMF ¶ 11.

### B.  Prior Enforcement Proceedings[2]

On April 11, 2014, Petitioner Viorel Micula filed an *ex parte* petition in this Court for confirmation of the Award, in the proceeding styled *Micula v. The Government of Romania*, Civil No. 1:14-cv-00600 (the "Prior D.C. Action").  SOMF ¶ 12.  At a hearing on April 16, 2015, the Honorable Amit P. Mehta denied the *ex parte* petition and held that service had to be made

---

[1]  Romania recounts the events leading up to the ICSID arbitration and the arbitration itself at length in its Opposition.  *See* Opp. at 8-10.  Petitioners do not go into detail here about the ICSID proceedings; since the Award is final and binding, the full history is irrelevant to the present dispute.  Petitioners note, however, that Romania's characterization of proceedings contains several misrepresentations.  For example, Romania claims that the EU "urged Romania to repeal [the incentive scheme at issue in the underlying arbitration] immediately."  Opp. at 8.  This is not the case.  *See* ECF 51-1, ¶ 216 ("The EU urges Romania to *align* the existing incompatible aid schemes without delay") (emphasis added); *id.* ¶ 235 ("The EU invites Romania to bring all incompatible aid measures in line. . .") (emphasis in original).
[2]  Romania discusses, at considerable length, other enforcement proceedings related to the Award in Romania, England, Belgium, Sweden, Luxembourg, and before the EU.  *See* Opp. at 10-17.  Petitioners do not address those proceedings in detail here, as they are irrelevant to the narrow issue before the Court:  whether a final, binding ICSID award should be confirmed.  To the extent Romania's inclusion of this lengthy summary is meant to suggest that those proceedings have any bearing on this Court's ruling, Romania is incorrect.  Those proceedings do not alter this Court's congressionally-mandated obligation to grant the Award "the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several states."  22 U.S.C. § 1650a(a).

under the Foreign Sovereign Immunities Act ("FSIA"), but stated that he "would urge the government of Romania" to "accept service without the need to jump through the hoops that are otherwise required under the Foreign Sovereign Immunities Act, and that way the process will proceed more expeditiously." *See* ECF No. 10-2, at 22:9-16; SOMF ¶ 12.  On August 31, 2015, Viorel Micula voluntarily dismissed the Prior D.C. Action without prejudice.  Case 1:14-cv-00600-APM (ECF No. 21); SOMF ¶ 12.

On April 21, 2015, Petitioners Ioan Micula, S.C. European Food S.A., S.C. Starmill S.R.L., and S.C. Multipack S.R.L. filed an *ex parte* petition to recognize the Award in the United States District Court for the Southern District of New York, styled *Micula, et al. v. The Government of Romania*, Case No 1:15-mc-00107 (the "Prior N.Y. Action") (ECF No. 1). SOMF ¶ 13.  Petitioner Viorel Micula moved on consent to intervene.  Case No 1:15-mc-00107 (ECF No. 9); SOMF ¶ 13.  On April 28, 2015, United States District Court Judge Naomi Buchwald issued an order and judgment recognizing the Award.  Case No 1:15-mc-00107 (ECF No. 13); SOMF ¶ 13.  Thereafter, Romania challenged the judgment in every manner imaginable, moving to vacate or stay the judgment (which the court denied), moving to reconsider the confirmation order (which the court denied), and ultimately appealing to the United States Court of Appeals for the Second Circuit.  Case 1:15-mc-00107 (ECF Nos. 22, 30, 65-66, 80, 82, 85); SOMF ¶ 14.  On October 23, 2017, the Second Circuit held that Petitioners should have effected service on Romania using the procedures set forth in the FSIA (which required the initiation of this proceeding) and vacated the judgment on procedural grounds "without prejudice to the Petitioners' filing an action to enforce the ICSID award in compliance with the FSIA and in a court in which venue is proper."  Case 15-3109 (ECF No. 132-1); SOMF ¶ 15.  The Second Circuit did not disturb the district court's findings on the merits of the

4

confirmation of the Award.

## C. Service of the Petition

Petitioners initiated the instant action on November 6, 2017 by filing a Petition to seek recognition of the Award.  ECF No. 1; SOMF ¶ 17.  On November 10 and 13, 2017, Petitioners served Romania with the relevant documents in compliance with the FSIA, 28 U.S.C. §1608(a)(2), and Article 10(a) of the Hague Service Convention.  ECF No. 5; SOMF ¶ 18.  On January 16, 2018, Romania moved to dismiss, arguing that service would only be proper under Articles 3, 5, and 6 of the Convention.  ECF No. 8, at 4, 7-8; SOMF ¶ 19.  Even though the first service was effective, Petitioners commenced a second form of service on February 16, 2018, sending the relevant documents to the Romanian Central Authority pursuant to 28 U.S.C. §1608(a)(2) and Articles 3, 5, and 6 of the Hague Service Convention, which Romania had contended was the proper method of service.  ECF No. 12; ECF No. 8 at 4, 7-8; SOMF ¶ 20.  On April 11, 2018, Romania filed a Sur-Reply contesting this method of service, despite the fact that it had previously argued service under Articles 3, 5, and 6 of the Convention would be proper. ECF No. 13 at 2-4; ECF No. 8 at 4; SOMF ¶ 20.

On May 22, 2018, the Court denied Romania's Motion to Dismiss, holding that "Petitioners successfully served Romania both under Article 10(a) and under Articles 3, 5, and 6."  ECF No. 15 at 2; SOMF ¶ 21.  The Court ordered Romania to show cause why it should not be sanctioned for representing that Romania had never authorized service under Article 10(a). ECF No. 16; SOMF ¶ 21.  On May 30, 2018, Romania represented that it had placed the United States on notice, via a verbal note, of Romania's requirements for service of process.  ECF No. 18 at 1; SOMF ¶ 22.  On July 13, 2018, the United States indicated that the U.S. Department of State ("State Department") had no record of receiving a verbal note.  ECF No. 31 at 2-3; SOMF

¶ 22.

At a Status Conference before this Court on July 23, 2018, the United States asserted that service of process on Romania should be effected through 28 U.S.C. § 1608(a)(4) because Romania objected to all other forms of service.  ECF No. 37 at 10:17-23:22; SOMF ¶ 23. Petitioners made clear that they disagreed with the United States and maintained that the first two services were valid.  *Id*. at 24:18-29:4.  Nevertheless, and while fully reserving their rights, Petitioners elected to proceed with service under 28 U.S.C. § 1608(a)(4).  ECF No. 36; SOMF ¶ 23.  Pursuant to 28 U.S.C. § 1608(a)(4), the U.S. Embassy in Bucharest served the relevant documents on Romania  on September 7, 2018.  ECF No. 44; SOMF ¶ 25.  Romania concedes that the September 7, 2018 service of process was valid.  ECF No. 49 at 9; SOMF ¶ 25.

On October 31, 2018, this Court issued an Order directing Romania to respond to Petitioners' Petition by November 6, 2018.  ECF No. 50; SOMF ¶ 26.  On November 6, 2018, Romania did not file a responsive pleading as contemplated by Fed R. Civ. P. 8, but instead filed a brief in Opposition.  ECF No. 51; SOMF ¶ 26.

## ARGUMENT

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).[3]  Just as with a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court should grant a motion for judgment on the pleadings if the petitioner "is entitled to judgment as a matter of law" on the basis of the parties' pleadings.  *Dale v. Exec. Office of the President*, 164

---

[3]  Under Fed. R. Civ. P. 8(b)(1), a party responding to a pleading must "(A) state in short and plain terms its defenses to each claim asserted against it; and (B) admit or deny the allegations asserted against it by an opposing party."  "An allegation . . . is admitted if a responsive pleading is required and the allegation is not denied."  Fed. R. Civ. P. 8(b)(6).  Though Romania ostensibly submitted its Opposition in response to this Court's order to respond to the Petition, ECF Nos. 50-51; SOMF ¶ 26, Romania's Opposition does not take the form of a responsive pleading and fails to admit or deny the allegations asserted in the Petition, instead raising a series of unresponsive, irrelevant arguments.  As such, all allegations in the Petition should be deemed admitted.  *See* Fed. R. Civ. P. 8(b)(6).  Further, Romania has waived any affirmative defenses it might have asserted.  *See* Fed. R. Civ. P. 8(c).

F. Supp. 2d 22, 24 (D.D.C. 2001); *see also Maniaci v. Georgetown Univ.*, 510 F. Supp. 2d 50, 58 (D.D.C. 2007) ("The appropriate standard for reviewing a motion for judgment on the pleadings is virtually identical to that applied to a motion to dismiss under Rule 12(b)(6)").  Granting relief under Rule 12(c) is particularly appropriate where, as here, there are no available defenses and no material issues of fact in dispute.  Indeed, as other courts have confirmed, a motion for judgment on the pleadings is a logical next step in ICSID enforcement proceedings.  *See Mobil Cerro Negro, Ltd. v. Venez.*, 863 F.3d 96, 117-18 (2d Cir. 2017) ("Litigation on actions to enforce awards need not be protracted . . . After the complaint is filed and service effected, the [ICSID] award-creditor may file a motion for judgment on the pleadings, for instance, or a motion for summary judgment.").  Romania's failure to contest the allegations of the Petition confirms that a Rule 12(c) motion should be granted.

