**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IOAN MICULA, et al.,** ) | |
| ) | |
| **Petitioners,** ) | |
| ) | |
| **v.** ) | **Case No. 17-cv-02332 (APM)** |
| ) | |
| **GOVERNMENT OF ROMANIA,** ) | |
| ) | |
| **Respondent.** ) | |

## <u>MEMORANDUM OPINION</u>

## I.   INTRODUCTION

Petitioners Viorel Micula, Ioan Micula, and three entities they control have asked this court to confirm an arbitration award entered in their favor against Respondent Government of Romania ("Romania") by a tribunal convened under the International Convention on the Settlement of Investment Disputes between States and Nationals of Other States.  Confirming the award would render it an enforceable judgment in the United States.  Romania raises a host of objections to confirming the award, including a challenge to the court's subject matter jurisdiction.  The European Commission, appearing as amicus curiae, also advocates against confirming the award.

For the reasons that follow, the court grants the petition to confirm the arbitration award and enters judgment in favor of Petitioners.

## II.      BACKGROUND

### A.      Factual Background

#### 1.      The ICSID Convention

The International Convention on the Settlement of Investment Disputes between States and Nationals of Other States ("Convention") is "a multilateral treaty aimed at encouraging and facilitating private foreign investment in developing countries." *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 100 (2d Cir. 2017).   The Convention carries out that purpose by providing a legal framework and procedural mechanism to resolve disputes between private investors and governments.   *See* Convention on the Settlement of Investment Disputes between States and Nationals of Other States Preamble, Mar. 18, 1965, T.I.A.S. No. 6090, 17 U.S.T. 1270.   The Convention establishes the International Centre for Settlement of Investment Disputes, or "ICSID," as an international institution that operates under the auspices of the World Bank. *See Mobil Cerro Negro*, 863 F.3d at 101.   ICSID convenes arbitration panels "to adjudicate disputes between international investors and host governments in 'Contracting States.'"   *Id.*   Romania and Sweden are signatories to the ICSID Convention.   So, too, is the United States.

"Any Contracting State or any national of a Contracting State" may ask ICSID to convene an arbitral tribunal to resolve a dispute.   Convention art. 36.   The tribunal is tasked with adjudicating the dispute and, if warranted, issuing a written award that addresses "every question submitted to the Tribunal" and "state[s] the reasons upon which [the award] is based."   *Id.* art. 48.   A party may contest the tribunal's decision, consistent with the procedures set forth in the Convention.   *See id.* arts. 51–52.   But critically, "except to the extent that enforcement [is] stayed," the tribunal's ruling is "binding on the parties and shall not be subject to any appeal or to any other remedy" other than

those afforded under the Convention.  *Id.* art. 53.   In other words, the domestic courts of member countries lack the authority to review the merits of a decision by an ICSID tribunal.

The Convention does not, however, confer upon ICSID the power to enforce arbitral awards. It left that function to its Contracting States.   Article 54(1) of the Convention provides: "Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State."  *Id.* art. 54(1).   Contracting States that, like the United States, have a federal system of government "may enforce such an award in or through [their] federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state."  *Id.*

The ICSID Convention also is not self-executing.  *See Medellin v. Texas*, 552 U.S. 491, 505–06 (2008) (explaining when a treaty obligation requires legislation to become domestic law). Contracting States must "take such legislative or other measures as may be necessary for making the provisions of this Convention effective in [their] territories." Convention art. 69.  In the United States, Congress gave the ICSID Convention domestic effect by passing the Convention on the Settlement of Investment Disputes Act of 1966.  *See* Convention on the Settlement of Investment Disputes Act of 1966, Pub. Law 89–532, 80 Stat. 334 (1966) (codified at 22 U.S.C. §§ 1650 and 1650a).  Section 3 of the Act addresses the enforcement of ICSID arbitration awards in the United States.  It provides in relevant part:  "The pecuniary obligations imposed by [an ICSID] award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." 22 U.S.C. § 1650a(a).  Federal courts are vested with "exclusive jurisdiction over actions and proceedings" to enforce ICSID awards. *Id.* § 1650a(b).

2.      *Events Leading to the ICSID Arbitration*

This case arises out of a dispute between Swedish investors and Romania.  Following the

overthrow of the communist regime of Nicolae Ceausescu in December 1989, the country of

Romania found itself in dire economic and social circumstances.  *See Ioan Micula, et al. v.

Romania*, ICSID Case No. ARB/05/20 (Dec. 11, 2013), ECF No. 1-1–1-4 [hereinafter Final

Decision], ¶ 137.  In response to these problems, Romania adopted a series of measures designed

to attract and promote investment.  *Id.* ¶¶ 138–144.  Among the measures was Emergency

Government Ordinance No. 24/1998 ("EGO 24"), which established a framework for granting

incentives to invest in "disfavored" regions of Romania.  *Id.* ¶ 145.

The petitioners in this case are Swedish nationals Viorel and Ioan Micula, along with three

companies they control, S.C. European Food S.A., S.C. Starmill S.R.L., and S.C. Multipack S.R.L.

*See* Petition to Confirm ICSID Award, ECF No. 1 [hereinafter Pet.], ¶¶ 8–12.  Starting in 1998, in

reliance on the incentives offered by EGO 24, Petitioners began to build an integrated food platform

designed to produce consumer products and beverages for the Romanian market.  Final Decision

¶¶ 166–172.

In August 2004, Romania thwarted Petitioners' plans when it announced that it would repeal

EGO 24, effective February 22, 2005.  *Id.* ¶ 241.  Romania made the repeal decision as part of the

process of becoming a member of the European Union ("EU").  *Id.* ¶¶ 234–239.  The action

followed Romania's receipt of advice from the European Commission—an institution of the

European Union that is responsible for ensuring the proper application of EU treaties—that the

incentives constituted "state aid" that was incompatible with the EU's prohibition of such

anticompetitive schemes.  *Id.*  The incentives' repeal caused Petitioners to suffer cash constraints

that prevented them from completing the projects they had planned in reliance on EGO 24.  *Id.* ¶ 172.

2.      *The ICSID Arbitration*

In 2002, Romania entered a bilateral investment treaty ("Sweden-Romania BIT") with the Kingdom of Sweden, which entered into force on April 1, 2003.  Final Decision ¶ 226.  That treaty granted certain protections to each country's investors who invested in the other country, including the right to arbitrate investment disputes.  *See* Agreement between the Government of the Kingdom of Sweden and the Government of Romania on the Promotion and Reciprocal Protection of Investments art. 2, Swed.-Rom., May 29, 2002, Law No. 541/2002 (Rom.) [hereinafter Sweden-Romania BIT].   Pertinent to the parties' dispute is Article 7 of the Sweden-Romania BIT.  *See generally Ioan Micula, et al. v. Romania*, ICSID Case No. ARB/05/20 (Sept. 24, 2008), ECF No. 62-2.  It provides that disputes concerning investments are to be settled by international arbitration, before either an ICSID arbitral tribunal or an ad hoc tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law.  *See id.* ¶ 57; Sweden-Romania BIT art. 7.

