# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In the Matter of the Application of<br><br>IOAN MICULA,<br>VIOREL MICULA,<br>S.C. EUROPEAN FOOD S.A.,<br>S.C. STARMILL S.R.L., and<br>S.C. MULTIPACK S.R.L.,<br><br>                             *Petitioners*,<br><br>    v.<br><br>THE GOVERNMENT OF ROMANIA,<br><br>                            *Romania.* | Civil Action No. 17-CV-02332-APM |

**GOVERNMENT OF ROMANIA'S RESPONSE TO**
**PETITIONERS' FIRST SET OF**
**POST-JUDGMENT INTERROGATORIES**

NOW COMES, the Respondent, Government of Romania, and responds to Petitioners' Ioan Micula, Viorel Micula, S.C. European Food S.A., S.C. Starmill S.R.L., and S.C. Multipack S.R.L. (collectively, "Petitioners"), First Set of Post-Judgment Interrogatories, stating as follows:

**INTERROGATORIES**

1.    Identify and describe the location of any bank accounts maintained by Romania or by any Instrumentality of Romania, within or without Romania. For each account, set forth the following:

        a.   The name, address and telephone number of the bank or entity where the asset is located;

        b.   The name of the account holder;

        c.   The account number;

1

d.  The value of the account as of the date these interrogatories are received by Romania;

e.  The value of the account as of the date these interrogatories are answered by Romania;

f.  A detailed description of the purpose for the funds in the account; and

g.  A detailed description of the account's activity from January 1, 2010 to the present date.

**RESPONSE:**

Objections. The Government of Romania (hereinafter referred to as "Romania") objects to this interrogatory on numerous grounds.  First, the interrogatory is overly broad, failing to limit its request per Section 1603(b)(2) and Section 1611 of the FSIA, (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity with (i) military character or (ii) under the control of a military authority or defense agency. Second, this interrogatory seeks information on banks maintained within Romania when enforcement proceedings are limited to the Romanian Government's assets within the United States and, thus, this interrogatory is not reasonably calculated to lead to the discovery of admissible evidence in this action.

Without waiving said objections, Romania responds as follows:

(a)      There is no authorized person currently available to provide information and or affirm the responses to this Interrogatory. On October 10, 2019, the Romanian Parliament dismissed the Romanian Government, according to Art. 110 of the Romanian Constitution. *See* a true and accurate copy of the Declaration of Dana Vilaia, at ¶¶ 12-24.  attached hereto as Exhibit A. The effect of this is that there is no viable individual who currently can obtain authorization to acquire the information sought in the interrogatories in question, and who has the authority to provide such information or has authorization to assess and present the information related to the interrogatories. *See Id.* As of October 10, 2019, the dismissed Government is operating with restricted capacity and has only limited powers according to Art. 110 par. (4) of the Romanian Constitution. It can only fulfill acts required for the administration of public affairs. Providing information on State assets does not fall under the permissible actions of the dismissed Government. This requires an official of the Romanian government to determine what is "*commercial property*" which is "*either a regular course of commercial conduct or a particular commercial transaction or act.*" *See Id*. It also requires such an individual to select and exclude and deem immune from execution, per Section 1611 of the FSIA: (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity, with (i) military character or (ii) under the control of a military authority or defense agency.  *See Id*. It also requires such an individual to select, exclude and deem immune from execution, that the property is property that of the Romanian Government in the United States of a foreign State per FSIA Section

2

1603(b)(2). *See Id.* The dismissed Government currently does not have the attributes and capacities to undertake these decisions. *See Id.*

(b)     The Romanian courts have acknowledged that the Romanian Government has made payment on the Award. *See Id.* at ¶¶ 7-11. On April 7, 2017, the Bucharest Court of Appeal by Judgment no. 342 (page 23, point 9) ruled that the Government of Romanian has paid the ICSID Award via the set-off as valid method payment of the ICSID Award. The Court also denied the possibility of Viorel Micula to execute the ICSID Award. *See Id.* at its Exhibit 1.

On October, 21, 2019, the Bucharest Court of Appeals, case no. 15755/3/2014, in which case the Romanian Government challenged the forced execution initiated by SC MULTIPACK SRL, SC STARMILL SRL, SC EUROPEAN FOOD SA and MICULA IOAN, based on the ICSID Award, entered a final judgment holding that the Set Off decisions no. 1202204/March 21, 2014 and no. 28892-20905/January 14, 2014 are valid and constitutes payment on the Award against SC European Food SA, one of the joint creditors of the ICSID Award. The ruling also annulled the enforcement measures taken by Mazilu și Asociații, counsel for the Miculas, against the Romanian Government commenced on April 29, 2014; This judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit *2.*

On October 15, 2019, the Bucharest Tribunal, in court case no. 21475/3/2019, entered Judgment no. 2217/October 15, 2019 whereby it denied the creditor, Viorel Micula, the right to commence forced execution against the Government of Romanian; this Judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit 3.

This Court has ruled that "§ 1650a the "possibility that an offset might apply to the award that would make execution in the full amount improper"; *see also* Restatement (Second) of Conflict of Laws § 116 (1971). "A judgment will not be enforced in other states if the judgment has been discharged by payment or otherwise under the local law of the state of rendition.")." *See* Memorandum Opinion dated September 11, 2019, at page 27 (ECF No. 86). Given that the Set Off has been determined to be recognized by the Romanian courts, this payment method should be applied towards the Award amount.

(c)     Providing information on the Romanian Government's assets facilitates payment on the Award, which payment on the Award constitutes state aid. *See Id.* ¶¶ at 25, 26. Per the European Commission's ("EC") position, Romania is "prohibited from taking "any steps" to implement the Award". *See Id.* at its Exhibit 4. Were the Romanian Government to provide information on its accounts or other type of assets, it would, in effect, be affording Petitioners information that could well lead to payment of the Award, which would constitute state aid under European Union ("EU") law. *See Id.* As the European Commission views posting a bond as state aid, providing information on assets which Petitioners can execute, would constitute state aid, which is defined *as an advantage in any form whatsoever conferred on a selective basis to undertakings by national public authorities. See Id.* As long as the investigation of Romania on the state aid matter is pending (resulting from

3

**the 18 June 19 General Order), any action of Romania, assisting Petitioners in executing the ICSID Award is considered an action for facilitating a state aid under EU law.** ***See Id.*, its Exhibit 4.**

2.      Identify and describe the location of any bank accounts that are not maintained by Romania or by an Instrumentality of Romania, but in which Romania or any Instrumentality of Romania has money deposited at this time, within or without Romania. For each account, set forth the following:

a.   The name, address and telephone number of the bank or entity where the asset is located;

b.   The name of the account holder;

c.   The account number;

d.   The value of the account as of the date these interrogatories are received by Romania;

e.   The value of the account as of the date these interrogatories are answered by Romania;

f.   A detailed description of the purpose for the funds in the account; and

g.   A detailed description of the account's activity from January 1, 2010 to the present date.

**RESPONSE:**

**Objections. Romania objects to this interrogatory on numerous grounds.  First, the interrogatory is overly broad, failing to limit its request per Section 1603(b)(2) and Section 1611 of the FSIA, (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity with (i) military character or (ii) under the control of a military authority or defense agency. Second, this interrogatory seeks information on banks maintained within Romania when enforcement proceedings are limited to the Romanian Government's bank accounts within the United States and, thus, this interrogatory is not reasonably calculated to lead to the discovery of admissible evidence in this action.**

**Without waiving said objections, Romania responds as follows:**

**(a)  There is no authorized person currently available to provide information and or affirm the responses to this Interrogatory. On October 10, 2019, the Romanian Parliament dismissed the Romanian Government, according to Art. 110 of the Romanian Constitution.**

4

*See* a true and accurate copy of the Declaration of Dana Vilaia, at ¶¶ 12-24.  attached hereto as Exhibit A.  The effect of this is that there is no viable individual who currently can obtain authorization to acquire the information sought in the interrogatories in question, and who has the authority to provide such information or has authorization to assess and present the information related to the interrogatories. *See Id.* As of October 10, 2019, the dismissed Government is operating with restricted capacity and has only limited powers according to Art. 110 par. (4) of the Romanian Constitution. It can only fulfill acts required for the administration of public affairs. Providing information on State assets does not fall under the permissible actions of the dismissed Government. This requires an official of the Romanian government to determine what is "*commercial property*" which is "*either a regular course of commercial conduct or a particular commercial transaction or act.*" *See Id*. It also requires such an individual to select and exclude and deem immune from execution, per Section 1611 of the FSIA: (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity, with (i) military character or (ii) under the control of a military authority or defense agency. *See Id.* It also requires such an individual to select, exclude and deem immune from execution, that the property is property that of the Romanian Government in the United States of a foreign State per FSIA Section 1603(b)(2). *See Id.* The dismissed Government currently does not have the attributes and capacities to undertake these decisions. *See Id.*

(b) The Romanian courts have acknowledged that the Romanian Government has made payment on the Award. *See Id.* at ¶¶ 7-11. On April 7, 2019, the Bucharest Court of Appeal by Judgment no. 342 (page 23, point 9) ruled that the Government of Romanian has paid the ICSID Award via the set-off as valid method payment of the ICSID Award. The Court also denied the possibility of Viorel Micula to execute the ICSID Award. *See Id.* at its Exhibit 1.

