# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In the Matter of the Application of

IOAN MICULA,
VIOREL MICULA,

S.C. EUROPEAN FOOD S.A.,
S.C. STARMILL S.R.L and

S.C. MULTIPACK S.R.L
                Petitioners

        - against –

THE GOVERNMENT OF ROMANIA,

                Respondent.

Civil Action No. 17 CV 2332

DECLARATION OF DANA VILAIA

## DECLARATION OF DANA VILAIA

I, **DANA VILAIA**, Managing Partner of S.P.A.R.L. Vilaia & Asociații, being duly sworn, deposes and states:

1. This Declaration is made based on my knowledge of the facts set forth herein and my professional qualifications and experience and, if sworn as a witness, I could and would competently testify to the statements contained herein.

2. I am authorized to sign this Declaration on behalf of the S.P.A.R.L. Vilaia & Asociații.

3. As part of the appointed Consortium, S.P.A.R.L. Vilaia & Asociații is the Romanian consortium counsel for Romanian Government, via the Ministry of Finance ("the Client") in the Civil Action No. 17 CV 2332 ("Civil Action") as filed by petitioners, Viorel Micula, Ioan Micula, European Food S.A., Starmill S.R.L and Multipack ("Petitioners") relating to the ICSID Arbitration Award issued in favor of Petitioners and against Romania in the amount of RON 376,433, 299 ("Award").

4. Part of my duties as the legal counsel for the Ministry of Finance of Romania, *inter alia*, is to receive reports from the Client concerning Micula's attempts to execute on the Award under the Romanian jurisdiction respectively to recognize and enforce the Award under the EU varies jurisdictions ("the Lawsuits")

5. Based on the information and documentation that I have received from the Client, I have knowledge and I am familiar with the pleadings and briefs filed in this Civil Action, the various lawsuits in Europe, including some decisions of the Romanian and EU Courts of Law.

6. Attorneys for Romania in all of the lawsuits in Romania and in Europe have asserted before all of the relevant Romanian and European courts, that the Award has been paid.

7. The Romanian Government made payments on the ICSID Award as follows: (i) <u>Set Off</u>: on January 14 and 15, 2014 the Romanian Ministry of Finance, via the National Agency

for Fiscal Administration ("NAFA"), issued the setoff decision and communicated to Petitioners the setoff of RON 337,492,864 (ca. EUR 76 million) against the tax debts owed by European Food to Romanian ("***Set Off***"); (ii) Forced Execution: on January 5, 2015, the judicial executor seized RON 36,484,232 (ca. EUR 8.1 million) from the Ministry of Public Finance's account.. Of this sum, the judicial executor subsequently transferred RON 34,004,232 (ca. EUR 7.56 million) as follows to three of the five Petitioners. Between February 5, 2015 and February 25, 2015, the judicial executor seized the additional RON 9,197,482 (ca. EUR 2 million) from the accounts of the Ministry of Public Finance ("***Forced Execution***") and (iii) Treasury Account: on March 9, 2015, the Ministry of Public Finance, pursuant to Law number 20/2015, voluntarily transferred the remaining amount of RON 472,788,675 (ca. EUR 106.5 million) (including the costs of judicial executor of RON 6,028,608) into a treasury account in the name of Petitioners in order to implement the Award ("***Treasury Account***").

8. On September 19, 2016, the Oradea Court of Appeals, case no. 177/35/CA/2016, acknowledged and recognized that the Romanian Government partially paid, at that time, the ICSID Award by Set Off and the Forced Execution. This was true, despite the fact that the Court found in favor of SC Scandic Distilleries SA, who challenged the Ministry of Finance's annulment of the tax warehouse.

### Judgment 178/CA/19.09.2016 (page 18) case no. 177/35/CA/2016

*„ The ICSID Award was implemented in two ways:*
*Part of the damages (337,492,864 RON - about 43% of the total amount) were directed by the state to one of the five applicants, respectively to EUROPEAN FOOD S.A. but not by direct payment, but by set-off with its debts to the state. The other part of the compensations granted, of a much smaller value (RON 43,100,691.04 - about 4%) were obtained by the other plaintiffs by way of forced execution.*
*After this compensation was made, during the forced execution, the representatives of the Romanian State notified the European Commission about the initiated enforcement method (respectively regarding the compensation), while also requesting a view of the Commission regarding the enforcement of the ICSID arbitration decision.*
*Therefore, the defendant in the arbitration file (Romania) sought the opinion of another party in the respective dispute (the European Commission) regarding the implementation or, on the contrary, the refusal to implement a decision expressly recognized by the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, concluded in Washington on May 18, 1965 and ratified by Romania by Decree no. 62 of May 30, 1975.*
*By Decision no. 2112 of 30.03.2015, the European Commission has forced Romania to recover the sums executed according to the ICSID Award both from the five applicants and from other 5 (five) companies in commercial or shareholder relations with the applicants."* [Our Note: one of these related companies being SC Scandic Distilleries SA, the petitioner in this case no. 177/35/CA/2016].

