**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

In the Matter of the Application of
IOAN MICULA,

VIOREL MICULA,

S.C. EUROPEAN FOOD S.A.,

S.C. STARMILL S.R.L and

S.C. MULTIPACK S.R.L
                          Petitioners

               - against –

THE GOVERNMENT OF ROMANIA,

                    Respondent.

Civil Action No. 17 CV 2332

**GOVERNMENT OF ROMANIA'S MEMORANDUM IN SUPPORT OF MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(B)(5)**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

I.  PRELIMINARY STATEMENT ............................................................................... 1

II.  RELEVANT FACTS AND PROCEDURAL BACKGROUND ...................................... 2

III.  LEGAL STANDARDS ............................................................................................ 9

    A.  Relief from Civil Judgments – Fed. R. Civ P. 60(b)(5) ............................ 9

    B.  The Convention on the Settlement of Investment Disputes between States and Nationals of Other States .................................................................. 10

IV.  ARGUMENT ....................................................................................................... 11

    A.  The Pecuniary Obligations of the Award have Been Satisfied, Therefore, the Judgment Should Be Voided Pursuant to Fed R. Civ. P. 60(b)(5) ................ 11

    B.  The Court's Ruling and Restatement (Second) of Conflict of Laws Compels the Conclusion That the Judgment Cannot Stand .................................. 13

    C.  The Principles Of International Comity Bars The Judgment to Stand ................. 17

    D.  The Act of State Doctrine Bars the Judgment To Stand ....................................... 19

    E.  The Foreign Sovereign Compulsion Doctrine Bars The Judgment From Standing ........................................................................................................ 20

V.  CONCLUSION ................................................................................................... 21

## TABLE OF AUTHORITIES

**U.S.A. Cases:**                                                                               **Page(s)**

*Micula v. Gov't of Romania*,
  404 F. Supp. 3d 265 (D.D.C. 2019)....................................................1, 2, 10, 11, 14, 20, 21

*Darren Brewer v. Insight Technology, Inc.*,
  Case No: 6:12-cv-668, 2014 WL 12623024 (M.D. FL. Jan. 3, 2014)...........1, 2, 14, 15, 16

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*,
  863 F.3d 96 (2d Cir. 2017) ..........................................................................................2, 14

*Mike Smith Pontiac, GMC, Inc. v. Mercedes-Benz of North America, Inc.*,
  741 A.2d 462  (Md. 1999) .................................................................................2, 14, 15, 16

*Grand Union Equipment Co. v. Lippner*,
  167 F.2d 953 (2d Cir. 1948) ..................................................................................................9

*Block v. Thousandfriend*,
  170 F.2d 428 (2d Cir. 1948) ..................................................................................................9

*Tobin v. Alma Mills*,
  92 F. Supp. 728 (W.D.S.C. 1950)...........................................................................................9

*Pierce Oil Corp. v. United States*,
  9 F.R.D. 619 (E.D. Va. 1949) .................................................................................................9

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,
  322 U.S. 238 (1944) ...............................................................................................................9

*United States v. Swift & Co.*,
  286 U.S. 106 (1932) ...............................................................................................................9

*Pennoyer v. Neff*,
  95 U.S. 714 (1877) .................................................................................................................9

*Bass v. Hoagland*,
  172 F.2d 205 (5th Cir. 1949) .................................................................................................9

*Torres–Troche v. Municipality of Yauco*,
  873 F.2d 499 (1st Cir. 1989)...................................................................................................9

*Kassman v. Am. Univ.*,
  546 F.2d 1029 (D.C. Cir.1976)...............................................................................................9

*Sunderland v. City of Philadelphia*,
  575 F.2d 1089 (3d Cir. 1978) ................................................................................................9

*Medellin v. Texas*,
  552 U.S. 491 (2008) .............................................................................................................10

*Hilton v. Guyot*,
  159 U.S. 113, 163-64 (1895) ...........................................................................................17, 18

*China Trade & Dev. Corp. v. M.V. Choong Yong*,
   837 F.2d 33 (2d Cir. 1987) ................................................................17

*Banco Nacional de Cuba v. Sabbatino*,
   76 U.S. 398 (1964) ...............................................................17, 19

*de Csepel v. Republic of Hungary*,
   714 F.3d 591 (D.C. Cir. 2013).......................................17, 18, 19

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
   731 F.2d 909 (D.C. Cir. 1984)......................................................17-18

*Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc.*,
   466 F.3d 88 (2d Cir. 2006) ...........................................................18

*W.S. Kirkpatrick & Co., Inc. v. Envt'l Tectonics Corp., Int'l*,
   493 U.S. 400 (1990) ......................................................................19

*Republic of Austria v. Altmann*,
   541 U.S. 677 (2004) ......................................................................19

*Ricaud v. Am. Metal Co.*,
   246 U.S. 304 (1918) ......................................................................19

*O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana S.A.*,
   830 F.2d 449 (2d Cir. 1987) ...........................................................20

*Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*,
   357 U.S. 197 (1958) ......................................................................20

*Mannington Mills, Inc. v. Congoleum Corp.*,
   595 F.2d 1287 (3d Cir. 1979) .........................................................20

*In re Sealed Case*, 825 F.2d 494 (D.C. Cir. 1987) .................................20

*European Community v. RJR Nabisco, Inc.*,
   764 F.3d 129 (2d Cir. 2014) ...........................................................20

## U.S.A. Legislation

Federal Rule of Civil Procedure 60(b)(5) ........................................1, 9, 11, 13

Fed. R. Evid. 801(d)(2)(a) .............................................................12

28 U.S.C. § 1610(c) .........................................................................4

ICSID Convention (Article 54) ..........................................3, 10, 11

**Romanian Cases**

*SC Multipack SRL, SC Starmill SRL, SC European Food SA, Micula Ioan v. The Romanian State through the Ministry of Public Finances*, Case no. 15755/3/2014 before the Bucharest Court of Appeals (2014) ........................................................................1, 2, 6, 7, 8, 11, 12, 13, 15-21

