UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IOAN MICULA et al., | ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) ) | Case No. 17-cv-02332 (APM) |
| GOVERNMENT OF ROMANIA, | ) ) ) | |
| Respondent. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

**I.   INTRODUCTION**

Pending before the court is (1) Respondent Government of Romania's ("Romania") Motion for Relief from Judgment Pursuant to Federal Rule of Civil Procedure 60(b)(5) and (2) Petitioners' Motion for a Civil Contempt Order and Sanctions.[1]  Romania claims that the International Centre for Settlement of Investment Disputes ("ICSID") award at issue in this case has been paid in full and therefore this court's $356 million judgment confirming that award ("the Judgment") should be voided or discharged.  Petitioners oppose Romania's motion on the grounds that approximately $97 million of the Judgment remains unpaid.  They also seek a civil contempt order against Romania for its willful disregard of this court's March 11, 2020 Order compelling Romania to produce post-judgment discovery ("the Discovery Order").  For the reasons that follow, Romania's motion for relief from judgment is denied, and Petitioners' motion for a civil contempt order is granted.

---

[1] The court will address by separate order Petitioners' Bill of Costs, ECF No. 137.

## II.     BACKGROUND

The facts of this case have been stated at length in prior opinions of this court, and therefore only the facts critical to the resolution of the pending motions will be briefly summarized here. *See Micula v. Gov't of Rom.* (*Micula II*), 404 F. Supp. 3d 265 (D.D.C. 2019); *Micula v. Gov't of Rom.* (*Micula I*), 104 F. Supp. 3d 42 (D.D.C. 2015).  In December 2013, an ICSID tribunal ruled for Petitioners in arbitration proceedings against Romania and awarded monetary damages of 376,433,229 Romanian Leu (RON)—the equivalent of $116,317,868—plus interest ("the Award"). *See Micula II*, 404 F. Supp. 3d at 270–71 (citing *Ioan Micula, et al. v. Romania*, ICSID Case No. ARB/05/20 (Sept. 24, 2008), ECF No. 62-2, ¶ 1329).  Shortly thereafter, Petitioners came to this court seeking to confirm the Award so it would become an enforceable judgment in the United States under 22 U.S.C. § 1650a.  *Micula I*, 104 F. Supp. 3d at 44.  Romania resisted confirmation of the Award on many grounds, including that it had already satisfied the Award in full—a contention the court ultimately rejected.  *See Micula II*, 404 F. Supp. 3d at 284.  After five years "on a long, winding road [of litigation,]" *id.* at 272, mostly owing to Romania's diversionary tactics, this court granted the petition to confirm the Award and entered judgment in favor of Petitioners in the amount of $356,439,727[2] on September 20, 2019, *see* Order & Final J., ECF No. 88 [hereinafter Final J.], at 2.  Romania appealed the Judgment, including this court's conversion of the ICSID award into U.S. dollars, and on May 19, 2020, the D.C. Circuit affirmed the Judgment in full.  *Micula v. Gov't of Rom.* (*Micula III*), 805 F. App'x 1 (D.C. Cir. 2020).

Instead of the Award confirmation clearing the way for execution to begin, however, Romania has continued to lay down roadblocks at every turn.  After months of trying in good faith

---

[2] The Final Judgment amount was calculated by Petitioners' expert by converting the Award to U.S. dollars as of the date of the Award and then adding "post-award interest to the outstanding dollar amount between 11 December 2013 and 18 September 2019."  Notice of Pet'rs Regarding Proposed Order and Final J., ECF No. 87, Ex. B, ECF No. 87-2, at 1.

2

to get Romania to respond to discovery requests, on December 2, 2019, Petitioners moved to compel Romania to answer post-judgment interrogatories. *See* Pet'rs' Mot. to Compel Romania to Answer Post-J. Interrogs., ECF No. 98. In opposition, Romania argued that the motion to compel was "moot" because it had already satisfied the Judgment in Romania and therefore "Petitioners [were] not entitled to any additional information about Romania's assets in pursuit of their post-judgment discovery." Resp't's Opp'n to Pet'rs' Mot., ECF No. 104, at 3, 8. The court found that argument to be a "nonstarter" after a hearing on the motion, where Romania conceded that although it had paid appreciable amounts to Petitioners through concurrent enforcement proceedings in Romania, it had not satisfied the Judgment in full. *See* Order, ECF No. 133 [hereinafter Discovery Order], at 1–2 (citing Hr'g Tr., Mar 9, 2020 (conceding payment of $213 million toward the $356 million judgment entered by the court)). Concluding that Respondent's "self-proclaimed insistence that it owe[d] no more than what it has already paid d[id] not 'substantially justify' its refusal to answer Petitioners' discovery demands," the court granted Petitioners' motion and awarded attorneys' fees and costs associated with preparing the motion to compel. *Id.* at 2 (citing Fed. R. Civ. P. 37(a)(5)).

