UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IOAN MICULA, et al., ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Case No. 17-cv-02332 (APM) |
| ) | |
| GOVERNMENT OF ROMANIA, ) | |
| ) | |
| Respondent. ) | |

**MEMORANDUM OPINION AND JUDGMENT**

    This Memorandum Opinion addresses the latest chapter in Petitioners' long-running battle over an international arbitration award entered in their favor against the Government of Romania. Petitioners now ask the court to enter judgment against Romania for accrued sanctions. *See* Pet'rs' Mot. for J. on Accrued Sanctions Against Romania, ECF No. 167 [hereinafter Pet'rs.' Mot.], Mem. of Law in Supp. of Pet'rs' Mot., ECF No. 167-1 [hereinafter Pet'rs' Mem.]. For the reasons explained below, their motion is granted.

**I.**

    First, a brief recap of the proceedings. In September 2019, the court confirmed an arbitration award granted Petitioners by the International Centre for Settlement of Investment Disputes and entered judgment against Romania in the amount of $331,557,687, a ruling that the D.C. Circuit would later affirm. *See Micula v. Gov't of Romania*, 404 F. Supp. 3d 265, 285 (D.D.C. 2019), *aff'd*, 805 F. App'x 1 (D.C. Cir. 2020). In October 2019, Petitioners served a set of 15 post-judgment interrogatories seeking information about Romania's assets held in the United States and worldwide. *See* Pet'rs' Mot. to Compel Romania to Answer Post-Judgment Interrogs.,

ECF No. 98, Pet'rs' First Set of Post-J. Interrogs. to Romania, ECF No. 98-3.  Romania, however, refused to answer the discovery demands.  Petitioners then sought an order of compulsion, which the court granted on March 11, 2020.  Order, ECF No. 133 [hereinafter March 11, 2020 Order].

Instead of complying, Romania filed a motion seeking relief from judgment, *see* Romania's Mot. for Relief from J., ECF No. 139, which prompted Petitioners to seek a civil contempt order and sanctions against Romania, *see* Pet'rs' Mot. for Civil Contempt Order and Sanctions Against Romania, ECF No. 151.  On November 20, 2020, the court denied the motion for relief from judgment and granted Petitioners' motion for a civil contempt order and sanctions.  *See Micula v. Gov't of Romania*, No. 17-cv-02332 (APM), 2020 WL 6822695, at *1 (D.D.C. Nov. 20, 2020). The court's civil contempt order stated as follows:

> If Romania fails to answer the post-judgment interrogatories within 14 days of entry of this Order, it shall pay Petitioners a fine in the amount of $25,000 per week, which shall double every four weeks reaching a maximum of $100,000 per week, until such time as Romania complies with the March 11, 2020 Order.

*Id.* at *7.

Petitioners now contend that Romania has not complied with the court's March 11, 2020 Order.  They ask the court to enter judgment in their favor "in the amount of $2.9 million [in accrued sanctions] as of August 2, 2021, to be supplemented at the time judgment is entered." Pet'rs' Mem. at 11.

## II.

The facts are not in dispute as to Romania's efforts to comply with the court's two prior orders.  Fourteen days after the civil contempt order, Romania provided initial responses to the Interrogatories.  *See* Pet'rs' Mot., Decl. of Francis A. Vasquez, Jr., ECF No. 167-2 [hereinafter Vasquez Decl.], ¶ 11; *see also* Pet'rs' Mot., Ex. 2, ECF No. 167-4 [hereinafter Romania's Initial

2

Responses]. As part of its response, Romania produced over 1,000 pages of records purporting to identify assets held by various government ministries. *See* Romania's Initial Responses. Romania then amended its responses on four separate occasions and produced even more pages identifying assets held by additional government ministries. *See* Vasquez Decl. ¶¶ 16–18, 21; Pet'rs' Mot., Exs. 4–6, 8, ECF Nos. 167-6–167-8, 167-10. All told, Romania says it produced "3,550 pages of documentation identifying assets" in excess of "Five Billion RON," or more than one billion U.S. dollars. Gov't of Romania's Resp. to Pet'rs' Mot., ECF No. 168 [hereinafter Romania's Opp'n], Decl. of Dana Vilaia, ECF No. 168-1, ¶¶ 19–20; Romania's Opp'n at 14.