In the alternative, this Court may confirm the Award under Federal Rule of Civil Procedure 56, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Courts in this circuit have made clear that "the Court's role in deciding a summary judgment motion is not to 'determine the truth of the matter, but instead [to] decide only whether there is a genuine issue [of material fact] for trial'" and that a "fact is material if it 'might affect the outcome of the suit under the governing law.'" *Von Drasek v. Burwell*, 121 F. Supp. 3d 143, 152 (D.D.C. 2015) (citing *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013)).  To survive a motion for summary judgment, Romania, as the non-moving party, would have to show evidence that "the [fact-finder] could reasonably find" in its favor.  *Id.*  As discussed below, Romania plainly has not and cannot do so.

Under either standard, Petitioners have established as a matter of law that this Court should confirm the Award and enter judgment for Petitioners.

## I.   THIS COURT HAS JURISDICTION TO CONFIRM THE AWARD

### A.  This Court Has Subject Matter Jurisdiction

United States District Courts have exclusive jurisdiction over actions to enforce ICSID awards.  22 U.S.C. § 1650a(b).  In addition, federal district courts have original jurisdiction over actions against foreign states under the FSIA.  28 U.S.C. § 1330.  Romania is not immune from suit under the FSIA because this case falls under the arbitration exception, which provides that:

> A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which the action is brought . . . to confirm an award made pursuant to such an agreement to arbitrate, if . . . the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral award . . . .

28 U.S.C. § 1605(a)(6)(B).

Petitioners' Award against Romania is governed by the ICSID Convention, which courts routinely hold qualifies for this exception to sovereign immunity.  Indeed, "every court to consider whether awards issued pursuant to the ICSID Convention fall within the arbitral award exception to the FSIA has concluded that they do."  *Blue Ridge Investments, L.L.C. v. Arg.*, 735 F.3d 72, 85 (2d. Cir. 2013); *Funnekotter v. Zim.*, 2011 WL 666227, at *2 (S.D.N.Y. Feb. 10, 2011) ("the immunity exception in Section 1605(a)(6)(B) applies because . . . Petitioners' arbitration award was obtained pursuant to [the ICSID Convention].").  Accordingly, this Court has subject matter jurisdiction.

### B.  This Court Has Personal Jurisdiction

In a case filed under the FSIA, "a district court will have personal jurisdiction over a

foreign state if the [petitioner] establishes the applicability of an exception to immunity and service of process has been effectuated pursuant to 28 U.S.C. § 1608." *Cronin v. Iran*, 238 F. Supp. 2d 222, 230 (D.D.C. 2002); 28 U.S.C. § 1330(b) ("Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subdivision (a) where service has been made under 1608 . . . ."). No minimum contacts analysis is required under the FSIA. *See World Wide Minerals, Ltd. v. Kaz.*, 116 F. Supp. 2d 98, 103 (D.D.C. 2000) (internal citations omitted).

The requirements of personal jurisdiction are satisfied in this case. First, as discussed above, the arbitration exception to immunity applies here. *See supra* Section I.A. Second, Petitioners have validly effectuated service on Romania three times, the first time pursuant to 28 U.S.C. §1608(a)(2) and Article 10 of the Hague Service Convention, the second time pursuant to 28 U.S.C. § 1608(a)(2) and Articles 3, 5, and 6 of the Hague Service Convention, and the third time pursuant to 28 U.S.C. § 1608(a)(4). *See supra* at 5-6. Moreover, this Court has already ruled that the first two services were valid, and Romania itself has conceded that the third service was effective. *See* ECF No. 15 at 10 (this Court holding that "Petitioners properly served Romania both under Article 10(a) and under Article 3, 5, and 6 of the Hague Service Convention"); ECF No. 49 at 9 (Romania stating that "Petitioners effectuated proper service upon Romania, via the Department of State through diplomatic channels, only on September 7, 2018" and that on this date, "this Court obtained personal jurisdiction over Romania"); SOMF ¶¶ 21, 25. Accordingly, there is no dispute that service of process was properly effected here, and personal jurisdiction over Romania exists.

## II.   THE AWARD SHOULD BE CONFIRMED PURSUANT TO THE ICSID CONVENTION AND IS ENTITLED TO FULL FAITH AND CREDIT UNDER U.S. LAW

The ICSID Convention and 22 U.S.C. § 1650a require that the Award be recognized and entered as a judgment of this Court.  Article 54(1) of the ICSID Convention provides that:

> Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State.  A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.

*See* Declaration of Francis A. Vasquez, Jr. ("Vasquez Decl."), Ex. 1 (ICSID Convention Art. 54(1)).  The United States is a Contracting State under the ICSID Convention.[4]  Accordingly, the United States has adopted implementing legislation that requires United States District Courts to give full faith and credit to ICSID awards.  Specifically, 22 U.S.C. § 1650a(a) provides that

> [t]he pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several states.

22 U.S.C. § 1650a(a).  Courts in this district have recognized that ICSID awards are thus entitled to full faith and credit.  *See TECO Guat. Holdings, LLC v. Guat.*, No. 17-102, 2018 WL 4705794, *2 (D.D.C. Sept. 30, 2018).

Article 54(2) of the ICSID Convention requires only that "[a] party seeking recognition or enforcement in the territories of a Contracting State shall furnish to a competent court . . . a

---

[4]  The United States signed the Convention on August 27, 1965 and deposited its instrument of ratification on June 10, 1966.  Romania signed the Convention on September 6, 1974 and deposited its instrument of ratification on September 12, 1975.  The Convention entered into force for the United States on October 14, 1966.  The Convention entered into force for Romania on October 12, 1975.  *Database of ICSID Member States*, ICSID, https://icsid.worldbank.org/en/Pages/about/Database-of-Member-States.aspx  (last visited November 20, 2018); SOMF ¶ 3.

copy of the award certified by the Secretary-General."   ICSID Convention Art. 54(2). Petitioners have provided this Court with a copy of the Award certified by ICSID's Secretary-General and, in doing so, have complied with ICSID's requirements for recognition and enforcement.  *See* ECF No. 1, at Ex. A; *see also Miminco v. Dem. Rep. Congo*, 79 F. Supp. 3d 213, 216 (D.D.C. 2015) ("[B]y filing a certified copy of the award, Petitioners have complied with the requirements of Article 54(2) of the ICSID Convention.").

Where Article 54(2)'s minimal requirements have been met, courts routinely and summarily confirm ICSID awards.  *See, e.g.*, *Duke Energy Int'l Peru Invs. No. 1 Ltd. v. Peru*, 904 F. Supp. 2d 131, 132-33 (D.D.C. 2012) (confirming petition to enforce ICSID award against the Republic of Peru); *Miminco*, 79 F. Supp. at 220 (confirming petition to enforce ICSID award against the Democratic Republic of the Congo).  This Court should similarly confirm the Award at issue here.[5]

## III. THE AWARD SHOULD BE CONVERTED INTO U.S. DOLLARS AS OF THE DATE OF THE AWARD

Petitioners further request that this Court enter judgment against Romania in the amounts awarded in the Award, with the foreign currency amounts set forth in the Award converted into U.S. Dollars as of December 11, 2013, the date of the Award.

Courts in this circuit have adopted the judgment conversion approach set forth in Restatement (Third) of Foreign Relations Law of the United States, which provides that "[i]f, in a case arising out of a foreign currency obligation, the court gives a judgment in dollars, the conversion from foreign currency to dollars is to be made at such rate as to make the creditor whole and to avoid rewarding a debtor who has delayed in carrying out the obligation,"

---

[5] Romania's Opposition raises a variety of purported "defenses" to confirmation, none of which are actually valid and none of which bar confirmation of the Award.  We consider each of Romania's "defenses" more fully *infra* at Section IV.

Restatement § 823 (2).   More specifically, "if the foreign currency has depreciated since the injury or breach," as is the case with the Romanian currency, "judgment should be given at the rate of exchange applicable at the date of the injury or breach."   *Id*. at cmt. c.   In the context of international arbitration awards, the "breach" day has been deemed to be the date that the arbitral award was issued.   *Cont'l Transfert Technique Ltd. v. Gov't of Nigeria*, 932 F. Supp. 2d 153, 159 (D.D.C. 2013).   Consistent with the Restatement principle of making the judgment creditor whole and to avoid benefiting Romania for its delays in the judgment recognition and enforcement process, the Award should be converted to U.S. Dollars as of the date of the Award, as the value of the Romanian currency has declined since the issuance of the Award on December 11, 2013.   *See* Vasquez Decl. Ex. 2, ¶ 3 n.1, ¶ 8 (Report of Richard Caldwell ("Caldwell Report"));   *Cont'l Transfert*, 932 F. Supp. at 158, 162 (stating that conversion of foreign arbitral awards into U.S. currency is "the norm, rather than the exception" and converting award issued in British Pounds and Nigerian Naira into U.S. Dollars as of the date of the award given the decline in the value of those currencies since the issuance of the award); *G.E. Transp. S.p.a. v. Alb.*, 693 F. Supp. 2d 132, 139-140 (D.D.C. 2010) (converting award issued in Euro into U.S. Dollars as of the date of the award); *Belize Bank Ltd. v. Gov't of Belize*, 191 F. Supp. 3d 26, 39-40 (D.D.C. 2016) (Mehta, J.) (converting award issued in Belizean Dollars into U.S. Dollars as of the date of the award).