In response to Romania's decision to revoke financial incentives, Petitioners initiated arbitration proceedings against Romania before an ICSID tribunal on August 2, 2005.   Final Decision ¶ 10.  Petitioners claimed that they had made investments in certain regions of Romania in reliance on the economic incentives.  *Id.* ¶ 131.  The revocation of those incentives, Petitioners alleged, caused them to suffer significant financial losses, for which Romania was liable.  *Id.* ¶¶ 131, 262.  The ICSID tribunal agreed.  In December 2013, the tribunal ruled for Petitioners and awarded monetary damages of 376,433,229 Romanian Leu (RON)—the equivalent of $116,317,868—plus

interest at the rate of the three-month Romanian Interbank Offer Rate, plus 5%, compounded on a quarterly basis with respect to certain amounts and periods ("the Award").  *Id.* ¶ 1329.

### 3.  *Romania Joins the European Union*

Meanwhile, in parallel with the ICSID arbitral tribunal proceedings, Romania continued taking steps necessary to join the EU.  *Id.* ¶¶ 246–47.  Romania formally joined the EU on January 1, 2007—*after* Petitioners invoked their right to arbitration under the Sweden-Romania BIT but *before* the ICSID tribunal ruled in favor of Petitioners.  *Id.* ¶¶ 247–49.

Shortly after the ICSID tribunal issued the award, the European Commission advised Romania that implementing or executing the Award would constitute impermissible new state aid, about which Romania would be required to notify the Commission.  *See* Commission Decision (EU) 2015/1470 of 30 March 2015, ECF No. 51-2 [hereinafter State Aid Decision], ¶ 2.  Three months later, in May 2014, the Commission issued a "suspension injunction," prohibiting Romania from taking any action to fulfill any part of the Award not yet paid until the Commission reached a final decision on whether the Award constituted state aid.  *Id.* ¶ 6.

As a result of the suspension injunction, Romania returned to ICSID.  Invoking Article 52 of the Convention, Romania asked ICSID to convene an ad hoc tribunal for the purpose of annulling the Award.  *Id.* ¶ 28.  ICSID did so, and on August 7, 2014, the tribunal agreed to stay enforcement of the Award.  *Id.*  It conditioned the stay, however, on Romania's committing, without qualification, to pay the full Award if the ICSID tribunal decided not to annul the Award.  *Id.* Romania declined to provide the unconditional commitment to pay.  *Id.* ¶ 29.  The tribunal then lifted the stay of enforcement on September 7, 2014.  *Id.*

Nearly a year after issuing the suspension injunction, on March 30, 2015, the Commission issued its decision on whether the Award constituted state aid in violation of EU law ("the State

Aid Decision"). The Commission found that it did. *Id.* ¶ 125. The Commission concluded that, because the benefits generated by Romania's incentive law was unlawful state aid, so too was the Award, which sought to compensate Petitioners for the advantages negated by the incentives' repeal. *Id.* ¶¶ 95, 109–24. The Commission rejected Petitioners' view that the ICSID Convention controlled, reasoning that EU law superseded the Sweden-Romania BIT. *Id.* ¶¶ 126–29. The State Aid Decision concluded by ordering Romania not to pay any further amounts on the Award and to recover any amounts already paid. *Id.* at 33, art. 2. Petitioners filed an appeal of the State Aid Decision with the General Court of the Court of Justice of the European Union, a constituent court of the EU's highest court, the Court of Justice of the European Union (CJEU).

In the meantime, the annulment proceedings before the ICSID ad hoc tribunal continued. Almost a year after the State Aid Decision, the ad hoc tribunal issued its final decision on February 26, 2016. It rejected Romania's effort to annul the Award. *See Ioan Micula, et al. v. Romania*, ICSID Case No. ARB/05/20 (Feb. 26, 2016), ECF No. 1-5. In so doing, the tribunal summarily rejected the argument put forward by the European Commission, which had intervened, that the Award was incompatible with EU law on state aid. *See id.* ¶¶ 308–28. The ICSID ad hoc tribunal's decision thus created a direct conflict with the Commission's State Aid Decision.

## B.      Petitioners' Efforts to Confirm the Award in the United States

As Petitioners and Romania duked it out before the Commission and ICSID over the validity of the Award, Petitioners came to the United States to attempt to "confirm" the Award under 22 U.S.C. § 1650a.[1] A confirmed Award would render it an enforceable judgment in United

---

[1] To be clear, the court uses the verb "confirm" in this Memorandum Opinion to mean the judicial act of "enforcing" an Award under § 1650a. As the Second Circuit and this court have held, § 1650a does not contemplate a "confirmation" or "recognition" procedure that is separate from "enforcing" an ICSID award. *See Mobil Cerro Negro*, 863 F.3d at 118–20 & 118 n.18; *Micula v. Gov't of Romania*, 104 F. Supp. 3d 42, 49 (D.D.C. 2015). Nevertheless, because Petitioners repeatedly use the term "confirm," for sake of consistency the court does as well.

States courts.  *See generally Micula v. Gov't of Rom.*, 104 F. Supp. 3d 42, 44 (D.D.C. 2015) [hereinafter *Micula I*].  Petitioners' efforts to confirm the Award, and Romania's corresponding efforts to resist confirmation, have proceeded on a long, winding road over five years along the I-95 corridor from Washington, D.C., to New York City, and back to Washington, D.C.

The opening act took place here, before this court.  On April 11, 2014, Petitioner Viorel Micula, proceeding only on his own behalf, filed a petition to confirm the Award.  Citing the practice of the federal District Courts in the Southern District of New York ("SDNY"), Viorel urged this court to confirm the Award though an ex parte, summary proceeding.  *See id.* at 46.  For that reason, Viorel never served the Government of Romania, and Romania did not formally appear.  *See id.* at 47.  This court, however, refused to confirm the Award in an ex parte proceeding. *See id.* at 52.  The court held that § 1650a did not permit ex parte confirmation of an ICSID award, but instead required a petitioner to "file a plenary action, subject to the ordinary requirements of process under the Foreign Service Immunities Act ["FSIA"]."  *Id.*  Viorel elected not to file such an action and voluntarily dismissed his petition.

Five days after this court ruled, the other Petitioners, later joined by Viorel, sought a presumably more favorable legal terrain and filed a petition for confirmation in the SDNY.  They initially found success.  On April 21, 2015, the court confirmed the Award in an ex parte, summary proceeding, thereby converting the Award to a judgment.  *See Micula v. Gov't of Rom.*, No. 15 MISC. 107, 2015 WL 4643180, at *2 (S.D.N.Y. Aug. 5, 2015) (allowing proceeding to move forward *ex parte*).  Romania later appeared and asked another judge in the SDNY to vacate the judgment on the ground that the ex parte proceeding violated the FSIA.  *See id.* at *3.  Also, the European Commission filed an amicus brief in those proceedings, and it urged the court either to abstain from exercising jurisdiction or vacate the judgment on the grounds of foreign comity, the

act of state doctrine, and the foreign compulsion doctrine, each argument premised on the ongoing proceedings in Europe.  *See id.* at *2, *6–8.  The court in the SDNY rejected all of these arguments and re-affirmed the judgment against Romania.  *See id.* at *3–8; *see also Micula v. Gov't of Rom.*, No. 15 Misc. 107 (LGS), 2015 WL 5257013 (S.D.N.Y. Sept. 3, 2015) (rejecting second motion for reconsideration by Romania).  Romania appealed.