On October, 21, 2019, the Bucharest Court of Appeals, case no. 15755/3/2014, in which case the Romanian Government challenged the forced execution initiated by SC MULTIPACK SRL, SC STARMILL SRL, SC EUROPEAN FOOD SA and MICULA IOAN, based on the ICSID Award, entered a final judgment holding that the Set Off decisions no. 1202204/March 21, 2014 and no. 28892-20905/January 14, 2014 are valid and constitutes payment on the Award against SC European Food SA, one of the joint creditors of the ICSID Award. The ruling also annulled the enforcement measures taken by Mazilu și Asociaţii, counsel for the Miculas, against the Romanian Government commenced on April 29, 2014; This judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit *2.*

On October 15, 2019, the Bucharest Tribunal, in court case no. 21475/3/2019, entered Judgment no. 2217/October 15, 2019 whereby it denied the creditor, Viorel Micula, the right to commence forced execution against the Government of Romanian; this Judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit 3.

This Court has ruled that "§ 1650a the "possibility that an offset might apply to the award that would make execution in the full amount improper"; *see also* **Restatement**

(Second) of Conflict of Laws § 116 (1971). "A judgment will not be enforced in other states if the judgment has been discharged by payment or otherwise under the local law of the state of rendition.")." *See* Memorandum Opinion dated September 11, 2019, at page 27 (ECF No. 86). Given that the Set Off has been determined to be recognized by the Romanian courts, this payment method should be applied towards the Award amount.

(c)    Providing information on the Romanian Government's assets facilitates payment on the Award, which payment on the Award constitutes state aid.  *See Id.* ¶¶ at 25, 26.   Per the European Commission's ("EC") position, Romania is "prohibited from taking "any steps" to implement the Award".   *See Id.* at its Exhibit 4. Were the Romanian Government to provide information on its accounts or other type of assets, it would, in effect, be affording Petitioners information that could well lead to payment of the Award, which would constitute state aid under European Union ("EU") law.  *See Id.*  As the European Commission views posting a bond as state aid, providing information on assets which Petitioners can execute, would constitute state aid, which is defined *as an advantage in any form whatsoever conferred on a selective basis to undertakings by national public authorities. See Id.* As long as the investigation of Romania on the state aid matter is pending (resulting from the 18 June 19 General Order), any action of Romania, assisting Petitioners in executing the ICSID Award is considered an action for facilitating a state aid under EU law.  *See Id.*, its Exhibit 4.

3.    Identify and describe the location, ownership (including name and address), and purpose of any and all Liquid Assets owned by Romania or by any Instrumentality of Romania, located within or without Romania.

RESPONSE:

Objections. Romania objects to this interrogatory on numerous grounds.  First, the interrogatory is overly broad, failing to limit it's request per Section 1603(b)(2) and Section 1611 of the FSIA, (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity with (i) military character or (ii) under the control of a military authority or defense agency. Second, this interrogatory seeks information on Liquid Assets maintained within Romania when enforcement proceedings are limited to the Romanian Government's assets within the United States and, thus, this interrogatory is not reasonably calculated to lead to the discovery of admissible evidence in this action.

Without waiving said objections, Romania responds as follows:

(a) There is no authorized person currently available to provide information and or affirm the responses to this Interrogatory. On October 10, 2019, the Romanian Parliament dismissed the Romanian Government, according to Art. 110 of the Romanian Constitution. *See* a true and accurate copy of the Declaration of Dana Vilaia, at ¶¶ 12-24.  attached hereto as

**Exhibit A. The effect of this is that there is no viable individual who currently can obtain authorization to acquire the information sought in the interrogatories in question, and who has the authority to provide such information or has authorization to assess and present the information related to the interrogatories.** *See Id.* **As of October 10, 2019, the dismissed Government is operating with restricted capacity and has only limited powers according to Art. 110 par. (4) of the Romanian Constitution. It can only fulfill acts required for the administration of public affairs. Providing information on State assets does not fall under the permissible actions of the dismissed Government. This requires an official of the Romanian government to determine what is "***commercial property***" which is "***either a regular course of commercial conduct or a particular commercial transaction or act.***" *See Id*. It also requires such an individual to select and exclude and deem immune from execution, per Section 1611 of the FSIA: (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity, with (i) military character or (ii) under the control of a military authority or defense agency.** *See Id.* **It also requires such an individual to select, exclude and deem immune from execution, that the property is property that of the Romanian Government in the United States of a foreign State per FSIA Section 1603(b)(2).** *See Id.* **The dismissed Government currently does not have the attributes and capacities to undertake these decisions.** *See Id.*

**(b)      The Romanian courts have acknowledged that the Romanian Government has made payment on the Award.** *See Id.* **at ¶¶ 7-11. On April 7, 2017, the Bucharest Court of Appeal by Judgment no. 342 (page 23, point 9) ruled that the Government of Romanian has paid the ICSID Award via the set-off as valid method payment of the ICSID Award. The Court also denied the possibility of Viorel Micula to execute the ICSID Award.** *See Id.* **at its Exhibit 1.**

> **On October, 21, 2019, the Bucharest Court of Appeals, case no. 15755/3/2014, in which case the Romanian Government challenged the forced execution initiated by SC MULTIPACK SRL, SC STARMILL SRL, SC EUROPEAN FOOD SA and MICULA IOAN, based on the ICSID Award, entered a final judgment holding that the Set Off decisions no. 1202204/March 21, 2014 and no. 28892-20905/January 14, 2014 are valid and constitutes payment on the Award against SC European Food SA, one of the joint creditors of the ICSID Award. The ruling also annulled the enforcement measures taken by Mazilu și Asociații, counsel for the Miculas, against the Romanian Government commenced on April 29, 2014; This judgment was entered after the 18 June 2019 Order of the European Court was issued.** *See Id.* **at its Exhibit** *2.*

> **On October 15, 2019, the Bucharest Tribunal, in court case no. 21475/3/2019, entered Judgment no. 2217/October 15, 2019 whereby it denied the creditor, Viorel Micula, the right to commence forced execution against the Government of Romanian; this Judgment was entered after the 18 June 2019 Order of the European Court was issued.** *See Id.* **at its Exhibit 3.**

> **This Court has ruled that "§ 1650a the "possibility that an offset might apply to the award that would make execution in the full amount improper";** *see also* **Restatement (Second) of Conflict of Laws § 116 (1971). "A judgment will not be enforced in other**

states if the judgment has been discharged by payment or otherwise under the local law of the state of rendition.").**" *See* Memorandum Opinion dated September 11, 2019, at page 27 (ECF No. 86). Given that the Set Off has been determined to be recognized by the Romanian courts, this payment method should be applied towards the Award amount.

(c)     Providing information on the Romanian Government's assets facilitates payment on the Award, which payment on the Award constitutes state aid. *See Id.* ¶¶ at 25, 26.     Per the European Commission's ("EC") position, Romania is "prohibited from taking "any steps" to implement the Award".     *See Id.* at its Exhibit 4. Were the Romanian Government to provide information on its accounts or other type of assets, it would, in effect, be affording Petitioners information that could well lead to payment of the Award, which would constitute state aid under European Union ("EU") law. *See Id.*   As the European Commission views posting a bond as state aid, providing information on assets which Petitioners can execute, would constitute state aid, which is defined *as an advantage in <u>any form whatsoever conferred</u> on a selective basis to undertakings by national public authorities*. *See Id.* As long as the investigation of Romania on the state aid matter is pending (resulting from the 18 June 19 General Order), any action of Romania, assisting Petitioners in executing the ICSID Award is considered an action for facilitating a state aid under EU law.  *See Id.*, its Exhibit 4.

4.     Identify and describe the location, ownership (including name and address), and purpose of any and all Tangible Assets owned by Romania or by any Instrumentality of Romania, located within or without Romania.

**RESPONSE:**

Objections. Romania objects to this interrogatory on numerous grounds.  First, the interrogatory is overly broad, failing to limit it's request per Section 1603(b)(2) and Section 1611 of the FSIA, (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity with (i) military character or (ii) under the control of a military authority or defense agency. Second, this interrogatory seeks information on Tangible Assets maintained within Romania when enforcement proceedings are limited to the Romanian Government's assets within the United States and, thus, this interrogatory is not reasonably calculated to lead to the discovery of admissible evidence in this action.

Without waiving said objections, Romania responds as follows:

(a) There is no authorized person currently available to provide information and or affirm the responses to this Interrogatory. On October 10, 2019, the Romanian Parliament dismissed the Romanian Government, according to Art. 110 of the Romanian Constitution. *See* a true and accurate copy of the Declaration of Dana Vilaia, at ¶¶ 12-24.  attached hereto as

Exhibit A.  The effect of this is that there is no viable individual who currently can obtain authorization to acquire the information sought in the interrogatories in question, and who has the authority to provide such information or has authorization to assess and present the information related to the interrogatories.  *See Id.* As of October 10, 2019, the dismissed Government is operating with restricted capacity and has only limited powers according to Art. 110 par. (4) of the Romanian Constitution. It can only fulfill acts required for the administration of public affairs. Providing information on State assets does not fall under the permissible actions of the dismissed Government. This requires an official of the Romanian government to determine what is "*commercial property*" which is "*either a regular course of commercial conduct or a particular commercial transaction or act.*" *See Id*. It also requires such an individual to select and exclude and deem immune from execution, per Section 1611 of the FSIA: (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity, with (i) military character or (ii) under the control of a military authority or defense agency.  *See Id.* It also requires such an individual to select, exclude and deem immune from execution, that the property is property that of the Romanian Government in the United States of a foreign State per FSIA Section 1603(b)(2).  *See Id.*  The dismissed Government currently does not have the attributes and capacities to undertake these decisions.  *See Id.*

(b)      The Romanian courts have acknowledged that the Romanian Government has made payment on the Award. *See Id.* at ¶¶ 7-11. On April 7, 2017, the Bucharest Court of Appeal by Judgment no. 342 (page 23, point 9) ruled that the Government of Romanian has paid the ICSID Award via the set-off as valid method payment of the ICSID Award. The Court also denied the possibility of Viorel Micula to execute the ICSID Award.  *See Id.* at its Exhibit 1.