9. On April 7, 2017, case no. 8803/3/2015, the Bucharest Court of Appeals, by Judgment no. 342 (page 23, point 9) acknowledged and recognized that the Government of Romanian has paid the ICSID Award via the Set-Off. The Court also denied the ability of Viorel Micula to execute the ICSID Award. *See Exhibit 1 to this Declaration – Excerpt from Final Judgment no. 342/April7, 2017 of the Bucharest Court of Appeal in court case no. 8803/3/2015.*



2


### Bucharest Court of Appeals Judgment no. 342/April 7, 2017 in case no. 8803/3/2015

*"Concretely - based on the documents administered in the case at hand, it is found <u>that the arbitral award was enforced by the debtor Romanian State willingly towards the creditor in the case at hand and operated by extinguishing a consistent part of the debt, including through compensation of mutual liabilities</u> and, in spite of all that, the official receiver issued acts of enforcement ignoring the aforementioned fact, and also added a fee for the forced execution in an amount thus increased, and by ignoring all the decisions of the European Commission presented in the case and which were mandatory, as shown above, were provided in agreement with Community regulations and were incumbent upon all parties, upon the Romanian State - this including all bodies, courts and national institutions involved, therefore also official receivers - subject to the Romanian State being sanctioned in case of noncompliance."*

10. On **October, 21, 2019**, the Bucharest Court of Appeals, case no. 15755/3/2014, whereby the Romanian Government challenged the forced execution initiated by SC MULTIPACK SRL, SC STARMILL SRL, SC EUROPEAN FOOD SA and MICULA IOAN, based on the ICSID Award, entered a final judgment stating that by the Set Off decisions no. 1202204/March 21, 2014 and no. 28892-20905/January 14, 2014 were compensating only the SC European Food SA debts, one of the joint creditors of the ICSID Award. The ruling also annulled the enforcement measured taken on April 29, 2014 by Mazilu și Asociații, judicial executor for the Miculas, against the Romanian Government. This judgment was entered after the 18 June 2019 Order of the European Court was issued. *See Exhibit 2 to this Declaration – Court Record from Final Judgment of the Bucharest Court of Appeal in court case no. 15755/3/2014.*

### Final Judgment of the Bucharest Court of Appeal in case no. 15755/3/2014

"*<u>Annuls</u> the debentures issued on April 30, 2014 in enforcement file no. 22/2014 by Civil Professional Society of Official Receivers Mazilu și Asociații, the conclusion of April 29, 2014 and the report of April 28, 2014 issued in the same enforcement file. <u>Finds that the compensation</u> decisions no. 1202204/March 21, 2014 and no. 28892-20905/January 14, 2014 issued by the MPF-ANAF <u>generated effects</u> only with regard to the receivable of SC European Food SA.[..]*"

11. On **October 15, 2019**, the Bucharest Tribunal, in court case no. 21475/3/2019, entered Judgment no. 2217/October 15, 2019 whereby it denied the Creditor, Viorel Micula, the right to commence forced execution against the Government of Romanian; this Judgment was likewise entered after the 18 June 2019 Order of the European Court was issued. *See Exhibit 3 to this Declaration – Court Record of Judgment of Bucharest Tribunal no. 2217/October 15, 2019 in court case no. 21475/3/2019.*

### Judgment no. 2217/October 15, 2019 of the Bucharest Tribunal in case no. 21475/3/2019

*"Dismisses the request for approval of forced execution".*

12. On October 10, 2019, the Romanian Parliament dismissed the Romanian Government according to Art. 110 of the Romania Constitution.

### Art. 110 of the Romanian Constitution

*"**Article 110** (1) The Government shall exercise its term of office until the validation of the general parliamentary elections.*

*(2) The Government shall be dismissed on the date the Parliament with-draws the confidence granted, or if the Prime Minister finds himself in one of the situations under*

*Article 106, except for revocation, or in case of his impossibility to exercise his powers for more than 45 days.*
*(3) In situations such as under paragraph (2) the provisions of Article 103 shall apply accordingly.*
*(4) The Government whose term of office ceased in accordance with par. (1) and (2) <u>shall continue to fulfill only the acts required for the administration of public affairs</u>, until the members of the new Government take the oath."*

13. Since the dismissal of the current Government, the President of Romania nominated a new prime minister, who has selected his minister candidates for the new Government.