*SC Multipack SRL, SC Starmill SRL, SC European Food SA, Micula Ioan v. The Romanian State through the Ministry of Public Finances*, Execution Case file no. 22/2014 opened by Mazilu și Asociații to execute the Award (2014)...........................................................................................4, 5, 7, 12, 13, 18

*SC Multipack SRL, SC Starmill SRL, SC European Food SA, Micula Ioan v. The Romanian State through the Ministry of Public Finances*, Case no. 378/35/2015 before Romania High Court of Justice and Cassation (2015) (case number (Case no. 378/35/2015) ...........................................................4, 8, 13

**EU Cases**

*Ioan Micula, Viorel Micula, S.C. Starmill SA, S.C. Multipack S.C. and  S.C. European Food SA v. European Commission*, Cases T-624/15, T-694/15 and T-704/15(2015)...............................................................5

*Viorel Micula v. Romanian Government*, (Case No. no 15/7241/A and 15/7242/A) First Instance Court of Bruxelles ....7, 12, 18, 19

**E.U Legislation, Treaties and Decisions**

BIT Treaty Article 2(3).................................................................................................2

Decision on State aid SA.38517 (2014/C) (ex 2014/NN) issued by the European Commission ..................................................................................................................5

**GOVERNMENT OF ROMANIA'S MEMORANDUM IN
SUPPORT OF MOTION FOR RELIEF FROM JUDGMENT
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(B)(5)**

PLEASE TAKE NOTICE that the Government of Romania ("Romania"), by its undersigned counsel, submits this Memorandum in Support of Romania's Motion for Relief from to Judgment Pursuant to Rule 60(b)(5), stating as follows:

## I.       PRELIMINARY STATEMENT

The ICSID Award that is the subject of this case has been paid in accordance with the amount that Petitioners' own executor and accounting expert, Mazilu și Asociații, determined was owed to Petitioners. Indeed, the Bucharest Court of Appeals (the "BCA") itself directed Petitioners to hire an executor to determine the amount owed and to execute on said amount. Once this amount was calculated, Petitioners accepted it (and, how could they not, for their own hired expert calculated it!) and, at present, Romania has paid it in full. Inasmuch as the Judgment in the recognition and enforcement case that Petitioners filed before this Court (not coincidentally, while the case before the BCA was pending in Romania) was and is based entirely on the underlying Award, now that the Award has been paid, permitting the Judgment to stand would contravene existing law, which this Court has acknowledged in its Opinion and other rulings in this case, and work a patent injustice on Romania. Having assumptively ruled that Romanian law applies to payment (*see Micula v. Gov't of Romania*, 404 F. Supp. 3d 265, 284 (D.D.C. 2019)), this Court must adhere to the Romanian BCA's recognition of the amount of the Award, which has indisputably been paid, and discharge the Judgment.

As this Court recognized, citing Restatement (Second) of Conflict of Laws § 116 (1971), "[a] judgment will not be enforced in other states if the judgment has been discharged by payment or otherwise under the local law of the state of rendition." *Micula*, *id*. at 283; *see also Darren Brewer v. Insight Technology, Inc*., Case No: 6:12-cv-668, 2014 WL 12623024 (M.D. Fl. Jan. 3, 2014).

1

Hence, the Judgment is "no longer subject to enforcement in another state." *See Darren Brewer*, 2014 WL 12623024 at *2. The fact that the Judgment by this Court was for a greater amount than the underlying Award (as determined by the BCA in its Decision) does not render the Judgment amount correct. In fact, the court in *Mike Smith Pontiac, GMC, Inc. v. Mercedes-Benz of North America, Inc*., 741 A.2d 462, 475 (Md. 1999) has held to the contrary. Permitting the Judgment to stand "would make execution in the full amount improper." *See Micula*, *id*. at 283-4 *citing Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela,* 863 F.3d 96, 100 (2d Cir. 2017).

Recognizing – and adhering to – the BCA Decision would also comport with the settled principles of  international comity, and the act of state and foreign sovereign compulsion doctrines. These are some of the bedrocks of U.S. foreign relations law which the public, as well as governments, have a strong interest in maintaining. They mediate the relationship between the U.S. legal system and those of other nations. They are intended to have a mutually equitable and protective affect: to limit the jurisdiction of American courts and shield governments as defendants in some circumstances. *See* <u>International Comity in American Law</u>, Columbia Law Review, Volume 115, No. 8, page, by William S. Dodge.

## II.      <u>RELEVANT FACTS AND PROCEDURAL BACKGROUND</u>

1.      On December 11, 2013 an Arbitration Tribunal ordered Romania to pay Petitioners the collective amount of RON 367,433,229 as damages for failing to ensure a fair and equitable treatment of Petitioners' investments, in violation of Article 2(3) of the BIT Treaty, plus interest, *inter alia*, until full payment of the Award ("Award"). (ECF No. 55-2, ¶ 6). *See a true and accurate copy of the Declaration of Dana Vilaia attached hereto as Exhibit A*, at ¶ 4.

2.      On November 6, 2017, Petitioners filed a Petition To Confirm ICSID Arbitration Award and Enter Judgment seeking the recognition of the Award in the amount ("Petition") (ECF No. 1).

2

3.      The Petition requested that the "pecuniary obligations against Romania be recognized and entered as a judgment by the Clerk of this Court in the same manner and with ***the same force and effect as if the Award were a final judgment of this Court***, as authorized by 22 U.S.C. § 1650a and Article 54 of the ICSID Convention" (Petition (ECF No. 1), p. 9, Prayer for Relief, ¶ (a) (emphasis added)), and sought judgment in the amount of 376,433,229 Romanian Leu (RON) at 3-month ROBOR plus 5% interest, compounded on a quarterly basis, with respect to certain amounts and periods specified in the Award with respect to the amounts and periods detailed in paragraph 1329(d) of the Award (Petition, p. 9, Prayer for Relief, ¶ (b)).