But Romania's obstinance continued. On March 25, 2020, Petitioners asked Romania to comply with the court's Order and to provide substantive responses to the interrogatories within 30 days. *See* Pet'rs' Mot. for Civil Contempt Order & Sanctions Against Romania, ECF No. 151, Mem. of Law in Supp. of Pet'rs' Mot., ECF No. 151-1 [hereinafter Pet'rs' Mot.], at 3. Five days later, Romania filed the instant Motion for Relief from Judgment under Federal Rule of Civil Procedure 60(b)(5), recycling—now for the third time—the argument that it has satisfied the Judgment in its entirety through parallel proceedings in Romania. *See* Gov't of Romania's Mem. in Supp. of Mot. for Relief from J. Pursuant to Fed. R. Civ. P. 60(b)(5), ECF No. 138 [hereinafter

3

Resp't's Mem.]. In support of this contention, Romania relies primarily on a Bucharest Court of Appeals ("BCA") ruling on a tax setoff (that has since been annulled)[3] and a report issued by Petitioners' executor as to the value of the Award in Romania. *See id.* at 6–7. In opposition, Petitioners maintain that the payments they have received through Romanian enforcement proceedings "come nowhere near to satisfying the $356 million Judgment [of this court], which remains operative and binding." Pet'rs' Opp'n to Romania's Mot. for Relief from J. Pursuant to Fed. R. Civ. P. 60(b)(5), ECF No. 143 [hereinafter Pet'rs' Opp'n], at 12.

Romania still has not responded to Petitioners' interrogatories. After over two months of continued good-faith attempts to get Romania to comply with the Discovery Order, Petitioners filed a Motion for a Civil Contempt Order and Sanctions Against Romania. *See* Pet'rs' Mot. at 3–5. In opposition, Romania first claims that the Foreign Sovereign Immunities Act ("FSIA") does not authorize the imposition of monetary contempt sanctions against Romania. *See* Gov't of Romania's Mem. in Opp'n to Pet'rs' Mot. for Civil Contempt Order & Sanctions Against Romania, ECF No. 152 [hereinafter Resp't's Opp'n], at 8–18. In the alternative, Romania maintains that it is substantially justified in not adhering to the Discovery Order, and therefore should not be held in contempt. *See id.* at 18–21.

## III. LEGAL STANDARD

### A. Relief from Judgment

A court may relieve a party from an otherwise final judgment if it finds that, among other things, "the judgment has been satisfied, released, or discharged." Fed. R. Civ. P. 60(b)(5). "The party seeking relief from a judgment bears the burden of demonstrating that he or she satisfies the

---

[3] *See* Notice of Suppl. Authority in Supp. of Pet'rs' Opp'n to Romania's Mot. for Relief from J. Pursuant to Fed. R. Civ. P. 60(b)(5), ECF No. 155 (notifying the court that the High Court of Romania had "resolved the appeal of the annulment of the set-off and has rejected Romania's claim that the annulment was invalid").

prerequisites for such relief." *Lewis v. U.S. Parole Comm'n*, 841 F. Supp. 2d 56, 61 (D.D.C. 2012) (citing *McCurry ex rel. Turner v. Adventist Health Sys./Sunbelt, Inc.*, 298 F.3d 586, 592 (6th Cir. 2002)). "Relief under Rule 60(b) is an extraordinary remedy that is to be granted only in exceptional cases." *SEC v. Bilzerian*, 815 F. Supp. 2d 324, 327 (D.D.C. 2011). For instance, "Rule 60(b)(5) may not be used to challenge the legal conclusions on which a prior judgment or order rests." *Horne v. Flores*, 557 U.S. 433, 447 (2009)). In exercising its discretion, the court must "balance the interest in justice with the interest in protecting the finality of judgments." *Summers v. Howard Univ.*, 374 F.3d 1188, 1193 (D.C. Cir. 2004).