Petitioners were not satisfied with Romania's efforts. After Romania's initial answer and its third and fourth amended answers, Petitioners sent deficiency letters to Romania, citing shortcomings in their responses and productions. Vazquez Decl. ¶¶ 12, 20, 22. Taken together, Petitioners complained primarily that Romania had failed to identify assets held by all Romanian ministries and instrumentalities, had not identified any assets held in the United States, and had not identified all assets held worldwide. *See id.* ¶¶ 14, 20, 23; Pet'rs' Mot., Exs. 3, 7, 9, ECF Nos. 167-5, 167-9, 167-11. In particular, Petitioners pointed out that Romania had not produced any bank account information in the United States (including for its U.S.-based embassy and consulates) or elsewhere, even though Petitioners specifically had requested such information. Pet'rs' Mot., Ex. 7, ECF No. 167-9, at 2–3. Petitioners also protested that Romania had not identified any tangible assets in the United States, even though Petitioners were aware of Romania's ownership of real property in New York City. *See id.*

After over a month passed with no reply to their last deficiency letter, Petitioners inquired of Romania on May 18, 2021, whether a response would be forthcoming. Pet'rs' Mot., Ex. 10, ECF No. 167-12. Counsel responded, "I am still waiting for a response from my client. I anticipate

a response by mid next week." *Id.* As of mid-July, Petitioners had heard nothing from Romania. Vasquez Decl. ¶ 24.

## III.

### A.

Regrettably, the parties have not succinctly set forth the legal standards governing the relief that Petitioners seek—entry of accrued sanctions in civil contempt proceedings. The court will do so now.

Civil contempt proceedings have three stages: First, "issuance of an order"; then, "following disobedience of that order, issuance of a conditional order finding the recalcitrant party in contempt and threatening to impose a specified penalty unless the recalcitrant party purges itself of contempt by complying with prescribed purgation conditions"; and finally "exaction of the threatened penalty if the purgation conditions are not fulfilled." *NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1184 (D.C. Cir. 1981). This case finds itself at the third, or "exaction," stage.

"At the third stage the court determines whether the party has fulfilled purgation conditions. If it has, it escapes the threatened penalty; if it has not, the penalty is imposed." *Id.* at 1185. In determining whether a party has fulfilled the "purgation conditions," "a finding of bad faith on the part of the contemnor is *not* required." *Food Lion, Inc. v. United Food & Com. Workers Int'l Union, AFL-CIO-CLC*, 103 F.3d 1007, 1016 (D.C. Cir. 1997). Indeed, the failure to comply need not be intentional. *See id.* That said, "an alleged contemnor's good faith is not entirely irrelevant to the ultimate determination of contempt." *Id.* at 1017. The D.C. Circuit has assumed that a "defense of good faith substantial compliance" is available. *Id.* "[T]he burden of proving good faith and substantial compliance is on the party asserting the defense." *Id.* To carry its burden, "a party must demonstrate that it took all reasonable steps within its power to comply

4

with the court's order." *Id.* (alteration and internal quotation marks omitted). And, although "good faith may be a factor in determining whether substantial compliance occurred, and may be considered in mitigation of damages, good faith alone is not sufficient to excuse contempt." *Id.* (footnotes omitted).

Finally, because "third-stage [contempt] proceedings remain civil in character, . . . only the clear and convincing evidence standard" applies to determine whether a party has fulfilled the "purgation conditions." *Blevins Popcorn*, 659 F.2d at 1186.

**B.**

The court finds, by clear and convincing evidence, that Romania has failed to fulfill the "purgation conditions" that would allow Romania to avoid imposition of at least some amount of accrued sanctions. The court's "purgation condition" was straightforward: respond to Petitioners' post-judgment interrogatories within 14 days. *See Micula*, 2020 WL 6822695, at *7. Though Romania has answered some of Petitioners' interrogatories, its overall efforts have fallen short in multiple, material respects.