Petitioners also request that this Court grant prejudgment interest at the rate provided for by the Award, 3-month ROBOR plus 5%, compounded quarterly from the dates specified in the Award.   Popa Decl. Ex. A, ¶ 1329(d); SOMF ¶ 6.   Where a foreign arbitral award provides for prejudgment interest, courts will routinely award interest at that rate.   *See Belize Bank Ltd.*, 191 F. Supp. 3d at 40 (stating that "[t]he Final Award includes prejudgment interest from September

7, 2012, at a rate of 17% per annum, compounded monthly, until the date of payment" and that "[t]he court will award the Bank pre-judgment interest consistent with the Final Award"); *BCB Holdings Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233, 251 (D.D.C. 2015) (stating that "the Court . . . has discretion to award prejudgment interest and will exercise that discretion because doing so is 'consistent with the underlying arbitration award'" and awarding "interest consistent with the Award").

Petitioners Ioan Micula, S.C. Starmill S.R.L., and S.C. Multipack S.R.L. have recovered certain amounts as result of judgment enforcement proceedings in Romania since the Award was rendered. Romania has also reclaimed certain amounts back from Petitioners, thus reducing the net amount recovered by Petitioners. The Award has also accrued interest. To arrive at the correct figure for entry of the judgment in U.S. Dollars taking into account Petitioners' net recovery interest accruals, Petitioners have submitted the Declaration of Oana Popa and calculations performed by Richard Caldwell, a financial expert with the Brattle Group. Popa Decl. ¶¶ 4, 9-13; Caldwell Report (Vasquez Decl. Ex. 2) ¶¶ 2-11. Petitioners submit that the judgment should be calculated as follows:

- Principal and Pre-Award Interest: Petitioners were awarded RON 376,433,229 in damages. *See* Popa Decl. Ex. A, ¶ 1329(c). Petitioners were also awarded interest at 3-month ROBOR plus 5%, compounded on a quarterly basis, calculated from certain dates specified in the Award. *Id.* ¶ 1329(d). Pre-Award interest amounted to RON 424,159,150. *See* Caldwell Report ¶¶ 4-5. Combined, Petitioners' Award and pre-Award interest amounts to RON 800,592,379. Converted into U.S. Dollars using the December 11, 2013 exchange rate, Petitioners' Award and pre-Award interest amounts to **$248,091,843**. Caldwell Report ¶ 5.

13

- <u>Payments Received from Romania</u>:  Petitioners Ioan Micula, S.C. Starmill S.R.L., and S.C. Multipack S.R.L. have received certain payments on the Award due to execution proceedings in Romania.  Popa Decl. Exs. D-G.  Payments that the Petitioners have received from Romania since the date of the Award have been converted into U.S. Dollars using the prevailing exchange rate on the date of payment.  These payments included: RON 34,004,232 on January 9, 2015 (equivalent to $8,970,436) and RON 9,096,459 on February 10, 2015 (equivalent to $2,321,177), for a total of RON 43,100,691 (equivalent to **$11,291,613**).  Caldwell Report ¶ 6 and Annex B; Popa Decl. Exs. D-G.

- <u>Payments Recovered by Romania</u>:  On the basis of the Decision of the European Commission 2015(2112) of 30 March 2015 on State Aid SA. 38517 (2014/C) (ex 2014/NN), in which the European Commission authorized Romania to recover payments made to Petitioners in connection with the Award, Romania recovered several payments from Petitioners between June 23, 2015 and July 31, 2018, amounting to RON 3,820,397.  Romania also recovered €250,126 from Petitioners.  Popa Decl. ¶ 11 and Ex. H.  Converted into U.S. Dollars using the exchange rate on the dates of the recoveries, Romania recovered $1,256,751 from Petitioners.  Caldwell Report ¶ 7 and Annex B.  Thus, Petitioners have received **$10,034,862** from Romania to date ($11,291,613 minus $1,256,751).

- <u>Post-Award, Pre-Judgment Interest</u>:  Post-Award, pre-judgment interest (*i.e.*, interest accruing after December 11, 2013 up until the date that a judgment is entered in this action) was computed at the rate specified in the Award, 3-month ROBOR plus 5%, compounded quarterly.  Caldwell Report ¶ 8 and Table 2.  Post-Award interest from

the date of the Award through November 2, 2018 amounted to **$93,500,705**. *Id*. at Table 2.[6]

- In total, Petitioners are owed **$331,557,687** as of November 2, 2018, stemming from the Award and pre-judgment interest, summarized as follows:

|  | Amount in USD | Caldwell Report |
|---|---|---|
| *Principal and Pre-Award Interest* | $248,091,843 | ¶ 5 and Tables 1-2 |
| *Net Payments Received* | - $10,034,862 | ¶¶ 6-7 and Table 2 |
| *Post-Award Interest* | $93,500,705 | ¶ 8 and Table 2 |
| **Total Due as of Nov. 2, 2018** | **$331,557,687** | ¶ 9 and Table 2 |

Petitioners also request that this Court grant post-judgment interest at the rate provided for by the Award, 3-month ROBOR plus 5%, compounded quarterly from the dates specified in the Award "until full payment of the Award." Popa Decl. Ex. A, ¶ 1329(d). Where an award, such as the Award here, explicitly provides for post-judgment interest, courts will grant such interest consistent with the terms of the award. *See BCB Holdings Ltd.*, 110 F. Supp. 3d at 251 (where arbitral tribunal "awarded petitioners pre-and post-judgment interest at an annual rate of 3.38% compounded annually," the court "accepts this determination and awards petitioners interest consistent with the Award"); *Mediso Med. Equip. Dev. Servs. v. Bioscan, Inc.*, 75 F. Supp. 3d 359, 365 (D.D.C. 2014) (awarding post-judgment interest at the rates provided for in the award for those portions of the award that included grant of post-judgment interest and awarding post-judgment interest at the federal statutory rate for those portions of the award that were silent).

## IV. NO DEFENSES APPLY TO THE ENFORCEMENT OF THE AWARD AS A MATTER OF LAW

---

[6] For an estimate of additional pre-judgment interest that would accrue from the period between November 2, 2018 and January 31, 2019, *see* Caldwell Report ¶¶ 10-11. Mr. Caldwell can update the amount to the date of the judgment once it has been entered. *Id.* ¶ 12.

Romania's Opposition raises a host of arguments that are wholly irrelevant to confirmation proceedings.  Indeed, it would violate the United States' obligations under the ICSID Convention if this Court were to impose any conditions on the recognition of an ICSID award or if the Court reviewed an ICSID award as if it were a final judgment of the Court's own rendering.  As scholars of ICSID arbitration confirm, a court's task in recognizing an ICSID award is "limited to verifying the authenticity of the award" and "may not be refused for reasons of domestic law."  Christopher H. Schreuer, The ICSID Convention, A Commentary ¶¶ 42, 47 (2d ed. 2009).  Courts in this district have accordingly acknowledged that the ICSID Convention "requires" that courts of member states "recognize an award" and "enforce the pecuniary obligations imposed by that award," and have noted that "[a] member state is 'not permitted to examine an ICSID award's merits, its compliance with international law, or the ICSID tribunal's jurisdiction to render the award;' all it may do is 'examine the judgment's authenticity and enforce the obligations imposed by the award.'"  *TECO*, 2018 WL 4705794, at *2 (citations omitted); *see also Miminco*, 79 F. Supp. at 218 (holding that "a court's confirmation of an ICSID award should entail nothing more than ministerial verification that the award is genuine").  As courts have further noted, an enforcement proceeding "does not portend a proceeding in which the court must entertain all manner of substantive defenses, or even defenses cognizable under the Federal Arbitration Act. . . .  The ICSID award-debtor would be a party to the action and would be able to challenge the United States court's jurisdiction to enforce the award . . . but would not be permitted to make substantive challenges to the award."  *Mobil*, 863 F.3d at 117-18.

Thus, absent concerns about the authenticity of the Award or about this Court's jurisdiction to enforce the Award, there is simply no viable defense to enforcement, and indeed

Romania offers none here.  Romania has not raised any challenge to the Award's authenticity (nor could it) and, as discussed *supra* Section I.B, Romania has explicitly conceded that on "September 7, 2018 . . . this Court obtained personal jurisdiction over Romania."  ECF No. 49 at 9; SOMF ¶ 25.  Instead, in its Opposition, Romania offers a variety of reasons as to why this Court should not confirm the Award, each of which plainly is without merit:

- Contrary to Romania's assertions, Opp. at 17-22, Romania has not "satisfied" the Award, given that (1) two of the measures Romania alleges led to satisfaction resulted in *zero payment* to Petitioners; (2) over $331 million of the Award (plus accruing interest) remains unpaid; and (3) these same satisfaction arguments have already been considered and rejected by other courts;

- Romania's argument that comity requires that this Court recognize the "satisfaction" of the Award, Opp. at 22-24, relies on an improper interpretation of comity, and would require this Court to ignore the fact that a Romanian appellate court *annulled* the tax setoff and that a Romanian Constitutional Court never actually addressed whether the deposit of funds into a Treasury Account constituted satisfaction;

- Romania's argument that the act of state doctrine requires this court to recognize the decisions of Romanian courts and the European Commission, Opp. at 24-28, simply does not apply here, as this Court need not rule on any "act" of a foreign state to confirm the Award;

- Romania's invocation of the foreign sovereign compulsion doctrine, Opp. at 28-29, impermissibly broadens the scope of this limited doctrine which, furthermore, applies only to private parties and not to Romania; and

- Romania's reference to the proceedings in *Slovak Republic v. Achmea BV*, Opp. at 23-24, 27-28, is likewise misplaced, as *Achmea* clearly does not apply to this matter.