Petitioners' victory proved to be fleeting.  At the same time Romania was prosecuting its appeal, another sovereign, the Bolivarian Republic of Venezuela, was also fighting an SDNY District Court's ex parte confirmation of an ICSID award in the Second Circuit.  On July 11, 2017, the Second Circuit issued its decision in *Mobil Cerro Negro, Ltd. v.  Bolivarian Republic of Venezuela*.  The case involved three key holdings.  The first was that the FSIA provides the sole basis for subject matter jurisdiction for proceedings under § 1650a, and that § 1650a does not itself confer such jurisdiction.  863 F.3d at 112–15.  Second, the court held the FSIA controls the manner of obtaining personal jurisdiction over a sovereign, and therefore confirming an ICSID award pursuant to a summary, ex parte proceeding was improper.  *See id.* at 116–21.  Finally, the court found that a proceeding pursuant to § 1650a must be initiated like a procedure to enforce a state court judgment—by way of a plenary action with service upon the foreign sovereign.  *See id.* at 121–24.

Based on these rulings in *Mobil Cerro Negro*, another panel of the Second Circuit on October 23, 2017, vacated the judgment against Romania.  *See Micula v. Gov't of Romania*, 714 Fed. App'x 18, 21–22 (2d Cir. 2017).  The panel also made clear that, under the FSIA's venue provision, venue was proper only in the District of Columbia, *see id.*, thereby forcing Petitioners to return to this District Court.

### C.      Proceedings Before this Court:  To Stay or Not to Stay?

If this case were a hypothetical in a law school class on Civil Procedure, Romania would get a failing grade.  Its procedural maneuvers have caused confusion and unnecessary delay, and no doubt increased expenses for Petitioners.

On November 6, 2017, Petitioners initiated this action once more before this court, filing their Petition to Confirm ICSID Arbitration Award and Enter Judgment.  *See* Pet.  After overcoming Romania's numerous objections to the validity of service under the FSIA—a process that took nearly a year[2]—the court entered an Order setting November 6, 2018, as the deadline for Romania to answer the Petition.  *See* Order, ECF No. 50 at 3.  It also set November 20, 2018, as the due date for Petitioners' renewed motion to confirm the arbitral award, and December 11, 2018, as the due date for Romania's opposition.  *See id.*

Romania never answered the Petition.  Instead, on November 6, 2018, it filed a lengthy memorandum of law in "Opposition" to the Petition.  *See* Resp.'s Mem. of Law in Opp'n to Pet., ECF No. 51 [hereinafter Resp't Opp'n].  Its Opposition asserted that Romania had satisfied the Award and that the act of state and the foreign sovereign compulsion doctrines required the court to deny the Petition.  *See generally id.*  Romania did not dispute the court's subject matter jurisdiction.  *See id.*  Petitioners timely filed their Motion for Judgment on the Pleadings or, In the Alternative, Summary Judgment on November 20, 2018.  *See* Pet'rs Mot. for J. on the Pleadings or, In the Alternative, Summ. J., ECF No. 55.  This is the operative motion before the court.[3]  But Romania did not file an opposition to the Petition, as ordered.  Instead, it moved to stay the

---

[2] *See* Order, ECF No. 15; Order, ECF No. 16; Order, ECF No. 23; Order, ECF No. 50.

[3] But it is not Petitioners' first dispositive motion.  Petitioners filed an initial Motion for Judgment and Confirmation of Arbitral Award, ECF No. 26, on June 28, 2018.  Romania opposed the Motion, *see* ECF No. 29, and it became ripe on July 19, 2018, *see* ECF No. 34.  As of that date, the status of proper service on Romania remained uncertain.  As a result, Petitioners agreed to re-serve process on Romania, in a manner to which it did not object.  *See* Notice, ECF No. 36.  Petitioners renewed service operated as a reset of the proceedings.  On October 31, 2018, the court deemed moot the Motion filed on June 28, 2018, by Petitioners.  *See* Order, ECF No. 50.

proceedings and asked the court to extend time to file a "responsive pleading" to the Petitioners'

Motion for Judgment.  *See* Resp't Motion to Stay Proceedings, ECF No. 57 [hereinafter Resp't

Mot. to Stay]; Resp't Mot. for Extension of Time to File Responsive Pleading, ECF No. 58.  The

reasons for Romania's requested stay were Petitioners' pending appeal of the State Aid Decision

to the General Court of the Court of Justice of the European Union, as well as bankruptcy

proceedings in Romania involving the entity Petitioners.  *See* Resp't Mem. of Law in Support of

Resp't Mot. to Stay, ECF No. 57-1.  On December 26, 2018, Petitioners filed oppositions to these

motions, as well as a reply in support of its Motion for Judgment, even though Romania had not

filed an opposition to their motion.  *See* ECF Nos. 61, 63, 64.  Romania moved to strike Petitioners'

reply, setting off yet another series of briefings.  *See* ECF Nos. 65, 66, 69.  To date, Romania has

yet to formally oppose Respondents' Motion for Judgment.

The European Commission entered these proceedings as amicus curiae on December 11,

2019.  *See* Br. of Amicus Brief the European Commission in Support of Romania, ECF No. 60

[hereinafter EC Amicus Br.].  The Commission took the position that the court must deny the

Petition.   It argued that the court lacked subject matter jurisdiction under the FSIA and,

correspondingly, lacked authority under § 1650a to confirm the Award.  Of particular note, the

Commission drew the court's attention to a recent decision of the European Court of Justice in

*Slovak Republic v. Achmea BV*.  *See id.* at 7–8 (citing *Slovak Republic v. Achmea*, Case C0284/16

(6 March 2018), ECLI:EU:C:108:158, ECF No. 51-3).  More on *Achmea* below.  But for present

purposes it suffices to say that the Commission argued that the decision in *Achmea* rendered the

arbitration agreement in the Sweden-Romania BIT invalid and unenforceable and, for that reason,

the court lacked subject matter jurisdiction under the FSIA.  *See id.* at 7–8, 10–12.  In addition to

this jurisdictional argument, the Commission also contended, as it had in the SDNY proceedings,

that the act of state doctrine and the foreign compulsion doctrine barred confirmation. *See generally id.* Petitioners opposed the Commission's arguments. *See* Pet'rs Mem. of Law in Response to Br. of Commission, ECF No. 62.

The Commission's brief apparently triggered a eureka moment for Romania. In its reply brief in support of its Motion for Stay, Romania asserted for the first time that the court lacks subject matter jurisdiction to confirm the Award. *See* Resp't Reply Mem. in Support of Resp't Mot. to Stay, ECF No. 68 [hereinafter Resp't Reply], at 14–17. Like the European Commission, Romania rooted its jurisdictional argument in the *Achmea* decision. *See id.* at 16–17.[4] Romania also reasserted that a stay was needed to allow the European court to resolve the appeal of the State Aid Decision. *See id.* at 17–21.

This is where the case stood as of June 2019. And then came one more unexpected turn.