On October, 21, 2019, the Bucharest Court of Appeals, case no. 15755/3/2014, in which case the Romanian Government challenged the forced execution initiated by SC MULTIPACK SRL, SC STARMILL SRL, SC EUROPEAN FOOD SA and MICULA IOAN, based on the ICSID Award, entered a final judgment holding that the Set Off decisions no. 1202204/March 21, 2014 and no. 28892-20905/January 14, 2014 are valid and constitutes payment on the Award against SC European Food SA, one of the joint creditors of the ICSID Award. The ruling also annulled the enforcement measures taken by Mazilu și Asociații, counsel for the Miculas, against the Romanian Government commenced on April 29, 2014; This judgment was entered after the 18 June 2019 Order of the European Court was issued.  *See Id.* at its Exhibit *2*.

On October 15, 2019, the Bucharest Tribunal, in court case no. 21475/3/2019, entered Judgment no. 2217/October 15, 2019 whereby it denied the creditor, Viorel Micula, the right to commence forced execution against the Government of Romanian; this Judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit 3.

This Court has ruled that "§ 1650a the "possibility that an offset might apply to the award that would make execution in the full amount improper"; *see also* Restatement (Second) of Conflict of Laws § 116 (1971). "A judgment will not be enforced in other

states if the judgment has been discharged by payment or otherwise under the local law of the state of rendition.").” *See* Memorandum Opinion dated September 11, 2019, at page 27 (ECF No. 86). Given that the Set Off has been determined to be recognized by the Romanian courts, this payment method should be applied towards the Award amount.

(c)     Providing information on the Romanian Government's assets facilitates payment on the Award, which payment on the Award constitutes state aid. *See Id.* ¶¶ at 25, 26.   Per the European Commission's ("EC") position, Romania is "prohibited from taking "any steps" to implement the Award". *See Id.* at its Exhibit 4. Were the Romanian Government to provide information on its accounts or other type of assets, it would, in effect, be affording Petitioners information that could well lead to payment of the Award, which would constitute state aid under European Union ("EU") law. *See Id.* As the European Commission views posting a bond as state aid, providing information on assets which Petitioners can execute, would constitute state aid, which is defined *as an advantage in any form whatsoever conferred on a selective basis to undertakings by national public authorities*. *See Id.* As long as the investigation of Romania on the state aid matter is pending (resulting from the 18 June 19 General Order), any action of Romania, assisting Petitioners in executing the ICSID Award is considered an action for facilitating a state aid under EU law. *See Id.*, its Exhibit 4.

5.     As to each Liquid and Tangible Asset identified in Interrogatories 3 and 4, identify all persons or entities with knowledge or information regarding the particular Liquid or Tangible Asset.

RESPONSE:

Objections. Romania objects to this interrogatory on numerous grounds.  First, the interrogatory is overly broad, failing to limit it's request per Section 1603(b)(2) and Section 1611 of the FSIA, (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity with (i) military character or (ii) under the control of a military authority or defense agency. Second, this interrogatory seeks information on Liquid and Tangible Assets maintained within Romania when enforcement proceedings are limited to the Romanian Government's assets within the United States and, thus, this interrogatory is not reasonably calculated to lead to the discovery of admissible evidence in this action.

Without waiving said objections, Romania responds as follows:

(a) There is no authorized person currently available to provide information and or affirm the responses to this Interrogatory. On October 10, 2019, the Romanian Parliament dismissed the Romanian Government, according to Art. 110 of the Romanian Constitution. *See* a true and accurate copy of the Declaration of Dana Vilaia, at ¶¶ 12-24.  attached hereto as Exhibit A.  The effect of this is that there is no viable individual who currently can obtain

authorization to acquire the information sought in the interrogatories in question, and who has the authority to provide such information or has authorization to assess and present the information related to the interrogatories. *See Id.* As of October 10, 2019, the dismissed Government is operating with restricted capacity and has only limited powers according to Art. 110 par. (4) of the Romanian Constitution. It can only fulfill acts required for the administration of public affairs. Providing information on State assets does not fall under the permissible actions of the dismissed Government. This requires an official of the Romanian government to determine what is "*commercial property*" which is "*either a regular course of commercial conduct or a particular commercial transaction or act.*" *See Id*. It also requires such an individual to select and exclude and deem immune from execution, per Section 1611 of the FSIA: (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity, with (i) military character or (ii) under the control of a military authority or defense agency. *See Id.* It also requires such an individual to select, exclude and deem immune from execution, that the property is property that of the Romanian Government in the United States of a foreign State per FSIA Section 1603(b)(2). *See Id.* The dismissed Government currently does not have the attributes and capacities to undertake these decisions. *See Id.*

(b) The Romanian courts have acknowledged that the Romanian Government has made payment on the Award. *See Id.* at ¶¶ 7-11. On April 7, 2017, the Bucharest Court of Appeal by Judgment no. 342 (page 23, point 9) ruled that the Government of Romanian has paid the ICSID Award via the set-off as valid method payment of the ICSID Award. The Court also denied the possibility of Viorel Micula to execute the ICSID Award. *See Id.* at its Exhibit 1.

On October, 21, 2019, the Bucharest Court of Appeals, case no. 15755/3/2014, in which case the Romanian Government challenged the forced execution initiated by SC MULTIPACK SRL, SC STARMILL SRL, SC EUROPEAN FOOD SA and MICULA IOAN, based on the ICSID Award, entered a final judgment holding that the Set Off decisions no. 1202204/March 21, 2014 and no. 28892-20905/January 14, 2014 are valid and constitutes payment on the Award against SC European Food SA, one of the joint creditors of the ICSID Award. The ruling also annulled the enforcement measures taken by Mazilu şi Asociaţii, counsel for the Miculas, against the Romanian Government commenced on April 29, 2014; This judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit *2.*

On October 15, 2019, the Bucharest Tribunal, in court case no. 21475/3/2019, entered Judgment no. 2217/October 15, 2019 whereby it denied the creditor, Viorel Micula, the right to commence forced execution against the Government of Romanian; this Judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit 3.

This Court has ruled that "§ 1650a the "possibility that an offset might apply to the award that would make execution in the full amount improper"; *see also* Restatement (Second) of Conflict of Laws § 116 (1971). "A judgment will not be enforced in other states if the judgment has been discharged by payment or otherwise under the local law of the state of rendition.")." *See* Memorandum Opinion dated September 11, 2019, at

11

**page 27 (ECF No. 86). Given that the Set Off has been determined to be recognized by the Romanian courts, this payment method should be applied towards the Award amount.**

**(c)      Providing information on the Romanian Government's assets facilitates payment on the Award, which payment on the Award constitutes state aid.  *See Id.* ¶¶ at 25, 26.    Per the European Commission's ("EC") position, Romania is "prohibited from taking "any steps" to implement the Award".  *See Id.* at its Exhibit 4. Were the Romanian Government to provide information on its accounts or other type of assets, it would, in effect, be affording Petitioners information that could well lead to payment of the Award, which would constitute state aid under European Union ("EU") law.  *See Id.*  As the European Commission views posting a bond as state aid, providing information on assets which Petitioners can execute, would constitute state aid, which is defined *as an advantage in <u>any form whatsoever conferred</u> on a selective basis to undertakings by national public authorities*. *See Id.* As long as the investigation of Romania on the state aid matter is pending (resulting from the 18 June 19 General Order), any action of Romania, assisting Petitioners in executing the ICSID Award is considered an action for facilitating a state aid under EU law.  *See Id.*, its Exhibit 4.**

6.      Set forth, identify, and describe any entities, persons, or states that owe a debt to Romania or an Instrumentality of Romania. For each Debtor, set forth the following:

a.   The name, address and telephone number of each Debtor;

b.   The amounts owed;

c.   The underlying reason for the debt;

d.   Whether or not there is written evidence of this indebtedness, and if so, the location and custodian of the written indebtedness;

e.   Whether there is any payment schedule that is in place, and if so, describe the schedule; and

f.   Whether Romania, or an Instrumentality of Romania, has commenced any litigation or enforcement proceedings concerning the amounts owed, and if so, describe the litigation or enforcement proceedings.