14. The date that the Parliament must ratify the newly proposed Government is not known as of the date this Declaration is executed.

15. Therefore, at present, it is not clear if the new proposed Government will be vested soon by the Parliament.

16. As of October 10, 2019, the dismissed Government is operating with restricted capacity and has only limited powers according to Art. 110 par. (4) of the Romanian Constitution. Specifically, it can only fulfill acts required for the administration of public affairs

17. Providing information on the State assets does not fall under the permissible actions of the dismissed Government.

18. Section 1610(a) of the Foreign Sovereign Immunities Act ("FSIA") allows execution against a foreign State's property located in the United States if the property is used for commercial activity:

19. This requires an official of the Romanian government to determine what is *"commercial property"* which is *"either a regular course of commercial conduct or a particular commercial transaction or act"*.

20. It also requires such an individual to select and exclude and deem immune from execution, per Section 1611 of the FSIA, (i) assets detained by a foreign central bank or monetary authority, or (ii) property that is or is intended to be used in connection with military activity, with (a) military character or (b) under the control of a military authority or defense agency.

21. It also requires such an individual to select and exclude and deem immune from execution, property that is of the Romanian Government in the United States of a foreign State per FSIA Section 1603(b)(2).

22. The dismissed Government currently does not have the attributes and capacities to undertake these determinations.

23. Even once a newly vested Government is in place, it would be difficult if not rather impossible to timely identify the Romanian Government properties in the United States, given that the newly elected Government may not be able to easily identify them.

24. This is so because of the organizational structure of the Government. The Government is structured with different ministries, such as, but not limited to, the Ministry of Finance and the Ministry of Foreign Affairs and many others.

25. Moreover, per the European Commission's ("EC") position, Romania is: *"prohibited from taking any steps to implement the Award"*. See Exhibit 4 to this Declaration – *Letter of the European Commission sent to the Romanian State*. Were the Romanian Government to provide information on its assets, it would in effect be affording Micula et al. information that could well lead to payment of the Award, which would facilitate payment on the Award.

26. As such, providing assets that Micula can execute, would constitute state aid, which is defined: *as an advantage in <u>any form whatsoever conferred</u> on a selective basis to undertakings*

*by national public authorities*; such an action constituting state aid under European Law ("EU") law. As long as the EC is investigating Romania on the state aid issue, which investigation is pending as a result of the 18 June 19 General Order, any action of Romania, assisting Micula in executing the ICSID Award is considered an action for facilitating a state aid under European Law. *See Exhibit 4 to this Declaration – Letter of the European Commission sent to the Romanian State.*

**Official position of the European Commission sent to the Romanian State**

*"We would like to recall that on 26 May 2014 the Commission adopted a suspension injunction and on 1 October 2014 it adopted a decision opening a formal State aid investigation into the implementation of the arbitral award. Both of <u>those decisions prohibit Romania from taking any steps to implement the award until the Commission has closed the investigation by way of a final decision</u>: the former on the basis of Article 13(1) of Regulation 2015/1589, the latter on the basis of Article 108(3) TFEU. As your authorities might remember the Miculas withdrew their challenge against the suspension injunction before the General Court and they never challenged the validity of the decision opening the formal investigation procedure, which they were entitled to do. In the absence of a successful challenge, <u>those decisions remain valid and binding on Romania</u>. Consequently, those decisions prohibit Romania from paying security as a condition of a stay of enforcement and from posting a bond as a condition for appealing the D.C. District Court's judgment.*

*Finally, we would like to recall that the Commission has appealed the General Court's judgment of 18 June 2019 and that appeal is still pending."*

27. In addition to the foregoing, the EC has made it clear that Romania posting a bond constitutes state aid. This position has been made before the United Kingdom tribunals: *"that the <u>payment of security into court as a condition of a stay of enforcement of the arbitral award constitutes an implementation of that award and/or gives rise to new State aid in favor of the Miculas</u>. That position <u>has not changed</u> following the annulment of the Commission's final decision of 30 March 2015 by the General Court on 18 June 2019. For the very same reason, the position of the Commission's services, as stated in its letter of 15 December 2015 (REF: COMP/O3/KVC/gdn D(2015) 139208), has also remained unaltered as regards the payment of a bond as a condition to appeal the judgment of 11 September 2019 of the District Court of the District of Columbia." See Exhibit 4 to this Declaration – Letter of the European Commission sent to the Romanian State.*

28. The translation from Romanian to English is made to the best of my knowledge.

29. Declarant saying nothing further.

30. I declare under penalty of perjury under the laws of the United States of America that the foregoing is based upon the true and correct information and documentation received from the Client, executed on five pages, on October 30, 2019.