4.      Romania filed its Opposition to Petition on November 6, 2018 (ECF Nos. 51-54).

5.      On November 20, 2018, Petitioners filed a Motion for Judgment on the Pleadings or, in the Alternative, Motion for Summary Judgment (the "Motion for Judgment") (ECF No. 55).

6.      On December 11, 2018, Romania filed a Motion for Extension of Time to File Responsive Pleading to the Motion for Judgment (ECF No. 58).

7.      On June 21, 2019 this Court denied Romania's Motion for Extension of Time to File Responsive Pleading to the Motion for Judgment, ruling that "the court will treat arguments made by Respondent in its various pleadings as its opposition to the Petitioners' Motion for Judgment on the Pleadings or in the Alternative Motion for Summary Judgment." (ECF No. 75).

8.      Romania therefore did not have the opportunity to file any formal Response or Opposition to the Motion for Judgment, including specifically, but not limited to, Petitioners' five (5)-page argument in Section III of their supporting Memorandum that the Arbitral Award should be converted from RON into U.S. Dollars.

9.      On September 11, 2019, this Court granted Petitioners' Motion for Judgment, which it called the "operative pleading," and thus also granted Petitioners' Petition, confirming the Arbitral Award (the "Opinion") (ECF No. 86). A copy of the Opinion is attached as Exhibit B.

10.      Thereafter, on September 20, 2019, the Court entered Judgment in favor of Petitioners in the amount of $356,439,727, plus post-judgment interest at the rate identified in the Award (the "Judgment") (ECF No. 88). A copy of the Judgment is attached as Exhibit C.

11.      On October 9, 2019, Romania filed its Notice of Appeal of the Court's Orders, appealing the Orders to the United States Court of Appeals for the District of Columbia Circuit (ECF No. 89).

12.      Romania filed a Motion and an Amended Motion to Stay Enforcement of Judgment and Discovery Pending Appeal and Motion to Waive *Supersedeas* Bond Requirement and a corresponding Memorandum and Amended Memorandum in support thereof (collectively, the "Motion to Stay") (ECF Nos. 94 and 95). After full briefing, on February 13, 2020, this Court denied the Motion to Stay (ECF No. 118).

13.      On or about November 27, 2019, Petitioners filed a Motion for Order Pursuant to 28 U.S.C. § 1610(c) (ECF No. 97) (the "Motion for Order"), seeking an Order from this Court allowing them to enforce the Judgment.

14.      On December 11, 2013, a *de jure* offset occurred between Romania and European Food SA in the amount of RON 337,492,864 due to certain preexisting tax liabilities European Food SA had to Romania. *See* Exhibit A, at ¶ 6.

15.      On January 14 and 15, 2014, the Romanian Ministry of Finance, via its National Agency For Fiscal Administration ("NAFA"), formally issued a set-off decision no. 28892-20905/14.01.2014 regarding the debts European Food SA owed to Romania. *See id*. at ¶ 7.

16.      Petitioners' suit challenging the legality of this set-off is currently pending at the Romania High Court of Justice and Cassation (Case no. 378/35/2015). *See id*. at ¶ 8.

17.      Petitioners, other than Viorel Micula, hired Mazilu și Asociații ("Mazilu") to execute the Award (execution file no. 22/2014). *See id*. at ¶ 9.

4

18.     On January 5, 2015, Mazilu seized RON 36,484,232 from the Ministry of Public Finance's account. *See id*. at ¶ 10. Mazilu transferred RON 34,004,232 of the amount seized to three of the five Petitioners: RON 11,334,744.16 to Ioan Micula, RON 11,334,744.14 to Multipack, and RON 11,334,744.14 to Starmill. *See id*. at ¶ 11. Mazilu retained the remaining balance of the seized funds (RON 2,480,000) as its compensation for the seizure. *See id*. at ¶ 12.

19.     Between February 5, 2015 and February 25, 2015, Mazilu seized an additional RON 9,197,482 from the accounts of the Ministry of Finance. *See id*. at ¶ 13.

20.     On March 9, 2015, the Romanian Ministry of Public Finance transferred RON 472,788,675.43 including RON 6,028,608 as executor fees (the "March 2015 Transfer"), into a specially created, legislatively authorized Treasury account in Petitioners' names. *See id*. at ¶ 14.

21.     Petitioners also commenced numerous recognition proceedings throughout Europe. *See id*. at ¶ 15.

22.     On March 30, 2015, following the completion of its Formal Investigation Procedure, the European Commission ("EC") issued its "Decision on State aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania – Award Micula v Romania of 11 December 2013" (the "Decision"). The Decision prohibited Romania from paying on the Award and required Romania to recoup any amounts already paid. *See id*. at ¶ 16.

23.     As a result of the Decision, Romania recouped the amount of RON 472,788,675.43 from the authorized Treasury account plus RON 4,962,706. *See id*. at ¶ 17.

24.     On November 6, 28 and 30, 2015, Petitioners filed cases T-624/15, T-694/15 and T-704/15 against the EC in the General Court of the European Union (the "GCEU") seeking to declare the Decision void. *See id*. at ¶ 18.

25.     On June 18, 2019, the GCEU issued an order annulling the Decision (the "General Order"). *See id*. at ¶ 19.

26.     On August 27, 2019, the EC filed an appeal before the Court of Justice of the European Union against the General Order (the "CJEU Appeal"), which remains pending. *See id*. at ¶ 20.

27.     On October 21, 2019, the Bucharest Court of Appeals ("BCA") issued its ruling, Decision no. 1483A/2019 in case no. 15755/3/2014 (the "BCA Decision"). *See id*. at ¶ 21 and its corresponding Exhibit 1, *the BCA Decision in Romanian and its English translation*.