### B. Civil Contempt

Under Federal Rule of Civil Procedure 37, "a district court may issue 'just orders' entering sanctions against a party that 'fails to obey an order to provide or permit discovery,' including an order granting a motion to compel." *Parsi v. Daioleslam*, 778 F.3d 116, 128 (D.C. Cir. 2015) (quoting Fed. R. Civ. P. 37(b)(2)(A)). Possible sanctions "include (but are not limited to) . . . holding the disobedient party in contempt." *Id.* "Unlike criminal contempt, which has a punitive goal, civil contempt is 'a remedial sanction designed to obtain compliance with a court order.'" *LaShawn A. ex rel. Moore v. Fenty*, 701 F. Supp. 2d 84, 90 (D.D.C. 2010) (quoting *Food Lion v. United Food Com. Workers Int'l Union*, 103 F.3d 1007, 1016 (D.C. Cir. 1997)). It is appropriate "only if the putative contemnor has violated an order that is clear and unambiguous, and the violation must be proved by clear and convincing evidence." *Broderick v. Donaldson*, 437 F.3d 1226, 1234 (D.C. Cir. 2006). "Once the moving party has come forward with sufficient evidence to establish a prima facie case of noncompliance, the respondent carries the burden to establish a justification for the violation in order to avoid a contempt finding." *LaShawn A.*, 701 F. Supp. 2d at 90. Upon granting a contempt motion, a court "must order the disobedient party, the attorney

advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure to obey a discovery order, unless the party's disobedience was substantially justified or the circumstances would otherwise render an expense award unjust." *Parsi*, 778 F.3d at 128 (cleaned up). "A party is substantially justified in opposing discovery or disobeying an order if there is a genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action." *Id.* at 127 (cleaned up).

## IV.  DISCUSSION

With these principles in mind, the court turns to the parties' motions. Because the arguments raised by Romania in its motion for relief from judgment are central to both requests for relief, the court begins there. The court then turns to Petitioners' motion for a civil contempt order and sanctions.

### A.  Romania's Motion for Relief From Judgment

The primary theory underlying Romania's Rule 60(b) motion and, for that matter, its opposition to Petitioners' motion for a contempt order, is that Romania's satisfaction of a judgment arising from the ICSID award in Romania translates into satisfaction of this court's Judgment. It does not. In fact, that argument fairs worse in trying to prevent execution of the Judgment than it did when Romania asserted it to try to stop enforcement of the Award. *Compare Micula II*, 404 F. Supp. 3d at 283 (recognizing that setoff and satisfaction are available defenses in an ICSID enforcement proceeding in U.S. courts, but rejecting Romania's claim of satisfaction (citing *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 121 (2d Cir. 2017)), *with Delta Foods Ltd. v. Republic of Ghana*, 265 F.3d 1068, 1071–72 (D.C. Cir. 2001) (explaining that "[o]nce the district court entered judgment, . . . everything changed" because Ghana then owed the judgment creditor an amount in U.S. dollars, not Ghanaian cedi). As the Second Circuit held in

*Competex, S.A. v. Labow*, "once an enforcing judgment is entered, a new obligation in dollars is created, and . . . the opportunity to prevent its *entry* by paying in [a foreign currency] does not imply the right to *satisfy* it by paying [in that foreign currency]." 783 F.2d 333, 340 (2d Cir. 1986). The D.C. Circuit embraced this holding in *Delta Foods*. There, the court rejected as "squarely at odds with the holding in *Competex*" the argument that the district court's judgment could be satisfied by paying a less valuable foreign judgment. 265 F.3d at 1072.

Petitioners do not dispute that Romania has satisfied the Romanian judgment confirming the Award, leading to the termination of Romanian enforcement proceedings that they initiated. *See* Resp. of Pet'rs to Romania's Notice of Suppl. Auth. in Supp. of Romania's Mot. for Relief from J. Pursuant to Fed. R. Civ. P. 60(b)(5), ECF No. 158 [hereinafter Pet'rs' Resp. to Suppl. Auth.], at 2. But that judgment, the value of which was determined by an accounting expert retained for the Romanian enforcement proceedings, was calculated in RON, not U.S. dollars. *See* Romania's Notice of Suppl. Auth. in Supp. of Romania's Mot. for Relief from J. Pursuant to Fed. R. Civ. P. 60(b)(5), ECF No. 157 [hereinafter Rom's Suppl. Auth.], ¶¶ 23–24; Pet'rs' Opp'n at 9 n.2 (explaining the purpose of Petitioners' accounting expert's report—the so-called "Mazilu Report"—and its role in Romanian enforcement proceedings). The parties offer differing accounts of the amount Romania has paid in satisfaction of the Romanian judgment. Romania contends it has paid RON 1,212,673,110.78—the equivalent of $286,129,990.14. Rom's Suppl. Auth. ¶ 23. Petitioners say Romania has made payments totaling approximately $274 million. Pet'rs' Resp. to Suppl. Auth. at 1. The court need not decide which amount is correct because for the instant inquiry it suffices to say that neither amount satisfies the $356 million Judgment entered by this court. *See* Final J. at 2.