First, Romania has not identified any bank account information, whether in the United States or elsewhere, even though Petitioners specifically requested that information. *See* Pet'rs' Mot., Ex. 8, ECF No. 167-10, at 2–3. At most, Romania has said that its "Ministry of Finance has not received information from the other ministries on such accounts in the United States," and it "has no knowledge of any accounts that are currently opened in the United States." *Id.* at 2, 3. That answer plainly does not supply the requested bank account information. Nor is it an affirmative denial that such accounts exist. Second, Romania has not identified any tangible assets that it owns in the United States. Petitioners, for example, have reason to believe that Romania owns real property in New York City. *See* Pet'rs' Mot., Ex. 7, ECF No. 167-9, at 2. Yet, Romania

has not fully confirmed its ownership of that property or any other in the United States; nor has it said that Romania owns no such property. Indeed, Romania has responded with silence to Petitioners' demand that it identify the address of any real property owned in the United States. *See id.* at 4 (stating "to the extent that Romania has provided information about tangible assets in the United States, it has not provided complete information regarding the addresses of such assets or other identifying information"). Third, Romania has offered only an incomplete listing of assets held worldwide. *See id.* at 3. Romania does not dispute, for instance, that it has not obtained and supplied asset information from all government ministries. *See* Romania's Opp'n at 15–16. Romania's answers are therefore incomplete in critical ways that would enable Petitioners to enforce the judgment.

## C.

Romania's primary response is that it has complied with the court's March 2020 Order and what remains is a run-of-the-mill dispute about the scope of discovery. Romania's Opp'n at 11–12. But this contention falls flat for two reasons. First, as noted, to show substantial compliance, Romania "must demonstrate that it took all reasonable steps within its power to comply with the court's order." *Food Lion*, 103 F.3d at 1016 (alteration and internal quotation marks omitted). To be sure, Romania has taken steps to respond to the interrogatories—it has produced thousands of pages that provide some information about assets held by the government. But, as discussed, Romania's answers have fallen materially short in key respects, such as the non-identification of bank account information and assets held in the United States. Romania offers no explanation for why it has failed to provide that basic information. It also has not said why there has been complete radio silence since mid-May with respect to Petitioners' deficiency letters.

Second, Romania's contention that what remains is a mere discovery dispute rings hollow. A review of Romania's responses to the interrogatories reveals no actual, specified objections about the scope of the requests or the burden they impose. *See generally* Pet'rs' Mot., Ex. 8, ECF No. 176-10; *see* Fed. R. Civ. P. 33(b)(4) ("The grounds for objecting to an interrogatory must be stated with specificity. Any ground not stated in a timely objection is waived unless the court, for good cause, excuses the failure."). Nor has Romania come to this court to complain about Petitioners' post-judgment interrogatories or to seek a protective order. *See* Fed. R. Civ. P. 26(c). It therefore cannot now be heard to complain that the discovery sought is "overly broad, unduly burdensome, or otherwise precluded by the Federal Rules." Romania's Opp'n at 14–15.

Citing *Parsi v. Daioleslam*, 778 F.3d 116, 128 (D.C. Cir. 2015), Romania contends that imposition of sanctions is unwarranted "if there is a genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action." Romania's Opp'n at 14. But that standard has no application here. The standard cited in *Parsi* concerns whether to award fees or other expenses under Rule 37(a)(5) against a party that has resisted discovery and lost a motion to compel. *See Parsi*, 778 F.3d at 126–27. Here, the court has already found Romania in civil contempt for refusing to comply with its discovery obligations, and the only question is whether Romania has complied with the court's order. It has not.

### IV.

For the foregoing reasons, the court finds by clear and convincing evidence that Romania has failed to satisfy the "purgation conditions" of this court's November 2020 Order, ECF No. 159. Accordingly, the court grants Petitioners' Motion for Judgment on Accrued Sanctions Against Romania, ECF No. 167.

The court will enter a judgment in the amount of $1,500,000, representing approximately 50% of the accrued sanctions as of August 2, 2021.  *See* Vasquez Decl. ¶ 29 (estimating $2.9 million in accrued sanctions from December 4, 2020 to August 2, 2021).  The court enters an award on only half of the accrued sanctions in recognition of Romania's answers and records productions to date, which constitute at least partial compliance with the court's March 2020 and November 2020 Orders.  *See Food Lion*, 103 F.3d at 1017 (stating that "good faith may be a factor in determining . . . mitigation of damages").  The court will consider entry of additional sanctions if Romania continues to remain non-compliant with the court's Orders.

Additionally, Romania's Motion to Stay Discovery, ECF No. 170, is denied.  Romania has not demonstrated that a stay of discovery pending appeal of this court's discovery order is warranted.

Dated:  November 8, 2021

Amit P. Mehta
United States District Court Judge