Romania's perpetual resort to these arguments reflects nothing more than Romania's ongoing, bad faith attempt to further delay enforcement of the Award.  Because there is no basis as a matter of law for Romania to resist confirmation of the Award, and because there are no material facts in dispute, this Court should grant the Petition and recognize the Award under 22 U.S.C. § 1650a.

### A.  Romania Has Not "Satisfied" the Award

As discussed above, Romania's contention that it has "satisfied" the Award is no defense to the confirmation of a binding, final ICSID award.  Even if satisfaction were a valid defense, Romania's arguments regarding satisfaction are entirely without merit simply because Petitioners have not actually been paid what they are owed.  The satisfaction of a judgment requires "the complete discharge of obligations under a judgment."  Black's Law Dictionary 1544 (10th Ed.); *see also* 47 Am. Jur. 2d Judgments § 765 (2018) ("payment of a judgment in full acts as a satisfaction.").  "Generally, the only way a money judgment can be satisfied is by payment in money, unless the parties agree otherwise."  47 Am. Jur. 2d Judgments § 778 (2018).  Courts in this circuit have routinely held that a judgment is satisfied only upon full payment of the judgment.  *See, e.g.*, *Lamphier v. Wash. Hosp. Ctr.*, 524 A.2d 729, 735 n.12 (D.C. Cir. 1987) (holding that "satisfaction is an acceptance of full compensation for the injury"); *Walker v. Mones*, 2007 WL 1576325, *3, n.3 (D.D.C. May 30, 2007) (holding that where judgment creditor was paid $25,203.23 on a remaining principal balance of $13,356.81, "the judgment was fully satisfied.").

As "[t]he party seeking relief from a judgment," Romania "bears the burden of demonstrating that [it] satisfies the prerequisites for such relief."  *Lewis v. U.S. Parole Comm'n*, 841 F. Supp. 2d 56, 61 (D.D.C. 2012).  "Relief under Rule 60(b) is an extraordinary remedy that is to be granted only in exceptional cases."  *SEC v. Bilzerian*, 815 F. Supp. 2d 324, 327 (D.D.C. 2011).  Romania has not met its burden here, nor has it shown any "exceptional" circumstances warranting an order that the Award has been satisfied.  To the contrary, as discussed below, of the three measures that Romania alleges "satisfied" the Award, two resulted in *zero* payment to Petitioners, and one resulted in the payment of approximately $10 million to certain Petitioners, with well over $331 million (plus interest that continues to accrue) left unpaid.  By any measure,

Romania has plainly not satisfied the Award.[7]

### 1. The Purported Tax Setoff Against S.C. European Food S.A. Did Not Satisfy the Award

On January 14, 2014, shortly after the Award was issued, the Romanian Ministry of Finance, through the National Agency for Fiscal Administration ("NAFA"), attempted to partially satisfy the Award by issuing a series of tax setoff decisions purporting to offset a portion of the Award against the tax debts of S.C. European Food S.A., one of the Petitioners. Popa Decl. ¶ 14 and Exs. I-J.  Romania's assertion that this was a credible and legitimate means to satisfy the Award is incorrect.  Opp. at 17-20.  Although Romania argues that the setoff was valid as a matter of Romanian law, it fails to acknowledge that the Romanian Oradea Court of Appeal (the "Oradea Court") *struck down* NAFA's attempt to satisfy the Award via a tax setoff in a decision issued on May 11, 2015.[8]

The Oradea Court cited two grounds for its annulment of the purported setoff.  First, it held that the specific provisions invoked by Romania as the basis for the setoff (the same provisions cited by Romania here) were inapplicable.  Popa Decl. ¶¶ 15-16 and Ex. L.  The court explained that the relevant law provided for setoffs of *fiscal liabilities* to the state budget and taxpayers, but did not apply here, where Romania was attempting to set off a *civil liability*

---

[7]  Tellingly, public statements from Romanian officials make it clear that Romania knows full well it has not satisfied the Award.  On March 31, 2015, Victor-Viorel Ponta, Romania's former Prime Minister, gave an interview in which he stated that Romania had "managed not to pay" the Petitioners the sums due under the Award.  Popa Decl. ¶ 31 and Ex. Y.  On April 28, 2015, Mr. Ponta stated that "on the one hand, the Romanian state must pay some money, on the other hand, it does not have to pay, under European law, and we try to save some money for Romania." *Id.* ¶ 31 and Ex. Z.  That Romania continues, in the face of such public statements, to claim it has fully "satisfied" the Award is yet more evidence of its bad faith.

[8]  Romania also misleadingly implies that, during arbitration proceedings, the ICSID Tribunal held that the setoff was valid.  *See* Opp. at 18-19 ("The ICSID Arbitral Tribunal, in the ICSID Award, held that Romania has a right to set off the Award pursuant to Romanian law.").  The Tribunal held no such thing.  In fact, the Tribunal explicitly stated that it was "not in a position to declare that Romania has a right to set-off the amounts awarded…" and that Romania "has not explained why the (Romanian law) conditions for set-off are fulfilled in this case…".  The Tribunal thus "dismiss[ed] [Romania's] request that the Award explicitly provide that any amount awarded to any of the Claimants is subject to set-off…" *See* ECF No. 51-1, ¶¶ 1291-1293.

resulting from an arbitral award. Popa Decl. Ex. L.[9]   Second, the court held the setoff was "illegal" because it was made with respect to only one of the Petitioners, while the Award obligates Romania to pay all of the Petitioners.  *Id.*  The Oradea Court's decision is binding on Romania.  Popa Decl. ¶ 16 and Popa Decl. Exs. M-N.

Romania buries its acknowledgment of the Oradea Court's decision in two "legal opinions" of Professor Radu Bufan, one dated January 14, 2016 (the "First Bufan Opinion") and one dated August 10, 2018 (the "Second Bufan Opinion").  ECF Nos. 52-3 and 52-4.  In the First Bufan Opinion, Professor Bufan states, in conclusory fashion, that the Oradea Court's decision is "not binding" because it is not a final and irrevocable judgment.  First Bufan Opinion ¶ 45.  That is not correct, however, because under Romanian law, the rule suspending the enforcement of a judgment on the basis of a pending appeal applies only to decisions that may be subject to forced execution.  Popa Decl. ¶ 18.  The Oradea Court's decision dealt with a recognition of a right— Romania's right to satisfy the Award by offsetting it against taxes owed by one Petitioner—and was not a judgment that could lead to a forced execution.  *Id.*  The Oradea Court's ruling invalidating the setoff thus stands unless rejected on appeal.  *See id.*; Almasan Opinion (Popa Decl. Ex. O) ¶ 79 (noting that under Romanian civil procedure law, "the first instance judgment enjoys the presumption of being legal and mandatory until a final award rendered in appeal would overturn the ruling. . .").

Perhaps realizing that his argument that the Oradea Court's decision was "not binding" was without merit, Professor Bufan changes course in the Second Bufan Opinion and

---

[9]   This interpretation is confirmed by Professor Adriana Almasan of the University of Bucharest, whose legal opinion was submitted during enforcement proceedings in Sweden.  *See* Popa Ex. O ("Almasan Opinion"). Professor Almasan noted that "the damages granted by the Award, are of civil nature, not of fiscal nature." *Id.* ¶ 71. Under Romanian law, "[w]henever one of the receivables is of fiscal nature and the opposing receivable is of civil nature, a legal set-off cannot operate at all. . ." *Id.* ¶ 72.  Therefore, "[i]n the present case, a valid fiscal set-off did not occur." *Id.* ¶ 73.

acknowledges that the Oradea Court's decision is "both binding and enforceable." Second Bufan Opinion at 2. Despite this acknowledgment, Professor Bufan then confusingly attempts to argue that the Oradea Court's decision has "only an interim *res judecata* effect" meaning that Romanian tax authorities are "not entitled to take any (other) actions related to the annulled administrative action" and the setoff action somehow still manages to "remain valid" pending further appeal. *Id.* at 2-3. This interpretation has no basis in Romanian law. As explained above—and as detailed in the very treatise Professor Bufan cites throughout the Second Bufan Opinion—because the Oradea Court's decision does not concern the forced execution of assets, its annulment of the setoff is not suspended pending appeal.[10] *See* Popa Decl. ¶ 18 and Ex. N.

Professor Bufan attempts to bolster this baseless "interim *res judecata*" argument by referencing records provided by NAFA and statements made by the European Commission, neither of which proves the attempted setoff is still operative. Second Bufan Opinion at 4-5.[11] The NAFA records, which NAFA created and supplied to Romania, represent nothing more than a self-serving attempt by the Romanian agency who claims it made the purported setoff to prove that the setoff is valid. Likewise, the March 30, 2015 European Commission decision and the January 17, 2018 letter issued by the EU Commissioner prove nothing. The March 30, 2015 European Commission decision is particularly irrelevant to the question of the setoff's validity, given that it was issued *before* the Oradea Court struck down the purported setoff on May 11,

---

[10] Apparently aware of Romanian law on this point, Professor Bufan illogically attempts to characterize the Oradea Court's decision as one subject to forced execution. *See* Second Bufan Opinion at 2 (". . . decisions dealing with the recognition of rights are both binding and enforceable, i.e. subject to forced execution."). This is, again, flatly contradicted by the same treatise Professor Bufan cites, which states that "the rule that the appeal suspends enforcement . . . regards of course *those* **decisions** *that are* **susceptible of fore-closure**" and that "a decision that annuls an act cannot be enforced through fore-closure." Popa Decl. Ex. N (emphasis in original). The Oradea Court's decision "annul[led] an act"—the purported setoff—and therefore "cannot be enforced through" forced execution, meaning that, under Romanian law, enforcement of the Oradea Court's decision annulling the setoff is *not* suspended pending an appeal.