## D.     The General Court Rules

On June 18, 2019, the General Court of the European Court of Justice issued its ruling on Petitioners' appeal of the State Aid Decision. *See* Pet'rs Notice of Suppl. Auth., ECF No. 74; *European Food S.A. et al. v. European Commission, Ioan Micula v. European Commission*, and *Viorel Micula et al. v. European Commission*, Case Nos. T-624/15, T-694/15, and T-704/15 (June 18, 2019), ECF No. 74-1 [hereinafter General Court Decision]. It held that the State Aid Decision "must be annulled in its entirety." *Id.* ¶ 111. The General Court's decision turned on its determination that EU law became applicable to Romania only upon its accession to the EU on January 1, 2007. *Id.* ¶¶ 66–67. Based on that premise, the court concluded the Commission lacked the "competence" to declare that the investment incentives—which Romania offered *before*

---

[4] To be fair, Romania did cite to *Achmea* repeatedly in its opposition brief, *see* Resp't Opp'n at 1–3, 16–17, 24, 27–28, but only in connection with its arguments under the act of state and foreign sovereign compulsion doctrine doctrines. It did not challenge subject matter jurisdiction based on *Achmea*.

acceding to the EU—violated EU rules on state aid.  *Id.* ¶¶ 67, 79.  The General Court also found that, because the ICSID tribunal's Award compensated Petitioners for Romania's pre-EU-accession repeal of the incentives, satisfying the Award would not constitute illegal state aid, even though it was entered after accession.  *See id.* ¶¶ 74–75, 80, 90-93, 95.

As a result of the General Court's decision, this court denied as moot Romania's request for a stay.  *See* Order, ECF No. 75.  It also denied Romania's motion for additional time to respond to Petitioners' Motion for Judgment.  *See id.*  The court indicated that it would consider the arguments made by Romania in its prior filings to collectively comprise its opposition to Petitioners' Motion.  *See id.*  The court also ordered further briefing on the impact of the General Court's nullification of the State Aid Decision.  *See id.*  The parties and the European Commission filed their supplemental briefs in July 2019,[5] and the Commission subsequently advised that it had lodged an appeal of the General Court's decision with the CJEU.  *See* European Comm'n's Notice of Suppl. Auth., ECF No. 84 [hereinafter EC Not. of Suppl. Authority].

At long last, five years after this matter first arrived in this District, the court now turns to the merits of whether to confirm the Award.

## III.   LEGAL STANDARD

A federal court's role in enforcing an ICSID award is limited.  As discussed, the ICSID Convention vests the power to enforce ICSID awards in the domestic courts of Contracting States. In the United States, Congress granted federal courts exclusive jurisdiction to enforce ICSID awards.  *See* 22 U.S.C. § 1650a(b).  Such awards "shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one

---

[5] In yet another instance of Romania not adhering to a court order, its supplemental response rehashed procedural history and arguments that had little or nothing to do with the General Court's decision.  The court struck Romania's response and allowed Romania to re-file a brief responsive to the court's request, *see* Minute Order, July 9, 2019, which it did on July 26, 2019, ECF No. 82.

of the several States." 22 U.S.C. § 1650a(a).  A federal court is "not permitted to examine an ICSID award's merits, its compliance with international law, or the ICSID tribunal's jurisdiction to render the award." *Mobil Cerro Negro*, 863 F.3d at 102, 118 (stating that an "ICSID-award debtor would be a party to the action . . . but would not be permitted to make substantive challenges to the award"); *TECO Guatemala Holdings, LLC v. Republic of Guatemala*, Civ. No. 17-102 (RDM), 2018 WL 4705794, at * 2 (D.D.C. Sept. 30, 2018) (citing *Mobil Cerro Negro*).  Instead, the court "may do no more than examine the judgment's authenticity and enforce the obligations imposed by the award." *Mobil Cerro Negro*, 863 F.3d at 102, 121 (stating that the ICSID-award debtor can make "non-merits challenges" to an award, such as "the authenticity of the award presented for enforcement, the finality of the award, or the possibility that an offset might apply to the award that would make execution in the full amount improper").  This limited role "reflects an expectation [under the Convention] that the courts of a member nation will treat the award as final." *Id.*

## IV.   DISCUSSION

With these principles in mind, the court turns to the challenges raised by Romania. It advances four arguments.  Romania asserts: (1) the court lacks subject matter jurisdiction under the FSIA, (2) it has fully satisfied the Award, (3) the act of state doctrine prohibits the Award's enforcement, and (4) so, too, does the foreign sovereign compulsion doctrine.  *See* Resp't Opp'n. at 17–29; Resp't Mot. to Stay; Resp't Reply.  The European Commission joins in each of these arguments, except Romania's contention that it has satisfied the Award.  *See* EU Amicus Br. at 10–20.

### A.      Subject Matter Jurisdiction

The court begins, as it must, with its subject matter jurisdiction to enforce the Award.  The

FSIA is "the sole basis for obtaining jurisdiction over a foreign state in the courts of the [United

States]."  *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 101 (D.C. Cir. 2015) (quoting

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989)); *see also*

28 U.S.C. §§ 1605–1607.  Pursuant to the FSIA, "a foreign state is presumptively immune from

the jurisdiction of the United States courts[,] unless a specified exception applies."  *Saudi Arabia*

*v. Nelson*, 507 U.S. 349, 355 (1993).  Because "subject matter jurisdiction in any such action

depends on the existence of one of the specified exceptions to foreign sovereign immunity" laid

out in the FSIA, as a "threshold" matter in every action against a foreign state, a district court

"must satisfy itself that one of the exceptions applies."  *Verlinden B.V. v. Cent. Bank of Nigeria*,

461 U.S. 480, 493–94 (1983); *see* 28 U.S.C. § 1605(a).  Once a plaintiff establishes as a threshold

matter that an exception applies, "the burden of proof in establishing the inapplicability of these

exceptions is upon the party claiming immunity."  *Transamerican S.S. Corp. v. Somali Democratic*

*Republic*, 767 F.2d 998, 1002 (D.C. Cir. 1985).

### 1.      Arbitration Exception and the Achmea decision

Here, Petitioners rest jurisdiction primarily on the FSIA's arbitration exception.  *See* Pet'rs

Resp. to EC Br., ECF No. 62 [hereinafter Pet'rs Resp. to EC].[6]  That exception provides:

> A foreign state shall not be immune from the jurisdiction of courts
> of the United States or of the States in any case . . . in which the

---

[6] Petitioners also assert in a footnote that the court has jurisdiction over this matter under the FSIA's "implied waiver" exception, because Romania did not challenge the court's subject matter jurisdiction either in its motion opposing confirmation of the Award or its motion to stay proceedings.  *See* Pet'rs Resp. to EC at 4 n.3 ("Because Romania did not raise subject matter jurisdiction under the FSIA in its responsive pleading, the 'implied waiver' exception under Section 1605(a)(1) also applies here.").  The court rejects this assertion for two reasons.  First, the court need not "consider cursory arguments made only in a footnote."  *Hutchins v. District of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999).  Second, the implied waiver doctrine applies only "narrowly" and includes an "implicit . . . requirement that the foreign state have intended to waive its sovereign immunity."  *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999).  "[C]ourts rarely find that a nation has waived its sovereign immunity . . . without

> action is brought[ ] . . . to confirm an award made pursuant to such
> an agreement to arbitrate, if . . . the agreement or award is or may be
> governed by a treaty or other international agreement in force for the
> United States calling for the recognition and enforcement of arbitral
> awards.