**RESPONSE:**

**Objections. Romania objects to this interrogatory on numerous grounds.  First, the interrogatory is overly broad, failing to limit it's request per Section 1603(b)(2) and Section 1611 of the FSIA, (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity with (i) military character or (ii) under the control of a military authority or defense agency. Second, this interrogatory seeks information on entities, persons, or states who owe a debt to Romania without limiting the information to those debts and or assets within the United States, where enforcement proceedings are limited to the Romanian Government's assets within the United States and, thus, this interrogatory is not reasonably calculated to lead to the discovery of admissible evidence in this action.**

**Without waiving said objections, Romania responds as follows:**

**(a)  There is no authorized person currently available to provide information and or affirm the responses to this Interrogatory. On October 10, 2019, the Romanian Parliament dismissed the Romanian Government, according to Art. 110 of the Romanian Constitution. *See* a true and accurate copy of the Declaration of Dana Vilaia, at ¶¶ 12-24.  attached hereto as Exhibit A.  The effect of this is that there is no viable individual who currently can obtain authorization to acquire the information sought in the interrogatories in question, and who has the authority to provide such information or has authorization to assess and present the information related to the interrogatories.  *See Id.* As of October 10, 2019, the dismissed Government is operating with restricted capacity and has only limited powers according to Art. 110 par. (4) of the Romanian Constitution. It can only fulfill acts required for the administration of public affairs. Providing information on State assets does not fall under the permissible actions of the dismissed Government. This requires an official of the Romanian government to determine what is "*commercial property*" which is "*either a regular course of commercial conduct or a particular commercial transaction or act.*" *See Id*. It also requires such an individual to select and exclude and deem immune from execution, per Section 1611 of the FSIA: (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity, with (i) military character or (ii) under the control of a military authority or defense agency.  *See Id.* It also requires such an individual to select, exclude and deem immune from execution, that the property is property that of the Romanian Government in the United States of a foreign State per FSIA Section 1603(b)(2).  *See Id.*  The dismissed Government currently does not have the attributes and capacities to undertake these decisions.  *See Id.*

**(b)     The Romanian courts have acknowledged that the Romanian Government has made payment on the Award. *See Id.* at ¶¶ 7-11. On April 7, 2017, the Bucharest Court of Appeal by Judgment no. 342 (page 23, point 9) ruled that the Government of Romanian has paid the ICSID Award via the set-off as valid method payment of the ICSID Award. The Court also denied the possibility of Viorel Micula to execute the ICSID Award.  *See Id.* at its Exhibit 1.**

**On October, 21, 2019, the Bucharest Court of Appeals, case no. 15755/3/2014, in which case the Romanian Government challenged the forced execution initiated by SC MULTIPACK SRL, SC STARMILL SRL, SC EUROPEAN FOOD SA and MICULA**

13

IOAN, based on the ICSID Award, entered a final judgment holding that the Set Off decisions no. 1202204/March 21, 2014 and no. 28892-20905/January 14, 2014 are valid and constitutes payment on the Award against SC European Food SA, one of the joint creditors of the ICSID Award. The ruling also annulled the enforcement measures taken by Mazilu și Asociații, counsel for the Miculas, against the Romanian Government commenced on April 29, 2014; This judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit *2.*

On October 15, 2019, the Bucharest Tribunal, in court case no. 21475/3/2019, entered Judgment no. 2217/October 15, 2019 whereby it denied the creditor, Viorel Micula, the right to commence forced execution against the Government of Romanian; this Judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit 3.

This Court has ruled that "§ 1650a the "possibility that an offset might apply to the award that would make execution in the full amount improper"; *see also* Restatement (Second) of Conflict of Laws § 116 (1971). "A judgment will not be enforced in other states if the judgment has been discharged by payment or otherwise under the local law of the state of rendition.")." *See* Memorandum Opinion dated September 11, 2019, at page 27 (ECF No. 86). Given that the Set Off has been determined to be recognized by the Romanian courts, this payment method should be applied towards the Award amount.

(c)     Providing information on the Romanian Government's assets facilitates payment on the Award, which payment on the Award constitutes state aid. *See Id.* ¶¶ at 25, 26.   Per the European Commission's ("EC") position, Romania is "prohibited from taking "any steps" to implement the Award". *See Id.* at its Exhibit 4. Were the Romanian Government to provide information on its accounts or other type of assets, it would, in effect, be affording Petitioners information that could well lead to payment of the Award, which would constitute state aid under European Union ("EU") law. *See Id.* As the European Commission views posting a bond as state aid, providing information on assets which Petitioners can execute, would constitute state aid, which is defined *as an advantage in <u>any</u> form whatsoever conferred on a selective basis to undertakings by national public authorities. See Id.* As long as the investigation of Romania on the state aid matter is pending (resulting from the 18 June 19 General Order), any action of Romania, assisting Petitioners in executing the ICSID Award is considered an action for facilitating a state aid under EU law. *See Id.*, its Exhibit 4.

7.      Set forth, identify, and describe any Creditors of Romania or an Instrumentality of Romania. For each Creditor, set forth the following:

a.   The name, address, and telephone number of each Creditor;

b.   The amounts owed;

    c.   The underlying reason for the obligation;

    d.   Whether there is any payment schedule that is in place, and if so, describe the schedule; and

    e.   Whether any such Creditor has commenced any litigation or enforcement proceedings concerning amounts owed, and if so, describe the litigation or enforcement proceeding.

**RESPONSE:**

**Objections. Romania objects to this interrogatory on numerous grounds.  First, the interrogatory is overly broad, failing to limit its request per Section 1603(b)(2) and Section 1611 of the FSIA, (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity with (i) military character or (ii) under the control of a military authority or defense agency. Second, this interrogatory is overly broad and not reasonably calculated to lead to the discovery of admissible evidence in this action because it seeks information on entities, persons, or states that are Creditors of Romania without limiting the request to Creditors who seek assets within the United States, which is the only place the instant enforcement proceedings can occur.**

**Without waiving said objections, Romania responds as follows:**

**(a) There is no authorized person currently available to provide information and or affirm the responses to this Interrogatory. On October 10, 2019, the Romanian Parliament dismissed the Romanian Government, according to Art. 110 of the Romanian Constitution. *See* a true and accurate copy of the Declaration of Dana Vilaia, at ¶¶ 12-24.  attached hereto as Exhibit A.  The effect of this is that there is no viable individual who currently can obtain authorization to acquire the information sought in the interrogatories in question, and who has the authority to provide such information or has authorization to assess and present the information related to the interrogatories.  . *See Id.* As of October 10, 2019, the dismissed Government is operating with restricted capacity and has only limited powers according to Art. 110 par. (4) of the Romanian Constitution. It can only fulfill acts required for the administration of public affairs. Providing information on State assets does not fall under the permissible actions of the dismissed Government. This requires an official of the Romanian government to determine what is "*commercial property*" which is "*either a regular course of commercial conduct or a particular commercial transaction or act.*" *See Id.* It also requires such an individual to select and exclude and deem immune from execution, per Section 1611 of the FSIA: (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity, with (i) military character or (ii) under the control of a military authority or defense agency.  *See Id.* It also requires such an individual to select, exclude and deem immune from execution, that the property is property that of the Romanian Government in the United States of a foreign State per FSIA Section**

15

1603(b)(2). *See Id.* The dismissed Government currently does not have the attributes and capacities to undertake these decisions. *See Id.*

(b) The Romanian courts have acknowledged that the Romanian Government has made payment on the Award. *See Id.* at ¶¶ 7-11. On April 7, 2017, the Bucharest Court of Appeal by Judgment no. 342 (page 23, point 9) ruled that the Government of Romanian has paid the ICSID Award via the set-off as valid method payment of the ICSID Award. The Court also denied the possibility of Viorel Micula to execute the ICSID Award. *See Id.* at its Exhibit 1.

On October, 21, 2019, the Bucharest Court of Appeals, case no. 15755/3/2014, in which case the Romanian Government challenged the forced execution initiated by SC MULTIPACK SRL, SC STARMILL SRL, SC EUROPEAN FOOD SA and MICULA IOAN, based on the ICSID Award, entered a final judgment holding that the Set Off decisions no. 1202204/March 21, 2014 and no. 28892-20905/January 14, 2014 are valid and constitutes payment on the Award against SC European Food SA, one of the joint creditors of the ICSID Award. The ruling also annulled the enforcement measures taken by Mazilu şi Asociaţii, counsel for the Miculas, against the Romanian Government commenced on April 29, 2014; This judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit *2.*

On October 15, 2019, the Bucharest Tribunal, in court case no. 21475/3/2019, entered Judgment no. 2217/October 15, 2019 whereby it denied the creditor, Viorel Micula, the right to commence forced execution against the Government of Romanian; this Judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit 3.

This Court has ruled that "§ 1650a the "possibility that an offset might apply to the award that would make execution in the full amount improper"; *see also* Restatement (Second) of Conflict of Laws § 116 (1971). "A judgment will not be enforced in other states if the judgment has been discharged by payment or otherwise under the local law of the state of rendition.")." *See* Memorandum Opinion dated September 11, 2019, at page 27 (ECF No. 86). Given that the Set Off has been determined to be recognized by the Romanian courts, this payment method should be applied towards the Award amount.

(c) Providing information on the Romanian Government's assets facilitates payment on the Award, which payment on the Award constitutes state aid. *See Id.* ¶¶ at 25, 26. Per the European Commission's ("EC") position, Romania is "prohibited from taking "any steps" to implement the Award". *See Id.* at its Exhibit 4. Were the Romanian Government to provide information on its accounts or other type of assets, it would, in effect, be affording Petitioners information that could well lead to payment of the Award, which would constitute state aid under European Union ("EU") law. *See Id.* As the European Commission views posting a bond as state aid, providing information on assets which Petitioners can execute, would constitute state aid, which is defined *as an advantage in <u>any form whatsoever conferred</u> on a selective basis to undertakings by national public authorities*. *See Id.* As long as the investigation of Romania on the state aid matter is pending (resulting from

the 18 June 19 General Order), any action of Romania, assisting Petitioners in executing the ICSID Award is considered an action for facilitating a state aid under EU law.  *See Id.*, its Exhibit 4.


8.    Identify every Romanian official who resides, temporarily or permanently, within

the United States.

**RESPONSE:**

Objections. Romania objects to this interrogatory on numerous grounds.  First, the interrogatory is overly broad, failing to limit it's request per Section 1603(b)(2) and Section 1611 of the FSIA, (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity with (i) military character or (ii) under the control of a military authority or defense agency. Second, this interrogatory seeks information on Romanian officials who are not subject to execution thus, this interrogatory is not reasonably calculated to lead to the discovery of admissible evidence in this action.