**Executed on October 30, 2019**

Av. DANA VILAIA

# EXHIBIT 1

6. – With the observation that they thus appear outlined from the perspective of the decisions of the European Commission – of the effects, at least the suspension of certain regulations <u>from the same field</u> (that of investments, of the protection of the internal/Community market, of assuring lawful competition) from the treaties (prior agreements, through the conclusion of subsequent treaties) (here the regulations of the T.F.E.U.) having incompatible provisions to the previous one, so that there is incompatibility in their simultaneous enforcement – from the perspective of art. 59 in the Convention regarding the law of treaties, Vienna, 1969.

7. – The Court also found that, according to art. 12 and 93 in the Regulation (E.C.) no. 659/1999 regarding the norms of enforcement of art. 93 in the Treaty of the E.C., the failure to observe the Order of suspension and recovery of illegal aid (and of the related interest) entitled the Commission even to directly notify the Court of Justice of the European Communities to declare that the noncompliance represented a violation of the Treaty of the E.U., to apply sanctions, even monetary ones (art. 171 in the Treaty).

8. – Are also considered the provisions of art. 5 in Law no. 188/2000, according to which "the activity of official receivers is carried out under the law, under observance of the rights and legitimate interests of the parties and of other interested persons (...)", as well as the provisions of art. 625 para. 1 of the Code of Civil Procedure, which provide that "forced execution shall be made under observance of the provisions of the law, of the rights of the parties and of other interested parties."

9. – Concretely – based on the documents administered in the case at hand, it is found that the arbitral award was enforced by the debtor Romanian State willingly towards the creditor in the case at hand and operated by extinguishing a consistent part of the debt, including through compensation of mutual liabilities and, in spite of all that, the official receiver issued acts of enforcement ignoring the aforementioned fact, and also added a fee for the forced execution in an amount thus increased, and by ignoring all the decisions of the European Commission presented in the case and which were <u>mandatory,</u> as shown above, were provided in agreement with Community regulations and were incumbent upon all parties, upon the Romanian State – this including all bodies, courts and national institutions involved, therefore also official receivers – subject to the Romanian State being sanctioned in case of noncompliance.

The criticism regarding <u>the failure to motivate</u> the appealed sentence cannot be accepted, because the fact that the appeal against enforcement was admitted relative to part of the arguments considered essential, which supported it, does not equal lack of motivation, because the analysis of the other arguments was considered to be lacking utility, thus observing the provisions of art. 525 (1) letter b) of the Code of Civil Procedure, as well as the case law of E.C.H.R. on the matter.

The Court finds that, on the contrary, the solution of the court of first instance is based on <u>solid arguments</u> – the first one being the Decision of the European Commission of <u>May 26, 2014</u> which <u>ordered the immediate suspension</u> by the Romanian State of any action related to the enforcement of the arbitral award which represents a writ of enforcement in the case – Decision notified in accordance with art. 297 TFEU (page 123, volume XIII) and having a

# EXHIBIT 2

Translation from Romanian

BUCHAREST COURT OF APPEAL
5th CIVIL SECTION –
Case no. 15755/3/2014
(stamp)

## CERTIFICATE
issued today, October 22, 2019

It is hereby certified by us, the Registry of the 5th Civil Section of the Bucharest Court of Appeal, that in **case no. 15755/3/2014 of this court**, with respect to the appeal filed by THE ROMANIAN STATE THROUGH THE MINISTRY OF PUBLIC FINANCE against civil sentence no. 1556/November 24, 2014 delivered by the 3rd Civil Section of the Bucharest Tribunal in case no. 15755/3/2014, against the appellees SC MULTIPACK SRL, SC STARMILL SRL, SC EUROPEAN FOOD SA and MICULA IOAN, the object of the case being "challenge against enforcement", **the 4th Civil Section of the Bucharest Court of Appeal** decided through civil judgment no. 1483 A/October 21, 2019:

"Admits the appeal filed against civil sentence no. 1556/November 24, 2014. Changes the appealed sentence, meaning that: it partly admits the challenge against enforcement. Annuls the debentures issued on April 30, 2014 in enforcement file no. 22/2014 by Civil Professional Society of Official Receivers Mazilu și Asociații, the conclusion of April 29, 2014 and the report of April 28, 2014 issued in the same enforcement file. Finds that the compensation decisions no. 1202204/March 21, 2014 and no. 28892-20905/January 14, 2014 issued by the MPF-ANAF produce effects only with regard to the receivable of SC European Food SA. Annuls the accounting expert report no. 2212014/April 9, 2014 elaborated in enforcement file no. 22/2014, with the consequence that the calculation of the receivables and related interests shall be redone relative to the compensation made with the receivable held by creditor SC European Food SA. Dismisses the rest of the challenge. Orders that the challenger should pay the trial expenses incurred in first instance by SC Starmill SRL, amounting to Lei 5000 and by SC European Food SA, amounting to Lei 3500. Dismisses the appeal against the conclusion of October 13, 2014 as unfounded. Definitive. Delivered by making the solution available to the parties through the court's registry."

This certificate was issued in one counterpart, at the request of the appellant **THE ROMANIAN STATE THROUGH THE MINISTRY OF PUBLIC FINANCE** acting through legal advisor Barar Doru Cătălin, being exempt from stamp duty in accordance with art. 30 in GEO no. 80/2013.

COURT CLERK OF THE COURT'S ARCHIVE,
DOBRE MIHAELA,
(illegible signature)
(stamp)

# EXHIBIT 3

*Translation from Romanian*

BUCHAREST TRIBUNAL
3rd CIVIL SECTION
Case no. 21475/3/2019
Date: October 23, 2019

### CERTIFICATE

It is hereby certified by us, the registry of this court, that through Civil Sentence no. 2217/October 15, 2019 delivered by the 3rd Civil Section of the Bucharest Tribunal in case no. 21475/3/2019 regarding the writ of summons filed by creditor MICULA VIOREL against the debtor THE ROMANIAN STATE THROUGH THE MINISTRY OF PUBLIC FINANCE, whose object was the approval of forced execution – arbitral award of USA, were decided the following:

"Dismisses the request for approval of forced execution.

Subject only to appeal within 30 days as of communication, to be submitted before the 3rd Civil Section of the Bucharest Tribunal.

Delivered in public session."

It is mentioned that this sentence is not motivated and drawn.

This certificate was issued at the request of the debtor, THE ROMANIAN STATE THROUGH THE MINISTRY OF PUBLIC FINANCE.

COURT CLERK,
Veronica Stoica
(illegible signature)
(stamp)

# EXHIBIT 4

Dear Andreea,

It has been the Commission's position throughout the UK proceedings that the payment of security into court as a condition of a stay of enforcement of the arbitral award constitutes an implementation of that award and/or gives rise to new State aid in favour of the Miculas. That position has not changed following the annulment of the Commission's final decision of 30 March 2015 by the General Court on 18 June 2019. For the very same reason, the position of the Commission's services, as stated in its letter of 15 December 2015 (REF: COMP/O3/KVC/gdn D(2015) 139208), has also remained unaltered as regards the payment of a bond as a condition to appeal the judgment of 11 September 2019 of the District Court of the District of Columbia.

We would like to recall that on 26 May 2014 the Commission adopted a suspension injunction and on 1 October 2014 it adopted a decision opening a formal State aid investigation into the implementation of the arbitral award. Both of those decisions prohibit Romania from taking any steps to implement the award until the Commission has closed the investigation by way of a final decision: the former on the basis of Article 13(1) of Regulation 2015/1589, the latter on the basis of Article 108(3) TFEU. As your authorities might remember the Miculas withdrew their challenge against the suspension injunction before the General Court and they never challenged the validity of the decision opening the formal investigation procedure, which they were entitled to do. In the absence of a successful challenge, those decisions remain valid and binding on Romania. Consequently, those decisions prohibit Romania from paying security as a condition of a stay of enforcement and from posting a bond as a condition for appealing the D.C. District Court's judgment.

Finally, we would like to recall that the Commission has appealed the General Court's judgment of 18 June 2019 and that appeal is still pending.

Kind regards
Koen Van de Casteele

**Koen Van de Casteele**
Head of Unit



**European Commission**
DG COMPETITION
Unit 03: State Aid Policy and Case Support

Building MADO, office 21/060
B-1049 Brussels/Belgium
+32 2 296 94 19
koen.van-de-casteele@ec.europa.eu
Competition websites: http://ec.europa.eu/competition
**DISCLAIMER**
"The views expressed are purely those of the writer and may not in any circumstances be regarded as stating an official position of the European Commission."