28.     The BCA ruled that the court cannot ignore the legal effects of the set-off decisions issued by NAFA and recognized that the set-off decisions applied only to 20% of the entire amount of the Award, specifically, the portion of the Award attributable to European Food SA. *See id*. at ¶ 22. The BCA further ruled that European Food SA's debt was considered fully paid by the NAFA set-off. *Id*.

29.     The BCA ordered Mazilu to issue a current report, outlining the total amounts owed by Romania to the remaining four Petitioners under the Award. *See id*. at ¶ 23. On November 19, 2019, Mazilu issued a report, drafted by Mazilu's hired, accounting expert, Stela Anton ("Mazilu Final Report"). *See id*. at ¶ 24 and its corresponding Exhibit 2, *a true and accurate copy of the Mazilu Final Report, in Romanian and its English translation*.

30.     The Mazilu Final Report dismissed S.C. European Food SA as a creditor of the Award. *See id*. at ¶ 25.

31.     The Mazilu Final Report indicated that the sum of 907,057,422.74  was to be paid, as follows: (a) RON 241,788,020.05 directly to Viorel Micula, and (b) RON 665,269,402.69 to SC Multipack SRL, SC Starmill SRL and Ioan Micula *See id*. at ¶ 26 and Exhibit 2, at pp. 57-59.

32.     On December 13, 2019, the Romanian Ministry of Finance made all the payments outlined in the Mazilu Final Report, as follows: (a) RON 243,499,271.69 directly to Viorel Micula, which included additional interest accrued through December 13, 2019, (b) a total of RON

670,713,010.55 into Mazilu's account, which amount was paid to the remaining Petitioners as follows: (i) a total of RON 665,269,402.69 was paid to SC Multipack SRL, SC Starmill SRL and Ioan Micula; and (ii) RON 5,443,607.55 to Mazilu as its executor's fees. *See id*. at ¶ 27 and its corresponding Exhibit 3, *a true and accurate copy of the payments to Petitioners and excerpt of the Romanian Ministry of Finance balance account*.

33. On December 23, 2019, Mazilu updated the Mazilu Final Report to include interest accrued between November 19, 2019, the date of the Mazilu Final Report, and December 16, 2019, the date SC Multipack SRL, SC Starmill SRL and Ioan Micula actually received the payment in their accounts ("Updated Mazilu Report"). *See id*. at ¶ 28 and its corresponding Exhibit 4, *a true and accurate copy of the Updated Mazilu Report, in Romanian and English*.

34. On January 6, 2020, Romania paid the additional interest amounts of RON 5,190,991.95 and execution costs of RON 8,099.55 as calculated in the Updated Mazilu Report. *See id*. at ¶ 29 and its corresponding Exhibit 5, *a true and accurate copy of Romanian's payment of interest and execution costs*.

35. On January 15, 2020, Mazilu closed its execution file 22/2014 according to the BCA Decision. *See id*. at ¶ 30 and its corresponding Exhibit 6, *a true and accurate copy of the English translation and Romanian copy of Mazilu's Closure*.

36. On December 13, 2019, Viorel Micula declared, under oath, that the total due to him under the Award was RON 243,499,271.69, which Romania paid. *See id*. at ¶ 31 and its corresponding Exhibit 7, *a true and accurate copy of the English translation and Romanian copy of Viorel Micula's Declaration*.

37. Based on this affirmation, on December 24, 2019, the First Instance Court of Bruxelles released and closed a pending seizure activity commenced by Viorel Micula. *See id*. at ¶

32 and its corresponding Exhibit 8, *a true and accurate copy of the bailiff letter in the Bruxelles case*.

38.     S.C. European Food SA acknowledged the validity of the BCA's ruling regarding the 20% set-off because it deducted the set-off amount when it made its required tax payment to the Romanian government on December 16, 2019. *See id.* at ¶ 35 and its corresponding Exhibit 11, *a true and accurate copy of the NAFA's Report as of December 23, 2019 in Romanian and its English translation*.

39.     In their Written Conclusion dated February 21, 2020 filed before the Romanian High Court of Cassation and Justice (Case no. 378/35/2015), Petitioners S.C. Multipack SRL, S.C. Starmill SRL, S..C. European Food SA and Ioan Micula advised the High Court of the fact that European Food SA applied the 20% set-off amount when it made its payment to NAFA. *See id.* at ¶ 36 and its corresponding Exhibit 12, *a true and accurate copy of the Petitioner's Written Conclusion in Romanian and its English translation*.

> *At the same time, the Ministry of Finance enforced Decision no. 1483/A/21.10.2019 of the Bucharest Court of Appeals and, <u>finding that the fiscal debts of S.C. EUROPEAN FOOD S.A. were set off only in proportion of 20% of the total amount obtained through the ICSID decision</u>, issued new administrative-fiscal documents whereby it reinstated upon this company the obligation to pay Lei 177,374,389, an amount that, through the annulment of the fiscal obligations pursuant to G.O. no. 6/2019 was reduced to the amount of Lei 98,898,434 (see letter no. 29327/13.12.2019 reinstating the debt of Lei 177,374,389, approving the annulment of the fiscal obligations pursuant to G.O. no. 6/2019 and reducing the amount to Lei 98,898.434 – Annex 2).*
>
> *<u>On December 16, 2020, S.C. EUROPEAN FOOD S.A. paid to the state budget the entire fiscal debt established pursuant to the new fiscal administrative documents</u> (namely the amount of Lei 98,898,434 as well as other outstanding obligations), <u>thus remaining practically debt-free towards the state budget</u> (see fiscal certificate no. 1834329 of February 11, 2010 – Annex 3).*

## III.   LEGAL STANDARDS

### A.   Relief from Civil Judgments – Fed. R. Civ P. 60(b)(5)

Fed. R. Civ. P. 60(b)(5) provides for relief from a judgment based on changed circumstances subsequent to the issuance of the judgment, such as where "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." *See*, *e.g.*, *also Grand Union Equipment Co. v. Lippner*, 167 F.2d 953 (2d Cir. 1948) (bankruptcy proceeding injunction modified); *Block v. Thousandfriend*, 170 F.2d 428 (2d Cir. 1948); *Tobin v. Alma Mills*, 92 F. Supp. 728 (W.D.S.C. 1950) (relief from ten year-old statutory injunction); *Pierce Oil Corp. v. United States*, 9 F.R.D. 619 (E.D. Va. 1949).