Despite this clear mathematical and legal reality, Romania nevertheless asserts four equally unavailing arguments in support of its contention that it should be relieved of the Judgment. First, Romania claims that both the Restatement (Second) of Conflict of Laws and a prior decision of this court confirm that "Romanian law governs as to payments," and therefore, having satisfied the Award in Romania, the Judgment here "can no longer be enforced." Resp't's Mem. at 13–14. This is incorrect as a matter of law and mischaracterizes the words of the court. As already discussed, once the court entered Judgment in favor of Petitioners, the question became whether Romania has satisfied the Judgment as entered in U.S. dollars. Romania does not contend that it has done so, and the application of Romanian law would not alter that fact. Moreover, when the court spoke of Romanian law in its Memorandum Opinion confirming the Award, it was in the context of "Romania's suggestion" that it had satisfied the Award, pre-confirmation. *Micula II*, 404 F. Supp. 3d at 285 (stating that the court had "applied Romanian law to assess whether Romania ha[d] satisfied the Award" for the purposes of confirming the Award and entering Judgment). As to that argument, the court "assume[d]" that Romanian law applied—as Petitioners had not asserted otherwise—yet concluded that Romania had not satisfied the ICSID Award, even under Romanian legal principles of debt satisfaction. *See id.* at 283–84. Thus, nothing in the prior decision of this court gives primacy to Romanian law or the Romanian proceedings in determining whether the Judgment has been satisfied in full.

Nor does the Restatement help Romania's cause. The Restatement (Second) of Conflict of Laws § 116 (1971) provides that "[a] judgment will not be enforced in other states if the judgment has been discharged by payment or otherwise under the local law of the state of rendition." Romania's reliance on that provision is premised on the faulty presumption that Romania is the "state of rendition." *See* Resp't's Mem. at 11. It is not. In fact, a "state" did not render the Award

8

at all, ICSID did. The cited Restatement provision therefore has no application here. Likewise, the two cases Romania cites pertaining to interstate judgment enforcement are of no consequence here, where this court is enforcing a Judgment arising from an ICSID award, not enforcing a Judgment entered under the laws of another state. *See* Resp't's Mem. at 14–17 (discussing *Darren Brewer v. Insight Tech., Inc.*, Case No. 12-cv-668, 2014 WL 12623024 (M.D. Fl. Jan 3, 2014), and *Mike Smith Pontiac, GMC, Inc. v. Mercedez-Benz of North American, Inc.*, 741 A.2d 462 (Md. 1999)).

The sense of déjà vu continues with Romania's remaining three arguments. It asserts that the principles of Comity, the Act of State Doctrine, and the Foreign Service Compulsion Doctrine all bar the Judgment from standing. *Id.* at 17–21. None of these arguments is a valid ground for setting aside the Judgment under Rule 60(b)(5), and they have all been raised, and rejected, at prior stages of this litigation. *See Micula II*, 404 F. Supp. 3d at 285 (finding that "international comity concerns play no role here"); *Micula v. Gov't of Rom.*, No. 15 Misc. 107, 2015 WL 4643180, at *3–8 (S.D.N.Y. Aug. 5, 2015) (rejecting foreign comity, act of state doctrine, and foreign sovereign compulsion doctrine arguments raised by European Commission in an amicus brief to urge the court to abstain from exercising jurisdiction or to vacate the judgment). The inapplicability of these doctrines is evident from the fact that neither the Petitioners nor this court challenges any act of Romania as a sovereign or any decision by its courts. *Cf., e.g.*, *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 409–10 (1990) (holding that the act of state doctrine "merely requires that . . . the acts of foreign sovereigns taken within their own jurisdiction shall be deemed valid"); *Bryant v. Int'l Sch. Servs. Inc.*, 502 F. Supp. 472, 490 (D.N.J. 1980) ("The foreign compulsion defense, developed in the context of antitrust litigation, shields from liability the acts of parties carried out in obedience to the mandate of a foreign government.").