[11] The Second Bufan Opinion refers to "Appendix 1" (NAFA fiscal records) and "Appendix 2" (January 17, 2018 letter from EU Commissioner Margrethe Vestager), neither of which was included in Romania's Opposition papers.

2015.  Moreover, Romania itself has acknowledged that the validity of the claimed setoff must be determined under *Romanian* law.  *See* Opp. at 18 ("whether the Respondent has a right to set off the Award . . . would be (primarily at least) a matter of Romanian law . . .") (quoting the Award, ECF No. 1-4, ¶ 1291).  The European Commission has no authority to analyze the legality of the claimed setoff under Romanian law and indeed did not make any such analysis in either the March 30, 2015 decision or in subsequent correspondence.  *See* ECF No. 51-2 (March 30, 2015 European Commission decision); Popa Decl. Ex. S (January 17, 2018 Letter from Margrethe Vestager).

Despite Professor Bufan's convoluted attempts to explain away the annulment of the setoff, two facts remain clear.  First, the only court to have heard and decided the issue has ruled against the validity of the purported setoff.  Second, by arguing that the pending appeal of the setoff decision somehow creates uncertainty regarding the status of the tax setoff,[12] Romania and Professor Bufan merely prove Petitioners' point:  Romania cannot rely upon the tax setoff decision in these proceedings to argue that the Award has already been satisfied.  It is thus clear that the annulled setoff cannot be said to have "satisfied" the Award, a conclusion supported by Romania's own admission that "Petitioners did not directly receive cash funds" via the setoff. Opp. at 17.  Given these facts, this Court should reject Romania's assertion that the purported setoff constitutes a partial satisfaction of the Award.

### 2.  Romania's Deposit of Funds into a Blocked Treasury Account Did Not Satisfy the Award

On March 9, 2015, pursuant to specially-enacted legislation, Law Number 20/2015, the Romanian Ministry of Finance deposited RON 472,788,675 into a Treasury account in the name

---

[12]  *See* First Bufan Report ¶ 66 (". . . the judgment of the Court of Appeal in Oradea deciding against the set-off is pending an appeal and therefore is neither final and irrevocable nor enforceable"); Second Bufan Report at 2 (". . . it does not mean that the setoff struck down by the Oradea Court of Appeal produced definitive effects. . .").

of Petitioners, but controlled by Romania.  Popa Decl. ¶ 23.  None of the Petitioners ever had

access to this account.  *Id*.  Romania subsequently withdrew the funds from the account after the

European Commission issued a Final Decision on March 30, 2015, holding that payment of the

Award would be incompatible with EU laws regarding state aid.  *Id*. ¶¶ 23-25.  Thus, and most

critically, ***none of the Petitioners ever received any funds from this Treasury account in***

***payment of the Award***.

Romania's argument that the Award has been "satisfied" by the creation of this Treasury

account, Opp. at 20-22, therefore strains the bounds of credulity.  Romania does not contest the

facts here.  It readily admits that "[i]mmediately after" Romania transferred funds into the

account, "the balance of the special account was frozen."  *Id*. at 21.  Romania further concedes

that "the European Commission later ordered Romania to not disburse the funds to Petitioners"

and that "Petitioners did not receive the funds."  *Id*.  Despite this, Romania somehow concludes

that, as a result of certain legislatively-approved procedures that resulted in the temporary

deposit of funds into a blocked account in the name of Petitioners, "the Award was satisfied in

full well before Petitioners filed their petition with this Court."  *Id*. at 22.  This conclusion simply

ignores the fact that no actual payment to the Petitioners was made.[13]

Further, Romania's portrayal of itself as a well-intentioned party who "respect[ed] its

duty" to pay Petitioners and who diligently attempted to do so via the Treasury account, only to

be thwarted by the European Commission, is entirely disingenuous.  Opp. at 1, 21-22.  Well

---

[13]  That Petitioners received nothing from the Treasury account is also confirmed by experts for both Petitioners and Romania.  *See* First Bufan Report ¶ 98 ("The effect of freezing the deposit account . . . was that neither the Petitioners nor the Romanian State . . . had access to that amount. . . ."); Second Bufan Report at 8-9 (noting that Romania "recover[ed] the compensation granted by the Award" and that "the funds have been retrieved subsequently"); Almasan Opinion ¶ 38 (concluding that the Treasury account "is not the equivalent of a payment" but rather "institutes conditions and preparatory steps to be followed internally by the debtor (i.e. the State) which may lead either to the release of funds on the State Treasury account to the creditors or to a transfer of the amounts on the State Treasury account to another State-owned account."); *id.* ¶ 104 (explaining that the Treasury account did not constitute payment under Romanian civil law "due to the fact that the Claimants were never granted access to the money disbursed by the State into a State Treasury account").

before Romania enacted Law Number 20/2015, it was aware that the European Commission would likely order it not to pay the Award.  On May 26, 2014, the European Commission sent Romania a letter "obliging Romania to suspend any action which may lead to the execution or implementation of the part of the Award that had not yet been paid."  Popa Decl. Ex. P ¶ 6.  On October 1, 2014, the European Commission initiated a formal investigation into the issue and warned Romania that "any execution of the Award . . . would amount to the granting of incompatible 'new aid'" under EU law.  *Id.* ¶ 71.  Thus, when Romania enacted Law Number 20/2015 on March 6, 2015, it was already well aware of the European Commission's position.  Law Number 20/2015 (1) explicitly blocked the funds in the Treasury account until the European Commission issued its final decision regarding execution of the Award; and (2) provided that the amounts would be transferred from the Treasury account to another state-owned account in the event that the European Commission issued a final order prohibiting Romania from paying the Award.  *See* Popa Decl. ¶¶ 23-25; Almasan Opinion ¶¶ 35-36, 45, 47.   Given the substance of the law and the context behind its enactment, it is clear that the purpose of Law Number 20/2015 was not to create a means by which Romania could pay the Award; rather, it was a facade through which Romania could claim it had satisfied the Award, all the while knowing that the European Commission would not allow it to actually pay Petitioners a cent.

Romania's argument that a decision by the Romanian Constitutional Court confirmed the legitimacy of Romania's Treasury account transfers under Law Number 20/2015—such that they constituted a "legal and viable" method of satisfying Romania's obligations under the Award—is also of no avail.  Opp. at 21-22.  The only effect of the Constitutional Court's decision was to reject a challenge to the constitutionality of Law Number 20/2015.  Popa Decl. ¶¶ 27-29; *see also* Opp. at 21 ("Thus, the March 2015 Transfer was made in a constitutional manner.").  The

24

Constitutional Court's ruling on the constitutionality of the legislation has no bearing on whether the Award has been satisfied and cannot alter the fact that Romania did not actually pay Petitioners any portion of the Award through the Treasury account, a fact Romania readily admits.  Absent actual payment, a judgment cannot be deemed satisfied.  *Samra v. Shaheen Bus. & Inv. Grp., Inc.*, 355 F. Supp. 2d 483, 499 n.13 (D.D.C. 2005) ("an obligation to pay money is not discharged until the payee actually receives the money.").[14]

Moreover, if Romania's argument is accepted, there would be nothing to prevent other ICSID members from promulgating similar "laws" that create sham accounts that are inaccessible to award recipients, and then claiming that the award has somehow been "satisfied." Such actions—which Romania claims are valid here—would destroy the very purpose of the ICSID Convention.  As Judge Schofield stated in the Prior N.Y. Action, "the United States has a compelling interest in fulfilling its obligations under Article 54 to recognize and enforce ICSID awards regardless of the actions of another state" and "[t]o do otherwise would undermine the ICSID Convention's expansive spirit on which many American investors rely when they seek to confirm awards in the national courts of the Convention's other member states."  Case No. 1:15-mc-00107, ECF No. 66 at 13.  As such, this Court should reject Romania's argument that it satisfied the Award by depositing funds into the Treasury account.

### 3.   Romania Has Satisfied Only a Tiny Fraction of the Award Via Forced Executions, and Romania Continues to Reclaim Such Payments to This Day

Though Romania attempts to claim otherwise, the only events that have led to actual recovery on the Award are a series of forced executions on the accounts of the Romanian Ministry of Finance.  These amounts, totaling approximately $10 million, represent only a small

---

[14]  The same holds true under Romanian law.  *See* Almasan Opinion ¶¶ 11, 16 (noting that under the Romanian civil code, "valid payments . . . require the creditor to enter into effective possession of the object of payment, at his venue" and that "electronic payments are effectively performed only upon the actual transfer of money").

fraction of the amount owed to Petitioners, of which $331,557,687 remains unpaid and continues to accrue interest.  *See supra* Section III.