28 U.S.C. § 1605(a)(6).   Courts consistently have held that the FSIA's arbitration exception confers subject matter jurisdiction over petitions to enforce ICSID awards.   *See Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 85 (2d Cir. 2013) ("[E]very court to consider whether awards issued pursuant to the ICSID Convention fall within the arbitral award exception to the FSIA has concluded that they do.").   Petitioners thus have satisfied their initial burden of identifying an applicable exception under the FSIA to sovereign immunity.   *See Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).

Romania says this case is different than those finding the arbitration exception applicable. It contends that the arbitration exception does not confer jurisdiction "because the arbitration clause in the Sweden-Romania BIT has been declared invalid." Resp't Reply at 15.  This argument rests on the European Court of Justice's decision in *Achmea*.  Specifically, Romania points to that part of the *Achmea* opinion stating that EU law "preclud[es] a provision in an international agreement concluded between Member States . . . under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal." Resp't Reply at 16 (quoting *Achmea* ¶ 60).  Applying that principle here, Romania contends that the arbitration clause in the Sweden-Romania BIT is "invalid as of Romania's accession to the E.U." *Id.*  The European

---

strong evidence that this is what the foreign state intended." *Foremost-McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 444 (D.C. Cir. 1990).  Such "strong evidence" is lacking here.  Since appearing in this matter, Romania has resisted this court's jurisdiction, at first on the ground that Petitioners failed to secure jurisdiction through proper service of process under the FSIA.  *See* Mot. to Dismiss for Insufficient Service of Process, ECF No. 7.  Once served, Romania again contested the court's subject matter jurisdiction under the arbitration exception, albeit belatedly in a reply brief.  *See* Resp't Reply at 14–17.  Though Romania should have raised its arbitration-exception challenge in an opening brief, the record lacks the "strong evidence" required to make a finding of implied waiver.

Commission shares this view of the effect of *Achmea*.  *See* EC Amicus Br. at 11 (arguing that *Achmea* "applies foursquare to the arbitration agreement in the Romania-Sweden BIT").

Petitioners, on the other hand, insist that *Achmea* is not controlling.  Pet'rs Resp. to EC at 5–7.  They argue that *Achmea* is materially distinguishable from this case on the facts.  *See id.* Specifically, Petitioners maintain that *Achmea* does not apply to the Sweden-Romania BIT because: (1) the Slovak Republic in *Achmea* had joined the EU *before* the arbitral tribunal commenced in that case, whereas here Romania acceded two years *after* the ICSID proceedings began, and (2) *Achmea* involved an arbitration under another treaty, not the ICSID Convention. *Id.* They also assert that the General Court's decision overturning the State Aid Decision confirms the inapplicability of *Achmea* and the continuing validity of the Sweden-Romania BIT's arbitration agreement.  *See* Pet'rs Reply in Support of Notice of Suppl. Auth., ECF No. 82, at 6.

At issue in *Achmea* was a 1992 bilateral investment treaty between the Netherlands and the Czech and Slovak Republic ("Slovak Republic").  That treaty, like the one at issue here, contained a provision providing for dispute resolution through international arbitration.  *Achmea* ¶ 4.  In May 2004, the Slovak Republic joined the EU.  *See id.* ¶ 6.  That same year, in response to the country's liberalization of its private medical insurance market, Achmea, a subsidiary of a Netherlands insurance group, set up a company in the Slovak Republic to sell private medical insurance.  *See id.* ¶ 7.  A mere two years later, the Slovak Republic began to partially roll back the market reforms. *See id.* ¶ 8.  Asserting financial harm as a result of these actions, Achmea invoked the bilateral investment treaty's arbitration clause and filed arbitration proceedings against the Slovak Republic in October 2008.  *Id.* ¶ 9.  In December 2012, the arbitral tribunal awarded Achmea damages in the amount of EUR 22.1 million.  *Id.* ¶ 12.

The case eventually made its way to the CJEU, where the court was presented with the following question:

> Does [EU law] preclude the application of a provision in a bilateral investment protection agreement between Member States . . . under which an investor of a Contracting State, in the event of a dispute concerning investments in the other Contracting State, may bring proceedings against the latter State before an arbitral tribunal where the investment protection agreement was concluded before one of the Contracting States acceded to the European Union but arbitral proceedings are not to be brought until after that date?

*Id.* ¶ 23.[7]   To address the question, the court turned first to the Treaty on the Functioning of the European Union, which sets forth the EU's authority to legislate and key principles of EU law. The court explained that among the Treaty's aims was to establish the primacy of European law over the law of the Member States, *see id.* ¶¶ 32–34, and a judicial system that operates through national courts and tribunals and the CJEU to "ensure consistency and uniformity in the interpretation of EU law," *id.* ¶ 35.   In resolving the issue posed, the CJEU asked three questions. First, it inquired whether the dispute before the arbitral tribunal related to the interpretation or application of EU law.  It did.  *See id.* ¶¶ 39–42.  Next, the court asked whether the arbitral tribunal "is situated within the judicial system of the EU."  It was not.  *See id.* ¶¶ 43–49.  Finally, the court questioned whether the arbitral award was subject to review by a court of a Member State.  It was not—the bilateral investment treaty at issue provided that the decision of the arbitral tribunal was final.  *See id.* ¶¶ 50–56.   In view of these considerations, the CJEU ruled that the bilateral investment treaty's arbitration provision was inconsistent with EU law because permitting arbitration outside of the EU system could prevent disputes "from being resolved in a manner that

---

[7] *Achmea* arrived at the CJEU by a process analogous to a federal court in the United States certifying a question of state law to a state supreme court.  The Slovak Republic had filed an action in the domestic courts of Germany to nullify the award, and the German court then referred the question presented to the CJEU.  *See id.* ¶¶ 12–13.

ensures the full effectiveness of EU law, even though they might concern the interpretation of application of that law." *Id.* ¶ 56. The CJEU thus held:

> [EU law] must be interpreted as precluding a provision in an international agreement concluded between Member States . . . under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.

*Id.* ¶ 60.

Having carefully considered the *Achmea* decision, this court finds that Romania has failed to carry its burden of showing that *Achmea* forecloses this court's jurisdiction under the FSIA's arbitration exception. The CJEU's reasoning in *Achmea* turned on protecting the "the autonomy of EU law." *Id*. ¶ 59. The court there deemed the arbitration provision invalid because, in short, the dispute called upon the arbitral tribunal to interpret or apply EU law and the tribunal's ultimate resolution of any question of EU law was not subject to review by a court or tribunal within the EU's judicial system. Here, Romania has not shown that the concern that animated *Achmea*—the un-reviewability of an arbitral tribunal's determination of EU law by an EU court—is present in this case. The court so concludes for three reasons.