Without waiving said objections, Romania responds as follows:

(a) There is no authorized person currently available to provide information and or affirm the responses to this Interrogatory. On October 10, 2019, the Romanian Parliament dismissed the Romanian Government, according to Art. 110 of the Romanian Constitution. *See* a true and accurate copy of the Declaration of Dana Vilaia, at ¶¶ 12-24.  attached hereto as Exhibit A.  The effect of this is that there is no viable individual who currently can obtain authorization to acquire the information sought in the interrogatories in question, and who has the authority to provide such information or has authorization to assess and present the information related to the interrogatories.  *See Id.* As of October 10, 2019, the dismissed Government is operating with restricted capacity and has only limited powers according to Art. 110 par. (4) of the Romanian Constitution. It can only fulfill acts required for the administration of public affairs. Providing information on State assets does not fall under the permissible actions of the dismissed Government. This requires an official of the Romanian government to determine what is "*commercial property*" which is "*either a regular course of commercial conduct or a particular commercial transaction or act.*" *See Id*. It also requires such an individual to select and exclude and deem immune from execution, per Section 1611 of the FSIA: (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity, with (i) military character or (ii) under the control of a military authority or defense agency.  *See Id.* It also requires such an individual to select, exclude and deem immune from execution, that the property is property that of the Romanian Government in the United States of a foreign State per FSIA Section 1603(b)(2).  *See Id.*   The dismissed Government currently does not have the attributes and capacities to undertake these decisions.  *See Id.*

(b)    The Romanian courts have acknowledged that the Romanian Government has made payment on the Award. *See Id.* at ¶¶ 7-11. On April 7, 2017, the Bucharest Court of

Appeal by Judgment no. 342 (page 23, point 9) ruled that the Government of Romanian has paid the ICSID Award via the set-off as valid method payment of the ICSID Award. The Court also denied the possibility of Viorel Micula to execute the ICSID Award. *See Id.* at its Exhibit 1.

On October, 21, 2019, the Bucharest Court of Appeals, case no. 15755/3/2014, in which case the Romanian Government challenged the forced execution initiated by SC MULTIPACK SRL, SC STARMILL SRL, SC EUROPEAN FOOD SA and MICULA IOAN, based on the ICSID Award, entered a final judgment holding that the Set Off decisions no. 1202204/March 21, 2014 and no. 28892-20905/January 14, 2014 are valid and constitutes payment on the Award against SC European Food SA, one of the joint creditors of the ICSID Award. The ruling also annulled the enforcement measures taken by Mazilu şi Asociaţii, counsel for the Miculas, against the Romanian Government commenced on April 29, 2014; This judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit 2.

On October 15, 2019, the Bucharest Tribunal, in court case no. 21475/3/2019, entered Judgment no. 2217/October 15, 2019 whereby it denied the creditor, Viorel Micula, the right to commence forced execution against the Government of Romanian; this Judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit 3.

This Court has ruled that "§ 1650a the "possibility that an offset might apply to the award that would make execution in the full amount improper"; *see also* Restatement (Second) of Conflict of Laws § 116 (1971). "A judgment will not be enforced in other states if the judgment has been discharged by payment or otherwise under the local law of the state of rendition.")." *See* Memorandum Opinion dated September 11, 2019, at page 27 (ECF No. 86). Given that the Set Off has been determined to be recognized by the Romanian courts, this payment method should be applied towards the Award amount.

(c)     Providing information on the Romanian Government's assets facilitates payment on the Award, which payment on the Award constitutes state aid. *See Id.* ¶¶ at 25, 26.   Per the European Commission's ("EC") position, Romania is "prohibited from taking "any steps" to implement the Award".   *See Id.* at its Exhibit 4. Were the Romanian Government to provide information on its accounts or other type of assets, it would, in effect, be affording Petitioners information that could well lead to payment of the Award, which would constitute state aid under European Union ("EU") law.  *See Id.*  As the European Commission views posting a bond as state aid, providing information on assets which Petitioners can execute, would constitute state aid, which is defined *as an advantage in any form whatsoever conferred on a selective basis to undertakings by national public authorities. See Id.* As long as the investigation of Romania on the state aid matter is pending (resulting from the 18 June 19 General Order), any action of Romania, assisting Petitioners in executing the ICSID Award is considered an action for facilitating a state aid under EU law.  *See Id.*, its Exhibit 4.

18

9.      Identify and describe all Foreign assistance that Romania, or an Instrumentality of Romania, receives from any Foreign entity (including any Foreign nation, business, corporation, consortium, or person).

**RESPONSE:**

**Objections. Romania objects to this interrogatory on numerous grounds.  First, the interrogatory is overly broad, failing to limit it's request per Section 1603(b)(2) and Section 1611 of the FSIA, (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity with (i) military character or (ii) under the control of a military authority or defense agency. Second, this interrogatory is overly broad and not reasonably calculated to lead to the discovery of admissible evidence in this action, for it seeks information on any and all Foreign Assistance to Romania without limiting the information to only assistance received by Romania within the United States and or applied within the United States, where these enforcement proceedings are pending.**

**Without waiving said objections, Romania responds as follows:**

**(a)  There is no authorized person currently available to provide information and or affirm the responses to this Interrogatory. On October 10, 2019, the Romanian Parliament dismissed the Romanian Government, according to Art. 110 of the Romanian Constitution. *See* a true and accurate copy of the Declaration of Dana Vilaia, at ¶¶ 12-24.  attached hereto as Exhibit A.  The effect of this is that there is no viable individual who currently can obtain authorization to acquire the information sought in the interrogatories in question, and who has the authority to provide such information or has authorization to assess and present the information related to the interrogatories.  *See Id.* As of October 10, 2019, the dismissed Government is operating with restricted capacity and has only limited powers according to Art. 110 par. (4) of the Romanian Constitution. It can only fulfill acts required for the administration of public affairs. Providing information on State assets does not fall under the permissible actions of the dismissed Government. This requires an official of the Romanian government to determine what is "*commercial property*" which is "*either a regular course of commercial conduct or a particular commercial transaction or act.*" *See Id.* It also requires such an individual to select and exclude and deem immune from execution, per Section 1611 of the FSIA: (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity, with (i) military character or (ii) under the control of a military authority or defense agency.  *See Id.* It also requires such an individual to select, exclude and deem immune from execution, that the property is property that of the Romanian Government in the United States of a foreign State per FSIA Section 1603(b)(2).  *See Id.*  The dismissed Government currently does not have the attributes and capacities to undertake these decisions.  *See Id.***

19

(b)     The Romanian courts have acknowledged that the Romanian Government has made payment on the Award. *See Id.* at ¶¶ 7-11. On April 7, 2017, the Bucharest Court of Appeal by Judgment no. 342 (page 23, point 9) ruled that the Government of Romanian has paid the ICSID Award via the set-off as valid method payment of the ICSID Award. The Court also denied the possibility of Viorel Micula to execute the ICSID Award.  *See Id.* at its Exhibit 1.

On October, 21, 2019, the Bucharest Court of Appeals, case no. 15755/3/2014, in which case the Romanian Government challenged the forced execution initiated by SC MULTIPACK SRL, SC STARMILL SRL, SC EUROPEAN FOOD SA and MICULA IOAN, based on the ICSID Award, entered a final judgment holding that the Set Off decisions no. 1202204/March 21, 2014 and no. 28892-20905/January 14, 2014 are valid and constitutes payment on the Award against SC European Food SA, one of the joint creditors of the ICSID Award. The ruling also annulled the enforcement measures taken by Mazilu și Asociații, counsel for the Miculas, against the Romanian Government commenced on April 29, 2014; This judgment was entered after the 18 June 2019 Order of the European Court was issued*.  See Id.* at its Exhibit *2.*

On October 15, 2019, the Bucharest Tribunal, in court case no. 21475/3/2019, entered Judgment no. 2217/October 15, 2019 whereby it denied the creditor, Viorel Micula, the right to commence forced execution against the Government of Romanian; this Judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit 3.

This Court has ruled that "§ 1650a the "possibility that an offset might apply to the award that would make execution in the full amount improper"; *see also* Restatement (Second) of Conflict of Laws § 116 (1971). "A judgment will not be enforced in other states if the judgment has been discharged by payment or otherwise under the local law of the state of rendition.")." *See* Memorandum Opinion dated September 11, 2019, at page 27 (ECF No. 86). Given that the Set Off has been determined to be recognized by the Romanian courts, this payment method should be applied towards the Award amount.

(c)     Providing information on the Romanian Government's assets facilitates payment on the Award, which payment on the Award constitutes state aid.  *See Id.* ¶¶ at 25, 26.   Per the European Commission's ("EC") position, Romania is "prohibited from taking "any steps" to implement the Award".  *See Id.* at its Exhibit 4. Were the Romanian Government to provide information on its accounts or other type of assets, it would, in effect, be affording Petitioners information that could well lead to payment of the Award, which would constitute state aid under European Union ("EU") law.  *See Id.*  As the European Commission views posting a bond as state aid, providing information on assets which Petitioners can execute, would constitute state aid, which is defined *as an advantage in <u>any form whatsoever conferred</u> on a selective basis to undertakings by national public authorities*. *See Id.* As long as the investigation of Romania on the state aid matter is pending (resulting from the 18 June 19 General Order), any action of Romania, assisting Petitioners in executing the ICSID Award is considered an action for facilitating a state aid under EU law.  *See Id.*, its Exhibit 4.