Courts long have attempted to reconcile the need for correction of unjust judgments with the aims of finality in litigation. Courts have an inherent power to modify judgments. *See* Moore & Rogers, Federal Relief from Civil Judgments, 55 YALE L. J. 623 (1946); *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944); *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932) (permanent injunction). Courts also have the power to disregard or void judgments (*see*, *e.g.*, *Pennoyer v. Neff*, 95 U.S. 714 (1877)) or to vacate them (*see*, e.*g.*, *Bass v. Hoagland*, 172 F.2d 205 (5th Cir. 1949)).

Finally, courts have found Rule 60(b)(5) to be an appropriate vehicle through which to seek credit against all or part of a judgment, for example, by the amount paid by a settling co-defendant. *See Torres–Troche v. Municipality of Yauco*, 873 F.2d 499, 501 & n. 7 (1st Cir. 1989); *see also Kassman v. Am. Univ.*, 546 F.2d 1029, 1033 (D.C. Cir.1976) (noting that "a motion for a credit on a judgment should be treated as a Rule 60(b)(5) motion for relief from a judgment which has been satisfied, released or discharged"); and *Sunderland v. City of Philadelphia*, 575 F.2d 1089, 1090–91 (3d Cir. 1978).

**B.     The Convention on the Settlement of Investment Disputes between States and Nationals of Other States**

The Convention on the Settlement of Investment Disputes between States and Nationals of Other States ("Convention") established the International Centre for Settlement of Investment Disputes ("ICSID"). *See* Convention on the Settlement of Investment Disputes between States and Nationals of Other States art. 1, opened for signature Mar. 28, 1965, 17 U.S.T. 1270. The Convention, however, did not confer upon ICSID the power to enforce its awards. It left that function to its contracting states. As this Court noted, Article 54(1) of the Convention provides:

> Each Contracting State ***shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award*** within its territories as if it were a final judgment of a court in that State. A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.

*See*, *Micula v. Gov't of Romania*, 404 F. Supp. 3d 265, 269 (D.D.C. 2019) (emphasis added).

The Convention also is not self-executing. *Id. citing Medellin v. Texas,* 552 U.S. 491, 505-06, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) (explaining when a treaty obligation requires legislation to become domestic law). Thus, contracting States must "take such legislative or other measures as may be necessary for making the provisions of this Convention effective in [their] territories." *Id.* citing Convention art. 69. In the United States, Congress gave the ICSID Convention domestic effect by passing the Convention on the Settlement of Investment Disputes Act of 1966. *See id.* citing Convention on the Settlement of Investment Disputes Act of 1966, Pub. Law 89-532, 80 Stat. 334 (1966) (codified at 22 U.S.C. §§ 1650 and 1650a) (the "Act"). Section 3 of the Act addresses the enforcement of ICSID arbitration awards in the United States. *Id.* As this Court observed: "The pecuniary obligations imposed by an ICSID award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." *Id.* citing 22 U.S.C. § 1650a(a).

10

## IV.     ARGUMENT

**A.     The Pecuniary Obligations of the Award have Been Satisfied; Therefore, the Judgment Should Be Voided Pursuant to Fed R. Civ. P. 60(b)(5).**

The Award expressly identified the pecuniary obligations that were imposed on Romania. Thereafter, at the direction of the BCA, and per the BCA Decision, Petitioners' own hand-picked executor, Mazilu, identified any remaining pecuniary obligations of the Award – down to last RON – in the Mazilu Final Report and Mazilu Updated Report. Petitioners agreed to and approved those amounts. And Romania has paid those amounts. With the Award thus having been satisfied, Petitioners closed their case executing the Award. Accordingly, no Judgment enforcing the Award in any amount greater than the agreed-upon amount can be valid, or be allowed to stand. Hence, the Judgment should be voided and discharged pursuant to Fed R. Civ. P. 60(b)(5).

Petitioners asked this Court to recognize the Award (ECF No. 1). As this Court has already observed, it had and has an obligation to "recognize an award rendered pursuant to [the] Convention as binding and ***enforce the pecuniary obligations imposed by that award within its territories*** as if it were a final judgment of a court in ***that*** State. *See Micula*, 404 F. Supp. 3d at 269 *citing* Convention art. 54(1) (emphasis added). Further, a contracting state with a federal constitution (such as the U.S.) may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state." *Id*.

The BCA Decision is a valid, binding final judgment issued by the state of rendition, Romania. The BCA made clear that the set-off decisions applied only to 20% of the entire amount of the Award, specifically, the portion of the Award attributable to European Food SA. *See Exhibit A* at ¶ 22. The BCA further ruled that European Food SA's debt was considered fully paid by the NAFA set-off. *Id*. Per the BCA Decision, Mazilu issued the Final Mazilu Report, which dismissed European Food SA as a creditor of the Award and set forth the total amounts owed by Romania to

the remaining four Petitioners under the Award. *See id*. at ¶¶ 24, 25. European Food SA acknowledged the validity of the set-off by applying the set-off against the tax liabilities it had to the Government. *See id*. at ¶ 35 and its corresponding Exhibit 11, *a true and accurate copy of the NAFA in Romanian and its English translation*.

On December 13, 2019, the Romanian Ministry of Finance made **all** the payments outlined in the Mazilu Final Report. *See id*. at ¶ 27 and its corresponding Exhibit 3, *a true and accurate copy of the payments to Petitioners and excerpt of the Romanian Ministry of Finance balance account*. On January 6, 2020, Romania paid **all** additional interest amounts as calculated in an Updated Mazilu Report. *See id*. at ¶ 29 and its corresponding Exhibit 5, *a true and accurate copy of Romanian's payment of interest and execution costs*.