Romania has paid a sum certain toward the ICSID Award in RON, thereby satisfying this court's Judgment to a degree, but there is no disputing that sum falls short of the full amount this court has ordered Romania to pay in U.S. dollars. The various international comity doctrines that Romania resurrects once again cannot change that reality.

To the extent that Romania is using its Rule 60(b)(5) motion to challenge the court's conversion of the ICSID Award to U.S. dollars, that ship has long sailed. *See* Resp't's Mem. at 16–17 (arguing that the Award was improperly converted from RON to dollars). As the court previously found, Romania did not contest Petitioners' request to convert the Award to U.S. dollars as of the date of the Award, which is the norm in proceedings under § 1650a, and so the court converted the Judgement into dollars. *See Micula II*, 404 F. Supp. 3d at 285 n.12 (citing *Belize Bank Ltd. v. Gov't of Belize*, 191 F. Supp. 3d 26, 39–40 (D.D.C. 2016)). The D.C. Circuit did not disturb that determination. *Micula III*, 805 F. App'x 1. Romania may not now use a Rule 60(b)(5) motion to "challenge the legal conclusions" upon which the "[J]udgment . . . rests." *Horne*, 557 U.S. at 447.

Accordingly, because Romania has not shown that relief under Rule 60(b)(5) is warranted, the court denies its motion. *See id.* ("The party seeking relief [under Rule 60(b)(5)] bears the burden of establishing that changed circumstances warrant relief.").

B.     **Petitioners' Motion for a Civil Contempt Order**

The court now turns to Petitioners' Motion for a Civil Contempt Order and Sanctions Against Romania. A civil contempt citation is appropriate where "the putative contemnor has violated an order that is clear and unambiguous, and the violation . . . [is] proved by clear and convincing evidence." *In re Sealed Case*, 932 F.3d 915, 939 (D.C. Cir. 2019) (cleaned up). Petitioners argue that "[e]ach of the requirements for holding Romania in civil contempt is easily

satisfied here." Pet'rs' Mot. at 7. "The Discovery Order unambiguously requires Romania to respond to Petitioners' interrogatory requests," Petitioners contend, "and Romania cannot in good faith claim that the order is not 'clear and reasonably specific.'" *Id.* Because Romania "has not provided *any* responses to the interrogatories" to which it was ordered to respond, Petitioners further argue, "there is clear and convincing evidence supporting a finding of civil contempt against Romania." *Id.* As a result, Petitioners submit that a civil contempt "sanction of $25,000 per week, payable to Petitioners and doubling every four weeks until either reaching a maximum of $100,000 per week or until Romania complies with the Discovery Order, is appropriate." *Id.* at 10. They also seek reimbursement of "expenses, including attorneys' fees, incurred in bringing Romania into Compliance with the Discovery Order." *Id*. at 2.

For its part, Romania does not dispute that it has refused to respond to the propounded interrogatories nor does it assert that the court's order was anything other than "clear and unambiguous." Instead, it advances three arguments as to why it should not be held in contempt. None is persuasive.

        1.     *Romania's Arguments*

Romania first argues that the FSIA "precludes enforcement of monetary contempt sanctions against [it]," and therefore "a contempt order should not even be ordered." Resp't's Opp'n at 8. According to Romania, "28 U.S.C. § 1610 and § 1611 describe the available methods of attachment and execution against a foreign sovereign's property," and "[m]onetary sanctions are not included in this scheme." *Id.* This argument ignores binding precedent, and counsel for Romania will have to answer for it. Petitioners cited the controlling authority in their opening brief, yet counsel for Romania blithely ignored it in her opposition. *See* Pet'rs' Mot. at 8–9. Such conduct is arguably a violation of the duty of candor—itself a sanctionable offense. Fed. R. Civ.

11

P. 11(b)(2) and (c)(1). The court will issue a separate Order to Show Cause why Romania's counsel should not be sanctioned for her conduct.