On March 30, 2014, pursuant to the Bucharest Tribunal's order recognizing the Award, a court-authorized executor imposed a 6-month deadline on the Romanian Ministry of Finance to pay Petitioners the Award plus interest and other costs.  Popa Decl. ¶ 8.  On October 31, 2014, after this deadline had passed, the executor issued orders to seize the accounts of the Ministry of Finance.  *Id*.  As a result of these forced execution proceedings, Petitioners Ioan Micula, S.C. Multipack S.R.L., and S.C. Starmill S.R.L. received a payment of RON 34,004,232 on or around January 9, 2015.  *Id*. ¶ 9.  These same Petitioners also received a payment of RON 9,096,459 on or around February 10, 2015.  *Id*.  These are the only payments received by any of the Petitioners to date.[15]  Thus, in total, Petitioners Ioan Micula, S.C. Multipack S.R.L., and S.C. Starmill S.R.L. received RON 43,100,691 as a result of the forced payment executions.  *Id*.  Converted into U.S. dollars, Petitioners received $11,291,613 from Romania.  *See* Caldwell Report ¶ 6.

However, Petitioners' small recovery on the Award has been further diminished on the basis of the March 2015 European Commission decision, which authorized Romania to recover funds paid to Petitioners in connection with the Award.  Popa Decl. ¶ 11.  Romania has recovered RON 3,820,397 and €250,126 through the course of several payments from Petitioners between June 23, 2015 and July 31, 2018, which amounts to $1,256,751 when converted into U.S. dollars.  *Id.* ¶ 9; Caldwell Report ¶ 7.  Thus, Petitioners have received the net amount of $10,034,862 from Romania to date.  Caldwell Report ¶ 7 and Table 2.  Moreover, Romania's most recent recovery from Petitioners was on July 31, 2018, *see* Popa Decl. ¶ 11, and it is likely that Romania will continue recovering amounts from Petitioners, thus further diminishing

---

[15]  Petitioner Viorel Micula has not received any payments in satisfaction of the Award, nor has Romania contended that it made any payments to Mr. Viorel Micula.

Petitioners' already-miniscule recovery.   The distributions received by certain Petitioners are clearly not sufficient to satisfy the Award.   Moreover, these distributions have already been accounted for in the Petitioners' calculation of the amounts incorporated into the judgment.  *See supra* Section III; Caldwell Report ¶ 7 and Table 2.

### 4. Romania's Arguments Regarding "Satisfaction" Have Been Considered and Rejected by Other Courts and Should Be Estopped Here

That Romania's arguments are without merit is further evidenced by the fact that the "satisfaction" arguments it advances in the Opposition are virtually identical to arguments it has made and that have been rejected by courts in other jurisdictions.   Considered in context, Romania's claims that it has "satisfied" the judgment are part of its continued pattern of attempting to derail enforcement of the Award and should be rejected under principles of collateral estoppel.

In the Prior N.Y. Action, Romania raised "satisfaction" arguments on multiple occasions. *See* Case No. 1:15-mc-00107, ECF No. 31 at 22, ECF No. 32 ¶¶ 13-29, ECF No. 81 at 7, ECF No. 81-6 ¶¶ 13-29, ECF No. 100 at 4-9.   Judge Lorna G. Schofield rejected these arguments, which were based on the same facts that Romania asserts here, holding that they were no barrier to confirming the Award and entering judgment against Romania.  *See Micula v. Gov't of Rom.*, 2015 WL 4643180, at *4 (S.D.N.Y. Aug. 5, 2015) (noting that "there can be *no* substantive review of an ICSID award in this court" and that "[t]o the extent Romania claims it has already paid at least part of the Award," such arguments could be raised in enforcement proceedings, not at the recognition phase) (emphasis in original); *Micula v. Gov't of Rom.*, 2015 WL 5257013, at *2 (S.D.N.Y. Sep. 3, 2015) (stating that the court did not err in concluding that any amount Romania paid was irrelevant at the recognition stage and noting that "no substantive review is permissible in any event, and the court merely converts the ICSID award into a judgment.").

Romania also advanced these same three methods of judgment satisfaction during enforcement proceedings before England's High Court of Justice.  *See* Vasquez Decl. Exs 3 (Romania's Skeleton Argument), at §§45-57, 63-69; Vasquez Ex. 4 at 3 (Joint Table of Submissions on Key Issues (stating that "the Award has been paid in full").  The High Court of Justice held that "these arrangements plainly do not constitute payment" of the Award and found that "most of the Award remains unpaid."  Vasquez Decl. Ex. 5, ¶ 176(3)-(4).[16]  Notably, Romania did not appeal this finding.  The English court's holding that the Award has not been satisfied is recognizable by this Court as a matter of comity and, under principles of collateral estoppel, precludes Romania from re-litigating the same issue here.  *See Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp. 2d 19, 33-34 (D.C. Cir. 2007) (holding that a foreign judgment has a preclusive effect where it is recognized under comity principles and satisfies requirements for collateral estoppel).

Under the doctrine of collateral estoppel, a court may hold that a recognized foreign judgment precludes litigation of an already-adjudicated issue where (1) "the issue was actually litigated, that is contested by the parties and submitted for determination by the [foreign] court"; (2) "the issue was actually and necessarily determined by a court of competent jurisdiction in the first trial;" and (3) "preclusion of the second action would not work in unfairness."  *Hurst*, 474 F. Supp. 2d at 32 (citations omitted); *see also Trikona Advisers, Ltd. v. Chugh*, 846 F.3d 22, 32 (2d. Cir. 2017) (articulating a similar standard for issue preclusion as applied to a foreign judgment).

---

[16]  On appeal, England's Court of Appeal (Civil Division) held that proceedings should be stayed pending the determination of an appeal before the General Court of the EU, but that Romania should provide security in the sum of £150m as a term of such stay.  *See Micula v. Romania v. European Commission*, Case No. A3/2017/1853, 1855, 1856 & 1903, ¶¶ 249 – 252 (Vasquez Decl. Ex. 6).  The Court of Appeal noted that, in the lower court, "the judge expressed the view that the appellants [Petitioners] had advanced a 'persuasive case'" for requiring Romania to provide security because "the Award has been unpaid for some years."  *Id.* ¶ 206.  The Court of Appeal concluded that the £150m security payment would "ensure that there are funds available against which execution could take place immediately" following the resolution of EU proceedings and would "assist the appellants to recover sums due to them promptly if the European courts rule in their favour."  *Id.* ¶¶ 234, 247.

The collateral estoppel doctrine clearly applies here.  First, as noted above, the payment of the Award was "actually litigated" between Petitioners and Romania before the High Court of Justice in connection with proceedings to set aside the Registration Order in that jurisdiction. Second, adjudication of the payment issue was necessary to the English proceedings, as it was one of Romania's principal challenges to the validity of the Registration Order.  *See* Vasquez Decl. Ex. 5 ¶ 9 (1)(i) (Romania arguing that "The Registration Order [should] be set aside because: (i) Romania has in fact paid the Award in full . . .").  There is also no basis to conclude that the High Court of Justice is anything but a competent court for such proceedings.[17]  Third, a finding of issue preclusion would not unfairly prejudice Romania because it has already litigated this issue and could not reasonably expect this Court to arrive at a different judicial outcome with respect to an identical argument that has already failed in another jurisdiction.  Accordingly, Romania should be estopped from attempting to rehash the same meritless arguments that it has raised in other jurisdictions in order to delay confirmation and enforcement proceedings relating to the Award.

### 5. Principles of Comity Do Not Compel Recognition of the Purported Satisfaction of the Award

Romania contends that principles of comity compel this Court to determine that Romania has satisfied its obligations under the Award, primarily via a purported setoff against one of the Petitioners' tax debts and the creation of a legislatively authorized Treasury account.  Opp. at 22-24.  "International comity is 'the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international

---

[17]  Indeed, U.S. courts routinely recognize the judgments of English courts.  *See, e.g.*, *Soc'y of Lloyd's v. Siemon-Netto*, 457 F.3d 94, 100 (2006) (affirming lower court's recognition and enforcement of English judgments and noting that "it would be hard to regard [English law] as repugnant to [American law], and no federal court has done so"); *Soc'y of Lloyd's v. Ashenden*, 233 F.3d 473, 476 (7th Cir. 2000) (recognizing English court judgment on the basis that "[t]he English judicial 'system . . . is the very fount from which our system developed; a system which has procedures and goals which closely parallel our own.'"); *Haynsworth v. Corp.*, 121 F.3d 956, 967 (5th Cir. 1997) (noting that England is "a forum that American courts repeatedly have recognized to be fair and impartial.").

duty and convenience.'"   *U.S. v. Sum of $70,990,605*, 4 F. Supp. 3d 189, 204 (D.D.C. 2014) (quoting *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895)).   Comity is a matter of judicial discretion.   *Comm'ns Imp. Exp. S.A. v. Congo*, 2015 WL 13667748, *2 (D.D.C. July 6, 2015); *see also Int'l Trading & Indus. Inv. Co. v. DynCorp. Aerospace Tech.*, 763 F. Supp. 2d 12, 24 (D.D.C. 2011) ("affording comity to foreign judgments is not mandatory").   Romania bears the burden of proving that comity is appropriate under the circumstances.   *See De Csepel v. Hung.*, 714 F.3d 591, 607 (D.C. Cir. 2013) (explaining that "'comity is an affirmative defense' for which the party seeking recognition of a foreign judgment bears the burden of proof.").