First, the facts here are materially different than *Achmea*. The applicability of EU law to the dispute in *Achmea* was clear, as both the challenged government action occurred, and the arbitration proceeding therefore commenced, *after* the Slovak Republic entered the EU. *See* ¶¶ 6, 8, 9. Here, on the other hand, all key events to the parties' dispute occurred *before* Romania acceded to the EU on January 1, 2007. *See* General Court Decision ¶ 13. The Sweden-Romania BIT entered into force nearly four years earlier on July 1, 2003. *See id.* ¶ 14. Romania repealed the incentives upon which Petitioners relied in making their investments the following year, in

August 2004.  *See id.* ¶ 12.  That revocation took legal effect on February 22, 2005, *see id.*, thereby "giving rise to the damage for which the compensation at issue was awarded," *id.* ¶ 72.  And, five months later, on July 28, 2005, Petitioners invoked their right to convene an ICSID arbitral tribunal pursuant to Article 7 of the BIT.  *See id.* ¶ 15.  Thus, unlike in *Achmea*, in which the contested government action occurred when the Slovak Republic was already an EU Member State and governed by EU law, Romania's challenged actions occurred when it remained outside the EU and subject, at least primarily, to its own domestic law.[8]

Second, a close inspection of the Final Decision shows that the dispute before the ICSID arbitral tribunal did not "relate to the interpretation or application of EU law" in the sense that concerned the court in *Achmea*.  *Achmea* ¶ 39.  Before the ICSID tribunal, Petitioners and Romania agreed that the claims put forward were based on the Sweden-Romania BIT and that the BIT's "substantive rules" supplied the "applicable law."  Final Decision ¶¶ 288, 318 ("There is no dispute among the Parties that the primary source of law for this Tribunal is the BIT itself.").  Insofar as EU law was concerned, the tribunal held, Romania had not yet acceded to the EU at the time it repealed the economic incentives and so "EU law was not directly applicable to Romania." *Id.* ¶ 319.  The tribunal did determine, however, that "EU law forms part of the 'factual matrix' of the case."  *Id.* ¶ 328.  "The overall context of EU accession in general and the pertinent provisions of EU law in particular may be relevant to the determination of whether, *inter alia*, Romania's

---

[8] The court uses the word "primarily" for a reason.  The Commission points out that, on February 1, 1993, Romania signed the Europe Agreement, which established an association between the EU and Romania and provided a legal framework for the accession process.  *See* Resp. of *Amicus Curiae* the European Commission to Pet.'s Notice of Suppl. Authority, ECF No. 76 [hereinafter EC Resp. to Suppl. Authority], at 7 n.; Final Decision ¶ 179.  The Europe Agreement came into force on February 1, 1995, long before the dispute at issue here arose.  Final Decision ¶ 185. According to the Commission, the Europe Agreement "forms part of E.U. law."  EC Resp. to Suppl. Authority at 7 n. The suggestion is that, because Romania was subject to the Europe Agreement, the arbitral tribunal passed on questions of European law.  But, as discussed below, although the tribunal considered EU law as part of its decision-making, it did not make the kind of pronouncements about EU law that would invite the type of autonomy concerns expressed in *Achmea*.

actions were reasonable in light of all the circumstances, or whether Claimants' expectations were legitimate." *Id.* Thus, in resolving the dispute before it, the ICSID arbitral tribunal considered EU law, but it did so for factual context, not as a source of controlling law. Indeed, the tribunal expressly passed on deciding whether "any payment of compensation arising out of this Award would constitute illegal state aid under EU law and render the Award unenforceable within the EU." *Id.* ¶¶ 330, 340. The tribunal therefore did not decide a question of EU law in a way that implicates the core rationale of *Achmea*. *See Achmea* ¶ 58 (expressing concern that an arbitral tribunal's application or interpretation of EU law would "call into question not only the principle of mutual trust between the Member States but also the preservation of the particular nature of the law established by the [governing EU] Treaties").

Finally, the General Court's ruling overturning the State Aid Decision confirms that the ICSID arbitral tribunal did not tread upon substantive EU law and, for that reason, *Achmea* does not affect the Award's validity. The General Court held that "EU law became applicable in Romania only as from its accession to the European Union on 1 January 2007." General Court Decision ¶ 67. It found that the events giving rise to the Award occurred before January 1, 2007, and that "the arbitral tribunal confined itself to determining the exact damage suffered by the applicants on the basis of the infringements committed by Romania in 2005." *Id.* ¶ 77. The Commission thus lacked the competence to review Romania's pre-accession actions and the Award's compatibility with EU state aid law. *See id.* ¶ 86. Based on these determinations, the General Court distinguished the present case from *Achmea*: "[I]t must be pointed out that, in the present case, the arbitral tribunal was not bound to apply EU law to events occurring prior to the accession before it, unlike the situation in the case which gave rise to the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158, paragraphs 38 to 41)." *Id.* ¶ 87. Romania fails to

acknowledge this key passage in the General Court's ruling.  *See* Resp't Resp. to Pet'rs Notice of

Suppl. Authority, ECF No. 79 [hereinafter Resp't Resp. to Suppl. Authority], at 5–6.  The General

Court's ruling therefore explicitly refutes Romania's position that the CJEU's decision in *Achmea*

nullified the arbitration agreement contained in the Sweden-Romania BIT.

Accordingly, this court possesses subject matter jurisdiction over this matter under the

FSIA's arbitration exception.

### B.    The Act of State and Foreign Sovereign Compulsion Doctrines

Having satisfied itself of jurisdiction, the court turns to Romania's other arguments.

Romania contends that two related doctrines—the act of state and foreign sovereign compulsion

doctrines—require the court to reject confirming the Award and to dismiss the Petition.  *See* Resp't

Opp'n at 25–30.  The Commission supports Romania's position.  *See* EC Amicus Br. at 18–22.

Under the act of state doctrine, "the courts of one state will not question the validity of public acts

(acts *jure imperii*) performed by other sovereigns within their own borders, even when such courts

have jurisdiction over a controversy."  *Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004).

Similarly, the foreign sovereign compulsion doctrine "shields from . . . liability the acts of parties

carried out in obedience to the mandate of a foreign government."  *See Mannington Mills, Inc. v.

Congoleum Corp.*, 595 F.2d 1287, 1293 (3d Cir. 1979).  The court accepts, for present purposes,

that the Commission qualifies as a "sovereign" under these doctrines.  *Cf. European Cmty. v. RJR

Nabisco, Inc.*, 764 F.3d 129, 144 (2d Cir. 2014), *rev'd and remanded on other grounds*, 136 S. Ct.

2090, 195 L. Ed. 2d 476 (2016) (holding that the European Community "is an organ of a foreign

state" for purposes of the FSIA).

The original rationale for invoking these doctrines has been overtaken by events.  Romania,

at first, argued that the State Aid Decision required the court to deny relief.  *See* Resp't Opp'n at

25–30.  But the General Court's decision then "annulled" the State Aid Decision.  General Court Decision ¶ 111.  Following this development, Romania pivoted and asserted that, notwithstanding the General Court's ruling, the doctrines still require not confirming the Award, because Petitioners never challenged either the Commission's decision to open a state aid investigation against Romania or the suspension injunction issued during the investigation.  *See* Resp't Resp. to Suppl. Authority at 6.  Because the General Court's decision does not purport to affect these "preparatory acts," Romania claims, it remains barred under EU law from paying any portion of the Award.  Therefore, the act of state and foreign sovereign compulsion doctrines carry the same force and effect as they did before the General Court's ruling.  *See id.*  Romania cites no more than a single case—*Spain v. Commission*, Case C-415/96, ECLI:EU:C:1998:533—to support its position, Resp't Resp. to Suppl. Authority at 6.