10.     Identify and describe any contract, agreement, or relationship between Romania or any Instrumentality of Romania and a Foreign entity (including any Foreign nation, business, corporation, consortium of person), by which such Foreign entity invests in any way in Romania, or an Instrumentality of Romania. Include in such description:

a.   The name and location of the Foreign entity;

b.   The date of execution of any contract or agreement, or of initiation of the relationship and current status of the contract, agreement, or relationship;

c.   The location and custodian of a copy of any contract or agreement;

A description of the terms of any contract, including, but not limited to, the obligations and liabilities of the Foreign entity to Romania or an Instrumentality of Romania, including any payment or royalty obligations to Romania or an Instrumentality of Romania;

d.   A description of any and all transfers of funds that have taken place under any contract, agreement, or relationship, including an identification of any bank or financial institution that participated in the transfer of the funds;

e.   A description of any and all transfers of funds intended to take place within the next five years, including an identification of the name and location of any bank or financial institution that will participate in the transfer of the funds; and

f.   A description of the ownership or interest, if any, of Romania or an Instrumentality of Romania in the Foreign entity.

21

**RESPONSE:**

**Objections.** Romania objects to this interrogatory on numerous grounds. First, the interrogatory is overly broad, failing to limit it's request per Section 1603(b)(2) and Section 1611 of the FSIA, (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity with (i) military character or (ii) under the control of a military authority or defense agency. Second, this interrogatory is overly broad and not reasonably calculated to lead to the discovery of admissible evidence in this action, for it seeks information on any contract, agreement, or relationship between Romania or any Instrumentality of Romania and a Foreign entity, without limiting the information to contracts or agreements, or information related to such, which result in assets within the United States, where these enforcement proceedings are pending.

**Without waiving said objections, Romania responds as follows:**

**(a)** There is no authorized person currently available to provide information and or affirm the responses to this Interrogatory. On October 10, 2019, the Romanian Parliament dismissed the Romanian Government, according to Art. 110 of the Romanian Constitution. *See* a true and accurate copy of the Declaration of Dana Vilaia, at ¶¶ 12-24. attached hereto as Exhibit A. The effect of this is that there is no viable individual who currently can obtain authorization to acquire the information sought in the interrogatories in question, and who has the authority to provide such information or has authorization to assess and present the information related to the interrogatories. *See Id.* As of October 10, 2019, the dismissed Government is operating with restricted capacity and has only limited powers according to Art. 110 par. (4) of the Romanian Constitution. It can only fulfill acts required for the administration of public affairs. Providing information on State assets does not fall under the permissible actions of the dismissed Government. This requires an official of the Romanian government to determine what is "*commercial property*" which is "*either a regular course of commercial conduct or a particular commercial transaction or act.*" *See Id.* It also requires such an individual to select and exclude and deem immune from execution, per Section 1611 of the FSIA: (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity, with (i) military character or (ii) under the control of a military authority or defense agency. *See Id.* It also requires such an individual to select, exclude and deem immune from execution, that the property is property that of the Romanian Government in the United States of a foreign State per FSIA Section 1603(b)(2). *See Id.* The dismissed Government currently does not have the attributes and capacities to undertake these decisions. *See Id.*

**(b)** The Romanian courts have acknowledged that the Romanian Government has made payment on the Award. *See Id.* at ¶¶ 7-11. On April 7, 2017, the Bucharest Court of Appeal by Judgment no. 342 (page 23, point 9) ruled that the Government of Romanian has paid the ICSID Award via the set-off as valid method payment of the ICSID Award. The Court also denied the possibility of Viorel Micula to execute the ICSID Award. *See Id.* at its Exhibit 1.

On October, 21, 2019, the Bucharest Court of Appeals, case no. 15755/3/2014, in which case the Romanian Government challenged the forced execution initiated by SC MULTIPACK SRL, SC STARMILL SRL, SC EUROPEAN FOOD SA and MICULA IOAN, based on the ICSID Award, entered a final judgment holding that the Set Off decisions no. 1202204/March 21, 2014 and no. 28892-20905/January 14, 2014 are valid and constitutes payment on the Award against SC European Food SA, one of the joint creditors of the ICSID Award. The ruling also annulled the enforcement measures taken by Mazilu și Asociații, counsel for the Miculas, against the Romanian Government commenced on April 29, 2014; This judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit *2.*

On October 15, 2019, the Bucharest Tribunal, in court case no. 21475/3/2019, entered Judgment no. 2217/October 15, 2019 whereby it denied the creditor, Viorel Micula, the right to commence forced execution against the Government of Romanian; this Judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit 3.

This Court has ruled that "§ 1650a the "possibility that an offset might apply to the award that would make execution in the full amount improper"; *see also* Restatement (Second) of Conflict of Laws § 116 (1971). "A judgment will not be enforced in other states if the judgment has been discharged by payment or otherwise under the local law of the state of rendition.")." *See* Memorandum Opinion dated September 11, 2019, at page 27 (ECF No. 86). Given that the Set Off has been determined to be recognized by the Romanian courts, this payment method should be applied towards the Award amount.

(c)     Providing information on the Romanian Government's assets facilitates payment on the Award, which payment on the Award constitutes state aid. *See Id.* ¶¶ at 25, 26.   Per the European Commission's ("EC") position, Romania is "prohibited from taking "any steps" to implement the Award". *See Id.* at its Exhibit 4. Were the Romanian Government to provide information on its accounts or other type of assets, it would, in effect, be affording Petitioners information that could well lead to payment of the Award, which would constitute state aid under European Union ("EU") law. *See Id.* As the European Commission views posting a bond as state aid, providing information on assets which Petitioners can execute, would constitute state aid, which is defined *as an advantage in <u>any form whatsoever conferred</u> on a selective basis to undertakings by national public authorities*. *See Id.* As long as the investigation of Romania on the state aid matter is pending (resulting from the 18 June 19 General Order), any action of Romania, assisting Petitioners in executing the ICSID Award is considered an action for facilitating a state aid under EU law. *See Id.*, its Exhibit 4.

11.     Identify the five persons most knowledgeable about Romania or an Instrumentality of Romania's Liquid Assets, Tangible Assets, accounts, or monies in any financial institution.

**RESPONSE:**

**Objections. Romania objects to this interrogatory on numerous grounds. First, the interrogatory is overly broad, failing to limit it's request per Section 1603(b)(2) and Section 1611 of the FSIA, (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity with (i) military character or (ii) under the control of a military authority or defense agency. Second, this interrogatory is overly broad and not reasonably calculated to lead to the discovery of admissible evidence in this action, for it seeks information from  persons most knowledgeable about Romania's Liquid and Tangible Assets, accounts and monies in any financial institution, without limiting the information to that within the United States, where these enforcement proceedings are pending.**

**Without waiving said objections, Romania responds as follows:**

**(a) There is no authorized person currently available to provide information and or affirm the responses to this Interrogatory. On October 10, 2019, the Romanian Parliament dismissed the Romanian Government, according to Art. 110 of the Romanian Constitution. *See* a true and accurate copy of the Declaration of Dana Vilaia, at ¶¶ 12-24. attached hereto as Exhibit A.  The effect of this is that there is no viable individual who currently can obtain authorization to acquire the information sought in the interrogatories in question, and who has the authority to provide such information or has authorization to assess and present the information related to the interrogatories.  *See Id.* As of October 10, 2019, the dismissed Government is operating with restricted capacity and has only limited powers according to Art. 110 par. (4) of the Romanian Constitution. It can only fulfill acts required for the administration of public affairs. Providing information on State assets does not fall under the permissible actions of the dismissed Government. This requires an official of the Romanian government to determine what is "*commercial property*" which is "*either a regular course of commercial conduct or a particular commercial transaction or act.*" *See Id*. It also requires such an individual to select and exclude and deem immune from execution, per Section 1611 of the FSIA: (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity, with (i) military character or (ii) under the control of a military authority or defense agency.  *See Id.* It also requires such an individual to select, exclude and deem immune from execution, that the property is property that of the Romanian Government in the United States of a foreign State per FSIA Section 1603(b)(2).  *See Id.*  The dismissed Government currently does not have the attributes and capacities to undertake these decisions.  *See Id.***

**(b)    The Romanian courts have acknowledged that the Romanian Government has made payment on the Award. *See Id.* at ¶¶ 7-11. On April 7, 2017, the Bucharest Court of Appeal by Judgment no. 342 (page 23, point 9) ruled that the Government of Romanian has paid the ICSID Award via the set-off as valid method payment of the ICSID Award. The Court also denied the possibility of Viorel Micula to execute the ICSID Award.  *See Id.* at its Exhibit 1.**

On October, 21, 2019, the Bucharest Court of Appeals, case no. 15755/3/2014, in which case the Romanian Government challenged the forced execution initiated by SC MULTIPACK SRL, SC STARMILL SRL, SC EUROPEAN FOOD SA and MICULA IOAN, based on the ICSID Award, entered a final judgment holding that the Set Off decisions no. 1202204/March 21, 2014 and no. 28892-20905/January 14, 2014 are valid and constitutes payment on the Award against SC European Food SA, one of the joint creditors of the ICSID Award. The ruling also annulled the enforcement measures taken by Mazilu și Asociații, counsel for the Miculas, against the Romanian Government commenced on April 29, 2014; This judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit *2.*

On October 15, 2019, the Bucharest Tribunal, in court case no. 21475/3/2019, entered Judgment no. 2217/October 15, 2019 whereby it denied the creditor, Viorel Micula, the right to commence forced execution against the Government of Romanian; this Judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit 3.