As a result of the satisfaction of the Award, on January 15, 2020, ***Mazilu closed its execution file 22/2014 of the Award*** according to the BCA Decision. *See id*. at ¶ 30 and its corresponding Exhibit 6, *a true and accurate copy of the English translation and Romanian copy of Mazilu's Closure*. Even before that, on December 13, 2019, ***Viorel Micula declared, under oath, that the total due to him under the Award was RON 243,499,271.69, which Romania paid***. *See id*. at ¶ 31 and its corresponding Exhibit 7, *a true and accurate copy of the English translation and Romanian copy of Viorel Micula's Declaration*. Based on Viorel Micula's affirmation, on December 24, 2019, the First Instance Court of Bruxelles released and closed a pending seizure activity commenced by Viorel Micula. *See id*. at ¶ 32 and its corresponding Exhibit 8, *a true and accurate copy of the bailiff letter in the Bruxelles case*.

Viorel Micula's statement is an admission that can and should be used to confirm that the Award is satisfied, at least as to him. *See*, *e.g*., Fed. R. Evid. 801(d)(2)(a) (a statement by an opposing party is not hearsay and can be offered against that party to prove the truth of the statement); *see also* Fed. R. Civ. P. 36 (b) "Effect of an Admission; Withdrawing or Amending It. A matter admitted

under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."

The remaining Petitioners also acknowledged and conceded that the Award has been paid in full because on January 15, 2020, their execution and collection case in Romania was closed and they have not contested or reopened the matter. *See id.* at ¶ 30 and its corresponding Exhibit 6, *a true and accurate copy of the English translation and Romanian copy of Mazilu's Closure.*

European Food SA acknowledged the validity of the BCA's ruling regarding the 20% set-off that was applied to it because it deducted that set-off amount when it made its required tax payment to the Romanian government on December 16, 2019. *See a true and accurate copy of the NAFA's Report as of December 23, 2019 in Romanian and its English translation attached hereto as* Exhibit 11.

Petitioners, Multipack SRL, Starmill SRL, European Food SA and Ioan Micula, advised the High Court of Cassation and Justice, in their Written Conclusion dated February 21, 2020 (Case no. 378/35/2015), of the fact that European Food SA applied the 20% set-off amount ruled by the BCA as validly set off when European Food SA made its payment to NAFA. *See a true and accurate copy of the Petitioner's Written Conclusion in Romanian and its English translation attached hereto as* Exhibit 12.

Because, at present, there are no remaining "pecuniary obligations imposed by the Award," the Award has been satisfied and the Judgment based on the Award is now discharged and, thus, void pursuant to Fed. R. Civ. P. 60(b)(5).

**B.    The Court's Ruling and Restatement (Second) of Conflict of Laws Compels the Conclusion That the Judgment Cannot Stand.**

This Court, citing Restatement (Second) of Conflict of Laws § 116 (1971), has already ruled that "a judgment will not be enforced in other states if the judgment has been discharged by payment

or otherwise under the local law of the state of rendition." *Micula*, 404 F. Supp. 3d at 283-284. This Court has also (correctly) ruled that the defense of setoff or satisfaction is available, making no distinction between the recognition and execution of an Award. *See id. citing Mobil Cerro Negro,* 863 F.3d at 121 (identifying as a defense in a proceeding under § 1650a the "possibility that an offset might apply to the award that would make execution in the full amount improper"). Finally, this Court applied Romanian law to the issues of payment (the Court "assume[d] that the law of Romania governs whether a claimed payment satisfies a portion of the Award"). *See id.* at 284.

The Restatement (Second) of Conflict of Laws is clear that the Judgment should be voided given that the Award has been satisfied. Moreover, it sustains the argument that Romanian law governs as to payments:

> When a judgment is rendered in one state upon the judgment of a court of another state, both judgments will remain in force ***until one of the judgments is discharged***. ….[a] judgment will not be enforced in other states if the ***judgment has been discharged by payment or otherwise under the local law of the state of rendition***."

Restatement (Second) of Conflict of Laws, §116 Payment or Other Discharge (emphasis added). *See also Mike Smith Pontiac, GMC, Inc. v. Mercedes-Benz of North America, Inc*., 741 A.2d 462, 475 (Md. 1999).

The situation described in the Restatement is precisely what has occurred in this case; thus, with the Award in Romania having been satisfied, the Judgment rendered by this Court, which is based entirely on the Award, can no longer be enforced.

As the court held in *Darren Brewer v. Insight Technology, Inc*., Case No: 6:12-cv-668, 2014 WL 12623024 (M.D. FL. Jan. 3, 2014):

> Once the creditor has received the amount due under a judgment for the payment of money, he can obtain no further monetary relief in any state . . . So also when the judgment has been discharged under the local law of the state of rendition by some other means, such as accord and satisfaction or release, the judgment will no longer be subject to enforcement in another state.

*Id*. at *2.

The court in *Darren Brewer* cautioned that if the Restatement is not adhered to, parties to a judgment will resort to forum shopping:

> Sound policy also supports this approach. Otherwise, the property of a judgment debtor that is seized and sold to satisfy and judgment might to subject to different valuation in different states.  This would encourage forum shopping by all parties to a judgment and increase post.

*Id*.

Here, Petitioners did what the court in *Brewer* feared would occur. They commenced multiple recognition and enforcement proceedings throughout Europe, including in Romania, to enforce the Award. *See* Exhibit A at ¶ 9. Petitioners hired different experts in those different cases to yield the most favorable monetary payout, without regard to consistency of methodology or approach. Therefore, now that the Award has been satisfied pursuant to the BCA Decision – issued by the state of rendition – the Judgment here should be voided.

The fact that the Judgment here is greater than the amount rendered pursuant to the BCA Decision in Romania does not mean that Petitioners are entitled to the higher amount. On this point, *Mike Smith Pontiac*, 741 A.2d 462 (Md. 1999), is instructive.