In *FG Hemisphere Associates, LLC v. Democratic Republic of Congo*, the D.C. Circuit expressly rejected the very argument that Romania makes here, holding that "the FSIA does not abrogate a court's inherent power to *impose* contempt sanctions on a foreign sovereign." 637 F.3d 373, 380 (D.C. Cir. 2011) (emphasis added). In reaching that conclusion, the court dismissed as unpersuasive the Fifth Circuit's opinion in *Af-Cap, Inc. v. Republic of Congo*, 462 F.3d 417 (5th Cir. 2006), the case upon which Romania primarily relies. *See* Resp't's Opp'n at 8–9 & n.2. It did so because "the Fifth Circuit [in *Af-Cap, Inc.*] never considered the distinction between" an order imposing a contempt sanction, as is at issue here, and an order enforcing one. *FG Hemisphere Assocs.*, 637 F.3d at 379. The court also brushed aside the notion, advanced by Romania, *see* Resp't's Opp'n at 14, that the legislative history of the FSIA "suggests" that "imposing a fine on a foreign state for failure to comply with a court order . . . would be unavailable," *FH Hemisphere Assocs.*, 637 F.3d at 378 (cleaned up). Quite the contrary, the court found, "there is not a smidgen of indication in the text of the FSIA [nor in the legislative history] that Congress intended to limit a federal court's inherent contempt power." *Id.*

Indeed, it is not unusual in this Circuit and elsewhere for courts to impose civil contempt sanctions on foreign sovereigns. *See, e.g.*, *Walters v. People's Republic of China*, 72 F. Supp. 3d 8, 12 (D.D.C. 2014) (holding "that civil contempt sanctions against Defendant [the People's Republic of China] are authorized in this Circuit"); *Chabad v. Russian Federation*, 915 F. Supp. 2d 148, 155 (D.D.C. 2013) (issuing civil contempt sanctions against the Russian Federation); *Sistem Muhendislik Insaat Sanayi Ve Ticaret, A.S. v. Kyrgyz Republic*, Case No. 12-cv-4502, 2018 WL 5629900, at *3 (S.D.N.Y. Oct. 31, 2018) (entering civil contempt sanctions against the Kyrgyz

Republic for noncompliance with a post-judgment discovery order). Romania's opposition does not grapple with these cases, nor does it cite a single case on this point decided after the D.C. Circuit's decision in *FG Hemisphere*. *See* Resp't's Opp'n at 8–17.

Second, Romania argues that "notions of comity, equity and international standards" weigh against imposing monetary contempt sanctions against Romania. *See* Resp't's Opp'n at 16. *FG Hemisphere* is instructive on this point, too. There, the court noted that "[a]lthough it may be true . . . that at least several countries have explicitly prohibited monetary sanctions against a foreign state for refusal to comply with a court order, that seems quite irrelevant because our Congress has not." 637 F.3d at 380. Additionally, the court stressed, "we should bear in mind that our discovery process is extraordinarily extensive compared to that of most foreign legal systems." *Id.*; *see also Export-Import Bank of the Republic of China v. Grenada*, Case No. 06-cv-2469, 2010 WL 5463876, at *3 (S.D.N.Y. Dec. 29, 2010) (rejecting Grenada's comity argument and holding that Grenada's status as a foreign sovereign did not preclude contempt sanctions). Thus, under controlling precedent, principles of international comity are no more relevant to Romania's argument in opposition to Petitioners' motion to compel than they were in support of its motion for relief from judgment. *See supra* at 9.

The third argument—that Romania is substantially justified in refusing to respond to Petitioners' discovery request—fails straight out the gate because it is premised on the fact that Romania "has filed a [Rule 60(b) motion]," and the arguments therein, Resp't's Opp'n at 19, which the court has now denied, *see supra* at 10. Contrary to Romania's contention, there is no "genuine dispute" as to whether Romania has satisfied the Judgment—it has not. *See* Resp't's Opp'n at 20 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). Romania admitted as much to the court at a March 2020 hearing, *see* Hr'g Tr., ECF No. 135, at 5:9–6:11 (conceding payment of $213

13

million toward the $356 million judgment entered by the court), and nothing has materially changed between the time Romania made that admission and its refusal to respond to ordered discovery.[4]  Accordingly, the court will grant Petitioners' motion for a civil contempt order and sanctions.