Romania cannot demonstrate that principles of comity would require this Court to find that the Award has been satisfied.   Indeed, recent Romanian judicial decisions do not support this conclusion.   First, as discussed above, the Oradea Court has annulled the Romanian Ministry of Finance's attempts to satisfy the Award through a purported tax setoff, and that decision is still binding notwithstanding a pending appeal.   *See supra* Section IV.A.1; Popa Decl. ¶¶ 15-18. Romania's Opposition fails to address this contradiction because Romania pretends it does not exist.   Indeed, the decision invalidating the tax setoff is completely absent from Romania's Opposition itself; Romania's only acknowledgment of it is buried within the attached reports from Professor Bufan.   ECF Nos. 52-3 and 52-4.   Second, although Romania's Constitutional Court has issued a decision confirming the constitutionality of Law 20/2015 (which created the Treasury account into which funds intended for Petitioners were deposited and then withdrawn by Romania), this decision *does not* address the issue of whether the Award has been paid.   Popa Decl. ¶¶ 27-29.   Romania therefore appears to be asking the Court to grant selective comity—to defer to its stated position in this action that the Award has been satisfied, but to ignore Romanian proceedings that contradict its position.   Romania provides no basis for the Court to

adopt such a skewed approach to the application of comity principles and its argument that comity requires a ruling in its favor should be rejected.

### 6. The Act of State Doctrine Does Not Compel Recognition of the Purported Satisfaction of the Award

Romania's argument that this Court should recognize the Award as satisfied under the act of state doctrine is completely misplaced.  The act of state doctrine does not apply to the confirmation and satisfaction of ICSID awards.

The act of state doctrine precludes U.S. courts "from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *McKesson Corp. v. Iran*, 672 F.3d 1066, 1073 (D.C. Cir. 2012) (citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964)).  The doctrine will only apply when "the relief sought or the defense interposed would [require] a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *McKesson*, 672 F.3d at 1073 (quoting *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990)). Importantly, "[a]ct of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign." *Kirkpatrick*, 493 U.S. at 406 (emphasis in original).  In determining whether to apply the doctrine, courts consider the "policies underlying our act of state cases—international comity, respect for the sovereignty of foreign nations on their own territory, and the avoidance of embarrassment to the Executive Branch in its conduct of foreign relations."  *Id*. at 408. However, even where "the validity of the act of a foreign sovereign within its own territory is called into question, the policies underlying the act of state doctrine may not justify its application." *Id*. at 409.  Romania, "as the party invoking the defense," "possesses the burden of proof."  *Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75, 88 (D.D.C. 2014).  Here, Romania has

failed to meet that burden.

First, as discussed above, see *supra* Section IV.A.1, the purported tax setoff which Romania claims "satisfies" the Award has been struck down by a Romanian appellate court. Despite the fact that Romania is appealing that decision, the current status of the setoff in Romania is that it is invalid.  Professor Bufan's attempt to argue that under Romanian law "the setoff is still valid" and "still in force" because "it is incorrect to state that the Oradea Court of Appeal decision is final," ECF No. 52-4 at 3-4, merely proves that there is no "final" judgment in Romania.  Thus, there is no "state act," and without such an act, no need for this Court to afford deference to Romania.  There is also no basis to find that the balance of foreign policy interests favors this Court giving deference to an invalidated "state act."  Holding otherwise would constitute an "expansion of the act of state doctrine . . . into new and unchartered fields." *Kirkpatrick*, 493 U.S. at 409.

Second, while the legislative creation of a Treasury account (and the subsequent finding by the Constitutional Court of Romania that the legislative action was constitutional) may well be considered "state acts" undertaken by Romania, it would be unreasonable for this Court to conclude that these state acts resulted in the payment of the Award when the facts, as explained above, simply do not bear this out.  *See supra* Section IV.A.2.  Indeed, other courts have evaluated the very same "state acts" and concluded that these measures did not satisfy the Award.  *See supra* Section IV.A.4.  Moreover, the narrow issue before the Court here is the recognition of the Award pursuant to the United States' obligations under the ICSID Convention, and the existence of the Treasury account has no bearing on that recognition.  Thus, because this Court need not even decide the effect of the Treasury account, an act of state analysis is unnecessary.  *See Kirkpatrick*, 493 U.S. at 406 ("Act of state issues only arise when a court *must*

32

*decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign.") (emphasis in original).[18]

Finally, Romania's act of state arguments wholly ignore the responsibility of U.S. courts to ensure that the United States fulfills its independent obligation to recognize and enforce ICSID awards.  ICSID Convention Art. 54(1) (Vasquez Decl. Ex. 1); 22 U.S.C. § 1650a.  The act of state doctrine does not relieve the Court of this obligation, which compels the granting of Petitioners' motion and the entry of judgment.

### B.  Decisions from the European Commission Do Not Bar Recognition of the Award

Romania's contention that three decisions issued by the European Commission—the European Commission's March 30, 2015 Decision in *Micula v. Romania* (the "2015 Commission Decision") (ECF No. 51-2),[19] the March 6, 2018 judgment of the European Court of Justice in *Slovak Republic v. Achmea BV* (the "Achmea Judgment") (ECF No. 51-3),[20] and the European Commission's July 19, 2018 Communication on the Protection of Intra-EU Investment (the "2018 Commission Communication") (ECF No. 51-4)[21]—bar recognition of the Award under the act of state and foreign sovereign compulsion doctrines is incorrect.  Neither doctrine applies

---

[18]  Indeed, courts in this circuit regularly decline to apply the act of state doctrine where the matter at hand does not require a decision regarding the legality of the foreign state's action.  *See, e.g.*, *Al-Tamimi v. Adelson*, 264 F. Supp. 3d 69, 87 (D.D.C. 2017) (declining to apply the act of state doctrine where "it is not clear to the court at this stage to what extent it '*must decide*' the legality of Israeli official actions.") (emphasis in original); *Austin Inv. Fund, LLC v. U.S.*, 2015 WL 7303514, *7 (D.D.C. Nov. 19, 2015) (declining to apply the act of state doctrine where "the IRS does not seek a declaration that any action of the Chinese government was illegal."); *Doe*, 69 F. Supp. 3d at 88 (declining to apply the act of state doctrine where "[n]o such sovereign public act is at issue in this suit."); *Sum of $70,990,605*, 991 F. Supp. at 167 (declining to apply the act of state doctrine where the "requested relief would not require that any official Afghan act be declared invalid"); *Wultz v. Iran*, 755 F. Supp. 2d 1, 52 (D.D.C. 2010) (holding that the act of state doctrine does not apply because "Plaintiffs do not ask the Court to inquire into the validity of any public act of China"); *Virtual Defs. & Dev. Int'l, Inc. v. Mold.*, 133 F. Supp. 2d 1, 8 (D.D.C. 1999) (declining to apply act of state doctrine because "[h]ere, the court is not asked to question the validity of a sovereign action, such as price fixing, but is merely asked to adjudicate a contract claim.").

[19]  In the 2015 Commission Decision, the European Commission held that payment of the Award would be incompatible with EU laws regarding state aid.  *See* ECF No. 51-2 at 33, Art. 2.

[20]  In the Achmea Judgment, the European Court of Justice held that an arbitration clause in a BIT between the Netherlands and Slovakia was incompatible with EU law.  *See* ECF No. 51-3 at 13.

[21]  In the 2018 Commission Communication, the European Commission stated that "EU investors cannot invoke intra-EU BITs, which are incompatible with Union law and no longer necessary in the single market. They cannot have recourse to arbitration tribunals established by such intra-EU BITs."  *See* ECF No. 51-4 at 26.

to the facts here, and Romania's reliance on each reflects its ongoing quest to complicate and delay the straightforward issue of recognizing an ICSID award.

### 1.  The Act of State Doctrine Does Not Bar Recognition of the Award

Just as with Romania's act of state arguments regarding alleged satisfaction of the Award, *see supra* Section IV.A.6, Romania's invocation of the doctrine as it applies to the European Commission's decisions fails for a simple reason:  Petitioners do not ask this Court to invalidate any act of the European Commission.  Romania misleadingly claims that this is not the case, protesting that if this Court granted the Petition, "it would in effect be stepping in and questioning the validity of the [2015 Commission Decision]" and "would also ignore and contradict the [2018 Commission Communication]."  Opp. at 26-27.  This is not so.

The issue before this Court is a narrow one:  the recognition of the Award.  All Petitioners ask here is that the Court perform its congressionally-mandated obligation of giving the Award "the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several states."  22 U.S.C. § 1650a(a).  As discussed above, *see supra* Section II, the requirements for confirming an ICSID award are minimal; in fact, "all [a court] may do is 'examine the judgment's authenticity and enforce the obligations imposed by the award.'"  *TECO*, 2018 WL 4705794, at *2 (citations omitted).  Thus, all this Court is required to do is determine whether the Award is authentic; contrary to Romania's assertions, it need not render judgment regarding the validity of the 2015 Commission Decision or the 2018 Commission Communication.  Given this, the act of state doctrine simply does not apply here. *See Kirkpatrick*, 493 U.S. at 406.