Petitioners answer Romania by submitting a declaration on EU law from Sir Nicholas Forwood Q.C., a barrister of the Bars of England and Wales and of Ireland.  *See* Pet'rs Reply in Support of Suppl. Authority, ECF No. 82, Decl. of Sir Nicholas Forwood, ECF No. 82-1.  Forwood explains that in his view of EU law, when, as here, a Commission ruling is declared void, the Commission "cannot take any steps that would be incompatible with the Court's findings," and must in fact "take account of the grounds of the judgment which have [led] to the finding of illegality."  *Id.* ¶¶ 13–14.  Applying that principle here, Forwood posits, the General Court's decision not only directly annulled the State Aid Decision, but by its rationale it also makes "untenable" the view that the decision to open the investigation and the suspension injunction remain effective.  *Id.* ¶ 16.  The General Court's decision was premised on the legal determination that Romania was not subject to EU law until it acceded to the EU and therefore the Commission lacked the "competence" to declare payment of the Award to be unlawful state aid.  *See id.* ¶ 15.

By that logic, Forwood explains, the Commission also lacks the "competence" to open an investigation or to issue a suspension injunction with regard to Romania's acts that are not subject to EU law.  *See id.* ¶¶ 17–19.  So, in his view, by virtue of the General Court's ruling, neither the decision to open the investigation nor the suspension injunction bars Romania from making payment on the Award.

The court finds Forwood's interpretation of EU law persuasive.  The authority that Forwood relies upon for the proposition that the "Commission must take account of the grounds of the judgment which have [led] to the finding of illegality" is *Société Nationale Maritime Corse Méditerranée (SNCM)*, Case T-1/15, ECLI:EU:T:2017:470.  *Id.* ¶ 14.  In that case, a General Court acknowledged that, under EU law,

> annulment of a Community act does not necessarily affect preparatory acts.  The annulment of an act terminating an administrative procedure consisting of different phases does not necessarily entail the annulment of the entire procedure prior to the adoption of the contested act, regardless of the grounds, the substance or the procedure, the annulment judgment.

*SNCM* ¶ 66.[9]  Yet, the court also stated that, "[i]n order to comply with a judgment of annulment and to give it full effect, the institutions are required to respect not only the operative part of the judgment but also the reasons which led to it and which constitute its support necessary, in that they are indispensable for determining the exact meaning of what has been judged in the device." *Id.* ¶ 64.  As Forwood correctly notes, taking account of the reasons for the General Court's judgment means that the Commission's "preparatory acts" in this case are equally as invalid as the final State Aid Decision.  Again, the logic of the General Court's decision is that Romania was not subject to EU law at the time it repealed the economic incentives and therefore an Award intended

---

[9]   Available at   https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:62015TJ0001   (English translation electronically generated).

to remedy that harm cannot be incompatible with EU state aid rules, as those rules did not apply at the relevant time.  The same logic applies to the Commission's acts of opening an investigation and issuing the suspension injunction.   They, too, were premised on the Commission's belief that it had the authority to scrutinize Romania's actions under EU law.  The General Court's decision makes clear that the Commission lacked the power to undertake even such preparatory steps.  The court therefore finds that, as a consequence of the General Court's decision, the Commission's preparatory acts of opening an investigation and issuing a suspension injunction do not bar Romania's payment of the Award.

The sole decision upon which Romania relies—*Spain v. Commission*[10]—is not to the contrary.  There, the court said that the "annulment of a Community measure does not *necessarily* affect the preparatory acts."  *Spain* ¶ 32 (emphasis added).  The court annulled the Commission's decision in *Spain* because the Commission had not fully analyzed the matter before it in the manner required by EU law.  The court did not, however, foreclose the Commission from correcting its error.  Instead, because the reliability of the Commission's findings were not challenged, the court left it open for the Commission to resume its inquiry.  *See id.* ¶ 34.  In other words, the Commission was permitted to pick up from the point of error, leaving the preparatory acts intact.  *See id.* ¶¶ 33–34.   This case, obviously, is quite different than *Spain*.   Here, the Commission lacked "competence" from the start to investigate a state aid violation by Romania because Romania's disputed acts all took place before it acceded to the EU.  The decision to open the investigation and the suspension injunction were as beyond the Commission's competence as the final State Aid Decision.   So, the Commission cannot now simply pick up where it left off, as was the case in *Spain*.  Accordingly, there is no extant sovereign act that Romania would risk defying if it were

---

[10] Available at https://perma.cc/JA7U-V8K2.

ordered to pay the Award.  The court thus finds that Romania has not made a sufficient showing that either the act of state or foreign sovereign compulsion doctrine forecloses confirming the Award.

For its part, the Commission, which has appealed the General Court's decision, *see* EC Not. of Suppl. Authority, points out that the General Court's decision is "merely a judgment of the lower of two courts in the EU judicial system" and is thus subject to reversal, *see* EC Resp. to Suppl. Authority at 4.  That may be, but this court's task is simply to consider whether to grant the pending petition and convert the Award to a judgment under § 1650a based on the legal landscape as it presently stands.  As the Second Circuit has explained, the text of § 1650a "suggest[s] an expectation" on the part of Congress "that actions to enforce ICSID awards would not be protracted."  *Mobil Cerro Negro*, 863 F.3d at 121; *id.* at 117 ("Litigation on actions to enforce awards need not be protracted.").  Nearly six years have passed since the ISCID tribunal entered the Award for Petitioners, and almost two years have elapsed since Petitioners re-initiated these enforcement proceedings.  Moreover, the Commission in taking an appeal to the CJEU did not seek to suspend the General Court's decision pending appeal.  *See* Pet'rs Resp. to European Comm'n's Not. of Suppl. Authority, ECF No. 85.  The court is not prepared to delay confirmation any longer based on the mere possibility that the CJEU, at some undefined time in the future, might reverse the General Court's decision.

### C.  Romania's Claimed Satisfaction of the Award

Romania's final argument is that the court should deny the Petition because it has satisfied the Award in full.  *See* Resp't Opp'n at 17–25; Resp't Mot. to Stay at 7–11.  Romania contends that it has done so through a series of tax setoffs and forced executions on accounts held by the

Romanian Ministry of Public Finance, and that the court must recognize the validity and effect of these actions taken under Romanian law.  *See* Resp't Opp'n at 19–25.

As a threshold matter, Petitioners contend that, in these proceedings, the court cannot consider Romania's argument that it has satisfied the Award.  *See* Pet'rs Mem. in Support of Pet'rs Mot. [hereinafter Pet'rs Mem.], ECF No. 55-1, at 16–18.  Petitioners insist that "Romania's contention that it has 'satisfied' the Award is no defense to the confirmation of a binding, final ICSID Award."  *Id.* at 18.  That assertion is wrong.  It rests on the mistaken understanding that, under § 1650a, there is a "confirmation" proceeding that is separate and distinct from an enforcement proceeding.  There is not.  *See supra* n.1.  Section 1650a speaks only of "enforcement" of an ICSID award.  *See Mobil Cerro Negro*, 863 F.3d at 118 n.18; *Micula I*, 104 F. Supp. 3d at 49.  In such a proceeding, the defense of setoff or satisfaction is available.  *See Mobil Cerro Negro*, 863 F.3d at 121 (identifying as a defense in a proceeding under § 1650a the "possibility that an offset might apply to the award that would make execution in the full amount improper"); *see also* Restatement (Second) of Conflict of Laws § 116 (1971) ("A judgment will not be enforced in other states if the judgment has been discharged by payment or otherwise under the local law of the state of rendition.").