This Court has ruled that "§ 1650a the "possibility that an offset might apply to the award that would make execution in the full amount improper"; *see also* Restatement (Second) of Conflict of Laws § 116 (1971). "A judgment will not be enforced in other states if the judgment has been discharged by payment or otherwise under the local law of the state of rendition.")." *See* Memorandum Opinion dated September 11, 2019, at page 27 (ECF No. 86). Given that the Set Off has been determined to be recognized by the Romanian courts, this payment method should be applied towards the Award amount.

(c) Providing information on the Romanian Government's assets facilitates payment on the Award, which payment on the Award constitutes state aid. *See Id.* ¶¶ at 25, 26. Per the European Commission's ("EC") position, Romania is "prohibited from taking "any steps" to implement the Award". *See Id.* at its Exhibit 4. Were the Romanian Government to provide information on its accounts or other type of assets, it would, in effect, be affording Petitioners information that could well lead to payment of the Award, which would constitute state aid under European Union ("EU") law. *See Id.* As the European Commission views posting a bond as state aid, providing information on assets which Petitioners can execute, would constitute state aid, which is defined *as an advantage in any form whatsoever conferred on a selective basis to undertakings by national public authorities. See Id.* As long as the investigation of Romania on the state aid matter is pending (resulting from the 18 June 19 General Order), any action of Romania, assisting Petitioners in executing the ICSID Award is considered an action for facilitating a state aid under EU law. *See Id.*, its Exhibit 4.

12. Identify the five persons most knowledgeable about debts owed to Romania or an Instrumentality of Romania, and about creditors of Romania.

**RESPONSE:**

**Objections. Romania objects to this interrogatory on numerous grounds.  First, the interrogatory is overly broad, failing to limit it's request per Section 1603(b)(2) and Section 1611 of the FSIA, (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity with (i) military character or (ii) under the control of a military authority or defense agency. Second, this interrogatory is overly broad and not reasonably calculated to lead to the discovery of admissible evidence in this action, for it seeks information from persons most knowledgeable about debts owed to Romania and about creditors of Romania, without limiting the information to those whose debts or creditors result in assets within the United States, where these enforcement proceedings are pending.**

**Without waiving said objections, Romania responds as follows:**

**(a)  There is no authorized person currently available to provide information and or affirm the responses to this Interrogatory. On October 10, 2019, the Romanian Parliament dismissed the Romanian Government, according to Art. 110 of the Romanian Constitution. *See* a true and accurate copy of the Declaration of Dana Vilaia, at ¶¶ 12-24. attached hereto as Exhibit A.  The effect of this is that there is no viable individual who currently can obtain authorization to acquire the information sought in the interrogatories in question, and who has the authority to provide such information or has authorization to assess and present the information related to the interrogatories.  *See Id.* As of October 10, 2019, the dismissed Government is operating with restricted capacity and has only limited powers according to Art. 110 par. (4) of the Romanian Constitution. It can only fulfill acts required for the administration of public affairs. Providing information on State assets does not fall under the permissible actions of the dismissed Government. This requires an official of the Romanian government to determine what is "*commercial property*" which is "*either a regular course of commercial conduct or a particular commercial transaction or act.*" *See Id*. It also requires such an individual to select and exclude and deem immune from execution, per Section 1611 of the FSIA: (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity, with (i) military character or (ii) under the control of a military authority or defense agency.  *See Id.* It also requires such an individual to select, exclude and deem immune from execution, that the property is property that of the Romanian Government in the United States of a foreign State per FSIA Section 1603(b)(2).  *See Id.* The dismissed Government currently does not have the attributes and capacities to undertake these decisions.  *See Id.***

**(b)    The Romanian courts have acknowledged that the Romanian Government has made payment on the Award. *See Id.* at ¶¶ 7-11. On April 7, 2017, the Bucharest Court of Appeal by Judgment no. 342 (page 23, point 9) ruled that the Government of Romanian has paid the ICSID Award via the set-off as valid method payment of the ICSID Award. The Court also denied the possibility of Viorel Micula to execute the ICSID Award.  *See Id.* at its Exhibit 1.**

26

On October, 21, 2019, the Bucharest Court of Appeals, case no. 15755/3/2014, in which case the Romanian Government challenged the forced execution initiated by SC MULTIPACK SRL, SC STARMILL SRL, SC EUROPEAN FOOD SA and MICULA IOAN, based on the ICSID Award, entered a final judgment holding that the Set Off decisions no. 1202204/March 21, 2014 and no. 28892-20905/January 14, 2014 are valid and constitutes payment on the Award against SC European Food SA, one of the joint creditors of the ICSID Award. The ruling also annulled the enforcement measures taken by Mazilu și Asociații, counsel for the Miculas, against the Romanian Government commenced on April 29, 2014; This judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit *2.*

On October 15, 2019, the Bucharest Tribunal, in court case no. 21475/3/2019, entered Judgment no. 2217/October 15, 2019 whereby it denied the creditor, Viorel Micula, the right to commence forced execution against the Government of Romanian; this Judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit 3.

This Court has ruled that "§ 1650a the "possibility that an offset might apply to the award that would make execution in the full amount improper"; *see also* Restatement (Second) of Conflict of Laws § 116 (1971). "A judgment will not be enforced in other states if the judgment has been discharged by payment or otherwise under the local law of the state of rendition.")." *See* Memorandum Opinion dated September 11, 2019, at page 27 (ECF No. 86). Given that the Set Off has been determined to be recognized by the Romanian courts, this payment method should be applied towards the Award amount.

(c)     Providing information on the Romanian Government's assets facilitates payment on the Award, which payment on the Award constitutes state aid. *See Id.* ¶¶ at 25, 26.   Per the European Commission's ("EC") position, Romania is "prohibited from taking "any steps" to implement the Award". *See Id.* at its Exhibit 4. Were the Romanian Government to provide information on its accounts or other type of assets, it would, in effect, be affording Petitioners information that could well lead to payment of the Award, which would constitute state aid under European Union ("EU") law. *See Id.* As the European Commission views posting a bond as state aid, providing information on assets which Petitioners can execute, would constitute state aid, which is defined *as an advantage in <u>any form whatsoever conferred</u> on a selective basis to undertakings by national public authorities. See Id.* As long as the investigation of Romania on the state aid matter is pending (resulting from the 18 June 19 General Order), any action of Romania, assisting Petitioners in executing the ICSID Award is considered an action for facilitating a state aid under EU law. *See Id.*, its Exhibit 4.

13.     Identify the five persons most knowledgeable about Foreign investments in Romania or in an Instrumentality of Romania.

**RESPONSE:**

**Objections. Romania objects to this interrogatory on numerous grounds.   First, the interrogatory is overly broad, failing to limit it's request per Section 1603(b)(2) and Section 1611 of the FSIA, (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity with (i) military character or (ii) under the control of a military authority or defense agency. Second, this interrogatory is overly broad and not reasonably calculated to lead to the discovery of admissible evidence in this action, for it seeks information from   persons most knowledgeable about Foreign investments in Romania or in an Instrumentality of Romania, without limiting the information to foreign investments resulting in Romanian Government assets within the United States, where these enforcement proceedings are pending.**

**Without waiving said objections, Romania responds as follows:**

**(a)   There is no authorized person currently available to provide information and or affirm the responses to this Interrogatory. On October 10, 2019, the Romanian Parliament dismissed the Romanian Government, according to Art. 110 of the Romanian Constitution. *See* a true and accurate copy of the Declaration of Dana Vilaia, at ¶¶ 12-24.  attached hereto as Exhibit A.  The effect of this is that there is no viable individual who currently can obtain authorization to acquire the information sought in the interrogatories in question, and who has the authority to provide such information or has authorization to assess and present the information related to the interrogatories.  *See Id.* As of October 10, 2019, the dismissed Government is operating with restricted capacity and has only limited powers according to Art. 110 par. (4) of the Romanian Constitution. It can only fulfill acts required for the administration of public affairs. Providing information on State assets does not fall under the permissible actions of the dismissed Government. This requires an official of the Romanian government to determine what is "*commercial property*" which is "*either a regular course of commercial conduct or a particular commercial transaction or act.*" *See Id*. It also requires such an individual to select and exclude and deem immune from execution, per Section 1611 of the FSIA: (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity, with (i) military character or (ii) under the control of a military authority or defense agency.  *See Id.* It also requires such an individual to select, exclude and deem immune from execution, that the property is property that of the Romanian Government in the United States of a foreign State per FSIA Section 1603(b)(2).  *See Id.*  The dismissed Government currently does not have the attributes and capacities to undertake these decisions.  *See Id.***

**(b)      The Romanian courts have acknowledged that the Romanian Government has made payment on the Award. *See Id.* at ¶¶ 7-11. On April 7, 2017, the Bucharest Court of Appeal by Judgment no. 342 (page 23, point 9) ruled that the Government of Romanian has paid the ICSID Award via the set-off as valid method payment of the ICSID Award. The Court also denied the possibility of Viorel Micula to execute the ICSID Award.  *See Id.* at its Exhibit 1.**

On October, 21, 2019, the Bucharest Court of Appeals, case no. 15755/3/2014, in which case the Romanian Government challenged the forced execution initiated by SC MULTIPACK SRL, SC STARMILL SRL, SC EUROPEAN FOOD SA and MICULA IOAN, based on the ICSID Award, entered a final judgment holding that the Set Off decisions no. 1202204/March 21, 2014 and no. 28892-20905/January 14, 2014 are valid and constitutes payment on the Award against SC European Food SA, one of the joint creditors of the ICSID Award. The ruling also annulled the enforcement measures taken by Mazilu şi Asociaţii, counsel for the Miculas, against the Romanian Government commenced on April 29, 2014; This judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit *2.*

On October 15, 2019, the Bucharest Tribunal, in court case no. 21475/3/2019, entered Judgment no. 2217/October 15, 2019 whereby it denied the creditor, Viorel Micula, the right to commence forced execution against the Government of Romanian; this Judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Id.* at its Exhibit 3.