In *Mike Smith Pontiac*, the dispute related to the payment of post-judgment interest. The judgment creditor obtained a final judgment in a Florida District Court, which included post-judgment interest calculated at the Federal rate of 3.51%. Shortly after that judgment was issued, the creditor filed the federal judgment in a Maryland state court under the Uniform Enforcement of Foreign Judgments Act. The debtor paid then paid all sums and interest then due on the Florida District Court judgment. About one year later, the creditor sought to obtain post-judgment interest on the judgment as recorded in Maryland, applying Maryland's 10% post-judgment interest rate. And, it requested that post-judgment interest at the higher Maryland state rate be determined to run

from the time the Florida District Court entered its judgment. The debtor, on the other hand, claimed that the full satisfaction of the Florida judgment resulted in a full satisfaction of the judgment as recorded in Maryland notwithstanding the higher post-judgment interest rate in Maryland. The Maryland court agreed with the debtor, and held that the Maryland judgment was discharged. The Maryland Court of Special Appeals affirmed, and the creditor appealed to the Maryland Court of Appeals.

The issue before the Maryland Court of Appeals was whether the full payment of the Florida judgment, which was made *after* the Florida judgment was recorded in Maryland and thus became a Maryland judgment, satisfied and discharged the Maryland judgment. The court concluded that the satisfaction of the Florida judgment did indeed satisfy and discharge the Maryland judgment – irrespective of the facts that: (1) the Maryland judgment was obtained before the Florida judgment was satisfied; and (2) the additional $1.7M of Maryland state-assessed post-judgment interest remained unpaid. *Id*. at 475. The court held:

> Despite the difference in the two interest rates, we hold that payment in full of the Florida District judgment satisfied and discharged the Maryland judgment. Restatement (Second) of Conflict of Laws § 116 states the general rule to be that '[a] judgment will not be enforced in other states if the ***judgment has been discharged by payment or otherwise under the local law of the state of rendition***.'

*Id*. (emphasis in original).

Here, the facts that Petitioners were permitted to convert the Award (in RON) into the Judgment (in U.S. Dollars), resulting in a higher Judgment amount, and that the Judgment was entered prior to the BCA Decision which calculated the full amount of the Award, which Romania then paid, does not permit the Judgment to stand. Because the Award has been satisfied, the Judgment is "no longer subject to enforcement in another state." *See Darren Brewer*, 2014 WL 12623024, at *2; *see also Mike Smith Pontiac*, *id*. This is especially true here, where this Court did not even afford Romania the opportunity to assert that, *inter alia*, Mr. Caldwell (the expert introduced not in the

16

Petition but on Petitioners' Motion for Judgment on the Pleadings, to which this Court did not allow Romania the opportunity to respond) incorrectly converted the Award. Consistent with the language of the Award, Mr. Caldwell should have applied the ROBOR interest rate to RON first, and then converted the amount. Moreover, Mr. Caldwell's findings did not incorporate the set-off amount that the BCA Decision had confirmed was valid.

Given the analogous facts here, for the same reasons as in the cited cases, this Court should grant this Motion and discharge or vacate the Judgment considering that the Award has been paid per the BCA Decision – regardless of the difference between the amount paid to satisfy the Award in Romania and the Judgment amount here.

**C.     The Principles Of International Comity Bars The Judgment to Stand.**

In addition to the foregoing, international Comity requires that this Court given deference to the BCA Decision. Given that after fair and fully litigated matter, a Romanian court determined the amounts due to Petitioners under the Award, this Court should give deference to the BCA Decision and discharge the Judgment.

International comity is one state's recognition of the legislative, executive, or judicial acts of another state, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws. *Hilton v. Guyot*, 159 13 U.S. 113, 163-64, 16 S.Ct. 139 (1895). A court must look to the entire context of the case both here and abroad. *See China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 36 (2d Cir. 1987). The legislative actions of a sovereign nation should be given deference and assumed valid by a U.S. Court. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 436-437, 84 S. Ct. 923, 36-37 (1964) (holding that a Cuban expropriation decree to seize sugar was valid), *de Csepel v. Republic of Hungary*, 714 F.3d 591, 606 (D.C. Cir. 2013) (quoting)). The "central precept of comity teaches that, when possible, the decisions of foreign tribunals should be given effect in domestic courts*." Laker*

*Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984). So long as a foreign court resolved a question after "full and fair" procedures, comity dictates that "the merits of the case should not . . . be tried afresh based upon the mere assertion of the party that the judgment was erroneous in law or in fact." *de Csepel*, 714 F.3d at 606 (quoting *Hilton v. Guyot*, 159 U.S. 113, 202-203 (1895) (internal quotation marks omitted); *see Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 94 (2d Cir. 2006)

The question of the amounts due under the Award has been "ful[ly]" and "fair[ly] litigated in Romania before the BCA. In the BCA proceedings, the parties received "full and fair" opportunities to present their arguments, before tribunals that complied with all of the requisites of due process, including adversarial procedures, an impartial adjudicator, and a public decision. *de Csepel*, 714 F.3d at 606. In fact, Petitioners were permitted to, and acted upon that permission to, select the executor they intended collect on the Award. Their hand-picked executor, Mazilu, at the direction of the BCA, hired accountant Stela Anton, whom Petitioners approved, to determine the amounts due under the Award. Most importantly, Petitioners approved, and never contested, the figures presented in the Mazilu Final Report. Petitioners also never contested the payments made by Romania. Finally, Viorel Micula confirmed that the sole amount due to him under the Award was paid by Romania, and Petitioners dismissed the collection case in Romania.

In light of the foregoing, the BCA Decision constitutes a sovereign act that is entitled to comity by this Court. This Court already ruled that Romanian law governs the issues of payment: "[This] court] assumes that the law of Romania governs whether a claimed payment satisfies a portion of the Award." *See,* 404 F. Supp. 3d at 283-284. If this Court permits the Judgment to stand, it would be in contravention of its own ruling and Romania's rules, orders and findings already adjudicated by and in Romania, a sovereign entity. Such an invalidation of a foreign sovereignty's acts is severe, undermining the very notion of comity. Thus, this Court should void the Judgment.