            2.      *Monetary Sanctions*

The final task for the court is to determine what amount of sanctions would best "coerce [Romania's] compliance" with the Discovery Order.  *In re Fannie Mae Sec. Litig.*, 552 F.3d 814, 823 (D.C. Cir. 2009); *see also Walters*, 72 F. Supp. 3d at 11 (deciding an appropriate sanction requires a court to consider what size award "will coerce the contemnor into compliance, compensate the complainant for losses due to the noncompliance, or both").  Petitioners request "a sanction of $25,000 per week, payable to Petitioners and doubling every four weeks until either reaching a maximum of $100,000 per week or until Romania complies with the Discovery Order." Pet'rs' Mot. at 10.  Romania opposes this amount on the grounds that it is unduly "punitive" and thus prohibited under 28 U.S.C. § 1606.  Resp't's Opp'n at 12–13 & n.3.  In support of its claim that Petitioners merely seek to "punish Romania," Romania asserts that Petitioners "justify[] the[] exorbitant amounts [requested]" by saturating their motion for sanctions "with reference [to] Romania's alleged current and prior 'bad acts.'"  *Id.* at 13.  The court disagrees with Romania, both as a matter of law and fact.

Petitioners' requested sanctions are not unduly "punitive," especially when the court considers Romania's past conduct, which is relevant to the court's calculus.  *See Fannie Mae Sec. Litig.*, 552 F.3d at 822–23 (describing lower court's determination of whether contempt order was appropriate as necessarily "fact-bound").  An order of civil contempt is meant to be coercive, and

---

[4] The court recognizes that Romania paid additional sums to Petitioners after the March 2020 hearing, but those amounts still do not fully satisfy the Judgment.

Romania's status as a sovereign does not immunize it from those effects. Nor is the amount requested "exorbitant." Petitioners convincingly cite to a host of cases showing that "[t]he amount Petitioners seek is more than the amount imposed on foreign sovereigns with smaller gross domestic products ('GDP') than Romania, such as the DRC, but less than the amount imposed on foreign sovereigns with larger GDPs, such as China and Russia." Pet'rs' Reply in Supp. of Mot. for Civil Contempt Order & Sanctions Against Romania, ECF No. 153, at 9; *accord Chabad*, 915 F. Supp. 2d at 154 (comparing defendant Russia's economy to that of the DRC, as sanctioned by the court in *FG Hemisphere*, for the purpose of determining the size of the award best calibrated to "coerce [Russia's] compliance"). For example, in *Walters*, the court ordered China to show cause why the court should not impose a sanction of $246,500 *per day* for failure to comply with a discovery order. *See* 72 F. Supp. 3d at 13. In *FG Hemisphere*, by contrast, the court upheld a sanction imposed on the DRC for violating a discovery order of "$5,000 per week, doubling every four weeks until reaching a maximum of $80,000 per week." 637 F.3d at 376. By way of comparison, the GDP of the DRC was $41.4 billion as of 2017, whereas Romania's was $211.9 billion.[5] These comparator cases show that Petitioners' request for a starting sanction of $25,000 per week, progressing up to an amount not to exceed $100,000, is sufficient but not excessive to coerce Romania's adherence to the Discovery Order and to compensate Petitioners for the "losses sustained" from Romania's noncompliance thus far. *Fannie Mae Sec. Litig.*, 552 F.3d at 823. Accordingly, the court will grant Petitioners' request.

---

[5] *See* Central Intelligence Agency, The World Factbook, https://www.cia.gov/library/publications/the-world-factbook/ (last visited Nov. 17, 2020).

**V.     CONCLUSION AND ORDER**

For the foregoing reasons, it is hereby **ORDERED** that:

1. Romania's Motion for Relief from Judgment Pursuant to Federal Rule of Civil Procedure 60(b)(5), ECF No. 138, is **DENIED**;

2. Petitioners' Motion for a Civil Contempt Order and Sanctions Against Romania, ECF No. 151, is **GRANTED**;

3. Romania is adjudged and decreed to be in civil contempt for its failure to comply with the court's March 11, 2020 Order, ECF No. 133;

4. Civil contempt sanctions are hereby awarded against Romania. If Romania fails to answer the post-judgment interrogatories within 14 days of entry of this Order, it shall pay Petitioners a fine in the amount of $25,000 per week, which shall double every four weeks reaching a maximum of $100,000 per week, until such time as Romania complies with the March 11, 2020 Order, ECF No. 133; and,

5. Romania shall pay Petitioners the attorneys' fees and costs associated with seeking a civil contempt order. Petitioners shall file a bill of fees and costs with the court by December 4, 2020.

Dated: November 20, 2020

Amit P. Mehta
United States District Court Judge