Moreover, even if the issue here necessitated an analysis of the act of state doctrine— which, to be clear, it does not—the doctrine would not apply, as the act of state doctrine applies

only to foreign official acts fully performed within a foreign sovereign's own territory.  *See, e.g.*, *Sum of $70,990,605*, 234 F. Supp. at 243 (holding that the act of state doctrine "merely requires that . . . the acts of foreign sovereigns taken within their own jurisdiction shall be deemed valid."). Romania itself acknowledges that this is true throughout its Opposition.  *See, e.g.*, Opp. at 24 ("The Act of State Doctrine states that the courts of one state will not question the validity of public acts performed by other sovereigns within their own borders. . ."). Here, Romania claims that the European Commission's prohibition against satisfaction of the Award should have extraterritorial effect.  Where, as in this case, any assets executed against the Award will necessarily be located within the United States, and therefore outside the EU, the act of state doctrine cannot preclude enforcement of the Award.  *See Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 522 (2d Cir. 1985) (holding that the act of state doctrine did not preclude judicial examination of an alleged taking by Costa Rica because the "situs" of the property was in in the United States, not Costa Rica).

### 2.   The Foreign Sovereign Compulsion Doctrine Does Not Compel This Court to Recognize and Apply the European Commission's Decisions

Romania's contention that this Court's recognition of the Award would "compel Romania to violate the [2015 Commission Decision, the Achmea Judgment, and the 2018 Commission Communication] and breach its obligations as a member state of the E.U.," Opp. at 28, is equally unavailing.

As an initial matter, by asking this Court to apply the foreign sovereign compulsion doctrine to a matter concerning recognition of an arbitration award, Romania seeks to broaden the doctrine far beyond its usual application, which is confined to antitrust matters and discovery violations.  *See IRIS Corp. v. Japan Airlines Int'l Co.*, 2008 WL 11436770, at *11 (E.D.N.Y. Jan. 14, 2008) ("Indeed, if this court were to apply the doctrine of foreign sovereign

compulsion to the facts of this case, it would be the first instance of which this court is aware that the foreign sovereign compulsion defense was applied beyond the realms of antitrust and discovery violations. . .").  In fact, to Petitioners' knowledge, there is only *one* instance where a court in this district has considered the foreign sovereign compulsion doctrine, a case involving a discovery dispute in which the court held that "defendants' foreign government compulsion defense must fail."  *U.S. CFTC v. Trade Exch. Network, Ltd.*, 61 F. Supp. 3d 1, 12 (D.D.C. 2014).  Romania should not be allowed to invoke the foreign sovereign compulsion doctrine to escape its obligations in a case where this Court is only being asked to recognize Petitioners' final, binding ICSID Award.

Moreover, Romania is not entitled to assert this doctrine because, as Romania itself concedes, the doctrine is limited to corporate conduct by private parties and thus does not apply to a foreign sovereign such as Romania.  *See* Opp. at 7 (noting that under the doctrine "[t]he acts of the private party 'become effectively acts of the sovereign' when compelled") (citations omitted); *Restatement (Third) on Foreign Relations*, § 441 (providing that the doctrine applies to a "person"); *Timberlane Lumber Co. v. Bank of Am., N.T. & S.A.*, 549 F.2d 597 (9th Cir. 1976) (superseded by statute on other grounds) (defining foreign compulsion as "corporate conduct which is compelled by a foreign sovereign"); *Inter-Am. Ref. Corp. v. Texaco Maracaibo, Inc.*, 307 F. Supp. 1291, 1297 (D. Del. 1970) (explaining that the compulsion doctrine protects "firms" faced with a conflicting government order from "hav[ing] to choose one country or the other in which to do business").  Romania fails to cite any authority supporting the notion that Romania, as a foreign sovereign, can be compelled to do anything.  Nor could Romania, as the very concept of "sovereignty" implies that a nation cannot be compelled to undertake an action it does not voluntarily choose to perform.  The foreign sovereign compulsion doctrine has never

been applied to a foreign state and an exception should not be made here.

Just as with the act of state doctrine, *see supra* Section IV.B.1, the foreign sovereign compulsion doctrine only applies to conduct that is compelled within a foreign sovereign's own territory. *See Restatement* § 441; *Inter-Am. Refining Corp.*, 307 F. Supp. at 1298 n.18. As explained above, this proceeding only involves enforcement of the Award within the United States. *See supra* Section IV.B.1. Accordingly, Romania's invocation of the foreign sovereign compulsion doctrine is insufficient grounds for not recognizing the Award.

### 3. The Achmea Judgment Does Not Apply to This Matter

Romania's contention that, pursuant to the Achmea Judgment, "the Award is void given that it was obtained on the basis of the BIT that is void"[22] is incorrect. Opp. at 28. In the Achmea Judgment, the European Court of Justice held that an arbitration clause in an intra-EU BIT between the Netherlands and Slovakia was incompatible with EU law. *See* ECF No. 51-3 at 13. Crucially, Romania ignores the fact that, *during the very same proceedings*, the Advocate General issued an opinion in which he stated that *Micula v. Romania* was "not relevant in the present case" because it "was not a dispute arising under an intra-EU BIT, since Romania had not yet acceded to the European Union in 2005,[23] when the arbitration commenced and when the dispute crystallised. Consequently, EU law was not applicable to the facts referred to in that

---

[22] Romania's suggestion that the Achmea Judgment renders intra-EU BITs "void" is inaccurate. The Achmea Judgment did not declare the underlying BIT "void," but rather only held that the arbitration clause in an intra-EU BIT was incompatible with EU law. *See* ECF No. 51-3 at 13. Further, it should be noted that Romania misleadingly describes the proceedings in *Achmea*, stating that "the Slovak Republic, and numerous member states submitting their observations . . . initiated a lawsuit against Achmea BV seeking to declare null and void the bilateral investment treaty . . ." Opp. at 16. The lawsuit was initiated by Slovakia alone. Moreover, several other EU member states—including Germany, France, the Netherlands, Austria, and Finland—intervened in the proceedings to argue that intra-EU BITs were *not* incompatible with EU law. *See* Vasquez Decl. Ex. 7, ¶¶ 34-37.

[23] Romania misleadingly conceals the fact that it had *not yet acceded to the EU* when the underlying arbitration here began, a crucial distinction from the Achmea Judgment, where both signatory countries to the underlying BIT were members of the EU when arbitration proceedings commenced. Romania notes only that "On April 25, 2005 Romania signed its Treaty of Accession to the E.U." Romania neglects to mention, however, that the Accession Treaty entered into force and Romania became a member of the EU only on January 1, 2007, well after the underlying arbitration here commenced on August 2, 2005. *See* ECF No. 51-1, ¶¶ 10, 249. Thus, EU law—and the Achmea Judgment—do not apply to the arbitration here.

arbitral procedure." *See* Vasquez Decl. Ex. 7 (Opinion of Advocate General Wathelet).

That the Achmea Judgment does not apply to proceedings here was further confirmed by the ICSID Tribunal in *UP and C.D Holding Internationale v. Hungary*, ICSID Case No. ARB/13/35 (Vasquez Decl. Ex 8). There, the Tribunal noted that the Achmea Judgment "contains no reference to the ICSID Convention or to ICSID Arbitration" and therefore "cannot be understood or interpreted as creating or supporting an argument that, by its accession to the EU, Hungary was no longer bound by the ICSID Convention." Vasquez Decl. Ex. 8 ¶ 258. The Tribunal further noted that "[t]here is no rule in EU law that provides that these obligations under the ICSID Convention are inconsistent with EU law or that obligations under the ICSID Convention have been terminated or replaced by the accession to the EU." *Id.* ¶ 259. So too here. Romania remains a party to the ICSID Convention, and nothing in the Achmea Judgment invalidates Romania's obligations under the ICSID Convention, the underlying ICSID arbitration, or the Award itself.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court enter a judgment:

(a) Granting Petitioners' Petition and confirming the Award pursuant to 22 U.S.C. § 1650a;

(b) Entering judgment against Romania in the amount of $331,557,687, reflecting the sum total of the Award net payments made by Romania, in addition to pre-judgment interest at the rate identified in the Award (calculated as of November 2, 2018);

(c) Ordering Petitioners, following the entry of an order and judgment in this action, to submit to the Court for its review and approval an amended judgment that includes all additional prejudgment interest accrued as of the date of the judgment;

(d) Awarding post-judgment interest at the rate identified in the Award from the date of

judgment until the date of full payment; and

(e) Such other and further relief as this Court deems just and proper.

Dated: Washington, D.C.
November 20, 2018

WHITE & CASE LLP                              SHEARMAN & STERLING LLP

By:  /s/ Francis A. Vasquez, Jr.              By:  /s/ Danforth Newcomb
Francis A. Vasquez, Jr. [Bar #442161]              Danforth Newcomb [Bar # 422772]
701 Thirteenth Street, N.W.                        Paula H. Anderson
Washington, DC 20005                               401 Ninth Street, N.W.
Telephone: (202) 626-3600                          Washington, DC 20004
fvasquez@whitecase.com                             Telephone: (202) 508-8000
                                                   DNewcomb@shearman.com
        -and-                                      Paula.Anderson@shearman.com

Jacqueline L. Chung                           *Counsel for Petitioner Viorel Micula*
Laura A. Grai
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
jacqueline.chung@whitecase.com
laura.grai@whitecase.com

*Counsel for Petitioners Ioan Micula, S.C.*
*European Food S.A., S.C. Starmill S.R.L.,*
*and S.C. Multipack S.R.L.*