A second threshold consideration concerns the choice of law.  What law must the court apply in deciding whether a claimed payment actually discharges the Award?  Neither side meaningfully addresses this issue.  Romania assumes that its domestic law applies.  *See* Resp't Opp'n at 18–20.  Petitioners cite District of Columbia law for general legal principles, *see* Pet'rs Mem. at 18, but do not squarely challenge Romania's assertion that Romanian law controls the legal effect of its claimed payments, *see id.* at 18–24.  The court therefore assumes that the law of Romania governs whether a claimed payment satisfies a portion of the Award.

With these threshold matters resolved, the court turns to Romania's arguments on the merits.  Romania first claims that a "*de jure* offset" occurred between Romania and Petitioner European Food on December 11, 2013. *See* Resp't Opp'n at 17. On January 14 and 15, 2014, the Romanian Ministry of Finance issued setoff decisions in the amount of RON 337,492,864 (EUR 76 million) against tax debts owed by European Foods to Romania.  *Id.*  Romania asserts that, "[u]nder Romanian law, the satisfaction of the Award, occurred when the conditions for the legal setoff were met: the first date that European Food owed back taxes *and* when it, and the other Petitioners, won the Award in arbitration, December 11, 2013." *Id.*  But Romania fails to acknowledge that a Romanian court declared the asserted tax setoffs to be unlawful under Romanian law.  *See* Decl. of Oana Popa, ECF No. 55-12, ¶¶ 15–16 and Ex. L, ECF No. 55-24. The Romanian court reasoned that the setoff violated Romanian law because (1) the setoff law relied upon by the Romanian finance authorities can be used to offset the state's fiscal obligations, but not civil liabilities, such as the Award, and (2) the setoff improperly applied only to one of the Petitioners, European Foods, and not the others.  *See id.*  Apparently, Romania appealed the court's ruling, but the appeal was stayed pending the outcome of the General Court review of the State Aid Decision.  *See* Popa Decl. ¶ 17.  The parties have not alerted this court of any developments related to the stayed appeal since the General Court issued its decision.  With the claimed tax setoffs at present annulled, Romania cannot rely on them to satisfy the Award.[11]

Next, Romania asserts that, on March 9, 2015, the Romanian Ministry of Public Finance transferred RON 472,788,675 (EUR 106.5 million) into a specially created, legislatively authorized Treasury account in Petitioners' names to satisfy the Award.  *See* Resp't Opp'n at 21.

---

[11] Petitioners also respond to various assertions made by Romania's Romanian law expert, Professor Radu Bufan, concerning the legal effect of the Romanian court's decision.  *See* Pet'rs Mem. at 20–22.  But because Romania itself does not advance those arguments in its legal briefs, the court does not consider them.

But as Petitioners point out, and Romania does not dispute, Romania actually controlled the account, Petitioners never had access to it, and Romania subsequently withdrew the funds from the account after the State Aid Decision. *See* Popa Decl. ¶¶ 23–25. Petitioners therefore have not received any of the money from the Treasury account in satisfaction of the Award. Under Romanian law, absent actual receipt of payment, a judgment is not deemed satisfied. *See* Popa Decl., Ex. O, Legal Op. of Adriana Almasan, ECF No. 55-27, ¶¶ 11–17. The funds transferred on March 9, 2015, therefore cannot be applied against the Award.

The last set of payments Romania identifies as satisfying the Award are certain seizures of funds from the Romanian Ministry of Public Finance's account. *See* Resp't Opp'n at 20. Petitioners do not dispute that they have received some money from Romania through these forced executions and that such sums are appropriately offset against the Award. *See* Pet'rs Mem. at 26. Petitioners estimate the total amount obtained to be slightly more than $11.2 million. *See id.* This amount therefore is properly reduced from the final judgment.

Before concluding, the court addresses a handful of other arguments that Romania makes concerning satisfaction of the Award. First, Romania contends that the General Court's decision "acknowledges that Romania has paid the Award." Resp't Resp. to Suppl. Authority at 2. The General Court did no such thing. The paragraphs that Romania cites from the General Court's decision—paragraphs 78, 80, and 82, *see* Resp't Resp. to Suppl. Authority at 2—merely refer to historic events leading up to the court's ruling. The General Court nowhere acknowledged that Romania had satisfied the Award.

Romania also contends that the court should not convert the Award into a judgment, because the General Court's decision "creates confusion as to the amount of the Award that qualifies as state aid, and any amount Romania had the right to recoup per the Decision." *Id.* at 3.

The argument is premised on a suggestion made by the General Court that some portion of the Award might be subject to EU state aid rules because it constitutes compensation for the period *after* Romania's accession to the EU, when no one disputes it was subject to EU law. *See id.* at 3– 4. The General Court, however, declined to make any division of the Award, because "the Commission did not draw a distinction between the periods of compensation for the damage suffered by the applicants before or after accession." General Court Decision ¶ 91. In other words, the Commission forfeited any such argument. Romania cannot convert the General Court's non-holding into a basis to decline to confirm the Award. The contention that *some portion* of the Award violates EU law goes to the merits of the ICSID panel's determination. That argument must be taken to the ICSID arbitral panel, and it is not a valid ground on which to reject converting the Award in full to a judgment. *See* Convention art. 53 ("The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention.").

Finally, Romania claims that the doctrine of international comity requires the court to recognize that Romania has fully satisfied the Award. *See* Resp't Resp. to Suppl. Authority at 7. But international comity concerns play no role here. *See Société Nationale Industrielle Aérospatiale v. U.S. District Court for the Southern District of Iowa*, 482 U.S. 522, 543 n.27 (1987) ("Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states."). At Romania's suggestion, the court has applied Romanian law to assess whether Romania has satisfied the Award. It has not. Accordingly, international comity provides no ground to decline to enforce the Award.

## V.     CONCLUSION AND ORDER

For the foregoing reasons, the court grants the Petition to Confirm Arbitration Award, ECF No. 1, as well as Petitioners' Motion for Judgment on the Pleadings, ECF No. 55.

It is further ordered that judgment shall be entered in favor of Petitioners and against Romania in the amount of $331,557,687,[12] which reflects the sum total of the Award net payments made by Romania, in addition to pre-judgment interest as of November 2, 2018, at the rate identified in the Award.  *See* Pet'rs Mem. at 13–15 (setting forth calculations for final judgment).

Petitioners shall submit by September 18, 2019, a draft Final Judgment that reflects the foregoing amount plus all additional prejudgment interest accrued between November 3, 2018, and September 18, 2019.

Dated:  September 11, 2019

_____
Amit P. Mehta
United States District Court Judge

---

[12] Petitioners asked the court to convert the Award to U.S. Dollars as of the date of the Award.  *See* Pet'rs Mem. at 11–12.  Romania has not objected to that request.  In any event, conversion of ICSID awards is the norm in proceedings under § 1650a.  *See Belize Bank Ltd. v. Gov't of Belize*, 191 F. Supp. 3d 26, 39–40 (D.D.C. 2016).