This Court has ruled that "§ 1650a the "possibility that an offset might apply to the award that would make execution in the full amount improper"; *see also* Restatement (Second) of Conflict of Laws § 116 (1971). "A judgment will not be enforced in other states if the judgment has been discharged by payment or otherwise under the local law of the state of rendition.")." *See* Memorandum Opinion dated September 11, 2019, at page 27 (ECF No. 86). Given that the Set Off has been determined to be recognized by the Romanian courts, this payment method should be applied towards the Award amount.

(c)    Providing information on the Romanian Government's assets facilitates payment on the Award, which payment on the Award constitutes state aid. *See Id.* ¶¶ at 25, 26.   Per the European Commission's ("EC") position, Romania is "prohibited from taking "any steps" to implement the Award".   *See Id.* at its Exhibit 4. Were the Romanian Government to provide information on its accounts or other type of assets, it would, in effect, be affording Petitioners information that could well lead to payment of the Award, which would constitute state aid under European Union ("EU") law.   *See Id.*   As the European Commission views posting a bond as state aid, providing information on assets which Petitioners can execute, would constitute state aid, which is defined *as an advantage in <u>any form whatsoever conferred</u> on a selective basis to undertakings by national public authorities*. *See Id.* As long as the investigation of Romania on the state aid matter is pending (resulting from the 18 June 19 General Order), any action of Romania, assisting Petitioners in executing the ICSID Award is considered an action for facilitating a state aid under EU law.   *See Id.*, its Exhibit 4.

14.    Identify and describe any books or records maintained by Romania, or an

Instrumentality of Romania, that concern the topics raised in Interrogatory requests numbers 1 to

13.

**RESPONSE:**

**Objections. Romania objects to this interrogatory on numerous grounds. First, the interrogatory is overly broad, failing to limit it's request per Section 1603(b)(2) and Section 1611 of the FSIA, (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity with (i) military character or (ii) under the control of a military authority or defense agency. Second, this interrogatory is overly broad and not reasonably calculated to lead to the discovery of admissible evidence in this action, for it seeks information from persons most knowledgeable about books and records maintained by Romania, or an Instrumentality of Romania that concern the topics raised in interrogatory requests numbers 1- 13, without limiting the information to that solely within the United States, where these enforcement proceedings are pending.**

**Without waiving said objections, Romania responds as follows:**

**(d) There is no authorized person currently available to provide information and or affirm the responses to this Interrogatory. On October 10, 2019, the Romanian Parliament dismissed the Romanian Government, according to Art. 110 of the Romanian Constitution. *See* a true and accurate copy of the Declaration of Dana Vilaia, at ¶¶ 12-24. attached hereto as Exhibit A. The effect of this is that there is no viable individual who currently can obtain authorization to acquire the information sought in the interrogatories in question, and who has the authority to provide such information or has authorization to assess and present the information related to the interrogatories. *See Id.* As of October 10, 2019, the dismissed Government is operating with restricted capacity and has only limited powers according to Art. 110 par. (4) of the Romanian Constitution. It can only fulfill acts required for the administration of public affairs. Providing information on State assets does not fall under the permissible actions of the dismissed Government. This requires an official of the Romanian government to determine what is "*commercial property*" which is "*either a regular course of commercial conduct or a particular commercial transaction or act.*" *See Id*. It also requires such an individual to select and exclude and deem immune from execution, per Section 1611 of the FSIA: (a) assets detained by a foreign central bank or monetary authority; or (b) property that is or is intended to be used in connection with military activity, with (i) military character or (ii) under the control of a military authority or defense agency. *See Id.* It also requires such an individual to select, exclude and deem immune from execution, that the property is property that of the Romanian Government in the United States of a foreign State per FSIA Section 1603(b)(2). *See Id.* The dismissed Government currently does not have the attributes and capacities to undertake these decisions. *See Id.***

**(a) The Romanian courts have acknowledged that the Romanian Government has made payment on the Award. *See Id.* at ¶¶ 7-11. On April 7, 2017, the Bucharest Court of Appeal by Judgment no. 342 (page 23, point 9) ruled that the Government of Romanian has paid the ICSID Award via the set-off as valid method payment of the ICSID Award. The**

**Court also denied the possibility of Viorel Micula to execute the ICSID Award.** *See Id.* at its **Exhibit 1.**

> **On October, 21, 2019, the Bucharest Court of Appeals, case no. 15755/3/2014, in which case the Romanian Government challenged the forced execution initiated by SC MULTIPACK SRL, SC STARMILL SRL, SC EUROPEAN FOOD SA and MICULA IOAN, based on the ICSID Award, entered a final judgment holding that the Set Off decisions no. 1202204/March 21, 2014 and no. 28892-20905/January 14, 2014 are valid and constitutes payment on the Award against SC European Food SA, one of the joint creditors of the ICSID Award. The ruling also annulled the enforcement measures taken by Mazilu şi Asociaţii, counsel for the Miculas, against the Romanian Government commenced on April 29, 2014; This judgment was entered after the 18 June 2019 Order of the European Court was issued.** *See Id.* **at its Exhibit** *2.*

> **On October 15, 2019, the Bucharest Tribunal, in court case no. 21475/3/2019, entered Judgment no. 2217/October 15, 2019 whereby it denied the creditor, Viorel Micula, the right to commence forced execution against the Government of Romanian; this Judgment was entered after the 18 June 2019 Order of the European Court was issued.** *See Id.* **at its Exhibit 3.**

> **This Court has ruled that "§ 1650a the "possibility that an offset might apply to the award that would make execution in the full amount improper";** *see also* **Restatement (Second) of Conflict of Laws § 116 (1971). "A judgment will not be enforced in other states if the judgment has been discharged by payment or otherwise under the local law of the state of rendition.")."** *See* **Memorandum Opinion dated September 11, 2019, at page 27 (ECF No. 86). Given that the Set Off has been determined to be recognized by the Romanian courts, this payment method should be applied towards the Award amount.**

**(b)    Providing information on the Romanian Government's assets facilitates payment on the Award, which payment on the Award constitutes state aid.** *See Id.* **¶¶ at 25, 26.   Per the European Commission's ("EC") position, Romania is "prohibited from taking "any steps" to implement the Award".** *See Id.* **at its Exhibit 4. Were the Romanian Government to provide information on its accounts or other type of assets, it would, in effect, be affording Petitioners information that could well lead to payment of the Award, which would constitute state aid under European Union ("EU") law.** *See Id.* **As the European Commission views posting a bond as state aid, providing information on assets which Petitioners can execute, would constitute state aid, which is defined** *as an advantage in <u>any form whatsoever conferred</u> on a selective basis to undertakings by national public authorities. See Id.* **As long as the investigation of Romania on the state aid matter is pending (resulting from the 18 June 19 General Order), any action of Romania, assisting Petitioners in executing the ICSID Award is considered an action for facilitating a state aid under EU law.** *See Id.*, **its Exhibit 4.**

15. Identify the names and titles, if any, of all individuals who participated or assisted in

preparing responses to these interrogatories, or who prepared or supplied any information used in responding to these interrogatories, indicating in the case of each such individual the interrogatory number which he or she prepared or for which he or she supplied any information or answer.

**RESPONSE:**

**(a) There is no authorized person currently available to provide information and or affirm the responses to this Interrogatory. On October 10, 2019, the Romanian Parliament dismissed the Romanian Government, according to Art. 110 of the Romanian Constitution.** *See* **a true and accurate copy of the Declaration of Dana Vilaia, at ¶¶ 12-24.  attached hereto as Exhibit A. The effect of this is that there is no viable individual who possesses or currently can obtain the information sought in the Interrogatories in question, and who has the authority to provide such information or has authorization to assess and present the information related to the Interrogatories.** *See Id.* **As of October 10, 2019, the dismissed Government is operating with restricted capacity and has only limited powers according to Art. 110 par. (4) of the Romanian Constitution. It can only fulfill acts required for the administration of public affairs.**

**(b) Counsel for Romania drafted and assisted in the preparation of the responses to these interrogatories.**

Dated: CHICAGO, IL
October 30, 2019

/s/*Ioana Salajanu*
Ioana Salajanu [ARDC No.: 6272981]
7620 Kidlare
Skokie, IL 60076
773.875.5438

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing was served by mailing the same to the Attorney indicated above, by first class mail, depositing said copies in the U.S. mail at 7620 Kildare, Skokie, Illinois before 11:00 p.m. and by email on  OCTOBER 30, 2019.

WHITE & CASE LLP

Francis A. Vasquez, Jr.
701 Thirteenth Street, N.W. Washington, DC 20005
Telephone: (202) 626-3600
fvasquez@whitecase.com

Jacqueline L. Chung
Laura A. Grai
1221 Avenue of the Americas New York, NY 10020
Telephone: (212) 819-8200
jacqueline.chung@whitecase.com
laura.grai@whitecase.com

*Counsel for Petitioners Ioan Micula, S.C. European Food S.A., S.C. Starmill S.R.L., and S.C. Multipack S.R.L.*

DENTONS US LLP

John W. Lomas, Jr.,
Daniel Morris
1900 K Street, NW
Washington, DC 20006
Telephone: (202) 496-7500
Facsimile: (202) 408-6399
john.lomas@dentons.com
daniel.morris@dentons.com

*Counsel for Petitioner Viorel Micula*