**D.      The Act of State Doctrine Bars the Judgment To Stand.**

The Court should also void the Judgment under the act of state doctrine. The doctrine imposes "a rule of decision" that "requires that, in the process of deciding [a case or controversy], the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *W.S. Kirkpatrick & Co., Inc. v. Envt'l Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990); *Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004); *Ricaud v. Am. Metal Co.*, 246 U.S. 304, 309-310 (1918) This doctrine recognizes that the sovereigns are exclusively responsible for their foreign affairs, and that courts would interfere in that constitutionally assigned role by impugning the legitimacy of acts taken by a foreign sovereign. *See Banco Nacional de Cuba*, 376 U.S. at 423 (1964). "[W]hen it is made to appear that the foreign government has acted in a given way . . . the details of such action or the merit of the result cannot be questioned but must be accepted by our courts as a rule for their decision" *See id.*

The question of the amount due under the Award has been "ful[ly]" and "fair[ly] litigated in Romania before the BCA. The BCA proceedings, the parties received "full and fair" opportunities to present their arguments, before tribunals that complied with all of the requisites of due process, including adversarial procedures, an impartial adjudicator, and a public decision. *de Csepel*, 714 F.3d at 606. In fact, Petitioners were permitted and acted upon that permission select the executor they intended to be appointed as their executor in their collection case in this case.  Their hand-picked executor, Mazilu, at the direction of the BCA, hired Stela Anton, whom Petitioners also approved, to determine the amounts due under the Award.  Most importantly, Petitioners approved, and never contested, the figures rendered by Stela Anton as presented in the Mazilu Final Report. Finally, Viorel Micula confirmed that the sole amounts due to him under the Award, and the remaining Petitioners did not contest the dismissal of the amounts due under the Award. *See* Exhibit A, ¶¶ 30-32.

The act of state doctrine bars permitting the Judgment to stand, as in doing so, the Court "question[s] the validity" of a foreign sovereign act. *See Altmann*, 541 U.S. at 700. This Court already ruled that Romanian law governs the issues of payment (this Court "assumes that the law of Romania governs whether a claimed payment satisfies a portion of the Award) *See Micula,* 404 F. Supp. 3d 265 at 283-284.  The Court permitting the Judgment to stand, not only contravenes its own ruling, but rejects a clear command of the state of rendition acts and ignores the principles of the act of state doctrine.

**E.      The Foreign Sovereign Compulsion Doctrine Bars The Judgment From Standing.**

The foreign sovereign compulsion doctrine provides that U.S. courts should abstain from granting relief that would compel entities to take actions that would violate the laws of a foreign sovereign. *See O.N.E. Shipping Ltd. v. Flota Mercante Grancolombian*a S.A., 830 F.2d 449, 453 (2d Cir. 1987); *see* also *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197 (1958); *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1292 (3d Cir. 1979). It proceeds from the principle that where a foreign entity is required to act in a certain manner by a foreign sovereign, an order from an American court compelling it to act differently would be a direct affront to the laws of the foreign sovereign. *In re Sealed Case*, 825 F.2d 494, 498-499 (D.C. Cir. 1987) ("We have little doubt . . . that our government and our people would be affronted if a foreign court tried to compel someone to violate our laws within our borders.").

The doctrine applies here to void the Judgment. Romania is a sovereign entity, which makes laws and issues judgments that have force *See RJR Nabisco Inc. v. European Community*, 764 F.3d 129, 144-145 (2d Cir. 2014). BCA has issued a final order that indicated the set off is valid and that European Food's debt has been satisfied under the Award. It has also ruled that Mazilu shall issue a report outlining the total amounts due under the Award. Per the BCA Decision, the Mazilu Final Report (which was based on Stela Anton's calculations) rendered the calculations, not only approved

20

by Petitioners, but not objected to.  Romania, in compliance with and pursuant to the BCA Decision, paid the Award in full.

This Court already ruled that Romanian law governs the issues of payment (this Court "assumes that the law of Romania governs whether a claimed payment satisfies a portion of the Award) *See Micula,* 404 F. Supp. 3d 265 at 283-284.  The Court permitting such Judgment, not only contravenes its own ruling, but rejects a clear command of the state of rendition acts and ignores the principles of the foreign sovereign compulsion doctrine.

## V.     CONCLUSION

WHEREFORE, Respondent, The Government of Romania, respectfully prays that this Court enter an Order:

    (a) Holding that the Judgment be deemed void or equitably discharged and of no further force or effect;

    (b) Void or vacate the District Court's Order granting Petitioners' Motion to Compel Romania to Answer Post-Judgment Interrogatories (ECF No. 133); and

    (c) Void or vacate the District Court's order granting Petitioners' Motion for Order Pursuant to 28 U.S.C. § 1610(c) (ECF No. 134).

    (d) In the alternative to the foregoing, The Government of Romania respectfully prays that this Court enter an Order:

        1. Amending the Judgment to remove Viorel Micula as a Petitioner and prohibit him from proceeding to any further execution;

        2. Amending the Judgment to remove SC European Food SA as a Petitioner and prohibit it from proceeding to any further execution;

21

3. Reducing the Judgment by the U.S. Dollar equivalent of RON 913,959,666,33, the amount that Romania has already paid to discharge the Award pursuant to the BCA Decision;

(e) Affording Romania any other and further relief that this Court deems necessary, just and proper.

Dated: March 30, 2020

Respectfully submitted,

THE GOVERNMENT OF ROMANIA

By:___*/s/ Ioana Salajanu*_____
        Ioana Salajanu

Ioana Salajanu
7620 Kildare
Skokie, IL 60076
Telephone: (773) 875.5438
 sedeidu@yahoo.com
*Attorney for Defendant Government of Romania*